1  JOSEPH W. COTCHETT (SBN 36324)
   jcotchett@cpmlegal.com
2  PHILIP L. GREGORY (SBN 95217)
   pgregory@cpmlegal.com
3  FRANK C. DAMRELL, JR (SBN 37126)
   fdamrell@cpmlegal.com
4  ANNE MARIE MURPHY (SBN 202540)
   amurphy@cpmlegal.com
5  **COTCHETT, PITRE & McCARTHY, LLP**
   840 Malcolm Road, Suite 200
6  Burlingame, California 94010
   Telephone:   (650) 697-6000
7  Facsimile:    (650) 692-3606

8  RICHARD DOYLE (SBN 88625)
   **CITY ATTORNEY**
9  NORA FRIMANN (SBN 93249)
   **OFFICE OF THE CITY ATTORNEY**
10 200 East Santa Clara Street, 16th Floor
   San José, California 95113
11 Telephone:   (408) 535-1900
   Facsimile:    (408) 998-3131
12 E-Mail Address:  cao.main@sanjoseca.gov

13 *Attorneys for Plaintiffs the City of San José; the City of San José,*
   *as successor agency to the Redevelopment Agency of the City of*
14 *San José; and the San José Diridon Development Authority*

15        **IN THE UNITED STATES DISTRICT COURT**
          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
16                  **SAN JOSE DIVISION**

17 **CITY OF SAN JOSÉ; CITY OF SAN**          | Case No. _____
18 **JOSÉ AS SUCCESSOR AGENCY TO**
   **THE REDEVELOPMENT AGENCY OF**           | **COMPLAINT:**
19 **THE CITY OF SAN JOSÉ; and THE SAN**
   **JOSÉ DIRIDON DEVELOPMENT**              | 1.  **TORTIOUS INTERFERENCE**
20 **AUTHORITY,**                            |     **WITH PROSPECTIVE**
                                              |     **ECONOMIC ADVANTAGE;**
21            **Plaintiffs,**                | 2.  **TORTIOUS INTERFERENCE**
                                              |     **WITH CONTRACTUAL**
22        v.                                  |     **ADVANTAGE;**
                                              | 3.  **CALIFORNIA'S UNFAIR**
23 **OFFICE OF THE COMMISSIONER OF**         |     **COMPETITION LAW (SECTION**
   **BASEBALL, an unincorporated association** |   **17200);**
24 **doing business as Major League Baseball;** | 4. **VIOLATIONS OF CALIFORNIA'S**
   **and ALLAN HUBER "BUD" SELIG,**          |     **CARTWRIGHT ACT;**
25                                            | 5.  **VIOLATIONS OF THE SHERMAN**
            **Defendants.**                  |     **ACT, SECTION 2; AND**
26                                            | 6.  **VIOLATIONS OF THE SHERMAN**
                                              |     **ACT, SECTION 1**
27
                                              |     **JURY TRIAL DEMANDED**
28

Law Offices
COTCHETT,
PITRE &

**COMPLAINT**

1

## TABLE OF CONTENTS

2  **I.   INTRODUCTION**................................................................................1

3  **II.   PARTIES**..........................................................................................6

4     **A. PLAINTIFFS** .............................................................................6

5     **B. DEFENDANTS** ...........................................................................7

6     **C. RELEVANT MARKETS** ...........................................................8

7  **III.   JURISDICTION AND VENUE** .......................................................9

8     **A. FEDERAL JURISDICTION** ....................................................9

9     **B. STATE PENDENT JURISDICTION** ......................................9

10     **C. VENUE** ....................................................................................9

11     **D. INTRADISTRICT ASSIGNMENT** .......................................10

12  **IV.   NATURE OF INTERSTATE TRADE AND COMMERCE** ...........10

13  **V.   FACTUAL BACKGROUND** .............................................................11

14     **A. RELEVANT HISTORY OF THE ATHLETICS** ....................11

15     **B. RELEVANT HISTORY OF THE CROSS BAY RIVAL – THE GIANTS** ..............12

16     **C. THE TERRITORIAL DISPUTE BETWEEN THE A's AND GIANTS**..................13

17     **D. MLB'S REFUSAL TO PERMIT RELOCATION OF THE OAKLAND A'S CLUB RESTRAINS COMPETITION AND CREATES ANTICOMPETITIVE EFFECTS THAT WILL LEAD TO CONSUMER HARM** ......................22

18

19     **E. THE MLB CONSTITUTION** ..................................................23

20     **F. THE GIANTS BLOCK THE A'S RELOCATION TO SAN JOSÉ** ..........................25

21     **G. DEFENDANTS' CONDUCT LIMITS COMPETITION IN THE BAY AREA BASEBALL MARKET AND PERPETUATES THE GIANTS' MONOPOLY OVER THE SANTA CLARA MARKET** ....................26

22

23     **H. THE AGREEMENTS HAVE RESTRAINED COMPETITION AND HAVE HAD ANTICOMPETITIVE EFFECTS AND LED TO CONSUMER HARM** ................27

24

25     **I. MLB HAS INTERFERRED WITH PLAINTIFFS' CONTRACTUAL RELATIONSHIP WITH THE ATHLETICS AND ITS FUTURE ECONOMIC ADVANTAGE** ................28

26

27     **J. PLAINTIFFS HAVE SUFFERED ANTITRUST INJURY** ................29

28        **1. The tax revenue to be received by the City of San José has been greatly diminished**................31

2. The City of San José has lost millions in new direct spending that would have accrued during the construction period and the post-construction period .........31

3. The City of San José's General Fund has lost millions ................................31

4. The City of San José's local agencies, including its school district, have lost hundreds of thousands of dollars on an annual basis .................................31

5. The City of San José has lost millions in new sales tax revenue that would have accrued during the construction period and the post-construction period .........32

6. The City of San José has lost hundreds of new jobs and the related revenues that would have been generated for the City ...................................32

7. The City of San José has lost new economic output generated by spending related to the ballpark ..................................................32

8. Plaintiffs have been deprived of free and open competition in the relocation of the Athletics ..................................................33

9. Plaintiffs failed to receive the benefits to which they were entitled under the Option Agreement, which benefits they would have received in an competitive marketplace absent Defendants' conspiracy ...................................33

10. Plaintiffs have lost millions of dollars spent on planning for the franchise relocation ..................................................33

11. Competition in the relocation of major league professional baseball teams has been restrained, suppressed, or eliminated ...................................34

VI.    CLAIMS FOR RELIEF ................................................34

COUNT ONE
TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE .....34

COUNT TWO
TORTIOUS INTERFERENCE WITH CONTRACTUAL ADVANTAGE .................35

COUNT THREE
VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW ...................36

COUNT FOUR
VIOLATION OF THE CALIFORNIA CARTWRIGHT ACT ........................38

COUNT FIVE
VIOLATION OF SECTION 2 OF THE SHERMAN ACT ........................40

COUNT SIX
VIOLATION OF SECTION 1 OF THE SHERMAN ACT ........................41

VII.    PRAYER FOR RELIEF ................................................41

DEMAND FOR JURY TRIAL ................................................44

Law Offices
COTCHETT, PITRE& MCCARTHY, LLP

1       Plaintiffs City of San José, City of San José as successor agency to the Redevelopment

2 Agency of the City of San José, and the San José Diridon Development Authority (collectively

3 "Plaintiffs") allege as follows:

4 **I.**     **INTRODUCTION**

5       1.    This action arises from the blatant conspiracy by Major League Baseball ("MLB")

6 to prevent the Athletics Baseball Club from moving to San José. For years, MLB has unlawfully

7 conspired to control the location and relocation of major league men's professional baseball clubs

8 under the guise of an "antitrust exemption" applied to the business of baseball.

9       2.    Baseball occupies a coveted place in American culture. It is a uniquely American

10 sport, originating before the American Civil War as a humble game played on sandlots. In 1871,

11 the first professional baseball league was born. Eventually the teams were divided into two

12 leagues, the National and American – these are the two leagues that persist today.

13       3.    Today there are 30 separate Major League Baseball Clubs in the United States, all

14 of which compete against each other in regularly scheduled games. Baseball is big business in the

15 United States with combined 2012 annual revenues of **$7.5 billion**. Whereas baseball may have

16 started as a local affair, modern baseball is squarely within the realm of interstate commerce.

17 MLB Clubs ply their wares nationwide; games are broadcast throughout the country on satellite

18 TV and radio, as well as cable channels; and MLB Clubs have fan bases that span from coast to

19 coast.

20       4.    However there is a dark side to this storied institution – MLB operates in clear

21 violation of state unfair business laws and federal antitrust laws, including the Sherman Antitrust

22 Act. The General Counsel of the Office of the Commissioner of Baseball has gone on record as

23 admitting that MLB prohibits franchise movements "except in the most dire circumstances where

24 the local community has, over a sustained period, demonstrated that it cannot or will not support a

25 franchise." According to internal MLB rules, three quarters of the teams in a league must vote in

26 favor of proposed team relocation or the relocation will be prohibited, thus denying other cities or

27 counties from competition for teams.

28

5.      At issue in this case is MLB's unlawful and continued restraint of the move by the Athletics from Oakland to San José, California.  Plaintiffs have suffered and continue to suffer damages and antitrust injury in the millions of dollars due to Defendants' unreasonable restraint of trade.[1]

6.      Plaintiffs seek relief under state laws and federal antitrust laws in connection with a threatened loss resulting from the unlawful exercise of market power by MLB in the market for major league men's professional baseball contests in the United States and Canada.  MLB is excluding competition and restraining trade in that market through the application of unreasonable restrictions in its Constitution which are preventing the City of San José from competing with the City of Oakland for the Athletics Baseball Club.  The MLB Constitution expired in December 2012 and no new Constitution has been posted on its website.

7.      MLB is made up of competitive member teams and has market power in the provision of major league professional baseball games in North America.  Use by MLB of Article 4.3 of its Constitution, which grants each Club absolute veto power over the relocation of a competitive team within its "operating territory," as well as application of Article 4.2 of its Constitution to restrict the transfer and relocation of the Oakland Athletics Club, are unreasonable, unlawful, and anticompetitive restraints under Section 1 of the Sherman Act.

8.      Through MLB and the exclusionary and anticompetitive provisions in the MLB Constitution, members of MLB have conspired to violate state laws, and have willfully acquired and maintained monopoly power in violation of Section 2 of the Sherman Act within their "operating territories," as defined by Section 4.1 of the MLB Constitution, by refusing to allow the relocation of MLB Clubs to markets where existing Clubs currently have MLB franchises.

9.      MLB and its Clubs have agreed to create exclusive television and radio broadcast rights within designated territories through contracts with individual MLB Clubs, thereby maintaining monopoly power within each team's "operating territory" by preventing others from broadcasting events within those territories.

---

[1]Plaintiffs are not seeking damages from the Athletics, as it is the Defendants, including MLB, that have acted to prevent the Athletics from relocating to San Jose.

Law Offices
COTCHETT,
PITRE&
MCCARTHY, LLP

10. MLB is comprised of thirty separately owned and operated major league men's baseball clubs in the United States and Canada. The MLB Clubs, like other sports leagues, have structured their governance to permit major decisions regarding on-field sporting competition and off-field business competition to be made by the club owners themselves. In so doing, the owners act in their own economic self-interest, including entering into a series of agreements that eliminate, restrict, and prevent off-field competition. These anticompetitive agreements go far beyond any cooperation reasonably necessary to provide major league men's professional baseball contests that increase fan appeal or respond to consumer preferences.

11. This action challenges – and seeks to remedy – Defendants' violation of state and federal laws and the use of the illegal cartel that results from these agreements to eliminate competition in the playing of games in the San Francisco Bay Area. Defendants have accomplished this elimination of competition by agreeing to divide the live-game market into exclusive territories, which are protected by anticompetitive territorial rights. Not only are such agreements not necessary to producing baseball contests, they are directed at reducing competition in the live-game market.

12. In a **1998** complaint against MLB and other Clubs, the New York Yankees conceded that MLB is a cartel that has exceeded the boundaries of necessary cooperation. (*New York Yankees Partnership and Adidas America, Inc. v. Major League Baseball Enterprises, Inc., et al.*, Case No. 98-civ-0129 (S.D.N.Y.).) The New York Yankees sued when MLB interfered with the New York Yankees' individual licensing agreement with Adidas. As the New York Yankees, a partner to the MLB operation in 1998, stated in their complaint:

> **"Defendants operate a horizontal cartel, through which the Major League Clubs have agreed not to compete with each other and thereby to fix prices and to reduce output below competitive levels in the (i) professional baseball retail licensing markets; and (ii) the professional baseball sponsorship markets."** *Id.* at ¶ 153. (Emphasis added.)

13. The violations of law and the restraints articulated in the present complaint are no less anticompetitive or justified than the restraints set forth in the New York Yankees' case

Law Offices
COTCHETT,
PITRE&
MCCARTHY, LLP

1    against MLB.  The New York Yankees and MLB reached a <u>confidential agreement</u> before any

2    briefing on the merits of the New York Yankees' suit to avoid future litigation exposure and

3    putting MLB under further scrutiny.

4          14.      Clubs in other sports leagues have also sued their respective leagues for violations

5    of state law and on antitrust grounds.  In 2007, Madison Square Garden, L.P., which owns the

6    New York Rangers Club, sued the National Hockey League ("NHL") to eliminate anticompetitive

7    restraints that are similar to those alleged in this complaint.  The Rangers' complaint flatly

8    conceded that the NHL was a "cartel" and acknowledged that the League's televising and

9    streaming restrictions were anticompetitive and unlawful.  (*Madison Square Garden L.P. v.*

10   *National Hockey League, et al.*, Case No. 07-8455 (S.D.N.Y.), Amended Complaint ("MSG

11   Complaint"), ¶ 6).  After the Rangers defeated the NHL's motion to dismiss the complaint, the

12   League and the Rangers quietly settled the lawsuit.

13         15.      In *American Needle, Inc. v. National Football League*, 130 S. Ct. 2201 (2010), the

14   United States Supreme Court unanimously <u>rejected</u> the NFL's claim that an agreement regarding

15   the joint marketing of club-owned intellectual property was the decision of a "single entity" – the

16   National Football League – not subject to section 1 of the Sherman Act.  The Supreme Court

17   reaffirmed lower court decisions that sports leagues are subject to the antitrust laws and that

18   league owners must refrain from agreements that unreasonably restrain trade.  The Supreme Court

19   also reaffirmed its own decision in *NCAA v. Board of Regents*, 468 U.S. 85 (1984), which held

20   that the hallmark of an unreasonable restraint is one that raises price, lowers output, or renders

21   output unresponsive to consumer preference.  The Supreme Court's decision extended a long line

22   of precedents recognizing that sports leagues are subject to the antitrust laws.  Indeed, the United

23   States District Court for the Eastern District of Pennsylvania found over a half-century ago that

24   television blackout agreements amount to "an unreasonable and illegal restraint of trade."  *United*

25   *States v. Nat'l Football League*, 116 F. Supp. 319, 327 (E.D. Pa. 1953).

26         16.      Despite clear precedents, MLB's Clubs continue to agree to divide the relevant

27   market by assigning an exclusive territory to each Club.  In exchange for being granted

28   anticompetitive protections in its own home market, the Club and its partners expressly agree not

1   to compete in the other Clubs' exclusive territories.  The stated purpose of these policies is to

2   create regional monopolies that protect the Clubs from competition in their respective local areas.

3          17.     As one set of commentators has put it:  "Absent the exclusive territorial

4   arrangements agreed to by league owners, individual teams would . . . arrange for their own

5   games to be available out-of-market. . . . Fans wishing to see only their favorite team now pay for

6   more games than they want, so sports leagues are currently using their monopoly power to

7   effectuate a huge wealth transfer.  Another significant group of less fanatic consumers would be

8   willing to pay a more modest sum for their favorite teams' games only.  As to these fans, the

9   current scheme reduces output."  Stephen F. Ross & Stefan Szymanski, *Fans of the World Unite*!

10  (Stanford Univ. 2008).

11         18.     These violations of laws and restraints are not necessary to maintain a level of

12  competitive balance within the league that fans prefer, or to maintain the viability of Clubs.  To

13  the extent that competition among Clubs would result in revenue disparities that preclude a fan-

14  optimal level of competitive balance, agreements that require revenue sharing, if set at levels that

15  do not restrict output, is an obvious and well-recognized less restrictive alternative, and one that

16  baseball already employs.

17         19.     In **1990**, when the San Francisco Giants were considering selling the team and

18  moving to Florida, Bob Lurie, the then-owner of the Giants, expressed interest in moving to San

19  José.  To accommodate the Giants, Walter Haas, the Athletics then-owner, gave his consent for

20  the Giants to relocate to San José for no consideration paid to the Athletics.  As a result, the MLB

21  Constitution was amended to provide that the Giants hold territorial rights to the County of Santa

22  Clara, which includes the **City of San José**.  The Giants twice were unsuccessful in their attempt

23  to obtain a publicly-funded stadium in the South Bay and although the Giants did not move, the

24  Giants continued to claim the territorial rights to the County of Santa Clara.

25         20.     The City of San José has one of the fastest growing populations in the Bay Area

26  and is home to dozens of large technology companies.  It is also easy to understand why the

27  Athletics wish to move to the City of San José.  Unlike San Francisco County, Santa Clara

28  County is immediately contiguous to Alameda County.  Moreover the Athletics are an

1    economically disadvantaged team in an aging stadium in Alameda County which the Athletics

2    must share with the Oakland Raiders (the only such arrangement in baseball), and are heavily

3    dependent on revenue sharing from their more well-heeled colleagues.

4           21.    San José has entered into an option agreement with the Athletics Investment

5    Group, LLC, the California limited partnership that owns and operates the Oakland A's.  By

6    refusing to allow the Oakland A's Club to locate to the City of San José, Defendants are

7    interfering with this contract.  Plaintiffs seek to restore competition among and between the clubs

8    and their partners by ending Defendants' collusive agreements.

9           22.    These practices, in addition to others described herein, have resulted in an

10   unreasonable restraint on competition, in violation of federal and California law, and constitute

11   unlawful, unfair, and/or fraudulent business practices under California law.

12          23.    This is an action for violation of California's Unfair Competition Law, Tortious

13   Interference with Contractual Advantage, and Tortious Interference with Prospective Economic

14   Advantage, and for violation of the federal Sherman Act, and violation of California's Cartwright

15   Act.

16   **II.**     **PARTIES**

17       **A.  PLAINTIFFS**

18          24.    Plaintiff **CITY OF SAN JOSÉ** is, and at all times mentioned herein was, a

19   California municipal corporation, organized as a Charter City under the California Constitution

20   and the laws of the State of California.  Plaintiff City of San José is located in the County of Santa

21   Clara.  Plaintiff City of San José has the capacity to sue pursuant to, *inter alia*, California

22   Government Code section 945 and brings this action individually and on behalf of the People of

23   the City of San José.

24          25.    Although the Redevelopment Agency of the City of San José (the "Agency") has

25   been dissolved, Plaintiff City of San José is suing in its capacity as the **Successor Agency to the**

26   **Redevelopment Agency of the City of San José.**  Plaintiff City of San José has the capacity to

27   sue pursuant to, *inter alia*, California Government Code section 945, and brings this action

28   individually and on behalf of the People of the City of San José.

**COMPLAINT**                                                 6

26.     Plaintiff **SAN JOSÉ DIRIDON DEVELOPMENT AUTHORITY** is a joint powers association comprised of the City of San José and the former Redevelopment Agency. The San José Diridon Development Authority was formed on March 8, 2011, when the City of San José and the then-Redevelopment Agency of the City of San José formed a joint powers authority under the Joint Exercise of Powers Act to facilitate the development and redevelopment of the Diridon Area, which is the area within the City of San José bounded on the North by the northerly line of the Julian Street right of way, bounded on the East by Los Gatos Creek, bounded on the South by the southerly line of the Park Avenue right of way, and bounded on the West by the westerly line of the railroad right of way adjacent to the Diridon station.

**B.  DEFENDANTS**

27.     Defendant **THE OFFICE OF THE COMMISSIONER OF BASEBALL d/b/a MAJOR LEAGUE BASEBALL** ("MLB") is an unincorporated association whose members are the thirty Major League Baseball Clubs.  It is the most significant provider of major league men's professional baseball games in the world.  MLB, on behalf of its members, has responsibility for administrative and operational matters relating to Major League Baseball.  MLB headquarters are located at 245 Park Avenue, New York, New York.

28.     Defendant **THE OFFICE OF THE COMMISSIONER OF BASEBALL** ("OCB") is an office created pursuant to the Major League Agreement entered into by the member Clubs of Major League Baseball.  Upon information and belief, the OCB has the power to act for and bind MLB in business matters centralized in the League.

29.     Through the MLB Constitution, MLB and the Clubs have adopted agreements governing all aspects of major league men's professional baseball.  The MLB Constitution was adopted by votes of the Clubs and may be amended by votes of the Clubs.  The rules in the MLB Constitution are vertical agreements between MLB and the Clubs and horizontal agreements between the Clubs.

30.     Each Club that is a member of MLB is a separate and independent business with a separate and independent owner, exercising significant autonomy in its business operations. While the Clubs cooperate to schedule and produce major league men's professional baseball

COTCHETT,
PITRE&
MCCARTHY, LLP

**COMPLAINT**                                                                 7

1  games and facilitate competition on the field, the Clubs compete off the field in the sale of tickets,

2  sponsorships, merchandise, and concessions.  The Clubs also compete in the developing,

3  licensing, and marketing of their respective trademarks for various purposes. The Clubs set their

4  own prices for the sale of tickets for attending games at their stadiums.  For legal purposes, the

5  MLB Clubs are competitors and are capable of conspiring under Section 1 of the Sherman Act.

6  *See Los Angeles Memorial Coliseum Comm'n v. National Football League* 726 F.2d 1381 (9th

7  Cir. 1984).

8      31.     Defendant **ALLAN HUBER "BUD" SELIG** ("Selig") is the Commissioner of

9  Major League Baseball, having served in that capacity since 1992, first as acting commissioner,

10  and as the official commissioner since 1998.  Upon information and belief, Selig is a resident of

11  Milwaukee, Wisconsin.

12      **C.  <u>RELEVANT MARKETS</u>**

13      32.     The relevant product market is the provision of major league men's professional

14  baseball contests.  There are peculiar and unique characteristics that set major league men's

15  professional baseball apart from other sports or leisure activities.  Close substitutes do not exist,

16  and watching or participating as a fan in major league men's professional baseball is not

17  interchangeable with watching or participating as a fan in other sports, leisure pursuits, or

18  entertainment activities.  Assuming a small, but significant, non-transitory increase in price to

19  attend major league men's professional baseball games, fans will not switch to attend other sports

20  or entertainment activities.  Accordingly, there is a unique and separate demand for major league

21  men's professional baseball.

22      33.     The relevant geographic market for the provision of major league men's

23  professional baseball is the United States and Canada, where the MLB Clubs are located and

24  where MLB Clubs play games.  Various geographic submarkets also exist, defined as a city, and

25  fifty miles from the corporate limits of that city, in which only one existing MLB Club is located.

26  This is defined as the "operating territory" in Article VIII, Section 8 of the MLB Constitution.

27      34.     The market in the United States and Canada for provision of major league men's

28  professional baseball is characterized by high barriers to entry.  MLB is the only provider of

major league men's professional baseball contests in the United States and Canada.  No other league in the United States and Canada provides a quality of play comparable to MLB.  Previous attempts at forming a major league professional baseball league to compete with MLB have failed (*e.g.,* the Federal League).  Moreover, an absolute barrier to entry exists in each geographic submarket by virtue of the absolute veto power granted to each MLB Club to preclude the entry of competition into its exclusive "operating territory."

35.     MLB exercises monopoly power (the ability to control prices and exclude competition) in this market as it is the only provider of major league men's professional baseball in the United States and Canada.

36.     MLB is engaged in conduct, complained of herein, which has affected and directly, substantially, and foreseeably restrained interstate and foreign commerce.

III.     **JURISDICTION AND VENUE**

A.     **FEDERAL JURISDICTION**

37.     Plaintiffs bring this action pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain injunctive relief and to recover damages, including treble damages, costs of suit and reasonable attorneys' fees, premised on Defendants' violation of the Sherman Act, 15 U.S.C. §§ 1, 2.  This Court has subject matter jurisdiction over these claims pursuant to Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, and 28 U.S.C. §§ 1331 and 1337(a).

B.     **STATE PENDENT JURISDICTION**

38.     This Court has subject matter jurisdiction over this claim pursuant to 28 U.S.C. § 1367.  Plaintiffs also bring this action pursuant to Section 17200 of the California Business and Professions Code.

C.     **VENUE**

39.     Venue is proper pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22.  Defendants transact business in this District and are subject to personal jurisdiction in this District.

1

### D.  INTRADISTRICT ASSIGNMENT

2

40.     Pursuant to Local Rules 3-2(c)-(e) and 3-5, assignment to the San José Division is

3

appropriate because the action arises in Santa Clara County and the underlying contract was

4

entered into and was to be performed in San José Division.

5

## IV.     NATURE OF INTERSTATE TRADE AND COMMERCE

6

41.     As then District Judge (now Supreme Court Justice) Sonia Sotomayor wrote:

7

Major League Baseball is a "monopoly industry." *Silverman v. Major League Baseball Relations*

8

*Inc.* 880 F. Supp. 246, 261 (S.D.N.Y. 1995).

9

42.     Major league men's professional baseball has attributes attractive to sports fans

10

that set it apart from other sports or leisure activities.  Close substitutes do not exist.  Watching

11

(or participating as a fan in) major league men's professional baseball cannot be reasonably

12

interchanged with watching (or participating as a fan in) other sports or other leisure activities.

13

43.     The provision of major league men's professional baseball contests in the United

14

States and Canada is a relevant product/service market.  This market is characterized by high

15

barriers to entry.  MLB has market power as it is the only provider of this product/service.  MLB,

16

acting through and in combination with the separate and independent Clubs, also exercises market

17

power through exclusive license agreements and other unnecessary and unjustified restraints on

18

each Club's competitive activities that are the subject of this complaint.

19

44.     Most importantly for this action, there is a relevant market for live presentations of

20

major league men's professional baseball games in various cities.  MLB's dominance in the

21

production of major league men's professional baseball games in the United States and Canada

22

gives it the ability, together with its partners, to exercise power in the market for live

23

presentations of MLB games.

24

45.     Defendants' conduct complained of herein has taken place in and affected, and

25

directly, substantially, and foreseeably restrained, the interstate and foreign trade and commerce

26

of the United States, by, *inter alia*, the interstate and foreign distribution of live MLB games.

27

28

Law Offices
COTCHETT,
PITRE&
MCCARTHY, LLP

**COMPLAINT**                                                                                            10

## V.   FACTUAL BACKGROUND

### A.   RELEVANT HISTORY OF THE ATHLETICS

46.     The Athletics are a Major League Baseball Club based in Oakland, California. The Athletics are popularly known as "the A's" and are a member of the Western Division of MLB's American League.

47.     One of the American League's eight charter franchises, the Club was founded in Philadelphia, Pennsylvania, in 1901 as the Philadelphia Athletics.  The Club had notable success in Philadelphia, winning three of four World Series from 1910 to 1913 and two in a row in 1929 and 1930.  However, after declining success, the team left Philadelphia for Kansas City in 1955 and became the Kansas City Athletics.

48.     The Athletics moved to Oakland in 1968.  In the early 1970's the team enjoyed tremendous success, winning three World Championships in a row from 1972 to 1974.  In 1980, Walter Haas purchased the Athletics and spearheaded a decade of success, both in the win column and in stadium attendance.  The Athletics won the American League Pennant in 1988, 1989, and 1990 and won the World Series in 1989.  More recently, the Athletics have often been playoff contenders but have not returned to the World Series since 1990.

49.     The Oakland Athletics are one of the most economically disadvantaged teams in major league men's professional baseball.  The Oakland Athletics are heavily dependent on revenue sharing from more well-heeled colleagues.  Because of the economic structure of baseball, which does not split team revenues as evenly as other sports, there is wide disparity between rich and poor teams and the Athletics are a poor team in revenues.

50.     The Oakland Athletics are housed in an old stadium, formally named O.co Coliseum, but also known as Oakland–Alameda County Coliseum, and commonly known as Oakland Coliseum or The Coliseum (the "Oakland Coliseum").  The Oakland Coliseum is the only remaining multi-purpose stadium in the United States which serves as a full-time home to both a Major League Baseball Club (the A's) and a National Football League team (the Raiders), where the two teams play games on the same field.

51.     Since the 1990's, attendance at A's games has plummeted and average attendance at the A's home games is the 25th of the 30 MLB Clubs.  For example, comparing attendance to its cross bay rivals, the San Francisco Giants, they average less than half the number of fans in attendance.  The following chart shows the numbers:

| 2013 Attendance | | | |
|---|---|---|---|
| San Francisco 32 Home Games | 1,332,865 | 41,652 average | Ranks 2/30 |
| Oakland 30 Home Games | 627,966 | 20,932 average | Ranks 25/30 |
| 2012 Attendance | | | |
| San Francisco | 3,337,371 | 41,695 average | 4/30 |
| Oakland | 1,679,013 | 20,728 average | 27/30 |

52.     The Oakland Coliseum is also the only major league park that hosts another team in another sport and is the fourth-oldest ballpark in the majors.  According to the 2010 census, the Giants' territory includes 4.2 million people; the A's territory 2.6 million.

53.     Spokespeople for the Athletics have repeatedly stated the Athletics have exhausted their options in Oakland after years of trying to increase attendance.

## B.  RELEVANT HISTORY OF THE CROSS BAY RIVAL – THE GIANTS

54.     The San Francisco Giants are a Major League Baseball Club based in San Francisco, California, playing in the National League West Division.  The Gothams, as the Giants were originally known, entered the National League in 1883.  Later the Club was known as the New York Giants.  The team was renamed the San Francisco Giants when the team moved to San Francisco in 1958. The Giants are currently the reigning World Series champion.

55.     The Giants have won the most games of any team in the history of American baseball.  They have won twenty-two National League pennants and appeared in nineteen World Series competitions – both records in the National League.  The Giants have won seven World

1   Series Championships, ranking second in the National League (the St. Louis Cardinals have won
2   eleven).

3       56.     Since arriving in San Francisco, the Giants have won five National League
4   Pennants, the 2010 World Series, and the 2012 World Series.

5       57.     The current home of the Giants is AT&T Park, located at the edge of downtown
6   San Francisco and the San Francisco Bay.  AT&T Park is widely-acclaimed as one of the best
7   ballparks in the league with its state-of-the-art design and breathtaking views.

8       58.     However, before moving to AT&T Park in 2000, the Giants played their home
9   games in Candlestick Park (from 1960 – 2000).

10      **C.  THE TERRITORIAL DISPUTE BETWEEN THE A's AND GIANTS**

11      59.     The instant territorial dispute between the A's and Giants traces its roots to the
12   1980s – and arises out of an effort by the A's to help its fellow Bay Area team in a time of need.

13      60.     In the late 1980's, the Giants were hoping to build a stadium in the South Bay Area
14   and requested that MLB approve expansion of their territory into Santa Clara and Monterey
15   Counties.  In 1981, Giants then-owner Bob Lurie declared Candlestick Park "unfit for baseball,"
16   and began a failed campaign for a new ballpark in San Francisco.

17      61.     In 1987 and 1989, respectively, the Giants sponsored ballot measures to build a
18   new ballpark in San Francisco.  The San Francisco voters <u>rejected</u> both measures.  After
19   considering new stadium sites on the Peninsula and in the South Bay, the Giants sponsored a
20   ballot measure to build a new stadium in Santa Clara.  The Santa Clara voters summarily <u>rejected</u>
21   that measure.

22      62.     In 1990, in what was viewed as a final effort to keep the Giants in the Bay Area,
23   Giants owner Bob Lurie pursued a new stadium in San José.  However, the Giants faced territorial
24   restrictions under MLB's Constitution, which expressly limited the Giants to San Francisco and
25   San Mateo Counties.  Faced with this definitive hurdle, Mr. Lurie reached out to then-A's owner
26   Walter Haas.  Over a handshake and without consideration, Mr. Haas consented to the Giants'
27   relocation to San José.  Mr. Haas never granted the Giants an exclusive right to Santa Clara

28

1    County, only his consent to pursue relocation of the Club to Santa Clara County in 1990.  On June

2    14, 1990, MLB unanimously approved this expansion.

3              63.       Commenting on this gentlemen's agreement, Commissioner Selig said, "Walter

4    Haas, the wonderful owner of the Oakland club, who did things in the best interest of baseball,

5    granted permission . . . What got lost there is they didn't feel it was permission in perpetuity."

6    Indeed, the MLB recorded minutes reflect that the San Francisco Giants were granted the Santa

7    Clara County operating territory subject to their relocating to Santa Clara.  *See* March 7, 2012

8    Oakland Athletics media release.  Ultimately, like the voters in San Francisco and Santa Clara

9    before them, the San José voters summarily rejected the Giants' ballot measure to relocate the

10   team to San José.

11             64.       San José voters rejected the proposal of the Giants for a taxpayer-funded stadium

12   both in 1990 and again in 1992.  After rejection by the voters in San José, the Giants abandoned

13   any interest in relocating to San José, and set their sights on selling the Club and moving to

14   Tampa Bay, Florida.  In 1992, after reaching a deal to relocate to Tampa Bay, by a 9 – 4 vote,

15   Major League Baseball rejected the deal to move to Florida and the Giants remained in San

16   Francisco.

17             65.       The Giants were unable to successfully obtain a vote to move into the County of

18   Santa Clara.  However, the return of the County of Santa Clara to its original status was not

19   formally accomplished.  *See* March 7, 2012 Oakland Athletics media release.

20             66.       Unable to acquire public financing in the South Bay, the Giants eventually

21   obtained private financing for the 2000 construction of AT&T Park in San Francisco's China

22   Basin.  Notably, this new stadium was closer to the A's home stadium than Candlestick Park.

23             67.       As early as 2004, Baseball San José, a community organization promoting

24   relocation of the Athletics to San José, lobbied the City of San José ("San José") to authorize a

25   new stadium in San José to lure the Athletics.  However, the Athletics pursued new stadium deals

26   in Fremont.

27             68.       In October 2004, San José and the San José Redevelopment Agency ("RDA")

28   began studying the potential for developing a ballpark in the Diridon Station area.  That process

culminated in February 2007, with the certification of an Environmental Impact Report ("EIR") for a ballpark project consisting of a 1.5 million square-foot MLB stadium and a parking structure with ground floor commercial uses on approximately 23.1 acres in San José.  The ballpark proposed in 2007 had a maximum seating capacity of 45,000.  In early 2009, San José began exploring the development of a modified project and proposed an Athletics ballpark to be built on 13.36 acres near the Diridon train station, bounded by Park Avenue and San Fernando and Autumn streets.  The current ballpark concept reduces the size of the stadium from 45,000 to 32,000 seats.  The following is an illustration of the proposed ballpark:



69.      Sports venues have become a catalyst for urban transformation or revitalization. New sports facilities attract businesses to the neighborhoods surrounding the sports facility, which creates additional jobs, consumer spending, and tax revenue.  New sports facilities also create an

incentive for new hotels, restaurants, and businesses to move to a city, which serves to revitalize a city by creating more economic activity, even out of season.  The downtown areas then generate higher hotel occupancy, restaurant patronage, retail jobs, and city revenues as the fans can walk from the stadium to restaurants and bars to celebrate.  The districts themselves then become as much of an attraction as the events and facilities in the cities.

70.     A 2009 **Economic Impact Analysis** prepared by Conventions Sports and Leisure International ("CSL") for the RDA **detailed the economic benefits of the proposed Athletics stadium in San José** ("CSL Study").  The CSL Study provided independent and conservative estimates of the quantifiable impacts that would be generated by an Athletics stadium in San José. A copy of the CSL Study is attached as **Exhibit 1**.  Findings and estimates of the CSL Study include the following:

- $96.0 million in net new direct spending in San José during a three year construction period; $558,000 in sales tax revenues to the City over the three year construction period;

- 980 jobs supported annually due to ballpark development;

- $82.9 million in net new annual direct spending in San José following construction, with a 30-year present value of $1.8 billion;

- $130 million ballpark-produced annual net new output in the City;

- Over a 30-year period, the estimated net present value of the total new economic output generated by spending related to the ballpark is $2.9 billion;

- $1.5 million per year in net new tax revenues would be generated for San José's General Fund, and more than $3.5 million per year for other local agencies, including:

  o  $706,000 a year for Redevelopment Agency Housing;
  o  $912,000 for Redevelopment Agency Non-Housing;
  o  $109,000 for San José General Obligation bonds; and,
  o  $495,000 for the San José Unified School District;

- The net present value of the City tax revenues generated by the ballpark over a 30-year and 50-year period is estimated to be approximately $31.2 million and $42.0 million, respectively;

Law Offices
COTCHETT,
PITRE&
MCCARTHY, LLP

**COMPLAINT**                                                                                          16

- Local hotels, restaurants, stores, and night spots would benefit, with the average ballpark attendee anticipated to spend $47 at businesses outside of the stadium; and,

- San José would benefit substantially more from development of the MLB baseball park than by using the same land for an alternative development.

71.    On March 7, 2012, the **Oakland Athletics** issued a statement "regarding A's and Giants sharing Bay Area territory."  The Oakland Athletics statement contained the following points:

a.   Of the four two-team markets in MLB, only the Giants and Athletics do not share the exact same geographic boundaries;

b.   MLB-recorded minutes clearly indicate that the Giants were granted Santa Clara County subject to relocating to the City of Santa Clara;

c.   The granting of Santa Clara County to the Giants was by agreement with the Athletics late owner Walter Haas, who approved the request without compensation to the Athletics;

d.   The Giants were unable to obtain a vote to move to Santa Clara County but the return of Santa Clara County to its original status in the MLB Constitution was not fully accomplished; and,

e.   The Athletics "are not seeking a move that seeks to alter or in any manner disturb MLB territorial rights."  Instead, the Athletics "seek an approval to create a new venue that our organization and MLB fully recognize is needed to eliminate [] dependence on revenue sharing."

72.    On May 12, 2009, the San José City Council and the Redevelopment Agency of the City of San José established negotiating principles for the development of a stadium in the downtown area of the City of San José for a Major League Baseball team, which were subsequently amended by the City Council on <u>August 3, 2010</u>.

73.    In 2010, after the Athletics' Fremont deal collapsed, the City of San José again explored a stadium deal with the Athletics.  The San José City Council reviewed and unanimously approved an **environmental impact study** ("EIS").  Upon approval of the EIS, San José Mayor

1    Chuck Reed called for a public vote on whether the Athletics could purchase land and build a new

2    stadium for the Athletics in San José.  However, at Commissioner Selig's request, Mayor Reed

3    delayed the vote pending the MLB Relocation Committee's determination of the A's–Giants

4    territorial dispute.

5          74.    On September 10, 2010, through the efforts of the Silicon Valley Leadership

6    Group, a letter from seventy-five of Silicon Valley's leading CEOs was sent to MLB urging

7    Commissioner Selig to approve the Athletics' move to San José.  A copy of the September 10,

8    2010 Letter is attached at **Exhibit 2**.

9          75.    In March 2011, the City of San José transferred assets in anticipation of the

10   Athletics move to San José.  The RDA transferred several properties in the Diridon

11   Redevelopment Project Area ("Diridon Area") to the San José Diridon Joint Powers Authority, a

12   joint powers authority made up of the City of San José and the RDA ("JPA").  The properties that

13   were the subject of the transfer were originally purchased by the RDA with the intent that the

14   properties, along with adjacent properties, be developed into a MLB park, or alternatively a mixed

15   use development with housing.[2]

16         76.    On November 8, 2011, the **San José City Council** executed an **option agreement**

17   with the Athletics Investment Group (the "Option Agreement").  A copy of the Option Agreement

18   is attached at **Exhibit 3**.  The Option Agreement granted the Athletics a two year option to

19   purchase six of the parcels of land that San José transferred to the JPA in March 2011.  The

20   Option Agreement permits the Athletics to purchase six parcels located in the Diridon Area of

21   Downtown San José to build a new stadium for a purchase price of $6,975,227 (the "San José

22   Stadium Property").  In exchange for the option to purchase these six properties from the JPA, the

23   Athletics agreed to pay $50,000 for the two year option, with the authority to extend the option

24   term by one year for an additional $25,000.

25

26   _____

[2] On June 28, 2011, three months after San José transferred the properties to the JPA, the Governor signed into law
27   ABX1 26, which prohibited Redevelopment Agencies from engaging in new business, established mechanisms and
     timelines for the dissolution of Redevelopment Agencies and created Successor Agencies to oversee dissolution of
28   the Redevelopment Agencies and redistribution of Redevelopment Agency assets.

77.     The Option Agreement further obligated the JPA and the Athletics to negotiate, in good faith, a purchase and sale agreement for the San José Stadium Property (the "Purchase Agreement"), with a first draft to be exchanged within 90 days.  The Option Agreement specified provisions that were required to be included in the Purchase Agreement.

78.     A March 2010 poll conducted by the San José State University's Survey and Policy Research Institute on behalf of the Mercury News found that 62 percent of those surveyed favored giving the Athletics city owned land for a stadium, with only 23.5 percent opposed.  The margin of error for the poll was 4.25 percentage points.

79.     Various local organizations, including the San José Silicon Valley Chamber of Commerce, the San José Convention and Visitors Bureau, the San José Sports Authority, and Baseball San José, have all expressed their support for a relocation by the Athletics to San José.

80.     On December 2, 2011, Stand For San José (a coalition group backed by the San Francisco Giants and the San José Giants to block the Athletics relocation to San José) filed a civil action against the City of San José, the San José Redevelopment Agency, and the Athletics, among others, in Santa Clara Superior Court, Case No. 1-11-CV-214196.  Despite a thorough EIS, the lawsuit claims the studies on issues such as traffic and air quality are insufficient under the California Environmental Quality Act ("CEQA"), allegedly necessitating additional studies.

81.     Despite the Giants' staunch opposition, the County of Santa Clara, the City of San José, and leading Silicon Valley businesses support the Athletics relocation.  In an April 2, 2013 letter to Commissioner Selig, San José Mayor Reed wrote:

> When will the A's be moving to San José?  That's the question that is most often asked of me by CEOs of Silicon Valley companies competing to retain and attract global talent . . . The A's ownership continues to express its desire to locate the team in San José and I strongly endorse that outcome . . . Direct communication between us will help resolve any lingering issues about our commitment to having the A's home plate be located in San José and could reduce the probability of additional litigation.

82.     In an April 4, 2013 response, Commissioner Selig wrote Mayor Reed.  Instead of meeting with Mayor Reed, the Commissioner referred the Mayor to MLB Relocation Committee Chairman Bob Starkey.

83.     Commissioner Bud Selig has failed to act on this territorial dispute for several years.  In March 2009, **Selig appointed a special Relocation Committee to evaluate the Bay Area territorial issues**.  The MLB Relocation Committee includes:

•      Chairman Bob Starkey: a former Arthur Anderson accountant who had done extensive work for the Commissioner and the Minnesota Twins;

•      Corey Busch: a former San Francisco Giants Executive Vice President under Bob Lurie;

•      Irwin Raij: an attorney at Foley & Lardner, LLP, who worked on ballpark deals for the Washington Nationals and Florida Marlins; and

•      Bob DuPuy: Major League Baseball's Chief Operating Officer.

84.     At the January 2012 owners' meetings, Selig said the situation was on the "front burner."  On March 7, 2012, MLB spokesman Pat Courtney said, "No decisions have been made."  As recently as May 16, 2013, Commissioner Selig said MLB had no news on the quest of the Oakland Athletics to relocate to San José.  According to Selig, the MLB Relocation Committee appointed in March 2009 "is still at work."

85.     While the Oakland Athletics have expressed the desire to move the Club to the City of San José, MLB has made it clear that it plans to oppose and prevent the relocation of the Oakland Athletics to San José.  MLB intends to effect this conspiracy by using various provisions in its alleged Constitution that unlawfully restrict and constrain the transfer and relocation of Clubs.

86.     Article VIII, Section 8 of the MLB Constitution provides in part:  "No franchise shall be granted for an operating territory within the operating territory of a member without the written consent of such member."  Article 4.1 of the MLB Constitution defines "operating territory" to mean:  "Each Member Club shall have exclusive territorial rights in the city which it is located and within fifty miles of that city's corporate limits."

87.     The purpose and effect of Article VIII, Section 8 of the alleged MLB Constitution is to unreasonably restrain trade by granting *de facto* exclusive territories to the MLB Clubs and allowing Clubs to protect their respective monopolies by preventing new team entry into operating territories previously assigned to an MLB Club.

88.     Because of the provisions of the former MLB Constitution, the relocation of the Oakland Athletics to San José, California, would purportedly place them within the "operating territory" of the San Francisco Giants Club, and therefore subject to application of Article VIII, Section 8 of the MLB Constitution.

89.     Granting another franchise absolute veto power over a competitor's relocation to San José, California, is facially anticompetitive and would deny consumers the benefits that would flow from increased competition.  A new MLB franchise in San José, California, would compete with the San Francisco Giants Club.  Entry of the Oakland Athletics Club in this region would increase competition, increase the output of baseball, increase the number of fans attending baseball games, and increase fan intensity levels in the relevant market.

90.     Upon information and belief, the San Francisco Giants Club previously exercised and/or threatened to exercise its veto to block the relocation of the Oakland Athletics Club to San José, California, in each instance preserving and maintaining the market power of MLB.

91.     The sole purpose and effect of Article VIII, Section 8 of the MLB Constitution is to shield Clubs from competition that otherwise would exist, absent this veto power.

92.     There is no pro-competitive justification to grant each MLB Club absolute veto power over whether to permit the relocation of a competitor club into its excusive "operating territory," especially a franchise like the San Francisco Giants Club, which is strong and established, with a large, loyal and enthusiastic fan base.  Indeed, the San Francisco Giants Club and the Oakland Athletics Club already compete within 50 miles of one another and have done so for many years.

93.     Other provisions in the MLB Constitution concerning Club relocation are equally exclusionary and anticompetitive and are without any pro-competitive justification.

94.     In addition, MLB has imposed a lengthy and, under the circumstances, unreasonable process for relocation of the Oakland Athletics Club.

95.     Taken together, these provisions unduly and unlawfully restrict the ability of MLB Clubs to relocate.  Moreover, even if MLB could proffer pro-competitive justifications for these provisions, their application to block the Oakland Athletics proposed relocation to San José, California, is unreasonable and anticompetitive.

96.     Any application of Article VIII, Section 8 of the MLB Constitution would be unreasonable and anticompetitive, intended solely to prevent the proposed relocation of the Oakland Athletics to San José.  MLB Commissioner Bob Selig has publicly stated:  "They need approval.  We have to go through an approval process.  It just depends on where they're moving to."  Selig also has stated that there is no timetable for resolving the territorial dispute between the Oakland A's and the San Francisco Giants.

97.     In short, MLB has prejudged the relocation of the Oakland Athletics to San José. Application of Article VIII, Section 8 of the MLB Constitution is motivated by a desire to limit competition.

98.     Upon information and belief, MLB, without even cursory consideration of the desirability of moving the Oakland Athletics to San José, California, has already determined it will not consider the relocation of the Oakland Athletics to San José.

D.  **MLB'S REFUSAL TO PERMIT RELOCATION OF THE OAKLAND A'S CLUB RESTRAINS COMPETITION AND CREATES ANTICOMPETITIVE EFFECTS THAT WILL LEAD TO CONSUMER HARM**

99.     Although many activities of MLB are legitimate under the antitrust laws, including the negotiation of labor agreements with players and the promulgation and enforcement of agreed rules of play, other activities which are anticompetitive and not necessary for the success of MLB in providing major league professional baseball games are illegal and unreasonable restraints of trade.

100.    The antitrust laws prohibit this association of competitive teams, which has market power, from restricting the competitive activities of individual members of MLB, except where

1    such restriction is shown to be reasonably necessary to the success of MLB or the achievement of

2    some other legitimate, pro-competitive purpose.

3         101.    MLB rules governing franchise relocations, and exclusive territories in particular,

4    are harmful to consumers when, as in this case, those rules are used to create and sustain an

5    exclusive territory as well as to prevent a team from entering another team's market and

6    competing for fans.

7         E.   **THE MLB CONSTITUTION**

8         102.    It has been long recognized that MLB Clubs, like the member clubs of all

9    professional sports leagues, must cooperate to define, schedule, and produce league contests.

10   That limited cooperation is fully consistent with the antitrust laws.  But the member clubs

11   continue to exist as separate businesses with separate owners that retain significant degrees of

12   autonomy in their operations.  In these operations, the clubs compete in business matters that are

13   separate and distinct from the facilitation of baseball games.

14        103.    The Major League Constitution (the "MLB Constitution") governs the operation of

15   Major League Baseball and is an agreement among the MLB Clubs.  The territorial rights of each

16   of the 30 Major League Clubs are spelled out in Article VIII, Section 8 of the MLB Constitution.

17   According to public sources, the MLB Constitution was last amended and ratified by the teams in

18   2008 and was to remain in effect through **December 31, 2012**.  A copy of the MLB Constitution

19   is attached at **Exhibit 4**.  No new Constitution has been posted by MLB.

20        104.    Upon information and belief, given the expiration of the MLB Constitution on

21   December 31, 2012, there is no operative MLB Constitution.  According to the MLB

22   Constitution, "[t]he Major League Clubs shall have assigned operating territories within which

23   they have the right and obligation to play baseball games as the home Club."  The relevant

24   territories are as follows (Article VIII, Section 8):

25        **San Francisco Giants**: City of San Francisco; and San Francisco, San Mateo, Santa
          Cruz, Monterey and Marin Counties in California; provided, however, that with
26        respect to all Major League Clubs, Santa Clara County in California shall also be
          included.

27

28        **Oakland Athletics**: Alameda and Contra Costa Counties in California.

105.   Of the four two-team markets in MLB, only the San Francisco Giants and the Oakland Athletics do not share the exact same geographic boundaries.

106.   MLB's territorial rules date back to 1876, when the initial National League Constitution established a Club's control of a 5 mile radius around its city.  After MLB expanded in 1960, MLB relocation rules were changed to establish power within the two individual leagues. The National League determined territories to be 10 miles beyond a Club's city limits; while the American League established a 100 mile radius around a Club's home ballpark.  Each league required a three-fourths vote to permit a Club to move, but neither league could stop the other from relocating into the other's territory.

107.   In 1994, MLB amended its territorial rules so that Clubs may only move to a new territory upon the approval of three-fourths of the Clubs in that league and one-half of the Clubs in the other league.  Clubs may not invade within 15 miles of another Club's established territory unless the "invaded" team grants permission.

108.   Under the MLB Constitution the **vote of three-fourths** of the Major League Clubs is required for the relocation of any of the Clubs.  (Article V, Sec. 2(b)(3).)  Similarly a **three-fourths vote** is required to amend the Constitution (which would be necessary to change the territorial rights specified in Article VIII, Section 8 of the MLB Constitution).  A **three-fourths vote** is also required for there to be expansion by the addition of a new Club or Clubs.  (Article V, Sec. 2(b)(1).)

109.   Notably under Article VI, Sections 1-2 of the MLB Constitution, the Clubs agree that any disputes between the Clubs are to be decided solely by the Commissioner as arbitrator, and the Clubs agree not to engage in litigation between the Clubs.

110.   Boundary rules grant each Club protected territorial rights, <u>**defined based on the lines of entire counties**</u>.  No Club may play its home games within the home territory or within fifteen miles from the boundary of the home territory of any other Club.  *See* Major League Rules 52(a)(1), 52(a)(4), 52(d)(1), 52(b)(1)(D) and National Association Agreement 10.06(B). However, there are a number of examples of Clubs that have overlapping territories.  (*e.g.*, the

1   Los Angeles Dodgers and the Los Angeles Angels; the New York Mets and the New York

2   Yankees; the Chicago White Sox and the Chicago Cubs).

3        111.   Reviewing the history of franchise movement in baseball, **almost no movement**

4   **has been allowed by the owners**.  MLB has been hostile to movement of Clubs.  The last move

5   was in **2005** when the Montreal Expos moved to Washington D.C. and became the Washington

6   Nationals.  This was the **first MLB relocation in 33 years**.

7        112.   Pursuant to a series of "constitutions" between and among the MLB Clubs,

8   League has obtained centralized control over distribution of live MLB games.  As described more

9   fully below, as a result of these agreements, the clubs have agreed not to compete in business

10   matters related to live major-league professional baseball games.

11        113.   The stated purpose of these restrictions is to restrain competition by protecting the

12   local market of each MLB game for the Clubs.

13        114.   Defendants have agreed to enforce and maintain these anticompetitive restrictions.

14        115.   The result of these agreements is a classic, horizontal, geographical market

15   division.

16        116.   Defendants have restrained and threatened to restrain competition in the carrying

17   of games, seeking to control the delivery of content through all media platforms in ways that go

18   beyond what is reasonably necessary to the production of baseball contests or to the success of

19   Major League Baseball.

20       **F.   THE GIANTS BLOCK THE A'S RELOCATION TO SAN JOSÉ**

21        117.   In 2005, investors led by John Fischer and Lew Wolff purchased the Athletics.

22   Faced with abysmal attendance and an old stadium in Oakland, Wolff pursued a move to the

23   South Bay.  From 2006 to 2009, with the support of Major League Baseball, the Athletics

24   attempted to broker a deal to build CISCO Field in Fremont.  As it became clear the Fremont City

25   Council would not approve the stadium, Commissioner Selig wrote Mr. Wolff a letter indicating

26   that the Athletics had the right to "discuss a ballpark with other communities," *e.g.,* San José.

27        118.   In February 2009, the Athletics terminated plans for a new stadium in Fremont,

28   and turned their focus to San José.  The Giants immediately interceded to prevent the Athletics

from moving to San José.  The Giants disingenuously took the position that the 1990 consent by the Athletics to allow the Giants to relocate to San José barred the Athletics from moving to San José in perpetuity.  Notably when the Giants moved to AT&T Park from Candlestick, they moved closer to the Athletics' ballpark.  If the Athletics were to move to the proposed site next to the HP Pavilion in San José, they would be 48 miles from AT&T Park (instead of the current distance of 16.4 miles).

119.     Commenting on the controversy, Bud Selig stated:

"Wolff and the Oakland ownership group and management have worked very hard to obtain a facility that will allow them to compete into the 21st century . . . The time has come for a thorough analysis of why a stadium deal has not been reached.  The A's cannot and will not continue indefinitely in their current situation."

**G.  DEFENDANTS' CONDUCT LIMITS COMPETITION IN THE BAY AREA BASEBALL MARKET AND PERPETUATES THE GIANTS' MONOPOLY OVER THE SANTA CLARA MARKET**

120.     As the years have dragged on, the MLB Relocation Committee's activities have remained shrouded in secrecy.  Commissioner Selig issued a directive that the A's and the Giants were prohibited from discussing any aspect of the dispute in public.  The silence from the Clubs was briefly broken when on March 7, 2012, three years after the MLB Relocation Committee was formed, the Athletics issued a short press release seeking to outline key facts of the dispute including the following:

•     Of the four two-team markets in Major League Baseball, only the Giants and A's do not share the exact same geographic boundaries;

•     Major League Baseball recorded minutes that clearly indicate the Giants were granted territorial rights to Santa Clara County "subject to" the team's relocation to Santa Clara;

•     The granting of territorial rights to Santa Clara County to the Giants was by agreement with the Athletics late owner, Walter Haas, who approved the request without consideration;

1          •       Despite the fact the Giants were unable to obtain a vote to move to Santa

2    Clara County, those territorial rights were never formally returned to their original status;

3    and,

4          •       The Athletics "are not seeking a move that seeks to alter or in any manner

5    disturb MLB territorial rights."  Instead, the Athletics "seek an approval to create a new

6    venue that our organization and MLB fully recognize is needed to eliminate [] dependence

7    on revenue sharing."

8          121.    The Giants issued a curt rebuttal claiming the City of San José is in the Giants'

9    defined territory and if the Athletics were allowed to move there, it would undermine the Giants'

10   investment in its stadium in San Francisco and marketing to fans.

11   **H.   THE AGREEMENTS HAVE RESTRAINED COMPETITION AND HAVE**

12   **HAD ANTICOMPETITIVE EFFECTS AND LED TO CONSUMER HARM**

13         122.    The above-described agreements have restrained horizontal competition between

14   and among the MLB Clubs and the MLB, including in the commercial exploitation of live games

15   where the Clubs could and would compete with each other.  In particular, in the absence of the

16   territorial rights restrictions and other competitive restraints, MLB Clubs would compete with

17   each other in the presentation of their teams' games to a much greater extent than the limited

18   opportunities that are now available.

19         123.    The above-described agreements have adversely affected and substantially

20   lessened competition in the relevant markets.

21         124.    Competition by individual Clubs independently acting to exploit the distribution of

22   their teams' games would produce consumer benefits.

23         125.    The above-described agreements do not concern matters of league business or

24   structure and do not concern any unique characteristic or need of baseball exhibitions.  These

25   anticompetitive restraints are not necessary to the exhibition of baseball and are not integral to the

26   sport itself.

27         126.    Teams in Major League Baseball, like teams in other major sports leagues, have

28   made attempts to compete in the market outside of their prescribed territories.

127.    There are no legitimate, pro-competitive justifications for these exclusive territorial agreements and other competitive restraints, which have harmed consumers in various ways, including in the ways described above.

128.    Defendants have misused the MLB Constitution for anticompetitive and unlawful purposes, the adverse effects of such misuse are continuing, and the territorial restrictions in the MLB Constitution should be declared unenforceable until such time as adequate relief is entered to remedy the violations alleged and the effects of the violations are dissipated.

## I.    MLB HAS INTERFERRED WITH PLAINTIFFS' CONTRACTUAL RELATIONSHIP WITH THE ATHLETICS AND ITS FUTURE ECONOMIC ADVANTAGE

129.    As reflected in **Exhibit 3**, since November 8, 2011, the San José City Council and the Athletics Investment Group have been contractually obligated to one another under an Option Agreement.  The Option Agreement granted the Athletics a two year option to purchase six of the parcels of land that San José transferred to the JPA in March 2011.  The Option Agreement permits the Athletics to purchase the San José Stadium Property for a purchase price of $6,975,227.  Defendants are interfering with and preventing the operation of the contract between the Athletics and San José as Defendants are actively preventing the Athletics from relocating to San José.  In addition to interfering with the existing Option Agreement, Defendants are interfering with negotiation of a Purchase Agreement (as provided for in the Option Agreement), and are also interfering with the economic relationship between Plaintiffs and the Athletics.

130.    Despite being aware of the Option Agreement, Defendants have prevented the Athletics from moving to San José, even though they knew that their actions would interfere with the performance of the contract.  Defendants' actions, if not stopped, will serve to completely prevent performance of the contract as the Athletics cannot move to San José without the consent of MLB.

131.    Plaintiffs have suffered millions in harm and stand to suffer billions in harm due to Defendants' refusal to permit the Athletics to move to San José.  Specifically, the City of San José

1    has lost hundreds of jobs, property tax revenue, and sales tax revenue. This harm is all directly

2    attributable to Defendants' conduct.

3        132.   Defendants' acts have disrupted the economic relationship between San José and

4    the Athletics, as well as performance under the Option Agreement and negotiation of a Purchase

5    Agreement pursuant to the Option Agreement.

6    **J.   PLAINTIFFS HAVE SUFFERED ANTITRUST INJURY**

7        133.   Plaintiffs are governmental entities which have suffered cognizable antitrust injury

8    under the Sherman Act and the Cartwright Act as well as violation of California law.  There has

9    been injury to competition in the relevant product market, which is the market for existing

10   American and National League baseball teams, as well as the market for the Athletics specifically.

11   As reflected in the history of this dispute, Plaintiffs compete with other major cities in the United

12   States in the team franchise market.  The City of San José is in competition with other major cities

13   that have the interest and ability to invest in hosting a Major League Baseball Club.  San José is

14   the tenth largest city in the United States and is the urban center of the Silicon Valley.  By

15   population, San José is significantly larger than San Francisco.

16       134.   MLB's actions have placed direct and indirect restraints on the purchase, sale,

17   transfer and relocation of Major League Baseball Clubs generally, and of the Athletics,

18   specifically, and on competition in the purchase, sale, transfer and relocation of such teams, all of

19   which directly and indirectly affect interstate commerce.  In short, Major League Baseball is an

20   unreasonable and unlawful monopoly created, intended and maintained by Defendants for the

21   purpose of permitting an intentionally select and limited group of Clubs to reap enormous profits.

22   MLB has achieved these restraints on trade and its monopoly status by engaging in an unlawful

23   combination and conspiracy, the substantial terms of which have been to eliminate all competition

24   in the relevant market, to exclude Plaintiffs from participating in the relevant market, to establish

25   monopoly control of the relevant market and to unreasonably restrain trade by denying the sale,

26   transfer, and relocation of the Athletics to San José.

27

28

135.    Defendant's unlawful activities have resulted in (a) the elimination of San José from competing in the market; (b) the exclusion of Plaintiffs from engaging in the business of Major League Baseball; and (c) loss of Plaintiffs' contractual and property rights.

136.    As reflected in **Exhibit 3**, since November 8, 2011, the San José City Council and the Athletics Investment Group have been contractually obligated to one another under an Option Agreement.  The Option Agreement granted the Athletics a two year option to purchase six of the parcels of land that San José transferred to the JPA in March 2011.  The Option Agreement permits the Athletics to purchase the San José Stadium Property for a purchase price of $6,975,227.  Defendants are interfering with and preventing the operation of the contract between the Athletics and San José as Defendants are actively preventing the Athletics from relocating to San Jose.

137.    As a result of Defendants' anticompetitive agreements, Plaintiffs are injured because MLB Clubs are prevented from offering to play their teams in a competitive market such as San José and are denied the freedom of movement available to businesses in virtually every other industry in the United States.

138.    Plaintiffs' injuries coincide with injuries to the public and to competition. The public ultimately pays the price for Defendants' anticompetitive behavior and suffers the loss not just of the enjoyment of a home team, but also the loss of tax revenue, property values and jobs. The citizens of the City of San José deserve a fair and competitive playing field.  The citizens of San José support the Athletics' relocation to San Jose.  In fact in 2010, seventy-five leading Silicon Valley CEOs[3] wrote to Selig expressing support for the move and concluding that those community leaders "strongly believe that both teams will thrive in a vibrant two team market anchored by San Francisco and the Bay Area's largest city, San José."  See **Exhibit 2**.

139.    While the full amount of Plaintiffs' damages will be calculated after discovery and awarded based on proof at trial, the combination and conspiracy alleged herein has injured Plaintiffs and threatened Plaintiffs with loss or damage in at least the following ways:

---

[3]Including the CEO of Cisco, Inc., Yahoo!, eBay, Kleiner Perkins and Adobe.

1        1.    <u>**The tax revenue to be received by the City of San José has been greatly**</u>

2             <u>**diminished**</u>

3         140.    San José reasonably expected an expansion of its tax base through the building of a

4    MLB stadium in the Diridon area and the hosting of the Athletics as the home city of the team.

5    The 2009 CSL Study which specifically analyzed the economic impact of the Athletics relocating

6    to San José, concluded that hundreds of thousands in tax revenue would be generated in the

7    construction period alone.

8        2.    <u>**The City of San José has lost millions in new direct spending that would have**</u>

9             <u>**accrued during the construction period and the post-construction period**</u>

10        141.    Net new direct spending during the construction period for the Athletics stadium in

11   San José has been conservatively estimated at $96.0 million just during a three year construction

12   period. Net new direct spending would then level off to $82.9 million in net new annual direct

13   spending following construction, with a 30-year present value of **$1.8 billion**. This is direct

14   spending that will not occur absent the relocation of the Athletics.

15       3.    <u>**The City of San José's General Fund has lost millions**</u>

16        142.    San José's General Fund has experiences shortfalls for a number of years as the

17   City has sought to weather the economic crisis. The City's struggling General Fund had been

18   damaged by Defendants' refusal to permit the Athletics to move to San José. The CSL Study

19   provides the conservative estimate that the Athletics stadium deal would have generated $1.5

20   million, per year, in new tax revenue for the General Fund. These funds are greatly needed for

21   the City's basic services, such as police, fire and parks and recreation.

22       4.    <u>**The City of San José's local agencies, including its school district, have lost**</u>

23            <u>**hundreds of thousands of dollars on an annual basis**</u>

24        143.    The City of San José's local agencies have lost millions per year due to

25   Defendants' actions. It is conservatively estimated that in addition to the General Fund revenue,

26   more than $3.5 million per year in net new property tax revenue would have been generated for

27   other local agencies, including, $706,000 a year for Redevelopment Agency Housing, $912,000

28   for Redevelopment Agency Non-Housing, $109,000 for San José General Obligation bonds; and,

1    $495,000 for the San José Unified School District.  Again, these are all funds that are desperately

2    needed by the City and its residents.

3        **5.    The City of San José has lost millions in new sales tax revenue that would**

4            **have accrued during the construction period and the post-construction period**

5        144.    As demonstrated by other stadium deals throughout the United States, including

6    the development of AT&T Park in San Francisco, new MLB ballparks act as a catalyst for local

7    economies.  Local hotels, restaurants, stores, and nightspots all stand to benefit, with the average

8    non-resident ballpark attendee anticipated to spend $47 at businesses outside of the stadium,

9    according to the CSL Study.  Stadiums bring with them new business opportunities, both directly

10   at the stadium and in the surrounding areas.  San José has lost millions in new sales tax revenue as

11   the result of Defendants' refusal to permit the Athletics to move to San José.  During the

12   construction period, San José conservatively would have realized $558,000 in new tax revenue.

13   The net present value of the City tax revenues generated by the ballpark over a 30-year and 50-

14   year period has been estimated to be approximately **$31.2 million** and **$42.0 million**, respectively.

15       **6.    The City of San José has lost hundreds of new jobs and the related revenues**

16            **that would have been generated for the City**

17       145.    The Defendants' actions have resulted in the loss of hundreds of jobs in San José –

18   including construction jobs, stadium jobs, service sector jobs and retail jobs.  The CSL Study

19   analyzed job growth that would be associated with the Athletics' move and found that **980 jobs**

20   would be supported annually due to ballpark development.  The net present value of the total

21   personal earnings generated by the jobs created as a result of the ballpark over a 30-year and 50-

22   year period is estimated to be approximately **$1.4 billion** and **$2.0 billion**, respectively, by the

23   CSL Study.

24       **7.    The City of San José has lost new economic output generated by spending**

25            **related to the ballpark**

26       146.    It is estimated that by 2018, the planned ballpark could conservatively generate

27   approximately **$86.5 million** in net new direct spending within the City of San Jose. Over a 30-

28   year and 50-year term, it is estimated that the net present value of this net new direct spending

could be approximately **$1.9 billion** and **$2.7 billion**, respectively.  The net new direct spending in the local economy as a result of the annual operations of the proposed ballpark will, in turn, generate approximately **$130.3 million** in total net new output in the City of San José. Overall, it is estimated that the net present value of the total net new **economic output** generated by the spending related to the operations of the ballpark would be approximately **$2.9 billion** over a 30-year period and **$4.1 billion** over a 50-year period.

**8.      Plaintiffs have been deprived of free and open competition in the relocation of the Athletics**

147.   Defendants have interfered with and are currently preventing the City of San José from competing as a home city of a MLB Club.  As a result, San José is being prevented from hosting MLB baseball games, and from hosting Athletics' games more specifically.

**9.      Plaintiffs failed to receive the benefits to which they were entitled under the Option Agreement, which benefits they would have received in an competitive marketplace absent Defendants' conspiracy**

148.   As stated above, on November 8, 2011, the San José City Council executed an Option Agreement with the Athletics Investment Group which granted the Athletics a two year option to purchase six of the parcels of land that San José transferred to the JPA in March 2011. The Option Agreement permits the Athletics to purchase the San José Stadium Property for a purchase price of $6,975,227.  In exchange for the option to purchase the San José Stadium Property the Athletics agreed to pay $50,000 for the two year option, with the authority to extend the option term by one year for an additional $25,000.  As described in detail above, the Athletics desire to move forward with the relocation to San José and construction of the stadium.  They are prevented from moving due to Defendants' conspiracy.

**10.     Plaintiffs have lost millions of dollars spent on planning for the franchise relocation**

149.   San José and the San José Redevelopment Agency have been actively working on the development of the ballpark in the Diridon Station area since 2004.  That process culminated in February 2007, with the certification of an Environmental Impact Report ("EIR") for the

1  ballpark project.  Since 2007 the EIR has been updated and amended.  This has been an expensive

2  and time consuming process.  In addition, the City and the RDA have commissioned the

3  preparation of economic impact analysis, including the CSL Study.

4      **11.    Competition in the relocation of major league professional baseball teams has**

5          **been restrained, suppressed, or eliminated**

6      150.    As described above, the purpose and effect of Article VIII, Section 8 of the MLB

7  Constitution is to unreasonably restrain trade by granting *de facto* exclusive territories to the MLB

8  Clubs and allowing Clubs to protect their respective monopolies by preventing new team entry

9  into operating territories previously assigned to an MLB Club.  Defendants' actions have

10  damaged competition that otherwise would exist in connection with the relocation of major league

11  professional baseball teams.

12  **VI.    CLAIMS FOR RELIEF**

13          **COUNT ONE**

14  **TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

15      151.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

16  allegation set forth in the preceding paragraphs of this Complaint.

17      152.    Under the Option Agreement, Plaintiffs enjoyed a successful economic

18  relationship with the Oakland Athletics Club.  Defendants knew Plaintiffs had an existing

19  economic relationship with the Oakland Athletics Club and that relationship included future

20  economic benefits for Plaintiffs.  Were it not for Defendants' wrongful scheme to block relocation

21  of the Oakland Athletics Club to San José, Plaintiffs' economic relationship with the Oakland

22  Athletics Club would have continued forward for the duration of the Option Agreement and for

23  the foreseeable future.

24      153.    Defendants intentionally interfered with Plaintiffs' economic relationship with the

25  Oakland Athletics Club by blocking relocation of the Oakland Athletics to San José.  Defendants

26  knew that such actions would interfere or was substantially certain to interfere with the economic

27  relationship between the Oakland Athletics Club and the City of San José.

28

154.    As a direct and proximate result of Defendants' actions, the economic relationship between the Oakland Athletics Club and Plaintiffs was in fact disrupted.

155.    Defendants' actions in interfering with Plaintiffs' economic relationship with the Oakland Athletics Club were wrongful including insofar as Defendants' actions violated federal and state antitrust law and California's Unfair Competition law.

156.    As a result of the wrongful actions of Defendants, and each of them, Plaintiffs have been damaged in an amount to be proven at trial, but which exceeds $75,000 (exclusive of interest and costs), and which, at a minimum, includes millions of dollars of lost revenues to Plaintiffs resulting from Plaintiffs' loss of revenue it reasonably expected under the Option Agreement and the Purchase Agreement, respectively.

157.    The aforementioned acts of Defendants were willful, oppressive, and/or malicious. Plaintiffs are therefore entitled to punitive damages in an amount to be proven at trial, in addition to all other damages and other relief.

## COUNT TWO

### TORTIOUS INTERFERENCE WITH CONTRACTUAL ADVANTAGE

158.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

159.    Defendants have engaged in wrongful acts to intentionally interfere with the economic and contractual relationship between Plaintiffs and the Oakland Athletics Club.

160.    On November 8, 2011, the City Council of the City of San José entered into a valid contract with the Oakland Athletics Club – specifically the Athletics Investment Group – in the form of the Option Agreement, benefits and rights under which specifically inured to Plaintiffs.

161.    Defendants were aware of the existence of the Option Agreement and were also aware that, through the Option Agreement, Plaintiffs were the direct and principal beneficiaries of significant rights with respect to relocating the Oakland Athletics Club to San José.

162.    Upon information and belief, when Defendants created the MLB Relocation Committee and intentionally engaged in tactics delaying any decision of the MLB Relocation

**COMPLAINT** 35

1   Committee for <u>over four years</u>, Defendants knew such activity would interfere or was

2   substantially certain to interfere with the Option Agreement.

3       163.    As a direct and proximate result of Defendants' wrongful actions, performance

4   under the Option Agreement and negotiation of a Purchase Agreement pursuant to the Option

5   Agreement were in fact disrupted.  Defendants disrupted the contractual relationship between the

6   Oakland Athletics Club and Plaintiffs.

7       164.    As a result of the wrongful actions of Defendants, and each of them, Plaintiffs

8   have been damaged in an amount to be proven at trial, but which exceeds $75,000 (exclusive of

9   interest and costs), and which, at a minimum, includes millions of dollars of lost revenues to

10   Plaintiffs resulting from Plaintiffs' loss of revenue it reasonably expected under the Option

11   Agreement and the Purchase Agreement, respectively.

12       165.    The aforementioned acts of Defendants were willful, oppressive, and/or malicious.

13   Plaintiffs are therefore entitled to punitive damages in an amount to be proven at trial, in addition

14   to all other damages and other relief.

15       WHEREFORE, Plaintiffs pray for relief as set forth below.

16   <div align="center">**COUNT THREE**</div>

17   <div align="center">**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**</div>

18       166.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

19   allegation set forth in the preceding paragraphs of this Complaint.

20       167.    The actions of Defendants and the unnamed co-conspirators as alleged herein

21   constituted unlawful, unfair, and/or fraudulent business practices in violation of California

22   Business and Professions Code § 17200 *et seq.*

23       168.    Defendants committed and continue to commit acts of unfair competition, as

24   defined by Section 17200 *et seq.* of the California Business and Professions Code, by engaging in

25   the acts and practices described above.

26       169.    This claim is instituted pursuant to Sections 17203 and 17204 of the California

27   Business and Professions Code, to obtain restitution from Defendants for acts, as alleged herein,

28

1  that violated Section 17200 of the California Business and Professions Code, commonly known

2  as the Unfair Competition Law.

3        170.  Defendants' conduct as alleged herein violated Section 17200.  The acts,

4  omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein,

5  constituted a common, continuous, and continuing course of conduct of unfair competition by

6  means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of

7  California Business and Professions Code Section 17200 *et seq.*, including, but not limited to,

8  violations of the Cartwright Act as set forth above.

9        171.  Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as

10  described above, whether or not in violation of the Cartwright Act, and whether or not concerted

11  or independent acts, are otherwise unfair, unlawful, and/or fraudulent.

12        172.  Defendants' acts or practices are unfair to consumers of professional baseball and

13  are unfair to competitors of MLB as the practices threaten an incipient violation of California's

14  antitrust laws.

15        173.  Plaintiffs are entitled to full restitution of all revenues, earnings, profits,

16  compensation, and benefits that may have been obtained by Defendants as a result of such

17  business acts or practices and at the expense of Plaintiffs.

18        174.  The illegal conduct alleged herein is continuing and there is no indication that

19  Defendants will not continue such activity into the future.

20        175.  The unlawful and unfair business practice of Defendants, and each of them, as

21  described above, have caused and continue to cause damages to Plaintiffs due to, among other

22  things, the suppression of competition among professional baseball clubs, specifically, between

23  the San Francisco Giants Club and the Oakland A's Club.

24        176.  The conduct of Defendants as alleged in this Complaint violates § 17200 of the

25  California Business and Professions Code.

26        177.  As alleged herein, Defendants and their co-conspirators have been unjustly

27  enriched as a result of their wrongful conduct and by Defendants' unfair competition.  Plaintiffs

28  are accordingly entitled to equitable relief including restitution of all revenues, earnings, profits,

1 │ compensation, and benefits that may have been obtained by Defendants as a result of such

2 │ business practices and at the expense of Plaintiffs, pursuant to the California Business and

3 │ Professions Code, §§ 17203 and 17204.

4 │   WHEREFORE, Plaintiffs pray for relief as set forth below.

5 │ <div align="center">**COUNT FOUR**</div>

6 │ <div align="center">**VIOLATION OF THE CALIFORNIA CARTWRIGHT ACT**</div>

7 │   178. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

8 │ allegation set forth in the preceding paragraphs of this Complaint.

9 │   179. Defendants and their co-conspirators created, operated, aided, or abetted a trust,

10 │ combine, or monopoly for the purpose of creating and carrying out restrictions on trade or

11 │ commerce with the purpose, intent, and effect of restraining horizontal competition among the

12 │ MLB Clubs and the MLB for the distribution of major league professional baseball games.

13 │   180. The trust, combine, or monopoly has resulted in an agreement, understanding, or

14 │ concerted action between and among Defendants and their co-conspirators that (a) major league

15 │ professional baseball games only be carried out within a team's protected territory, and (b) certain

16 │ cities and counties are prohibited from hosting major league professional baseball games.

17 │   181. The trust, combine, or monopoly has resulted in an agreement, understanding, or

18 │ concerted action between and among Defendants and their co-conspirators to limit the location of

19 │ MLB Clubs and the number of cities that can host MLB Clubs, and to thereby keep the price of

20 │ merchandise and tickets artificially high.

21 │   182. By virtue of exclusionary and anticompetitive agreements, such as the absolute

22 │ veto power under Article VIII, Section 8 of the MLB Constitution, MLB has willfully acquired

23 │ and maintained monopoly power in the relevant geographic market and each submarket by

24 │ blocking the relocation of Clubs, including the relocation of a competitive team to San José,

25 │ California, thereby preventing competition in the relevant geographic market and each submarket.

26 │   183. The MLB Clubs which are actual competitors in the market for major league

27 │ men's professional baseball games have conspired with and through MLB to maintain a

28 │ monopoly power in their "operating territories" by refusing to allow the relocation of MLB Clubs

1    to markets where existing Clubs currently have territorial rights, thereby restricting trade and

2    commerce, limiting competition within geographic regions, and controlling prices.

3        184.    Through the anticompetitive conduct described herein, Defendants and their co-

4    conspirators have willfully acquired and maintained, and unless restrained by the Court, will

5    continue to willfully maintain, that monopoly power over the market for MLB games by

6    anticompetitive and unreasonably exclusionary conduct.  These activities have gone beyond those

7    which could be considered as "legitimate business activities," and are an abuse of market

8    position. Defendants and their co-conspirators have acted with an intent to illegally acquire and

9    maintain that monopoly power in the relevant product market, and their illegal conduct has

10   enabled them to do so, in violation of the Cartwright Act, Cal. Bus. & Prof. Code§ 16700 *et seq.*

11       185.    The following agreements are void and not enforceable under the Cartwright Act,

12   Business and Professions Code § 16722:

13       •   The exclusionary and anticompetitive provisions in the MLB Constitution,

14           including the absolute veto power under Article VIII, Section 8 of the MLB

15           Constitution; and

16       •   The agreements of Defendants and their co-conspirators to prevent or limit team

17           relocation; and

18       •   The agreements of Defendants and their co-conspirators to restrict which cities

19           may host a MLB Club.

20       186.    The above-described actions constitute monopolization of the relevant geographic

21   market and each submarket in violation of the Cartwright Act.

22       187.    Plaintiffs have suffered an ascertainable loss of money or property as the result of

23   the actions of Defendants and their co-conspirators, including but not limited to the loss of tax

24   revenue and the loss of revenue under the Option Agreement.

25       188.    The conduct of Defendants and their co-conspirators is a substantial factor in

26   Plaintiffs' loss.  The loss was a direct and proximate result of the willful conspiracy of Defendants

27   and their co-conspirators to restrain trade and lessen competition.

28

189.     As Defendants and their co-conspirators created, operated, aided, or abetted a trust with the purpose of lessening competition in the business of Major League Baseball and the business of hosting of Major League Baseball in violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, Plaintiffs, accordingly, seek damages and injunctive relief pursuant to Cal. Bus. & Prof. Code Section 16750.  Pursuant to the Cartwright Act, Plaintiffs are authorized to recover three times the damages they sustained plus interest.

190.     As a direct and legal result of the acts of Defendants and their co-conspirators, Plaintiffs were forced to file this action, resulting in ongoing attorneys' fees, costs, and other expenses for which they seek recovery according to proof.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT FIVE

### VIOLATION OF SECTION 2 OF THE SHERMAN ACT

191.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

192.     MLB possesses monopoly power in the market for major league men's professional baseball games in the relevant geographic market and each submarket.

193.     By virtue of exclusionary and anticompetitive provisions in the MLB Constitution, including the absolute veto power under Article VIII, Section 8 of the MLB Constitution, MLB has willfully acquired and maintained monopoly power in the relevant geographic market and each submarket by blocking the relocation of Clubs, including the relocation of a competitive team in San José, California, thereby inhibiting the development of competition in the relevant geographic market and each submarket.

194.     The MLB Clubs which are actual competitors in the market for major league men's professional baseball games have conspired with and through MLB to maintain a monopoly power in their "operating territories" by refusing to allow the relocation of MLB Clubs to markets where existing clubs currently have territorial rights.

195.     Through the anticompetitive conduct described herein, Defendants and their co-conspirators have willfully acquired and maintained, and unless restrained by the Court, will

1  continue to willfully maintain, that monopoly power over the market for major league baseball

2  games by anticompetitive and unreasonably exclusionary conduct.  These activities have gone

3  beyond those which could be considered as "legitimate business activities," and are an abuse of

4  market position. Defendants and their co-conspirators have acted with an intent to illegally

5  acquire and maintain that monopoly power in the relevant product market, and their illegal

6  conduct has enabled them to do so, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

7      196.    The above-described actions constitute monopolization of the relevant geographic

8  market and each submarket in violation of Section 2 of the Sherman Act.

9      197.    Defendants' anticompetitive conduct has directly and proximately caused antitrust

10  injury to Plaintiffs, as set forth above.  Plaintiffs will continue to suffer antitrust injury and

11  threatened loss or damage unless MLB is enjoined from continuing to engage in the foregoing

12  violations of law.

13      WHEREFORE, Plaintiffs pray for relief as set forth below.

14                    **COUNT SIX**

15      **VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

16      198.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

17  allegation set forth in the preceding paragraphs of this Complaint.

18      199.    Beginning at a time  presently unknown to Plaintiffs, and continuing through the

19  present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered

20  into a continuing agreement, combination or conspiracy in restraint of trade with the purpose,

21  intent, and effect of restraining horizontal competition among the MLB member clubs and the

22  MLB, with the purpose, intent, and effect of restraining trade and commerce in the distribution of

23  major league professional baseball games, in violation of Section 1 of the Sherman Act, 15 U.S.C.

24  § 1.

25      200.    The contract, combination or conspiracy has resulted in an agreement,

26  understanding, or concerted action between and among Defendants and their co-conspirators that

27  regular season games will only be carried within a team's protected geographical territory.

28

Law Offices
COTCHETT,
PITRE&
MCCARTHY, LLP

**COMPLAINT**                                                    41

201.    The contract, combination, or conspiracy has restrained competition between and among Defendants in violation of Section 1 of the Sherman Act.  It has led to anticompetitive effects in the relevant markets, as alleged above and caused injury to consumers and competition in those relevant markets and elsewhere.

202.    Defendants' contract, combination, agreement, understanding or concerted action with the co-conspirators occurred in or affected interstate commerce.  Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between and among Defendants and other unnamed co-conspirators.  These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

203.    Defendants' anticompetitive conduct has directly and proximately caused antitrust injury, in the form of lower tax revenue and no revenue from the Option Agreement, as set forth above.  Plaintiffs will continue to suffer antitrust injury and other damage unless Defendants are enjoined from continuing to engage in the foregoing violations of law.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, and each of them, pray as follows:

A.    This Court declare the conduct of Defendants, and each of them, constituted a conspiracy and that Defendants, and each of them, are liable for the conduct of or damage inflicted by any other co-conspirator;

B.    Defendants, and each of them, be permanently enjoined from enforcing Article VIII, Section 8 of the MLB Constitution and to prohibit the relocation of the Oakland Athletics Club to San José, California;

C.    The contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudged to have been a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

Law Offices
COTCHETT,
PITRE&
MCCARTHY, LLP

**COMPLAINT**

1    D.    The actions of Defendants and their co-conspirators to illegally acquire and

2    maintain monopoly power in the relevant product market be adjudged to have been in violation of

3    Section 2 of the Sherman Act, 15 U.S.C. § 2;

4    E.    Judgment be entered for Plaintiffs and against Defendants for three times the

5    amount of damages sustained by Plaintiffs as allowed by law, together with the costs of this

6    action, including reasonable attorneys' fees, pursuant to Sections 4 and 16 of the Clayton Act, 15

7    U.S.C. §§ 15 and 26 and Section 16700 *et seq.* of the Cartwright Act;

8    F.    Plaintiffs be awarded actual damages on pendent claims;

9    G.    Plaintiffs be awarded punitive damages on pendent claims;

10   H.    Plaintiffs be awarded pre-judgment and post-judgment interest at the highest legal

11   rate from and after the date of service of this Complaint to the extent provided by law;

12   I.    Defendants and their co-conspirators be enjoined from further violations of the

13   antitrust laws; and,

14   J.    Plaintiffs have such other, further or different relief, as this Court may deem just

15   and proper under the circumstances.

16   Dated: June 18, 2013              COTCHETT, PITRE & McCARTHY, LLP

17

18                                     By:

19                                        JOSEPH W. COTCHETT
                                          PHILIP L. GREGORY
20                                        FRANK C. DAMRELL, JR
                                          ANNE MARIE MURPHY
21                                        *Attorneys for Plaintiffs*

22                                     OFFICE OF THE CITY ATTORNEY

23

24                                     By:
                                          NORA FRIMANN
25                                        RICHARD DOYLE
                                          *Attorneys for Plaintiffs*
26

27

28

Law Offices
COTCHETT,
PITRE &

**COMPLAINT**                                                              43

1

## DEMAND FOR JURY TRIAL

2

Plaintiffs hereby demand a trial by jury of all issues so triable.

3

Dated: June 18, 2013                    COTCHETT, PITRE & McCARTHY, LLP

4

5                                       By: _____

6                                           JOSEPH W. COTCHETT
                                            PHILIP L. GREGORY
7                                           FRANK C. DAMRELL, JR
                                            ANNE MARIE MURPHY
8                                           *Attorneys for Plaintiffs*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

*Economic Impact Analysis:*

# Proposed
# Major League Ballpark

*Presented to:*

# Redevelopment Agency
# of the
# City of San Jose

*Presented by:*



*September 2, 2009*



September 2, 2009


Harry S. Mavrogenes
Executive Director
San Jose Redevelopment Agency
200 East Santa Clara Street
14th Floor Tower
San Jose, California 95113


Dear Mr. Mavrogenes:

Conventions, Sports & Leisure International ("CSL") is pleased to present this report regarding an assessment of the economic and fiscal impacts associated with the Oakland Athletics ("A's") playing in a new Major League Baseball ("MLB") ballpark in the City of San Jose, California ("the City"). The attached report summarizes our research and analyses and is intended to assist project representatives in understanding the benefits, costs and tradeoffs the City can anticipate should the A's relocate to a new ballpark in San Jose.

The information contained in this report is based on estimates, assumptions and other information developed from research of the market, our knowledge of sports facilities and other factors, including certain information provided by the City. All information provided to us by others was not audited or verified and was assumed to be correct. Because procedures were limited, we express no opinion or assurances of any kind on the achievability of any projected information contained herein and this report should not be relied upon for that purpose. Furthermore, there will be differences between projected and actual results. This is because events and circumstances frequently do not occur as expected, and those differences may be material. We have no responsibility to update this report for events and circumstances occurring after the date of this report.

September 2, 2009
Page 2 of 2


We sincerely appreciate the opportunity to assist you with this project, and would be pleased to be of further assistance in the interpretation and application of the study's findings.


Very truly yours,


Bill Rhoda
CSL International

## Table of Contents

EXECUTIVE SUMMARY .......................................................................................... i

    Introduction ........................................................................................... i

    Key Findings ......................................................................................... ii

        Ballpark Construction Period Economic Impacts ......................... ii

        Ballpark Annual Operations Economic Impacts ........................... iii

        City of San Jose Revenues / Costs ............................................... iv

    Key Assumptions ................................................................................. vi

    Exclusions and Limitations .................................................................. vii

1.    INTRODUCTION .............................................................................. 1

2.    ECONOMIC IMPACT METHODOLGY ............................................... 2

    Direct Spending .................................................................................... 2

    Multiplier Effects ................................................................................. 5

    Fiscal Impacts / Costs .......................................................................... 8

3.    ECONOMIC IMPACTS OF BALLPARK DEVELOPMENT ..................... 9

    Description of Potential Development Site .......................................... 9

    Estimate of Potential Demand ............................................................ 12

        Impact of New MLB Ballparks on Attendance ........................... 12

        Ticket Price ................................................................................. 13

    Key Operating Assumptions .............................................................. 15

        In-Facility Assumptions .............................................................. 15

        Out-of-Facility  Spending Assumptions ..................................... 16

    Direct Economic Impact ..................................................................... 19

        Spending Adjustment .................................................................. 19

        Adjusted Net New Direct Spending (A's Games) ....................... 20

        Adjusted Net New Direct Spending (Non-MLB Events) ............ 22

    Indirect and Induced Impacts .............................................................. 23

        Total Output ................................................................................ 24

        Employment ................................................................................ 25

## Table of Contents

Personal Earnings.................................................................. 25

Construction-Period Economic Impacts ................................ 27

Potential for Enhanced Ancillary Development ...................... 30

4.   CITY OF SAN JOSE REVENUE / COST ANALYSIS ....................... 32

General Fund Revenues .......................................... 32

Property Tax.......................................................... 34

Property Tax in Lieu of Vehicle License Fees............................ 34

Sales Tax ............................................................. 35

Transient Occupancy Tax ....................................... 35

Utility Users' Tax .................................................. 36

Business License Tax............................................. 36

Franchise Fee ....................................................... 36

Conveyance Tax Transfer ...................................... 36

Construction Tax................................................... 37

General Fund Expenditures...................................... 38

Daytime Service Population ................................... 39

General Government Services ................................ 39

Finance and Economic Development ...................... 39

Police Services...................................................... 40

Fire Protection Services ........................................ 40

General Service..................................................... 40

Public Works......................................................... 40

Transportation ...................................................... 41

Community Services.............................................. 41

APPENDIX I. – ECONOMIC IMPACTS OF ALTERNATIVE DEVELOPMENT ..........................I-1

Construction-Period Economic Impacts .....................................I-5

General Fund Revenues and City Costs.......................................I-7

## Table of Contents

APPENDIX II. – MAJOR LEAGUE BASEBALL OVERVIEW ................................................. II-1

    League Overview ........................................................................ II-1

    Fan Demographics ...................................................................... II-2

    MLB Attendance......................................................................... II-4

    MLB Ballpark Development......................................................... II-6

        MLB Ballpark Summary.................................................... II-6

        MLB Ballpark Financing ................................................... II-8

        Impact of New MLB Ballparks on Attendance ....................... II-10

    MLB Ticket Prices..................................................................... II-10

    MLB Premium Seating .............................................................. II-12

    Media and Sponsorship.............................................................. II-13

    Franchise Valuations................................................................. II-14

    Player Salaries.......................................................................... II-16

    Review of Recently Built/Planned Ballparks ...................................... II-17

        Busch Stadium ............................................................ II-17

        Citi Field ................................................................... II-18

        Citizens Bank Park........................................................ II-19

        Marlins Ballpark .......................................................... II-20

        Nationals Park............................................................. II-20

        PETCO Park................................................................ II-21

        Target Field................................................................. II-23

        Yankee Stadium ........................................................... II-24

**Executive Summary**

**Introduction**

The attached report summarizes Conventions, Sports & Leisure International's ("CSL") research and analyses of the economic and fiscal impacts associated with the Oakland Athletics ("A's") hosting home games in a new Major League Baseball ("MLB") ballpark in San Jose. This report is intended to assist project representatives in understanding the associated economic and fiscal impacts to the City should the A's relocate to a new ballpark in San Jose. For the purposes of this report, quantifiable effects are characterized in terms of economic impacts and fiscal impacts. Economic impacts are conveyed through measures of direct spending, total output, personal earnings, and employment. Fiscal impacts denote changes in tax revenues.



CSL has developed an independent and conservative estimate of the quantifiable impacts generated by the operations of the baseball club and a potential new ballpark located in the Diridon Area of San Jose. In all areas of analysis, CSL has attempted to use conservative assumptions with regard to spending in the local community and the related impacts.

If a new MLB ballpark is not built in San Jose, it is likely that alternative development will occur on the same site in the Diridon Area in the future. The Alternative Development Scenario, presented in Appendix I of this report, assumes the construction of approximately 1.0 million square feet of new office and retail space. There are a number of other locations in downtown and North San Jose able to accommodate this type and scale of office development.

For the purposes of this report, the development of a ballpark is referred to as the "Ballpark Development Scenario". The ballpark site described herein is the only feasible location for a downtown MLB ballpark that has been identified. In addition to the analysis of potential economic impacts associated with a new ballpark, an in depth analyses of Major League Baseball was conducted and is utilized in the findings presented herein. This analysis is presented in full detail in Appendix II of this report.



**Executive Summary (cont'd)**

**Key Findings**

Ballpark Construction Period Economic Impacts

Construction of the ballpark is assumed to take place from 2011 to 2013 with the first year of operations commencing in 2014.  It is estimated that the proposed San Jose ballpark will cost approximately $461 million in 2009 dollars or $489 million in 2011 dollars, the year construction is expected to commence. The economic impacts resulting from the ballpark construction expenditures depend on the nature of the spending and the extent to which the spending takes place locally.  It has been assumed that approximately 25 percent of labor spending and 20 percent of material spending related to construction will directly impact the San Jose economy.  Based on these assumptions, the total net new direct spending occurring within San Jose was calculated.  The net new economic impacts to the City of San Jose resulting from the anticipated spending levels were estimated by applying multipliers that specifically reflect the unique characteristics of the local construction industry.  The following table summarizes the construction period impacts for the Ballpark Development Scenario.

**Ballpark Development Scenario**
**Economic Impact Summary**
**Net New  Impacts - Construction Period** [1]
**(2009 Dollars)**

| Category | Net Present Value |
| --- | --- |
| Net New Direct Spending | $96,000,000 |
| Total Output | $144,946,000 |
| Jobs | 350 |
| Earnings | $65,226,000 |
| Tax Revenues | $558,000 |

As shown, the net present value of the net new direct spending estimated to take place within the City of San Jose from 2011 to 2013 as a result of the ballpark's construction is approximately $96.0 million.  This net new direct spending is expected to generate approximately $144.9 million in total output during the thee-year construction period. This level of economic activity is estimated to support 350 annual construction jobs during the construction period, generating personal earnings of approximately $65.2 million. The net present value of the sales tax revenues generated to the City over the three year construction period is estimated to be approximately $558,000.  Additional taxes generated during the construction period such as construction tax and conveyance tax are excluded from the tax revenues discussed here but have been included in Section 4 of this report (City of San Jose Revenue/Cost Analysis).



## Executive Summary (cont'd)

Ballpark Annual Operations Economic Impacts

For the purposes of this report, construction of the ballpark is assumed to be completed in 2013 with the first year of operations commencing in 2014. Throughout this analysis, 2018 is considered to be a stabilized year of operations for the Ballpark Development Scenario and serves as the basis for presenting the associated economic and fiscal impacts. The table below summarizes the net new economic impacts associated with the net new direct spending expected to occur due to the annual operations of the proposed Ballpark Development Scenario.

**Ballpark Development Scenario**
**Economic Impact Summary**
**Net New Impacts - Annual Ongoing Operations**
**(2009 Dollars)**

| Category | Stabilized Year | 30-Year Net Present Value | 50-Year Net Present Value |
|---|---|---|---|
| Net New Direct Spending | $86,453,000 | $1,906,872,000 | $2,721,674,000 |
| Total Output | $130,300,000 | $2,873,000,000 | $4,102,000,000 |
| Jobs | 980 | n/a | n/a |
| Earnings | $61,940,000 | $1,371,500,000 | $1,968,400,000 |

As shown, it is estimated that in a stabilized year of operations, 2018, the Ballpark Development Scenario could generate approximately $86.5 million in net new direct spending within the City of San Jose. Over a 30-year and 50-year term, it is estimated that the net present value of this net new direct spending could be approximately $1.9 billion and $2.7 billion, respectively.

The net new direct spending in the local economy as a result of the annual operations of the proposed ballpark will, in turn, generate approximately $130.3 million in total net new output in the City of San Jose during a stabilized year of operations. Overall, it is estimated that the net present value of the total net new economic output generated by the spending related to the operations of the ballpark could be approximately $2.9 billion over a 30-year period and $4.1 billion over a 50-year period.

Increased economic activity associated with the proposed ballpark is assumed to spur the creation of jobs within the local economy. It is estimated that the Ballpark Development Scenario could support approximately 980 full and part-time jobs in a stabilized year of operations, 2018. The table on the following page outlines the estimated number of jobs created as a result of the Ballpark Development Scenario.



## Executive Summary (cont'd)

**Ballpark Development Scenario**
**Employment Summary**
**Average Annual Net New Jobs Created [1]**

| Job Type | Average Annual Jobs |
|---|---|
| Construction Period Jobs | 350 |
| *(During each of the 3 years of construction.)* | |
| Annually Recurring Jobs [2] | 980 |
| *(Direct, indirect and induced jobs.)* | |

*Notes:*
*(1) Includes both full and part-time employees.*
*(2) Includes 138 net new direct ballpark-specific jobs (50 percent of the anticipated ballpark-specific employees).*

Based on the jobs estimated to be supported by the level of economic output generated by the ballpark, it is estimated that total personal earnings in a stabilized year of operations, 2018, could be approximately $61.9 million as shown in the previous table. The net present value of the total personal earnings generated by the jobs created as a result of the Ballpark Development Scenario over a 30-year and 50-year period is estimated to be approximately $1.4 billion and $2.0 billion, respectively.

City of San Jose Revenues / Costs

As a result of the direct and indirect economic impacts generated by new developments in San Jose, the public sector (the City of San Jose, Santa Clara County and the State of California) could realize increased tax collections. Based on the estimates of direct spending, the resulting tax collections and associated costs of potential site development have been calculated for the Ballpark Development Scenario. The development of a new ballpark will also increase costs associated with various City services.

For the Ballpark Development Scenario, game-day/event costs for extra policing or emergency services are not included in cost estimates as these will be paid for by the MLB team. Additional costs including City staff regarding normal ongoing management discussions with ballpark administration are also not included in these estimates. The following table provides a summary of the City's General Fund revenues that are anticipated to be generated annually as a result of the ballpark's operations less the associated annual service cost to the City's General Fund.



## Executive Summary (cont'd)

**Projection of Annual City General Fund Revenues Less Service Expenses**
**Ballpark Development Scenario**
**City of San Jose, CA**

**(2009 Dollars)**

| City General Fund Impact | Stabilized Year | Ballpark Development Scenario | |
|---|---|---|---|
| | | 30-Year Net Present Value | 50-Year Net Present Value |
| **Annual Revenue** | $1,496,400 | $31,186,000 | $42,044,000 |
| **Annual Service Cost** | ($46,000) | ($1,009,000) | ($1,403,000) |
| **Game-day Event Costs** | To be Paid by MLB Team | | |
| **Net General Fund Revenues** | **$1,450,400** | **$30,177,000** | **$40,641,000** |

As illustrated above, it is anticipated that a net of approximately $1.5 million could be generated to the General Fund in a stabilized year of operations under the Ballpark Development Scenario. Furthermore, the net revenue to the City's General Fund attributable to the Ballpark Development Scenario over a 30-year and 50-year period is estimated to be approximately $30.2 million and $46.4 million, respectively.

The following table provides a comparison of the property tax revenues generated to jurisdictions other than the City that can be anticipated under the potential Ballpark Development Scenario.

**Property Tax Revenues Generated to Other Jurisdictions**
**Ballpark Development Scenario**

**(2009 Dollars)**

| Other Property Tax Revenues Generated | Stabilized Year | 30-Year Net Present Value | 50-Year Net Present Value |
|---|---|---|---|
| Redevelopment Agency - Housing | $706,000 | $13,866,000 | $14,670,000 |
| Redevelopment Agency - Non-housing | 912,000 | 17,479,000 | 18,425,000 |
| San Jose GO Bonds | 109,000 | 2,143,000 | 2,790,000 |
| County | 948,000 | 18,172,000 | 22,113,000 |
| Santa Clara Valley Water District | 15,000 | 331,000 | 776,000 |
| Bay Area Air Quality Management District | 1,000 | 30,000 | 64,000 |
| San Jose Unified School District | 495,000 | 10,115,000 | 12,243,000 |
| San Jose-Evergreen Community College | 69,000 | 1,418,000 | 1,719,000 |
| County Office of Education | 112,000 | 2,237,000 | 2,906,000 |
| ERAF & Offsets to State Funding for Schools | 166,000 | 3,596,000 | 14,803,000 |
| **Total Property Tax Revenues** | **$3,533,000** | **$69,387,000** | **$90,509,000** |



## Executive Summary (cont'd)

### Key Assumptions

The results of the analysis provided herein are sensitive to the following assumptions:

- ***Ballpark Development.*** This analysis assumes a ballpark with a seating capacity of approximately 32,000. The construction costs for the facility are assumed to total approximately $461.0 million in 2009 dollars including $369.0 million in hard construction costs and $92.0 million in soft costs including architectural, engineering, legal fees, etc.

- ***Events and Attendance.*** Based on an analysis of the A's historical attendance, the historical attendance of other MLB teams moving into new facilities, the characteristics of the San Jose market and CSL's industry experience, it is estimated that the proposed ballpark would host 81 A's games and three non-MLB events annually, drawing an estimated annual attendance of nearly 2.1 million. The assumption of only three annually recurring non-MLB events at the ballpark is a somewhat conservative estimate given the mild San Jose climate which could allow year round use of the ballpark. In addition, the City of San Jose lacks a large outdoor facility, such as an amphitheater, capable of hosting major events. Therefore, the potential exists for a new ballpark to attract more large-scale outdoor events to the San Jose market.

- ***Fan Origin.*** Fan origin is based on the results of a number of other sports and entertainment studies conducted in San Jose and intercept surveys of other MLB teams conducted by CSL. It is assumed that approximately 50 percent of all attendees to A's games will be non-San Jose residents <u>and</u> will be visiting San Jose with the primary purpose of attending a game. Furthermore, it is assumed that the other 50 percent of attendees will be residents of San Jose or will be non-San Jose residents visiting the City for a purpose other than attending the ball game.

- ***In-Facility Spending.*** Assumptions for in-facility spending are based on an analysis of Major League ballparks, an analysis of A's operations and CSL's experience in the sports and entertainment industry. The specific in-facility spending assumptions utilized in this analysis are outlined in the following table.

| | | | | | |
|---|---|---|---|---|---|
| **In-Facility Per Capita Daily Spending Estimates** | | | | | |
| **Proposed San Jose Ballpark** | | | | | |
| **(2009 Dollars)** | | | | | |
| **Event Type** | **Ticket Price** | **Food & Beverage** | **Merchandise** | **Parking** | **Total** |
| A's Games | $30 | $15 | $3 | $1 | **$49** |
| Non-MLB Events | $45 | $16 | $10 | $3 | **$74** |



**Executive Summary (cont'd)**

It should be noted that the estimates of direct spending and associated <u>economic</u> impacts related to the team were based on the A's estimated annual operating expenditures, which are detailed later in this report.  The per capita in-facility spending estimates for A's games shown in the previous table were utilized to calculate the direct in-facility spending on taxable items such as concessions and merchandise in order to estimate the associated <u>fiscal</u> impacts generated to the City of San Jose as a result of the in-facility spending that takes place at the ballpark during A's games.   However, the direct spending and associated economic/fiscal impacts for non-MLB events was based solely on the per capita spending estimates outlined in the previous table.

- **_Out-of-Facility Spending._**  Assumptions for out-of-facility spending are based on information obtained from fan intercept surveys conducted by CSL at other MLB ballparks and CSL's experience in the sports and entertainment industry.  The following table summarizes the average out-of-facility per capita spending figures utilized to calculate the economic impacts for each type of event assumed to be hosted at the proposed ballpark.  For purposes of this study, only the out-of-facility spending for _non-San Jose residents_ who were assumed to be visiting the City for the sole purpose of attending a ballgame was utilized to estimate the economic impacts of the proposed ballpark.  Out-of-facility spending by fans whose primary purpose for visiting the area was assumed to be something other than attending a baseball game has been excluded from these per capita estimates.

**Out-of-Facility Per Capita Daily Spending Estimates**
**Proposed San Jose Ballpark**
**(2009 Dollars)**

| Event Type | Lodging | Entertainment | Food/Beverage | Transportation | Retail | Misc. | Total |
|---|---|---|---|---|---|---|---|
| A's Games | $6 | $7 | $19 | $7 | $7 | $1 | **$47** |
| Non-MLB Events | $6 | $3 | $6 | $3 | $5 | $3 | **$26** |

### _Exclusions and Limitations_

_The information contained in this report is based on estimates, assumptions, and other information developed from research of the market, knowledge of the sports industry and other factors, including certain information provided by third parties.  All information provided to us by others was not audited or verified and was assumed to be correct. Because the procedures were limited, we express no opinion or assurances of any kind on the achievability of any projected information contained herein and this report should not be relied upon for that purpose._



**Executive Summary (cont'd)**

*This analysis makes certain assumptions based on the best available information at the time the study was conducted.  However, there are certain variables such as the cost of land, potential infrastructure costs and potential land sale/lease proceeds for Redevelopment Agency property for which information was not available, and consequently, was not included in this analysis.  In addition, no attempt has been made to assess the qualitative impacts typically associated with the development of professional sports facilities, which could include such factors as improvements in the quality of life among the local population, increased media exposure for the City/local government, an increase in civic pride among local residents and other such factors.*

*Furthermore, there will be differences between projected and actual results.  This is because events and circumstances frequently do not occur as expected, and those differences may be material.*

<div align="center">******</div>

This report should be read in its entirety to obtain the background, methods and assumptions underlying the findings presented herein.



# 1. Introduction

Conventions, Sports & Leisure International ("CSL") was retained to provide an analysis of the economic and fiscal impacts associated with the Oakland Athletics ("A's") hosting home games in a new Major League Baseball ("MLB") ballpark in San Jose.   The attached report summarizes our research and analyses and is intended to assist project representatives in understanding the associated economic and fiscal impacts to the City should the A's relocate to a new ballpark in the San Jose.

The Oakland Athletics currently play their home games at Oakland-Alameda County Coliseum ("Coliseum"), located in Oakland, California.  The Coliseum has served as the home of the A's since their move from Kansas City, Missouri in 1968.   In 2008, approximately 1.7 million fans attended A's games at the 35,067-seat Coliseum. Recently, the A's have begun to consider various ballpark development options in northern California, including the development of a 32,000-seat ballpark in San Jose.

In order to gain an understanding of the impacts that the operations of the A's may have on the local economy, CSL developed an independent estimate of the quantifiable impacts generated by the operations of the baseball club and new ballpark.   Typically, and for the purposes of this report, quantifiable effects are characterized in terms of *economic impacts* and *fiscal impacts*.  *Economic impacts* are conveyed through measures of direct spending, total output, personal earnings, and employment.   *Fiscal impacts* denote changes in tax revenues.

The assumptions underlying the estimates of economic and fiscal impacts are based on the historical operations of the A's, fan intercept surveys conducted at MLB games, industry data, the use of IMPLAN multipliers and CSL's experience in quantifying the economic and fiscal impacts of similar projects.

The study's findings are presented in the following sections:

1.   Introduction
2.   Economic Impact Methodology
3.   Economic Impacts of Ballpark Development
4.   City of San Jose Revenue / Cost Analysis

Appendix I      Economic Impacts of Alternative Development
Appendix II     Major League Baseball Overview

This report outlines the key highlights of the economic and fiscal impact analysis of the A's and a new ballpark in San Jose.  The study is designed to assist in understanding the impacts that the construction and operations of a major league ballpark will have on the local economy.   The report should be read in its entirety to obtain the background, methods and assumptions underlying the findings.



1

## 2. Economic Impact Methodology

The construction and operation of a new major league ballpark in San Jose would provide certain quantifiable impacts to the local and regional economies.  As previously stated, economic impacts are conveyed through measures of direct spending, total output, personal earnings, and employment.  Fiscal impacts denote changes in tax revenues.  The remainder of this section gives a brief explanation of the methodology utilized herein.

**Direct Spending**

Direct spending represents the initial spending that occurs as a direct result of the operations of a MLB team and new ballpark.  During *construction* of the ballpark, direct spending is generated on materials, supplies, labor, professional fees, etc.  This spending occurs not only with the initial construction of the ballpark but also with any subsequent capital improvements that are made to the ballpark.

During team and ballpark *operations*, direct spending is generated both inside and outside of the facility.  For purposes of this report, the first round of in-facility spending related to the operations of the team was based on the estimated annual expenditures of the A's.  However, for non-MLB events, in facility direct spending was estimated based on spending related to tickets, concessions, merchandise, premium seating, advertising, rent, etc. by ballpark attendees, corporate sponsors and any other facility users.

Outside the ballpark, direct spending is generated by fans, event staff, facility users, etc. on lodging, food and beverages, retail, entertainment, transportation, etc. in connection with their usage of the ballpark.  Further, the team generates non-fan or ballpark-related direct spending for national television agreements, local radio broadcasts, MLB revenue sharing agreements and other such sources.

The graphic on the following page illustrates the components of direct spending that could be generated by the A's playing in a new ballpark in San Jose.



2

## 2. Economic Impact Methodology (cont'd)



Total *gross* direct spending flows to various economic entities including the ballpark, MLB teams, restaurants, hotel operators, retail businesses and other such entities. Focusing on the flow of spending is particularly important when analyzing the unique characteristics of MLB professional sports teams and facilities. As some of the spending that occurs in connection with the construction of the ballpark as well as the ongoing operations of the team and ballpark does not fully impact the local area, reductions in the total *gross* direct spending are made to reflect the amount of spending associated with the team and ballpark that is considered *net new* to the City of San Jose economy.

Several adjustments are made to *gross* spending to determine the *net new* impacts on the San Jose economy. These adjustments include:

- *Leakage* – Leakage represents the portion of gross spending that occurs outside the local economy, which for purposes of this report is considered the City of San Jose. Leakage can occur in two manners. First, *immediate* leakage occurs when initial direct expenditures occur outside the defined geographic area. Examples of this type of immediate leakage include an out-of-town fan that stays overnight in a hotel or patronizes a restaurant located outside of the San Jose city limits. Secondly, leakage also occurs when initial spending that occurs within the defined geographic area is, in turn, used immediately to pay for non-local goods, services, etc. Examples of this type of secondary leakage include salaries paid to players who live outside of San Jose, concessionaire profits retained by companies operating outside of San Jose, etc.



## 2. Economic Impact Methodology (cont'd)

- *Displacement* – Displacement refers to spending that would have likely occurred anyway in the City without the presence of the team and ballpark. Examples of displaced spending would include spending by San Jose residents in connection with their attendance at the ballpark (tickets, food and beverage, merchandise, etc.) that would have been spent within San Jose on other items (movie, restaurant, shopping, etc.) if they did not attend ballgames. For purposes of this report, all spending by local residents was considered displaced. Another example of displaced spending would include spending at the ballpark by fans from outside of San Jose whose primary purpose for visiting San Jose was something other than attending a baseball game. For the purposes of this report, spending by fans falling into this category was excluded from the analysis herein.

As illustrated in the following graphic, the flow of *gross* direct spending associated with the construction of the ballpark and operation of the ballpark and team is adjusted to reflect only the spending that is considered *net new* to the City of San Jose. The resulting spending, after all adjustments, is referred to throughout the remainder of this analysis as *net new* direct spending.

### Direct Spending Adjustments

Gross Spending
Construction:
• Materials
• Supplies
• Labor
• Prof. Fees
Team Expenditures:
• Salaries
• Benefits
• Operations
• Scouting
• Marketing
• Ticketing
• Administrative
• Other
Out-of-Ballpark:
• Lodging
• Restaurants
• Bars
• Retail
• Entertainment
• Transit
• Services
• Other
Ballpark Expenses:
• Concessions
• Merchandise
• Parking
• Other
Spending Adjustments
Adjustments are made for displacement (spending that would have occurred anyway by local residents) or leakage (spending occurring outside San Jose)
Net New Spending
Represents portion of gross spending that is new to San Jose and would not have occurred without the presence of the proposed MLB Ballpark.

## 2.  Economic Impact Methodology (cont'd)

**Multiplier Effects**

Economic impacts are further increased through the re-spending of direct spending.  The total impact is estimated by applying economic multipliers to net new direct spending to account for the total economic impact.  Total output multipliers are used to estimate the aggregate total spending that takes place beginning with *direct spending* and continuing through each successive round of re-spending.  Spending impacts beyond initial direct spending are generally discussed in terms of their indirect and induced effects on the surrounding economy.  Each is discussed in more detail as follows:

*Indirect effects-* consist of the re-spending of direct expenditures.  These indirect impacts extend further as the dollars constituting the direct expenditures continue to change hands.  This process, in principle, could continue indefinitely.  However, recipients of these expenditures may spend all or part of it on goods and services outside of San Jose, put part of these earnings into savings, or use them to pay taxes.  This process halts the process of subsequent expenditure flows and does not generate additional spending or impact within the community after a period of time.  This progression is termed *leakage* and reduces the overall economic impact.

Indirect impacts occur in a number of areas including the following:

- Wholesale industry as purchases of food and merchandise products are made;
- Transportation industry as the products are shipped from purchaser to buyer;
- Manufacturing industry as products used to service arena, sports franchise(s), vendors and others are produced;
- Utility industry as the power to produce goods and services is consumed; and,
- Other such industries.

*Induced effects* consist of the positive changes in spending, employment, earnings and tax collections generated by personal income associated with the operations of the various facilities.  Specifically, as the economic impact process continues, wages and salaries are earned, increased employment and population are generated, and spending occurs in virtually all business, household, and governmental sectors.  This represents the induced spending impacts generated by direct expenditures.

The appropriate multipliers to be used are dependent upon certain regional characteristics and also the nature of the expenditure.  An area which is capable of producing a wide range of goods and services within its border will have high multipliers, a positive correlation existing between the self-sufficiency of an area's economy and the higher probability of re-spending occurring within the region.  If a high proportion of the expenditures must be imported from another geographical region, lower multipliers will result.



5

## 2.  Economic Impact Methodology (cont'd)

The following graphic illustrates the flow of direct spending through the successive rounds of re-spending including indirect and induced effects on the City's economy.

### Multiplier Effect

| Direct | Construction | Operations | |
|---|---|---|---|
| | | Team Ballpark Expenditures | Out-of-Ballpark |

| Indirect | Food & Merchandise Wholesaler | Transport Company | Manufacturers | Energy/ Utilities | Numerous Other Industries |
|---|---|---|---|---|---|

| Induced | Business Services | Household Spending | Governmental Spending | All Other Economic Sectors |
|---|---|---|---|---|

The multiplier estimates used in this analysis are based on the IMPLAN system. IMPLAN, which stands for *Impact Analyses and Planning*, is a computer software package that consists of procedures for estimating local input-output models and associated databases.  Input-output models are a technique for quantifying interactions between firms, industries and social institutions within a local economy.

IMPLAN was originally developed by the U.S. Forest Service in cooperation with the Federal Emergency Management Agency and the U.S. Department of the Interior's Bureau of Land Management to assist in land and resource management planning.  Since 1993, the IMPLAN system has been developed under exclusive rights by the Minnesota Implan Group, Inc. which licenses and distributes the software to users.  Currently, there are hundreds of licensed users in the United States including universities, government agencies, and private companies.

The economic data for IMPLAN comes from the system of national accounts for the United States based on data collected by the U. S. Department of Commerce, the U.S. Bureau of Labor Statistics, and other federal and state government agencies.  Data are collected for 528 distinct producing industry sectors of the national economy



## 2.  Economic Impact Methodology (cont'd)

corresponding to the Standard Industrial Categories (SICs).   Industry sectors are classified on the basis of the primary commodity or service produced.  Corresponding data sets are also produced for each county and zip code in the United States, allowing analyses at both the city and county level and for geographic aggregations such as clusters of contiguous cities, counties, individual states, or groups of states.  For purposes of this analysis, economic multipliers specific to the City of San Jose were used based on local zip codes.

Data provided for each industry sector include outputs and inputs from other sectors, value added, employment, wages and business taxes paid, imports and exports, final demand by households and government, capital investment, business inventories, marketing margins, and inflation factors (deflators).  These data are provided both for the 528 producing sectors at the national level and for the corresponding sectors at the county level.   Data on the technological mix of inputs and levels of transactions between producing sectors are taken from detailed input-output tables of the national economy. National and county level data are the basis for IMPLAN calculations of input-output tables and multipliers for geographic areas.  The IMPLAN software package allows the estimation of the multiplier effects of changes in final demand for one industry on all other industries within a local economic area.

Multiplier-effects estimated in this analysis include:

- *Total output* represents the total direct, indirect, and induced spending effects generated by the A's playing in a new ballpark.

- *Personal earnings* represent the wages and salaries earned by employees of businesses impacted by the A's and ballpark operations.

- *Employment* is expressed in terms of full or part-time jobs.

The economic multipliers specific to the City of San Jose for those industries directly impacted by the potential development are presented in the table on the following page.



## 2.  Economic Impact Methodology (cont'd)

**City of San Jose Economic Multipliers**

| Industry | Total Output Multiplier | Personal Earnings Multiplier | Employment Multiplier |
|---|---|---|---|
| Advertising and Related Services | 1.59392 | 0.68704 | 10.49897 |
| Construction - New Non-Residential | 1.51160 | 0.68022 | 9.30784 |
| Food and Beverage Services | 1.46629 | 0.53986 | 18.19416 |
| Hotels and Motels | 1.48907 | 0.53542 | 12.16139 |
| Amusement and Recreation Industries (Entertainment) | 1.50280 | 0.65853 | 18.74686 |
| Personal Services | 1.49326 | 0.34804 | 6.93554 |
| Radio and Television Broadcasting | 1.63522 | 0.73611 | 6.86089 |
| Retail Stores | 1.45365 | 0.64700 | 9.53630 |
| Spectator Sports Companies | 1.54281 | 0.86285 | 7.38274 |
| Transit and Ground Passenger Transportation | 1.46150 | 0.60890 | 14.46750 |

### Fiscal Impacts / Costs

In addition to the economic impacts that could be generated throughout San Jose by the A's and a new ballpark, the City would receive tax revenues from a variety of sources and incur certain costs.  In preparing estimates of fiscal impacts, total tax revenues attributable to the *direct, indirect and induced spending* were examined.  Tax revenues examined and estimated herein include sales, hotel, utility user, franchise, business license, construction & conveyance and property taxes generated to the City of San Jose. It is also anticipated that costs will accrue to the City's General Fund as a result of the development scenarios under consideration.  Cost categories estimated and examined herein include general government, finance, economic development, police, fire, capital maintenance and community service costs.



8

## 3.  Economic Impacts of Ballpark Development

The purpose of this section is to provide a detailed analysis of the economic impacts associated with the proposed ballpark development.  The information presented in this section is divided into the following areas:

- Description of Potential Development Site;
- Estimate of Potential Demand;
- Key Operating Assumptions;
- Direct Economic Impact;
- Indirect and Induced Impacts;
- Construction-Period Economic Impacts; and,
- Potential for Enhanced Ancillary Development.

### Description of Potential Development Site

As shown on the map on the following page, the proposed development site is situated in the South San Francisco Bay Area, in the City of San Jose, Santa Clara County.  The project site is located along the western edge of the Greater Downtown Area of San Jose, in the Burbank/Del Monte Strong Neighborhoods Initiative Redevelopment Project Area. The development site is bounded by San Fernando Street on the north, Park Avenue on the south, Autumn Street on the east and the Caltrain railroad tracks on the west.



## 3. Economic Impacts of Ballpark Development (cont'd)

**Potential Development Site**



Project Site Location

In October 2004, the City of San Jose and the Redevelopment Agency began studying the potential for developing a ballpark in the Diridon Station area. That process culminated in February 2007, with the certification of an Environmental Impact Report for a ballpark project consisting of a 1.5 million square-foot MLB stadium and a parking structure with ground floor commercial uses on approximately 23.1 acres in the City of San Jose. The ballpark proposed in 2007 had a maximum seating capacity of 45,000 and a maximum height of 165 feet, with scoreboards approximately 200 feet and lights approximately 235 feet above finished grade.



## 3.  Economic Impacts of Ballpark Development (cont'd)

In early 2009, the City of San Jose began exploring the development of a modified project.  The current ballpark concept reduces the size of the stadium from 45,000 to 32,000 seats.  The completion of construction on the Bay Area segment of High Speed Rail (San Francisco to San Jose) and an upgrade to Diridon Station is contemplated for 2016.  The extension of BART service to Diridon Station is anticipated to be complete no earlier than 2018.  The illustration below includes a preliminary concept of how the ballpark might be situated on the site.





## 3. Economic Impacts of Ballpark Development (cont'd)

### Estimate of Potential Demand

Impact of New MLB Ballparks on Attendance

Typically, the development of a new ballpark has a significant positive impact on an MLB franchise's attendance. The following table summarizes the changes in average per-game attendance that has resulted from the development of new MLB ballparks since 1992.

**Impact of New MLB Ballparks on Attendance**

| Team | New Stadium | Year Open | Prior Year Attendance | First Year Attendance | First-Year Change | Fifth Year Attendance | Fifth-Year Change |
|---|---|---|---|---|---|---|---|
| Cleveland Indians | Progressive Field | 1994 | 26,888 | 39,121 | 45% | 42,806 | 59% |
| San Francisco Giants | AT&T Park | 2000 | 25,659 | 40,973 | 60% | 40,307 | 57% |
| Philadelphia Phillies | Citizens Bank Park | 2004 | 28,973 | 40,626 | 40% | 42,254 | 46% |
| Baltimore Orioles | Oriole Park at Camden Yards | 1992 | 31,515 | 44,047 | 40% | 44,475 | 41% |
| Milwaukee Brewers | Miller Park | 2001 | 19,427 | 34,704 | 79% | 27,296 | 41% |
| Seattle Mariners | Safeco Field | 1999 | 32,735 | 36,004 | 10% | 43,740 | 34% |
| Texas Rangers | Rangers Ballpark in Arlington | 1994 | 27,711 | 39,733 | 43% | 36,141 | 30% |
| San Diego Padres | Petco Park | 2004 | 25,024 | 37,243 | 49% | 29,969 | 20% |
| Cincinnati Reds | Great American Ballpark | 2003 | 23,199 | 29,077 | 25% | 25,414 | 10% |
| Pittsburgh Pirates | PNC Park | 2001 | 21,591 | 30,430 | 41% | 22,435 | 4% |
| Atlanta Braves | Turner Field | 1997 | 35,818 | 42,771 | 19% | 34,858 | -3% |
| Detroit Tigers | Comerica Park | 2000 | 25,018 | 30,106 | 20% | 23,667 | -5% |
| Houston Astros | Minute Maid Park | 2000 | 33,000 | 37,730 | 14% | 30,299 | -8% |
| Washington Nationals | Nationals Park | 2008 | 24,217 | 29,005 | 20% | n/a | n/a |
| St. Louis Cardinals | Busch Stadium | 2006 | 43,691 | 42,588 | -3% | n/a | n/a |
| **Average** | | **2000** | **28,298** | **36,944** | **34%** | **34,128** | **25%** |

Note: 1. Citi Field (2009) and Yankee Stadium (2009) have been excluded as the New York Mets and New York Yankees have yet to complete a full season in their new ballparks.
    2. Coors Field (1995) and Chase Field (1998) have been excluded as the Colorado Rockies and Arizona Diamondbacks were expansion franchises.
    3. Sorted by fifth-year change.
    4. Excludes Yankee Stadium (2009), Citi Field (2009), Target Field (2010) and new Marlins ballpark (2012).
Source: Major League Baseball.

As shown in the table above, 14 of the 15 new MLB ballparks listed experienced an attendance increase in their first year of operations. On average, first-year ballparks experienced a 34 percent increase in per-game attendance. On a 5-year basis, just three ballparks have experienced a decrease in average per-game attendance. The average fifth-year attendance increase associated with new ballparks is 25 percent. The higher attendance figures of the first year relative to the fifth year can be attributed to the honeymoon period in which new ballparks experience increased attendance from people who would not normally attend games.

Average attendance at Oakland A's games over the past five seasons has been approximately 24,300 fans per game, while average per game attendance for all MLB teams over that same period has been approximately 31,700. (See Appendix II Major League Baseball Overview for detail).

Based on the historical increases in attendance associated with new MLB ballpark development, it is anticipated that the A's average attendance at a new ballpark in San



### 3.  Economic Impacts of Ballpark Development (cont'd)

Jose could be approximately 29,250 fans per game in the first year.  This represents an approximate 20 percent increase over the average attendance to A's games in Oakland over the last five years.  However, the projected average attendance of 29,250, assumed in the first year, is still nine percent below the average attendance to MLB games over the past five years and 11 percent lower than average MLB attendance in 2008.  For purposes of conservatism, it has been assumed that after the first year of operations, attendance will decrease by five percent annually until year six when attendance is assumed to level off at approximately 24,300 per game over the remainder of the 50-year analysis.

This analysis assumes the construction of a ballpark with a seating capacity of approximately 32,000 to be completed in time for the 2014 MLB season.  With an average estimated attendance of 24,300, the ballpark would be filled to approximately 76 percent of capacity, on average, but would have the smallest seating capacity in Major League Baseball.  By contrast, the average MLB ballpark has a seating capacity of approximately 45,000.

Ticket Price

The average ticket price for the A's in 2008 was approximately $29.20.  For the purposes of this report, the average 2008 ticket price was inflated at three percent annually to the year 2014, the first year the ballpark is expected to be open. In general, many major league teams realize an increase in ticket prices of approximately 15 to 20 percent after moving into a new facility due to enhanced fan amenities, better sightlines, etc. However, for purposes of conservatism, no increase in the average ticket price for the A's was assumed as a result of playing in a new ballpark. After adjusting for inflation, the average ticket price utilized in this analysis was calculated to be approximately $35 in 2014 ($30 in 2009).

**Key Operating Assumptions**

The initial step in estimating the economic impacts generated by a sports franchise and facility is to develop assumptions pertaining to annual events and attendance as well as per capita spending levels of ballpark patrons.  For purposes of this analysis, assumptions have been developed for two types of ballpark events: A's games and non-MLB events.

In-Facility Assumptions

The key assumptions related to A's games at the proposed ballpark are based on the team's historical attendance and ticket prices, per capita spending estimates experienced



13

## 3.  Economic Impacts of Ballpark Development (cont'd)

at other San Jose sports and entertainment events as well as the past intercept studies conducted by CSL in various MLB markets, premium seating inventory based on current stadium development plans and other such operating assumptions.  These assumptions form the basis for the estimates of in-ballpark spending.

The analysis includes assumptions for A's games as well as various other non-MLB events that are envisioned to utilize the proposed ballpark.   The following table summarizes the event and attendance assumptions for all events assumed to be hosted at the ballpark.

**Event and Attendance Estimates - Stabilized Year**
**Proposed San Jose Ballpark**

| | Average Annual Event Days | Average Event Attendance | Estimated Annual Attendance | Estimated Percent Local [1] | Estimated Percent Non-Local [2] |
|---|---|---|---|---|---|
| *Recurring Events:* | | | | | |
| A's Games | 81 | 24,300 [3] | 1,968,000 | 50% | 50% [2] |
| Non-MLB Events [4] | 3 | 30,000 | 90,000 | 20% | 80% |
| **TOTAL (All Events)** [5] | **84** | **24,500** | **2,058,000** | **49%** | **51%** |

Notes:
*(1) Represents the percentage of attendees assumed to live in the City of San Jose based on previous sports and entertainment studies conducted in San Jose and intercept studies conducted by CSL in other MLB markets.*
*(2) Represents the percentage of attendees assumed to live outside the City of San Jose based on previous sports and entertainment studies conducted in San Jose and intercept studies conducted by CSL in other MLB markets. Only includes non-local attendees whose primary reason for visiting the City is to attend the ballgame. Excludes all other non-local attendees.*
*(3) Based on the A's historical attendance. Assumes attendance will spike 20 percent in year-1 (2014) above historical levels and decrease 5% annually before leveling out in 2018.*
*(4) Based on the operations of other similar MLB ballparks.*
*(5) Average event attendance and percentage of local patron estimates are based on weighted averages.*

Source:
*A's historical operations, industry standards and CSL International research.*

As shown, the ballpark is estimated to host 84 events annually, which includes 81 A's home games and three non-MLB events, for total annual attendance of approximately 2.1 million.  The assumption of only three annually recurring non-MLB events at the ballpark is a somewhat conservative estimate given the mild San Jose climate which could allow year round use of the ballpark.  In addition, the City of San Jose lacks a large outdoor facility, such as an amphitheater, capable of hosting major events.   Therefore, the potential exists for a new ballpark to attract more large-scale outdoor events to the San Jose market.

Based on the results of the surveys conducted at MLB ballparks, previous studies conducted at sporting events in San Jose and CSL's experience conducting economic analyses throughout the country, it was estimated that approximately 70 percent of attendees of A's games would not reside in San Jose (non-local attendees). Furthermore,



## 3.  Economic Impacts of Ballpark Development (cont'd)

it was assumed that only 70 percent of these non-local attendees would be visiting San Jose with the primary purpose of attending the ballgame. Conversely, 30 percent of non-local attendees were assumed to be visiting San Jose for some other purpose than to attend the ballgame.  These individuals who were assumed to be in San Jose for some other purpose than to attend the ballgame were excluded from the analysis as it was assumed that they were already in town and would have spent money in the City regardless of their attendance at the game.

For purposes of this analysis, only those non-local attendees (70 percent of <u>all</u> attendees) whose primary purpose for visiting San Jose was to attend the ballgame (70 percent of <u>non-local</u> attendees) were included in the calculation for out-of-facility ballpark spending.  Given these assumptions, it was estimated that approximately 50 percent of A's game attendees would be non-local and be visiting San Jose with the primary purpose of attending the ballgame. Furthermore, it was assumed that 80 percent of attendees of non-MLB events hosted at the proposed ballpark would be non-local.

The number of non-local residents attending the ballgame is important to the net new spending that takes place as a result of the ballpark's existence, as these non-local attendees are bringing dollars into the local economy that would likely be spent elsewhere in the absence of the ballpark.

The overall economic impact from in-facility spending in the ballpark is driven by the number of patrons that visit the facility annually and by the amount each patron spends within the ballpark.  The following table outlines the estimated in-facility per capita spending specific to the events held within the proposed ballpark.

**In-Facility Per Capita Daily Spending Estimates [1]**
**Proposed San Jose Ballpark**
**(2009 Dollars)**

| Event Type | Ticket Price | Food & Beverage | Merchandise | Parking | Total |
|---|---|---|---|---|---|
| A's Games | $30 | $15 | $3 | $1 [2] | **$49** |
| Non-MLB Events | $45 | $16 | $10 | $3 [3] | **$74** |

*Notes:*
*(1) Based on other comparable ballparks.*
*(2) Assumes 30 percent of fans would utilize available parking and that there would be 3 people per car.*
*(3) Assumes 50 percent of fans would utilize available parking and that there would be 3 people per car.*

*Source:*
*Industry standards and CSL International research.*

As shown, total per capita in-facility daily spending for A's games is estimated to be approximately $49, while total per capita in-facility daily spending for non-MLB events is estimated to be approximately $74.  The estimates for in-facility per capita spending



## 3.  Economic Impacts of Ballpark Development (cont'd)

were derived from the historical operations of the A's and industry standards in the sports and entertainment industry.

It should be noted that the estimates of direct spending and associated <u>economic</u> impacts related to the team were based on the A's estimated annual operating expenditures, which are detailed later in this section.  The per capita in-facility spending estimates for A's games shown in the previous table were utilized to calculate the direct in-facility spending on taxable items such as concessions and merchandise in order to estimate the associated <u>fiscal</u> impacts generated to the City of San Jose as a result of the in-facility spending that takes place at the ballpark during A's games.  However, the direct spending and associated economic/fiscal impacts for non-MLB events was based solely on the per capita spending estimates outlined in the previous table.

<u>Out-of-Facility Spending Assumptions</u>

While purchases made at the ballpark represent the most visible source of spending related to the A's and the ballpark, spending taking place outside of the ballpark by patrons in conjunction with their attendance at events can also have significant impacts on the local economy.  In order to assist in estimating the amount of out-of-facility spending that could take place related to A's games at the proposed ballpark, data from previous sports and entertainment studies conducted in San Jose as well as information from previous intercept studies conducted by  CSL for other MLB teams were utilized.

The amount of spending fans make in conjunction with their ballpark visit often depends on the patron's origin.  Fans that travel from outside of the local area to attend games may be more likely to spend money on hotels, restaurants, travel expenses and other such expenditures during their visits.  In addition, money spent by non-local fans can often be considered new to the economy, as that spending may not have taken place locally if not for the patron's visit to the ballpark.

Based on intercept studies conducted by CSL in other MLB markets, respondents were asked to estimate the amount they intended to spend on each of several types of expenditures in relation to their attendance at the game.  The table on the following page summarizes the average spending per respondent captured as part of the previous intercept studies for each spending category as it relates specifically to their attendance at the ballgame.  To evaluate the difference in spending patterns, the spending estimates were separated into those fans who came to the city for the day to attend the game and those fans who stayed overnight in the city. It should be noted that the averages presented below for out-of-facility spending include the responses of **all** non-local respondents and include data from those respondents who indicated that they spend no money outside of the ballpark for each spending category.



## 3.  Economic Impacts of Ballpark Development (cont'd)

**Out of Facility Spending Comparison - Day Trip vs. Overnight Attendees[1]**
**All Non-Local Attendees**

| Attendee Type | Lodging | Entertainment | Food/Beverage | Transportation | Shopping | Misc. | Total |
|---|---|---|---|---|---|---|---|
| Day Trip | n/a | $5 | $16 | $7 | $4 | $1 | **$33** |
| Overnight | $36 | $23 | $35 | $14 | $23 | $5 | **$137** |
| All (Day Trip and Overnight)[2] | $15 | $12 | $24 | $10 | $12 | $2 | **$75** |

*Notes:*
*(1) Represents out-of-facility spending for **all** non-local attendees.*

*(2) Represents the weighted average out-of-facility spending for non-local attendees visiting the city for the day as well as those non-local attendees staying overnight.*

*Source: Past CSL intercept studies conducted in other comparable MLB markets.*

As shown above, the overall average out-of-facility spending reported by respondents of the two intercept groups was approximately $75 per day.  However, these spending estimates include those non-local respondents who were visiting the city for some other purpose than to attend the ballgame.

Due to differences in the spending habits of those non-local respondents who were in town strictly to attend the game and those non-local respondents who were in town for other purposes, a further analysis was completed to ascertain the per capita spending estimates related to only those non-local respondents whose primary purpose for visiting the city was to attend the ballgame. Furthermore, by utilizing the per capita spending estimates only from those non-local respondents whose primary purpose for visiting the city was to attend the game, the out-of-facility spending estimates should better reflect the net new spending that could take place as a result of the ballpark's operations. The following table presents the out-of-facility spending estimates specific to those non-local attendees whose primary purpose for visiting the city was to attend the ballgame.

**Out of Facility Spending Comparison - Day Trip vs. Overnight Attendees[1]**
**Non-Local Attendees Whose Primary Purpose for Visiting City was to Attend Ballgame**

| Attendee Type | Lodging | Entertainment | Food/Beverage | Transportation | Shopping | Misc. | Total |
|---|---|---|---|---|---|---|---|
| Day Trip | n/a | $5 | $16 | $8 | $5 | $1 | **$34** |
| Overnight | $20 | $10 | $24 | $8 | $11 | $2 | **$77** |
| All (Day Trip and Overnight)[2] | $6 | $7 | $19 | $7 | $7 | $1 | **$47** |

*Notes:*
*(1) Represents out-of-facility spending for **only** those non-local attendees whose primary purpose for visiting the city was to attend the ballgame.*

*(2) Represents the weighted average out-of-facility spending for non-local attendees visiting the city for the day as well as those non-local attendees staying overnight.*

*Source: Past CSL intercept studies conducted in other comparable MLB markets.*

As shown in the previous table, the average out-of-facility per capita spending specific to those non-local attendees whose primary purpose was to attend the ballgame was $47 per day. As a point of comparison, the average out-of-facility per capita spending captured from the previous intercept studies conducted by CSL was compared to the out-of-facility per capita spending estimates of similar studies conducted at other sports and entertainment events in San Jose.  The comparison is shown in the table on the following page.



### 3.  Economic Impacts of Ballpark Development (cont'd)

**Daily Out-of-Facility Per Capita Spending Comparison**
**Previous San Jose Sporting Event Studies vs. CSL Studies**

| Source | Study Year | Daily Per Capita Spending | Daily Per Capita Spending Inflated to 2009 [1] |
|---|---|---|---|
| San Jose Sharks Study | 2008 | $63 | $65 |
| San Jose MLS Study | 2007 | $77 | $82 |
| San Jose CAHA Study | 2007 | $123 | $130 |
| San Jose NCAA Study | 2007 | $142 | $151 |
| CSL Intercept Studies [2] | 2009 | $47 [3] | $47 [3] |

*Notes:*
*(1) Inflated at 3% annually.*
*(2) Based on the results of the intercept studies conducted at other MLB ballparks.*
*(3) Represents out-of-facility spending for non-local visitors only. Does not include out-of-facility spending from local residents.*

As shown, the total estimated out-of-facility spending reported for the other sports and entertainment events previously hosted in San Jose ranged from a low of $65 to high of $151, in 2009 dollars.  The following table summarizes the detailed out-facility per capita spending estimates utilized to project the economic impacts associated with all out-of-facility spending estimated to take place in the City of San Jose as result of the events hosted at the proposed ballpark.

**Out-of-Facility Per Capita Daily Spending Estimates**
**Proposed San Jose Ballpark**
**(2009 Dollars)**

| | Lodging | Entertainment | Food/Beverage | Transportation | Retail | Misc. | Total |
|---|---|---|---|---|---|---|---|
| *Recurring Events:* | | | | | | | |
| A's Games [1] | $6 | $7 | $19 | $7 | $7 | $1 | **$47** |
| Non-MLB Events | $6 | $3 | $6 | $3 | $5 | $3 | **$26** |

*Notes:*
*(1) Per capita spending numbers are specific to non-local attendees whose primary purpose for visiting the City is to attend the ballgame.*
*Source:*
*Previous CSL MLB intercept surveys, prior sports and entertainment spending studies conducted in San Jose and industry standards.*

In addition to the detailed adjusted out-of-facility spending estimates for A's games in San Jose, the detailed out-of-facility spending estimates for non-MLB events envisioned to be hosted at the proposed San Jose ballpark is estimated to be approximately $26 per person daily, as shown in the previous table. These spending figures form the basis for calculating the out-of-facility spending estimates associated with the events hosted at the proposed ballpark in San Jose. Furthermore, for purposes of calculating the total direct spending that is estimated to take place outside the ballpark, it was assumed that 60 percent of all out-of-facility spending as a result of the ballpark's operations would take place within the City of San Jose. This estimate was based on an analysis of the



## 3. Economic Impacts of Ballpark Development (cont'd)

percentage of corporations and population within the City of San Jose relative to Santa Clara County.

### Direct Economic Impact

The direct impact discussed in this report includes team and ballpark expenditures as well as spending by ballpark patrons before and after events taking place outside of the ballpark at local establishments such as restaurants, hotels, retail shops and other such places. CSL developed an economic model for an MLB team and ballpark to calculate the initial round of spending related to team operations. The assumptions related to attendance and spending levels at non-MLB events were used to estimate direct spending related to the ballpark but not directly attributable to the team.

Estimates related to out-of-ballpark spending are based on fan-intercept surveys conducted by CSL at MLB ballparks, historical survey data collected in San Jose at other events and venues and CSL's industry experience. This data was used to develop an understanding of fan spending before and after A's games. Spending estimates for other events at the proposed ballpark were developed based on industry averages and CSL's experience conducting similar studies throughout the country. In addition to fan spending before and after home games, other areas of economic activity that have been used to calculate the impact associated with the A's include team expenditures and visiting team/media spending.

Spending Adjustment

Adjustments to the gross direct spending sources related to A's games have been made to reflect the fact that spending patterns of professional sports teams vary significantly from those in other more typical industries, as a portion of the initial spending immediately leaves the local economy. Traditionally, multipliers that are used in economic impact studies are designed to reflect such leakage. As such, many economists argue that it is not necessary to adjust the initial round of spending since the multipliers take this into account. However, because the largest expense of a professional sports franchise, players' salaries, does not necessarily fully impact the local area (players often do not reside in the local area year-round), the initial round of spending has been adjusted downward in this analysis.

A gross direct spending adjustment was made to the portion of A's expenditures allocated to player salaries and the percentage of player spending that is assumed to take place locally. It is assumed that approximately 10 percent of A's' players will live within the



## 3.  Economic Impacts of Ballpark Development (cont'd)

City of San Jose and that those players will spend approximately 50 percent of their income within the City San Jose.

Players not residing in San Jose are assumed to spend significantly less of their income within the City.  Specifically, it is assumed that players that are not San Jose residents will spend approximately five percent of their income within the City.  Overall, it is estimated that approximately $5.1 million, or seven percent, of the estimated $70 million in total players' salaries would be spent within San Jose.

In addition to the player salary adjustment, it is also necessary to adjust other team expenditures to reflect the fact that not all team expenditures occur locally.  In total, gross direct spending related to team operations has been reduced by approximately 62 percent in order to estimate the adjusted economic impacts expected to occur within the City.

Adjusted Net New Direct Spending (A's Games)

Based on the assumptions discussed herein, estimates of the adjusted net new direct spending related to the A's have been developed and are presented in the table on the following page.



## 3.  Economic Impacts of Ballpark Development (cont'd)

Estimated Net New Direct Spending - A's Games [1]
(After Spending Adjustment)
Ballpark Development Scenario
(2009 Dollars)[2]

| Category | Stabilized Year [3] | 30-Year Net Present Value [4] | 50-Year Net Present Value [4] |
|---|---|---|---|
| **Team Ballpark Expenditures** [5] | | | |
| Major League Player Compensation | $4,359,000 | $123,948,000 | $223,692,000 |
| Player Benefit Plan | 2,899,000 | 82,429,000 | 148,760,000 |
| Major League Team Operations | 4,975,000 | 106,178,000 | 147,527,000 |
| Scouting and Player Development | 9,950,000 | 212,357,000 | 295,054,000 |
| Stadium Operations | 7,462,000 | 159,268,000 | 221,290,000 |
| Marketing, Publicity and Ticket Operations | 3,234,000 | 69,016,000 | 95,893,000 |
| General and Administrative | 5,970,000 | 127,414,000 | 177,032,000 |
| Ballpark Property Tax | 3,992,000 | 78,398,000 | 102,072,000 |
| Concessions [6] | 8,809,000 | 191,871,000 | 265,092,000 |
| Merchandise [6] | 2,349,000 | 51,166,000 | 70,691,000 |
| Parking [6] | 215,000 | 4,705,000 | 6,488,000 |
| **Total In-Facility** | **$54,214,000** | **$1,206,750,000** | **$1,753,591,000** |
| | | | |
| **Out-of-Facility Spending** [7] | | | |
| Lodging | $3,724,000 | $81,117,000 | $112,072,000 |
| Restaurant | 10,977,000 | 239,089,000 | 330,328,000 |
| Retail | 3,890,000 | 84,726,000 | 117,058,000 |
| Local Transit | 4,354,000 | 94,823,000 | 131,008,000 |
| Entertainment | 3,952,000 | 86,067,000 | 118,911,000 |
| Other | 626,000 | 13,643,000 | 18,849,000 |
| **Total Out-of-Facility** | **$27,523,000** | **$599,465,000** | **$828,226,000** |
| | | | |
| **Visiting Team Spending** [8] | | | |
| Lodging | $810,000 | $17,280,000 | $24,009,000 |
| Per Diem | 269,000 | 5,748,000 | 7,987,000 |
| Transportation | 105,000 | 2,247,000 | 3,123,000 |
| **Total Visiting Team** | **$1,184,000** | **$25,275,000** | **$35,119,000** |
| | | | |
| **TOTAL NET NEW SPENDING** | **$82,921,000** | **$1,831,490,000** | **$2,616,936,000** |

Notes:

(1) Net new direct spending represents the portion of gross direct spending that is considered to be newly created in the San Jose economy as a result of the A's operations.

(2) Presented in 2009 dollars, discounted at 3 percent annually.

(3) The year 2018 is presented as a stabilized year of operations.

(4) Net present value calculation assumes a discount rate of 5.2 percent.

(5) In-facility spending figures represent all expenditures related to the operations of the team.

(6) Represents the cost of goods and labor related to this revenue source.

(7) Out-of-facility spending figures are only for non-local attendees whose sole purpose for visiting the City is to attend the ballgame.

(8) Visiting team spending represents all spending assumed to take place within the City that is directly attributable to the players and personnel of the visiting team.

As shown, the net new *annual* direct spending estimated to take place within San Jose related to A's games in a stabilized year of operations (2018), is estimated to be total approximately $82.9 million in 2009 dollars while the 30-year and 50-year net present value of this net new spending is estimated to be approximately $1.8 billion and $2.6 billion, respectively.



## 3.  Economic Impacts of Ballpark Development (cont'd)

Adjusted Net New Direct Spending (Non-MLB Events)

Based on the assumptions discussed herein, estimates of the adjusted spending related to non-MLB events were developed and are presented in the following table.

**Estimated Net New Direct Spending - Non-MLB Events [1]**
**Ballpark Development Scenario**
**(2009 Dollars)[2]**

| Category | Stabilized Year [3] | 30-Year Net Present Value [4] | 50-Year Net Present Value [4] |
|---|---|---|---|
| *In-Facility Spending* [5] | | | |
| Ticket Revenue | $380,000 | $8,119,000 | $11,281,000 |
| Concessions | 1,353,000 | 28,868,000 | 40,110,000 |
| Merchandise | 845,000 | 18,043,000 | 25,069,000 |
| Parking | 282,000 | 6,014,000 | 8,356,000 |
| **Total In-Facility** | **$2,860,000** | **$61,044,000** | **$84,816,000** |
| | | | |
| *Out-of-Facility Spending* [6] | | | |
| Lodging | $188,000 | $4,009,000 | $5,571,000 |
| Restaurant | 145,000 | 3,099,000 | 4,305,000 |
| Retail | 121,000 | 2,582,000 | 3,588,000 |
| Local Transit | 73,000 | 1,549,000 | 2,153,000 |
| Entertainment | 77,000 | 1,653,000 | 2,296,000 |
| Other | 68,000 | 1,446,000 | 2,009,000 |
| **Total Out-of-Facility** | **$672,000** | **$14,338,000** | **$19,922,000** |
| | | | |
| **TOTAL NET NEW SPENDING** | **$3,532,000** | **$75,382,000** | **$104,738,000** |

*Notes:*

*(1) Net new direct spending represents the portion of gross direct spending that is considered to be newly created in the San Jose economy as a result of the ballpark's existence.*

*(2) Presented in 2009 dollars, discounted at 3 percent annually.*

*(3) The year 2018 is presented as a stabilized year of operations.*

*(4) Net present value calculation assumes a discount rate of 5.2 percent.*

*(5) In-facility spending figures include all spending assumed to take place within the stadium attributable to all events other than A's games.*

*(6) Out-of-facility spending figures are only for non-local attendees at all non-MLB events.*

As shown above, the net new *annual* direct spending related to non-MLB events during a stabilized year of operations is estimated to total approximately $3.5 million in 2009 dollars within San Jose while the 30-year and 50-year net present value of this net new spending is estimated to be approximately $75.4 million and $104.7 million, respectively.



## 3.  Economic Impacts of Ballpark Development (cont'd)

Overall, it is estimated that A's games and the other events hosted at the ballpark could generate approximately $86.5 million in adjusted net new direct spending in a stabilized year of  operations (2018) in 2009 dollars within the City of San Jose. As shown in the following table, the 30-year and 50-year net present value of all adjusted direct spending related to the Ballpark Development Scenario is estimated to be approximately $1.9 billion and $2.7 billion, respectively.

**Total Estimated Adjusted Net New Direct Spending[1]**
**Ballpark Development Scenario**
**(2009 Dollars)[2]**

| Category | Stabilized Year [3] | 30-Year Net Present Value [4] | 50-Year Net Present Value [4] |
|---|---|---|---|
| A's Games [5] | $82,921,000 | $1,831,490,000 | $2,616,936,000 |
| Non-MLB Events [5] | 3,532,000 | 75,382,000 | 104,738,000 |
| **TOTAL NET NEW SPENDING** | **$86,453,000** | **$1,906,872,000** | **$2,721,674,000** |

*Notes:*
*(1) Net new direct spending represents the portion of gross direct spending that is considered to be newly created in the San Jose economy as a result of the ballpark's existence.*
*(2) Presented in 2009 dollars, discounted at 3 percent annually.*
*(3) The year 2018 is presented as a stabilized year of operations.*
*(4) Net present value calculation assumes a discount rate of 5.2 percent.*
*(5) Includes in-facility and out-facility net new direct spending.*

The following section discusses the impacts of these adjusted net new direct spending levels as they flow through the local economy and outlines the indirect and induced economic impacts.

### Indirect and Induced Impacts

The initial spending of new dollars in an economy begins a series of spending in which the dollars are cycled and recycled through the economy.  The indirect spending represents the impact that the various rounds of re-spending of the direct expenditures has on the defined economies.

As money leaves the economy due to exportation or leakage, the input-output model adjusts each successive round of spending, recognizing only the impact that the spending has on the defined economy.  The re-spending of the dollars is estimated by utilizing economic multipliers and applying them to the amount of direct, or initial spending.



## 3.  Economic Impacts of Ballpark Development (cont'd)

Total Output

Total output represents the total direct, indirect, and induced spending effects generated by the proposed Ballpark Development Scenario. Total output is calculated by multiplying the adjusted net new direct spending for each spending category by the proper economic multiplier, which represents the successive rounds of additional spending in the local economy.  The following table outlines the estimated total output related to the proposed Ballpark Development Scenario.

Estimated Total Net New Output [1]
Ballpark Development Scenario
(2009 Dollars)[2]

| Category | Stabilized Year [3] | 30-Year Net Present Value [4] | 50-Year Net Present Value [4] |
|---|---|---|---|
| *A's Games* | | | |
| Team Ballpark Expenditures | $82,800,000 | $1,842,000,000 | $2,678,000,000 |
| Total Out-of-Facility | 40,500,000 | 883,000,000 | 1,219,000,000 |
| Total Visiting Team | 1,800,000 | 37,000,000 | 53,000,000 |
| **Total A's** | **$125,100,000** | **$2,762,000,000** | **$3,950,000,000** |
| | | | |
| *Non-MLB Events* | | | |
| Total In-Facility | $4,200,000 | $90,000,000 | $124,000,000 |
| Total Out-of-Facility | 1,000,000 | 21,000,000 | 28,000,000 |
| **Total Non-MLB Events** | **$5,200,000** | **$111,000,000** | **$152,000,000** |
| | | | |
| **TOTAL OUTPUT[3]** | **$130,300,000** | **$2,873,000,000** | **$4,102,000,000** |

Notes:
(1) Total net new output includes direct, indirect and induced spending. Net new total output is calculated by applying the appropriate output multipliers to each net new direct spending category. ( *Indirect* spending is created as a result of the re-spending of direct expenditures throughout the local economy. *Induced* spending consists of the positive changes in spending, employment, earnings and tax collections generated by personal income associated with the operations of the ballpark.)
(2) Presented in 2009 dollars, discounted at 3 percent annually.
(3) The year 2018 is presented as a stabilized year of operations.
(4) Net present value calculation assumes a discount rate of 5.2 percent.

Source:
CSL net new direct spending estimates and IMPLAN.

As shown, in 2009 dollars the levels of adjusted net new direct spending previously discussed are estimated to generate approximately $130.3 million in total output in San Jose during a stabilized year of operations (2018).

Overall, it is estimated that the net present value over a 30-year and 50-year period of the total economic output generated by spending related to events hosted at the ballpark is approximately $2.9 billion and $4.1, respectively. Furthermore, it is estimated that approximately 96 percent of the total economic output generated by spending related to the development of the ballpark would be generated as a result of A's games, and the remaining total economic output generated by the ballpark would be attributable to the non-MLB events hosted at the ballpark.



## 3.  Economic Impacts of Ballpark Development (cont'd)

Employment

Increased economic activity associated with the proposed ballpark development is assumed to spur the creation of jobs within the local economy.  As illustrated in the following table, the level of economic activity previously presented is estimated to support approximately 980 total jobs in a stabilized year of ballpark operations (2018).

**Estimated Total Net New Jobs[1]**
**Ballpark Development Scenario**

| Category | Stabilized [2] Year |
|---|---|
| *A's Games* | |
| Team Ballpark Expenditures | 490 |
| Total Out-of-Facility | 420 |
| Total Visiting Team | 20 |
| **Total A's** | **930** |
| | |
| *Non-MLB Events* | |
| Total In-Facility | 40 |
| Total Out-of-Facility | 10 |
| **Total Non-MLB Events** | **50** |
| | |
| **TOTAL JOBS** | **980** |

*Notes:*
*(1) Represents the number of job estimated to be created within San Jose as result*
*of the ballpark's operations. Total net new jobs are calculated by applying the*
*appropriate employment multipliers to each net new direct spending category.*
*(2) The year 2018 is presented as a stabilized year of operations.*

Personal Earnings

Personal earnings represent the wages and salaries earned by employees of businesses impacted by the ballpark development.  Based on the jobs estimated to be supported by the level of economic output generated by the ballpark development, it estimated that total earnings in a year of stabilized operations (2018) could be approximately $61.9 million in 2009 dollars as shown in the table on the following page.



### 3. Economic Impacts of Ballpark Development (cont'd)

**Estimated Total Net New Earnings[1]**
**Ballpark Development Scenario**
**(2009 Dollars)[2]**

| Category | Stabilized Year [3] | 30-Year Net Present Value [4] | 50-Year Net Present Value [4] |
|---|---|---|---|
| *A's Games* | | | |
| Team Ballpark Expenditures | $43,400,000 | $968,000,000 | $1,411,000,000 |
| Total Out-of-Facility | 15,900,000 | 347,000,000 | 479,000,000 |
| Total Visiting Team | 640,000 | 13,800,000 | 19,100,000 |
| **Total A's** | **$59,940,000** | **$1,328,800,000** | **$1,909,100,000** |
| | | | |
| *Non-MLB Events* | | | |
| Total In-Facility | $1,630,000 | $34,700,000 | $48,200,000 |
| Total Out-of-Facility | 370,000 | 8,000,000 | 11,100,000 |
| **Total Non-MLB Events** | **$2,000,000** | **$42,700,000** | **$59,300,000** |
| | | | |
| **TOTAL EARNINGS** | **$61,940,000** | **$1,371,500,000** | **$1,968,400,000** |

*Notes:*

*(1) Represents the total net new personal earnings estimated to be created in San Jose as result of the ballpark's operations.*

*Total net new earnings are calculated by applying the appropriate earnings multipliers to each net new direct spending category.*

*(2) Presented in 2009 dollars, discounted at 3 percent annually.*

*(3) The year 2018 is presented as a stabilized year of operations.*

*(4) Net present value calculation assumes a discount rate of 5.2 percent.*

*Source:*

*CSL net new direct spending estimates and IMPLAN.*

As shown above, it is estimated that the net present value of the total earnings generated by the proposed Ballpark Development Scenario over a 30-year and 50-year period could be approximately $1.4 billion and $2.0 billion, respectively.

A detailed analysis of the specific tax revenues generated to the City of San Jose's General Fund and specific City costs associated with the Ballpark Development Scenario is provided in a subsequent section of this report entitled City of San Jose Revenue / Cost Analysis.

The table on the following page summarizes the net new economic impacts associated with the estimated net new direct spending expected to occur due to the operations of the proposed ballpark.



## 3.  Economic Impacts of Ballpark Development (cont'd)

**Ballpark Development Scenario [1]**
**Economic Impact Summary**
**Net New Impacts - Annual Ongoing Operations**
**(2009 Dollars)[2]**

| Category | Stabilized Year [3] | 30-Year Net Present Value [4] | 50-Year Net Present Value [4] |
|---|---|---|---|
| Net New Direct Spending [5] | $86,453,000 | $1,906,872,000 | $2,721,674,000 |
| Total Output [6] | $130,300,000 | $2,873,000,000 | $4,102,000,000 |
| Jobs [7] | 980 | n/a | n/a |
| Earnings | $61,940,000 | $1,371,500,000 | $1,968,400,000 |

*Notes:*

*(1) Construction of the ballpark is assumed to take place from 2011 to 2013 and open in 2014.  These impacts are excluded from this table.*

*(2) Presented in 2009 dollars, discounted at 3 percent annually.*

*(3) The year 2018 is presented as a stabilized year of operations.*

*(4) Net present value calculation assumes a discount rate of 5.2 percent.*

*(5) Net new direct spending represents the portion of gross direct spending that is considered to be newly created in the San Jose economy as a result of the ballpark's existence. Assumes 60 percent of all out-of-facility direct spending related to the operations of the ballpark takes place within San Jose. Overall, it is estimated that 34 percent of all spending occurring because of the ballpark will be net new to the San Jose economy.*

*(6) Total net new output includes direct, indirect and induced spending. Net new total output is calculated by applying the appropriate output multipliers to each net new direct spending category. (Indirect spending is created as a result of the re-spending of direct expenditures throughout the local economy. Induced spending consists of the positive changes in spending, employment, earnings and tax collections generated by personal income associated with the operations of the ballpark.)*

*(7) Represents the number of full and part time jobs estimated to be created within San Jose as result of ballpark development operations. Total net new jobs are calculated by applying the appropriate employment multipliers to each net new direct spending category.*

**Construction-Period Economic Impacts**

The economic impact of the construction phase of a project is determined by the volume and nature of construction and other development-related expenditures as well as the region in which they take place.

In order to estimate construction costs for the proposed San Jose ballpark, an analysis of comparable MLB ballparks was conducted.  For the purposes of this analysis, comparable ballparks were defined as recently constructed open-air ballparks.   Due to their considerable development costs, Yankee Stadium and Citi Field were excluded from this analysis.   The following exhibit depicts the construction cost and the cost per seat for each of the comparable ballparks.  These costs include both hard costs and soft costs such



## 3.  Economic Impacts of Ballpark Development (cont'd)

as engineering costs.  It should be noted that construction costs exclude the cost of land and off-site improvements for all facilities presented below.  Adjusted construction costs presented below were determined by first normalizing the original construction costs to 2009 dollars using the Turner Construction Cost Index.  These construction costs were then adjusted to San Jose construction costs using cost of living indices.

**Comparable Open-Air MLB Ballparks**
**Construction Costs per Seat**

| Stadium | Team | Opening Year | Original Cost (millions) | Adjusted [1] Cost | Seating Capacity | Cost Per Seat |
|---|---|---|---|---|---|---|
| Target Field | Minnesota Twins | 2010 | $559.4 | $785.5 | 40,000 | $19,636 |
| Busch Stadium | St. Louis Cardinals | 2006 | 368.0 [2] | 760.7 | 46,900 | 16,219 |
| Nationals Park | Washington Nationals | 2008 | 581.2 [3] | 698.8 | 41,888 | 16,682 |
| PETCO Park | San Diego Padres | 2004 | 449.4 | 519.7 | 42,000 | 12,375 |
| Great American Ballpark | Cincinnati Reds | 2003 | 296.7 | 498.9 | 45,000 | 11,088 |
| AT&T Park | San Francisco Giants | 2000 | 290.0 | 421.2 | 41,503 | 10,149 |
| **Average** | | **2005** | **$424.1** | **$614.1** | **42,882** | **$14,400** |

(1) Represents the original construction cost adjusted to 2009 dollars via the Turner Construction Cost Index and then adjusted to reflect the differences in the cost of living between San Jose and each respective market.  Projected cost of stadiums opening after 2009 have not been adjusted due to lack of future indices.

(2) Land costs of $20 million were deducted from total development costs of $388.0 million.

(3) Land costs of $111.6 million were deducted from total development costs of $692.8 million.

Source:  ACCRA Cost of Living Index, municipal authorities, facility management, public records, and industry publications.  Amounts have not been audited or otherwise verified.

As shown in the table above, the average adjusted construction cost for the comparable ballparks analyzed is $614.1 million, with a high of $785.5 million at Target Field and a low of $421.2 million at AT&T Park.  The adjusted cost per seat ranged from a high of $19,636 at Target Field to a low of $10,149 at AT&T Park with an average cost of $14,400 per seat in San Jose construction dollars.

Using the average adjusted cost per seat as a proxy, an estimate of the construction costs for the proposed San Jose Ballpark was developed as outlined in the table below.

**Proposed San Jose Ballpark**
**Estimated Construction Cost**

| | | |
|---|---|---|
| Average Cost per Seat - Comparable Facilities | | $14,400 |
| Number of Seats in Proposed San Jose Ballpark | | 32,000 |
| | | |
| Construction Cost Estimate (2009 Dollars) | | $460,800,000 [1] |
| Hard Construction Costs | @ 80% | $369,000,000 |
| Soft Construction Costs | @ 20% | $92,000,000 |
| | | |
| Construction Cost Estimate (2011 Dollars) | | $489,000,000 [2] |
| Hard Construction Costs | @ 80% | $391,000,000 |
| Soft Construction Costs | @ 20% | $98,000,000 |

(1) Rounded to nearest million.

(2) Inflated 3 percent annually from 2009 estimate.



28

## 3.  Economic Impacts of Ballpark Development (cont'd)

As shown, it is estimated that the proposed San Jose ballpark could cost approximately $461 million in 2009 dollars.  This includes approximately $369.0 million in hard construction costs and $92.0 million in soft costs which are typically comprised of architectural, engineering, legal fees, etc.  In 2011 dollars, the year construction of the ballpark is expected to commence, it is anticipated that total construction costs will be approximately $489 million.

The economic impacts resulting from the ballpark construction expenditures depend on the nature of the spending and the extent to which the spending takes place locally.  It has been assumed that approximately 25 percent of labor spending and 20 percent of material spending related to construction will directly impact the San Jose economy.  Based on these assumptions, it is estimated that approximately $112 million of the $489 million ballpark construction expenditures would be spent on materials and labor derived from within the City of San Jose.  For the purposes of this analysis, it is assumed that this spending would occur over a period of three years commencing in 2011 with approximately $37 million spent each year.

Based on the assumptions for construction costs related to the Ballpark Development Scenario, the total direct spending occurring within San Jose was calculated.  The net new economic impacts to the City of San Jose resulting from the anticipated spending levels were estimated by applying multipliers that specifically reflect the unique characteristics of the local construction industry.  The table below summarizes these impacts.

**Ballpark Development Scenario**
**Economic Impact Summary**
**Net New  Impacts - Construction Period [1]**
**(2009 Dollars)**

| Category | Net Present Value [2] |
|---|---|
| Net New Direct Spending | $96,000,000 |
| Total Output | $144,946,000 |
| Jobs [3][4] | 350 |
| Earnings | $65,226,000 |
| Tax Revenues | $558,000 |

*Notes:*
*(1) Assumes a three-year construction period (2011-2013).*
*(2) Shown in 2009 dollars, discounted at 5.2 percent annually. Represents NPV of construction impacts over the three-year construction period.*
*(3) Represents jobs created during each of the 3 years that construction occurs.*
*(4) Represents the average number of annually recurring full and part time jobs created during the construction period.*



## 3.  Economic Impacts of Ballpark Development (cont'd)

As shown, the net present value of the total net new direct spending expected to take place as result of the ballpark's construction from 2011 to 2013 is estimated to be $96.0 million.  This level of direct spending is expected to generate approximately $144.9 million in total output during the thee-year construction period.  This level of economic activity is estimated to support 350 annual construction jobs during the construction period generating personal earnings of approximately $65.2 million.  Furthermore, it is estimated that the construction of the ballpark could generate net new City sales tax revenues of $558,000.  Additional taxes generated during the construction period such as construction tax and conveyance tax are excluded from the tax revenues discussed here but have been included in Section 4 of this report (City of San Jose Revenue/Cost Analysis).

It should be noted that unlike the other economic impact figures presented in this report, the impacts related to the construction of the Ballpark Development Scenario are not measured over the entire 50-year analysis.  Rather, the construction related impacts presented herein represent the total impacts taking place only during the construction period, which is estimated to be from 2011 through 2013.

### Potential for Enhanced Ancillary Development

As has been the case with the construction and development of similar projects throughout the country it is anticipated that the development of the ballpark will help to spur ancillary development in the Diridon Area.  Although not included in the economic impact estimates provided in this report, it is likely that the ballpark development will accelerate potential commercial development on properties adjacent to the ballpark site.  This catalytic effect is likely to increase the overall impacts associated with the development of a ballpark.  Petco Park in San Diego and AT&T Park in San Francisco are two examples of the positive effect a new ballpark can have on adjacent development.  Without the development of a ballpark, the development of adjacent properties would likely occur over a longer period of time.

PETCO Park opened in 2004 in the East Village neighborhood of San Diego, California.  The Park was built at a cost of approximately $449 million, with approximately $387 financed by the City of San Diego.  As part of the agreement, the City issued $225 million in municipal bonds secured by hotel/motel taxes, with team ownership agreeing to help jump-start area development by building a  512-room Omni Hotel through their real estate company, JMI Realty.  Since the construction of the Park, nearly $2 billion of public and private investment has



### 3.  Economic Impacts of Ballpark Development (cont'd)

transformed the 26 blocks surrounding the Park into a thriving mixed-use, mixed-income community.  Projects planned or currently under development include the addition of more than 4,500 homes, 750 hotel rooms, 3,000 public parking spaces and 640,000 square feet of commercial space.  The ballpark development also resulted in the clean-up of approximately 75,000 tons of contaminated soil and waste, as well as the construction of a new main library and a new fire station.  In 2005, Petco Park received a Catalyst Project award at the Urban Land Institute San Diego/Tijuana chapter's Smart Growth Awards for Excellence.  The award was presented to Petco Park for its positive affect on the surrounding neighborhood and its alleviation of contaminated soils.



Since its construction in 2000, AT&T Park in San Francisco, has laid the groundwork for a dramatic urban transformation of the City's Mission Bay neighborhood.    The  303-acre  area  includes approximately  4,000  new  housing  units,  with another 2,000 in the planning stages.  In addition to residential  developments,  it  also  includes  six million square feet of new commercial, office and technology space, 800,000 square feet of City and neighborhood-serving retail space and a 500-room hotel with 50,000 square feet of retail and entertainment space.  Residents also directly benefit from the 49 acres of public open space and parks, a new public school and new fire and police stations.  Completing the Mission Bay transformation is the $1.7 billion University of California-San Francisco research and hospital complex, set to open in 2014.  Mission Bay has also become the home to the vast majority of biotechnology companies currently headquartered in San Francisco.  Costs of the Mission Bay development are expected to amount to approximately $4 billion.



## 4. City of San Jose Revenue / Cost Analysis

As a result of the direct and indirect economic impacts generated by new developments in San Jose, the public sector (the City of San Jose, Santa Clara County and the State of California) realizes increased tax collections. Based on the estimates of direct spending, the resulting tax collections and associated costs of potential site development have been calculated for the Ballpark Development Scenario. The following analysis describes the annual revenue and cost impacts to the City's General Fund. All revenue and expenditure forecasts are presented in 2009 dollars for a stabilized year for the Ballpark Development Scenario. In addition, the 30-year and 50-year net present value of the revenue and expenditure forecasts have been provided in full detail.

**General Fund Revenues**

The table on the following page summarizes the revenues expected to accrue to the City's General Fund as a result of the potential Ballpark Development Scenario. This table also provides estimates of the potential tax revenues generated to other municipal taxing jurisdictions under the Ballpark Development Scenario. A general description of the method used for this analysis is provided for each revenue item. The remainder of this section describes the methodology and assumptions used for each City General Fund revenue item.



## 4.  City of San Jose Revenue / Cost Analysis (cont'd)

**Projection of Annual City General Fund Revenue Impact**
**Fiscal and Economic Impact Analysis**
**Ballpark Development Scenario**
**City of San Jose, CA**
**(2009 Dollars)[1]**

| Revenue Source [4x5x6x7] | | Stabilized Year [2] | 30-Year Net Present Value [3] | 50-Year Net Present Value [3] |
|---|---|---|---|---|
| **Property Tax [4x5x6x7]** | | $459,000 | $9,013,000 | $11,565,000 |
| **Property Tax in Lieu of VLF [8]** | | 193,000 | 3,782,000 | 4,924,000 |
| Total Property Taxes | | $652,000 | $12,795,000 | $16,489,000 |
| **Sales Tax [9]** | | | | |
| Ballpark/Team Related [10] | 1.0% City share | $505,000 | $11,020,000 | $15,358,000 |
| **Transient Occupancy Tax [11]** | 4.00% | 156,000 | 3,405,000 | 4,706,000 |
| | *Revenue Factor ($2009)* | | | |
| **Utility User Tax [12]** | | 124,400 | 2,656,000 | 3,690,000 |
| **Franchise Tax [14]** | | 54,000 | 1,153,000 | 1,602,000 |
| **Business License Tax [15]** | *applied to daily population*  $36.60 [13] | 5,000 | 107,000 | 149,000 |
| **Conveyance Tax** | | | | |
| Secured Property Value | | 0 | 0 | 0 |
| Annual Turnover Rate | | 0% | 0% | 0% |
| Taxable Amount | | 0 | 0 | 0 |
| Tax Rate | | *$3.3 per $1,000 of value* [16] | | |
| General Fund Share [17] | | 9.6% | 9.6% | 9.6% |
| Total Conveyance Tax | | 0 | 0 | 0 |
| **Construction Tax [18]** | $0.08 per square foot | 0 | 50,000 | 50,000 |
| **Total Annual Revenue Impact to City General Fund** | | **$1,496,400** | **$31,186,000** | **$42,044,000** |

| Other Municipal Property Tax Revenues Generated | Stabilized Year [1][2] | 30-Year Net Present Value [3] | 50-Year Net Present Value [3] |
|---|---|---|---|
| Redevelopment Agency - Housing | $706,000 | $13,866,000 | $14,670,000 |
| Redevelopment Agency - Non-housing | 912,000 | 17,479,000 | 18,425,000 |
| City GO Bonds | 109,000 | 2,143,000 | 2,790,000 |
| County | 948,000 | 18,172,000 | 22,113,000 |
| Santa Clara Valley Water District | 15,000 | 331,000 | 776,000 |
| Bay Area Air Quality Management District | 1,000 | 30,000 | 64,000 |
| San Jose Unified School District | 495,000 | 10,115,000 | 12,243,000 |
| San Jose-Evergreen Community College | 69,000 | 1,418,000 | 1,719,000 |
| County Office of Education | 112,000 | 2,237,000 | 2,906,000 |
| ERAF & Offsets to State Funding for Schools | 166,000 | 3,596,000 | 14,803,000 |
| **Total Property Tax Revenues [19]** | **$3,533,000** | **$69,387,000** | **$90,509,000** |

*Notes:*

(1) Presented in 2009 dollars, discounted at 3 percent annually.

(2) The year 2018 is presented as a stabilized year of operations.

(3) Net present value calculation assumes a discount rate of 5.2 percent.

(4) Property tax includes payments from the Redevelopment Agency to the City based on a percentage of property tax.

(5) Allocation of property taxes has been adjusted to reflect the tax increment revenue distribution anticipated in the Diridon Project Area from 2009 to 2048.

(6) In 2048 the Diridon Project Area will cease to collect tax increment.  Therefore, current property tax rates are applied in years 2048 through 2063.

(7) Assessed property value is based on hard construction costs which account for approximately 80 percent of total construction costs.

(8) Property tax in lieu of Vehicle License Fees is assessed at a rate of $0.57 per $1,000 of assessed property value.

(9) 1.0 percent City of San Jose Sales Tax levied on goods and services.

(10) New net sales taxes generated as a result of ballpark operations.

(11) Based on 10 percent transient occupancy tax of which 6 percent is allocated to the TOT Fund and 4 percent of which is allocated to the City's General Fund.

(12) Utility User tax is based on 5 percent of estimated utilities (telephone, electric and gas) for the proposed ballpark.

(13) Technical Memorandum "Updated Fiscal and Economic Impact Analysis of Major League Soccer Stadium" by Economic Planning Systems (March 2009).

(14) Franchise Fee tax is based on 2 percent of estimated utilities (water, electric and gas) for the proposed ballpark.

(15) Business license tax is applied using the average revenue approach and applied to the daily service population.

(16) The City receives $3.30 per $1,000 value of properties that are resold in conveyance tax.

(17) Currently, 9.6 percent of the City's conveyance tax revenue can be used for parks operations and maintenance purposes.

(18) Construction tax for business, commercial, or industrial uses, or for any other use other than dwelling unit use.  The construction tax rate is $0.08 per square foot of completed construction.

(19) Excludes tax increment revenues allocated to the City General Fund.



## 4. City of San Jose Revenue / Cost Analysis (cont'd)

As illustrated, under the Ballpark Development Scenario, it is estimated that the annual revenues generated to the City of San Jose in a stabilized year of operations would be approximately $1.5 million in 2009 dollars. The net present value of the City tax revenues generated by the Ballpark Development Scenario over a 30-year and 50-year period is estimated to be approximately $31.2 million and $42.0 million, respectively.

Property Tax

The City's General Fund will receive increased property tax revenues from the Ballpark Development Scenario. Property taxes collected under this scenario are based on current tax rates for the City of San Jose. Under the Ballpark Development Scenario, the hard construction costs of the stadium are used as a proxy for the assessed value. The total estimated construction cost for the ballpark is $489 million in 2011 dollars including $391 million in hard costs and $98 million in soft costs. Starting in 2009, it is expected that the Diridon Area could be designated as a tax increment redevelopment area for a forty-year period. Under this scenario, it is assumed that 2047 would be the last year in which the Diridon Project Area would collect tax increment. Therefore, taxes will start to accrue to the City in 2048 and have been calculated at current tax rates for years 2048 through 2063. Also included are payments by the Agency to the City, in an amount calculated based on a percentage of property taxes, that compensate the City for parking rights granted to the County pursuant to a proposed agreement with the County.

Property Tax in Lieu of Vehicle License Fees

Property Tax in-Lieu of Vehicle License Fee ("VLF") is based on the starting or base backfill and the proportionate growth of assessed value in the City associated with the project. More specifically, SB 1096 adopted in 2004 established a formula which ties this revenue to increases in the aggregate assessed value of the City. The formula translates into approximately $0.57 in additional property tax in-lieu of VLF for every $1,000 in additional assessed value.

The following chart illustrates the projected allocation of property tax revenues to various taxing jurisdictions during the period for which the Diridon Area will be treated as a tax increment area.



## 4.  City of San Jose Revenue / Cost Analysis (cont'd)



Property Tax Revenue Allocation

Sales Tax

The State of California assesses a 7.25 percent sales tax on goods and services. In addition to the statewide sales tax, the City of San Jose levies an additional sales tax of 1.0 percent and an additional 1.0 percent is levied for the County/VTA Transportation Fund for a total sales tax levy on all consumer goods and services of 9.25 percent.

Ballpark and team related sales taxes generated to the City General Fund are based on taxable sales related to in-facility and out-of-facility spending associated directly with ballpark operations.

Transient Occupancy Tax

The City of San Jose levies a transient occupancy tax for all stays in a hotel.  A portion of the revenue collected from this tax is earmarked to fund the fine arts and cultural programs and to provide a subsidy to the convention and cultural facilities of the City of San Jose.

Estimates for nightly stays associated with baseball games are based on fan intercept surveys previously conducted by CSL at MLB baseball games as well as the anticipated non-local attendance at all ballpark events.



## 4.  City of San Jose Revenue / Cost Analysis (cont'd)

The City's Transient Occupancy Tax rate is currently 10 percent, six percent of which is placed in the Transient Occupancy Tax Fund and four percent of which is deposited in the General Fund.  The calculation in the previous table includes only the four percent allocated to the City's General Fund revenues.

Utility Users' Tax

The utility users' tax is calculated at five percent of utility bills for all telephone, gas, and electric service.  For the Ballpark Development Scenario, the tax is based on five percent of estimated utilities (telephone, electric and gas) for the proposed ballpark.

Business License Tax

The Business License Tax is calculated per employee and based on total business taxes expected to be collected and divided by the number of employees in the City of San Jose. It is estimate that each employee will generate approximately $36.60 per year.

Franchise Fee

The City collects franchise fees for cable television service in the amount of five percent of gross receipts annually; fees for gas and electric are the equivalent of two percent of gross receipts annually.  Additionally, franchise fees are collected for water at a rate of two percent of gross annual receipts.  For the Ballpark Development Scenario, the tax is based on two percent of estimated utilities (water, electric and gas) for the proposed ballpark.

Conveyance Tax Transfer

The City of San Jose collects conveyance tax, of which 64 percent is allocated to the Parks, Recreation and Neighborhood Services Department.  Of this amount, 15 percent may be used for park maintenance activities (or roughly 9.6 percent of the total tax revenue).  Therefore, it is assumed that 9.6 percent of the conveyance tax generated from a new development would be transferred to the City's General Fund.  The City receives $3.30 per $1,000 value of properties that are resold in conveyance tax. For purposes of this analysis it was assumed that there would be no annual turnover related to the Ballpark Development Scenario and no associated conveyance tax revenue.



## 4.  City of San Jose Revenue / Cost Analysis (cont'd)

<u>Construction Tax</u>

A one-time collection is made at the time of construction of any building, or portion thereof, planned or designed for use for business, commercial, or industrial uses, or for any other use other than dwelling unit use.  The construction tax rate is $0.08 per square foot of completed construction.



## 4.  City of San Jose Revenue / Cost Analysis (cont'd)

### General Fund Expenditures

While neither the City nor the Redevelopment Agency will be responsible for the costs to operate ballpark, the development of a new ballpark will likely impact various City services.   The following table summarizes the cost expected to accrue to the City's General Fund as a result of the potential development scenario.  A general description of the method used for this analysis is provided for each cost item.  The remainder of this section describes the methodology and assumptions used for each City General Fund cost item.  The net new fiscal impacts for the City's General Fund have been estimated for the potential  Ballpark  Development  Scenario  under  consideration  as  presented  in  the following table.

<div align="center">

Projection of Annual City General Fund Service Costs
Fiscal and Economic Impact Analysis
Ballpark Development Scenario
City of San Jose, CA
(2009 Dollars)[1]

</div>

|  |  |  | Stabilized Year [2] | 30-Year Net Present Value [3] | 50-Year Net Present Value [3] |
|---|---|---|---|---|---|
| **Service Population** |  |  |  |  |  |
| ballpark employees |  |  | 275 [4] | n/a | n/a |
| daytime service population |  |  | 137 | n/a | n/a |
| **Service Costs** | 2009 Costs | Service Cost Factors |  |  |  |
| General Government [5] | $17.00 [6] | per daytime service population | $2,000 | $50,000 | $69,000 |
| Finance [7] | $3.00 [6] | per daytime service population | 0 | 9,000 | 12,000 |
| Economic Development [8] | $2.00 [6] | per daytime service population | 0 | 6,000 | 8,000 |
| Police [9] | $160,856 [6] | per officer with 1.19 per 1,000 daytime svc. pop'n | 26,000 | 561,000 | 780,000 |
| Fire [10] | $154,421 [6] | per firefighter with 0.64 per 1,000 daytime svc. pop'n | 14,000 | 290,000 | 403,000 |
| Capital Maintenance |  |  |  |  |  |
| General Services | $16.00 [6] | per daytime service population | 2,000 | 47,000 | 65,000 |
| Public Works | $8.00 [6] | per daytime service population | 1,000 | 23,000 | 33,000 |
| Transportation | $14,333 [6] | per road mile | no change | no change | no change |
| Community Service |  |  |  |  |  |
| Library | $10.56 [6] | per resident | no change | no change | no change |
| Parks, Rec. & Neighborhood Services | $15,000 [6] | per acre of park | no change | no change | no change |
| Planning, Building and Code Enforcement | $8.00 [6] | per daytime service population | 1,000 | 23,000 | 33,000 |
| **Game-Day/Event Costs [11]** |  |  | to be paid by MLB team |  |  |
| **Total Annual City General Fund Costs** |  |  | **$46,000** | **$1,009,000** | **$1,403,000** |

*Notes:*
*(1) Presented in 2009 dollars, discounted at 3 percent annually.*
*(2) The year 2038 is presented as a stabilized year of operations.*
*(3) Net present value calculation assumes a discount rate of 5.2 percent.*
*(4) Represents the weighted average of daily employees assuming 200 full-time staff and 600 part-time employees on the assumed 84 event nights. Does not include the jobs estimated to be created as a result of the indirect/induced economic impacts of the project.*
*(5) Includes city attorney, auditor, clerk, manager, mayor, council, emergency services, employee services and information technology.*
*(6) Technical Memorandum "Updated Fiscal and Economic Impact Analysis of Major League Soccer Stadium" by Economic Planning Systems, Inc. (March 2009).*
*(7) Includes independent police auditor.*
*(8) Includes Redevelopment Agency expenses.*
*(9) Includes salary, benefits, uniform, safety equipment, and an overhead cost equivalent to 10 percent of the expenditure per officer.*
*(10) Includes salary, benefits, uniform, safety equipment, and an overhead cost equivalent to 10 percent of the expenditure per firefighter.*
*(11) It is anticipated that game-day/event costs such as the need for extra policing and emergency services will be paid by the MLB team.*



**4. City of San Jose Revenue / Cost Analysis (cont'd)**

As illustrated, under the Ballpark Development Scenario, it is estimated that service costs to the City of San Jose in a stabilized year of operations would be approximately $46,000 in 2009 dollars. The net present value of the anticipated service costs attributable to the Ballpark Development Scenario over a 30-year and 50-year period is estimated to be approximately $1.0 million and $1.4 million, respectively.

For the Ballpark Development Scenario, game-day/event costs for extra policing or emergency services are not included in cost estimates as these will be paid for by the MLB team. Additional costs including City staff regarding normal ongoing management discussions with ballpark administration are also not included in these estimates.

Daytime Service Population

Many of the City related costs were calculated using the daytime service population. Based on the methodology used in similar studies conducted for the City of San Jose, the daytime service population was estimated to be half of the weighted average number of full and part-time ballpark employees. For purposes of this analysis, the weighted average number of full and part-time ballpark employees was estimated to be 275, which implies a daytime service population of 137. It should be noted that the weighted average number of full and part-time ballpark employees is not the same figure as the number of full and part-time jobs created as result of the economic impacts associated with the ballpark presented earlier in this report.

General Government Services

According to the City's Adopted Budget, the City spends approximately $17.00 per daytime service population to provide general government services, which include the services of the City Attorney, Auditor, Clerk, Manager, Mayor, and Council, as well as emergency services, employee services, and information technology.

Finance and Economic Development

Services provided by the Department of Finance and Economic Development include financial management of the City's resources, financial reporting and disbursements. According to the City's Adopted Budget, the City spends approximately $3.00 per daytime service population to provide finance services and approximately $2.00 per daytime service population to provide economic development services.



## 4.  City of San Jose Revenue / Cost Analysis (cont'd)

Police Services

The increased daytime service population generated by a new development will require additional police officers to provide policing and security services.  It is assumed that the City's current service level of roughly 1.19 police officers per 1,000 daytime service population will be applied to each scenario.  For the purposes of this analysis, an annual cost estimate of $146,200 per officer has been assumed.  An additional 10 percent is included to cover administrative costs, for total policing costs per police officer of approximately $161,900.  The police service cost estimates provided in this report do not include game-day/event costs for extra policing as it is anticipated that these will be paid by the MLB team.

Fire Protection Services

The increased daytime service population generated by a new development will require additional firefighters to provide fire protection services.  It is assumed that the City's current service level of roughly 0.64 firefighters per 1,000 daytime service population will be applied to the scenario.  For the purposes of this analysis, an annual cost estimate of $140,400 per firefighter has been assumed.  An additional 10 percent is included to cover administrative costs, for total fire protection costs per firefighter of approximately $154,500.  The fire protection service cost estimates provided in this report do not include game-day/event costs for extra emergency services as it is anticipated that these will be paid by the MLB team.

General Service

The General Service Department provides various types of maintenance services that assist general City operations such as facility management, fleet and equipment services, and parks and civic grounds management.  Associated costs are based on department costs of $16.00 per daytime service population.

Public Works

The Public Works Department plans and designs public facilities, but does not provide any operation or maintenance services.  In cases where private developers design and construct a facility dedicated for public use, the department staff is responsible for reviewing the design and performing building inspection.  Associated costs are based on department costs of approximately $8.00 per daytime service population.



## 4.  City of San Jose Revenue / Cost Analysis (cont'd)

<u>Transportation</u>

The Department of Transportation is responsible for various road maintenance related services, sewer maintenance, parking services, transportation planning and strategic support.  The cost of providing transportation services is estimated to be approximately $15,000 per road mile.  For the purpose of this analysis, it is assumed Department costs will not be increased through either of the development scenarios.  Transportation costs provided in this report do not include game-day/event costs as it is anticipated that these will be paid by the MLB team.

<u>Community Services</u>

The Community Services category includes library services; parks, recreation, and Neighborhood Services; Planning, Building, and Code Enforcement; and other community services.  Environmental services are not estimated because any incremental costs resulting from a new development are assumed to be covered through user fees.  Library services are assumed to have per capita operations and maintenance costs of approximately $10.00 per City resident.  Park costs are assumed to be approximately $14,333 per acre of park.  The planning, building, and code enforcement costs are assumed to cost $8.00 per daytime service population.



## Appendix I   Economic Impacts of Alternative Development

If a new MLB ballpark was not built in San Jose, it is likely that an alternative development would occur on the same site in the Diridon Area at some point.  As such, the purpose of this analysis is to provide an evaluation of the "opportunity cost" if the City decides to pursue the Ballpark Development Scenario.

The most likely alternative use of the proposed ballpark development site would be the development of new office and retail space.  For the purposes of this report, this scenario is referred to as the Alternative Development Scenario.  Under this scenario, it is assumed that approximately four office buildings with approximately 1.0 million square feet of office space and 43,000 square feet of retail space would be developed over a period of approximately 18 years.  It has been assumed that every five years one of the four planned office buildings will become available with construction commencing in 2018.  Full build-out of the Alternative Development Scenario is expected to be completed in the year 2035.  Based on standard industry density ratios, it is assumed that each office building will be able to accommodate approximately one employee per 250 square feet of office space.

It can be argued that the Alternative Development Scenario, as presented, is very optimistic based on the historic absorption of office space in San Jose and the fact that a good portion of the 1.5 million square feet of new office space (Riverpark Towers, Oracle Building) or entitled property (Boston Properties) would need to be absorbed before new construction in the Diridon Area would be feasible.  Moreover, any decision to move forward with an office and retail development would likely wait until all construction related to the high speed rail and BART was complete.

It is assumed the Alternative Development would be located on the parcel of land in the Diridon    Area    illustrated    in    the    diagram    on    the    following    page.



## Appendix I   Economic Impacts of Alternative Development (cont'd)

**Alternative Development Site**



Office Buildings    Parking

Specific assumptions related to the Alternative Development Scenario are presented in the  following table.

**Alternative Development Scenario Assumptions**

| | |
|---|---|
| Construction Start Date | 2018 |
| Construction Completion Date | 2035 |
| Number of Buildings | 4 buildings |
| Office Space | 986,467 sq. feet |
| Retail | 43,333 sq. feet |
| Total Square Footage (1) | 1,029,800 sq. feet |
| | |
| Parking Spaces | 2,086 spaces |
| Parking Spaces per 1000 sq. feet | 2.0 |

*Other Assumptions:*

- Parking Level Floor-to-Floor Heights: 10'-0"
- Retail Level Floor-to-Floor Heights: 20'-0"
- Office Level Floor-to-Floor Heights: 13'-0"
- All buildings include 2 levels of parking below grade.
- Building heights measured from grade to roof deck, not including mechanical penthouses.
- Typical Building Height, excluding mechanical penthouse, is 124'-0" for Phase 1



## Appendix I   Economic Impacts of Alternative Development (cont'd)

As with the proposed Ballpark Development Scenario, the Alternative Development Scenario would provide certain quantifiable benefits to the local and regional economies. The primary economic impact associated with the alternative development would be the disposable spending of each new employee that would reside in the City of San Jose.  For the purpose of this analysis, it has been assumed that 50 percent of the employees are new to the City of San Jose and 50 percent of their spending occurs within the City.

As construction of the Alternative Development Scenario will occur over a 20-year period, the economic impacts presented herein are shown for a stabilized year of operations for the entire development, 2038.  Furthermore, the economic impacts are presented in year 2009 dollars and were discounted at 3.0 percent annually.

The table on the following page summarizes the net new economic impacts to the City associated with the Alternative Development Scenario in a stabilized year of operations (2038), presented in 2009 dollars, and the net present value of those cumulative impacts over a 30-year and 50-year period.



## Appendix I   Economic Impacts of Alternative Development (cont'd)

**Alternative Development Scenario [1]**
**Economic Impact Summary**
**Net New Impacts**
**(2009 Dollars) [2]**

| Category | Stabilized Year [3] | 30-Year Net Present Value [4] | 50-Year Net Present Value [4] |
|---|---|---|---|
| Net New Direct Spending [5] | $71,586,000 | $826,260,000 | $1,421,253,000 |
| Total Output [6] | $104,097,000 | $1,201,511,000 | $2,066,717,000 |
| Earnings | $46,204,000 | $533,268,000 | $917,296,000 |
| Indirect and Induced Jobs [7] | 690 | n/a | n/a |

*Notes:*

*(1) Includes 1.0 million square feet of office space and 43,000 square feet of retail space.  Construction of the alternative development will take place from 2018 to 2035. These impacts are excluded from this table.*

*(2) Presented in 2009 dollars, discounted at 3 percent annually.*

*(3) The year 2038 is presented as a stabilized year of operations.*

*(4) Net present value calculation assumes a discount rate of 5.2 percent.*

*(5) Net new direct spending represents the portion of gross direct spending that is considered to be newly created in the San Jose economy as a result of the alternative development's existence. Assumes 50 percent of all employees in the office space are new to the City and 50 percent of their spending will take place within San Jose.*

*(6) Total net new output includes direct, indirect and induced spending. Net new total output is calculated by applying the appropriate output multipliers to each net new direct spending category. (Indirect spending is created as a result of the re-spending of direct expenditures throughout the local economy. Induced spending consists of the positive changes in spending, employment, earnings and tax collections generated by personal income associated with the operations of the alternative development.)*

*(7) Represents the number of full and part time jobs estimated to be created within San Jose as result of the operations of the alternative development. Total net new jobs are calculated by applying the appropriate employment multipliers to each net new direct spending category.*

As illustrated, the impacts associated with the Alternative Development Scenario during a stabilized year of operations include approximately $71.6 million in direct spending and approximately $104.1 million in total output (direct, indirect and induced spending). These expenditure levels, in turn, are expected to support approximately 690 jobs that could generate approximately $46.2 million in personal earnings during a stabilized year of operations.

Over a 30-year period, the present value of the cumulative net new impacts generated to the City of San Jose include approximately $826.3 million in direct spending generating approximately $1.2 billion in total output and $533.3 million in personal earnings.



**Appendix I   Economic Impacts of Alternative Development (cont'd)**

Over a 50-year period, the present value of the cumulative net new impacts generated to the City of San Jose include approximately $1.4 billion in direct spending generating approximately $2.1 billion in total output and $917.3 million in personal earnings. The following table outlines the estimated number of jobs created as a result of the Alternative Development Scenario.

<div align="center">

**Alternative Development Scenario**
**Employment Summary**
**Average Annual Net New Jobs Created [1]**

</div>

| Job Type | Average Annual Jobs |
|----------|--------------------:|
| Construction Period Jobs | 80 |
| *(During each of the 12 years of construction.)* | |
| Annually Recurring Jobs [2] | 2,663 |
| *(Direct, indirect and induced jobs.)* | |

*Notes:*
*(1) Includes both full and part-time employees.*
*(2) Includes 1,973 net new direct development-specific jobs (50 percent of the anticipated office and retail development-specific employees) and 690 indirect and induced jobs.*

It should be noted that the spending estimates for the Alternative Development Scenario do not include the spending of businesses that would occupy the potential office and retail space. This is because spending levels vary widely based on business types and it is difficult to estimate the amount of business spending that will take place with any reliable accuracy. For example, if the offices are occupied by professional services, the economic impact would be relatively low compared to the impacts if those same offices were occupied by driving industries.

**Construction-Period Economic Impacts**

The economic impact of the construction phase of a project is determined by the volume and nature of construction and other development-related expenditures as well as the region in which they take place.

The economic impacts resulting from the Alternative Development Scenario construction expenditures depend on the nature of the spending and the extent to which the spending takes place locally. For the purposes of this analysis, a construction cost of $300 per square foot (including all associated parking structures), in 2009 dollars, has been assumed for the construction of the office and retail space. This cost per square foot estimate excludes all soft construction costs and the cost of land. It is estimated that approximately 25 percent of labor spending and 20 percent of material spending related to the construction of the development will directly impact the San Jose economy.



## Appendix I   Economic Impacts of Alternative Development (cont'd)

It is anticipated that construction of the Alternative Development Scenario will commence in 2018 and be completed in 2035.  As previously stated, it is envisioned that a total of approximately 1.0 million square feet of office and 43,000 square feet of retail space will be developed.  It has been assumed that the first of the four planned office buildings will be constructed over a three year period starting in 2018 and ending in 2020.  It is assumed that construction of the second office buildings will commence in 2023, two years after the completion of the first.  Similarly, it is anticipated that construction on the third and fourth buildings would start two years after completion of the previous building, with construction of the all four buildings being completed in 2035. As it is assumed that the office and retail space will require some time to attract tenants, it was assumed that the first stabilized year of operations for the Alternative Development Scenario would be 2038, which is the year for which all associated impacts are presented herein.

The annual net new construction spending anticipated to take place in San Jose for the Alternative Development Scenario is presented in the chart below.



**Alternative Development Scenario**
**Net New Direct Construction Spending Occurring in San Jose**

*Note:*

*Assumes each building constructed over three-year periods commencing in 2018 with completion of all 4 office buildings in 2038.*
*The net new construction spending presented above does not represent total construction spending but rather the amount estimated to directly impact the City of San Jose.*

Based on the assumptions for construction costs related to the Alternative Development Scenario, the total direct spending occurring within San Jose was calculated.  The net new economic impacts to the City of San Jose resulting from the anticipated spending levels were estimated by applying multipliers that specifically reflect the unique characteristics of the local construction industry.  These impacts are summarized in the table on the following page.



## Appendix I   Economic Impacts of Alternative Development (cont'd)

**Net New Construction Period Economic Impacts[1]**
**Alternative Development Scenario**
**(2009 Dollars)**

| Category | Net Present Value[2] |
|---|---|
| Net New Direct Spending | $44,000,000 |
| Total Output | $67,102,000 |
| Jobs[3][4] | 80 |
| Earnings | $30,196,000 |
| Tax Revenues | $834,000 |

*Notes:*
*(1) Assumes construction will begin in 2018 and be completed in 2035.*
*(2) Shown in 2009 dollars, discounted at 5.2 percent annually. Represents NPV*
*of construction impacts over the eighteen-year construction period.*
*(3) Represents jobs created during each of the 12 years that construction occurs.*
*(4) Represents the average number of annually recurring full and part time jobs*
*created during the construction period.*

As shown, the net present value of the net new direct spending expected to occur between 2018 and 2035, the period in which construction of the Alternative Development is anticipated to take place, is estimated to be $44.0 million.  This level of direct spending is expected to generate approximately $67.1 million in total output during the construction period.  During the construction period, this level of economic activity is estimated to support 80 annual construction jobs and generate personal earnings of approximately $30.2 million. Furthermore, the net present value of the net new City tax revenues generated during the construction period are estimated to be approximately $834,000. Additional taxes generated during the construction period such as construction tax and conveyance tax are excluded from this discussion, but they are included in a table at the end of this section.

It should be noted that unlike the other economic impact figures presented in this report, the impacts related to the Alternative Development Scenario construction are not measured for the entire 50-year analysis.  Rather, the construction related impacts presented herein represent the total impacts taking place only during the 18-year construction period, which is estimated to last from 2018 through 2035.

**General Fund Revenues & City Costs**

The following tables provide estimates for the annual revenue and cost impacts to the City's General Fund.  All revenue and expenditure forecasts are presented in 2009 dollars for a stabilized year for the Alternative Development Scenario.  In addition, the 30-year and 50-year net present value of the scenario has been provided in full detail.  For the purpose of evaluating the value of the fiscal impact, this analysis considers the program absorption.



## Appendix I   Economic Impacts of Alternative Development (cont'd)

Projection of Annual City General Fund Revenue Impact
Fiscal and Economic Impact Analysis
Alternative Development Scenario
City of San Jose, CA
(2009 Dollars)[1]

| Revenue Source | | | Stabilized Year [2] | 30-Year Net Present Value [3] | 50-Year Net Present Value [3] |
|---|---|---|---|---|---|
| Property Tax [4][5][6][7] | | | $313,000 | $3,903,000 | $6,036,000 |
| Property Tax in Lieu of VLF [8] | | | 133,000 | 1,645,000 | 2,601,000 |
|    Total Property Taxes | | | $446,000 | $5,548,000 | $8,637,000 |
| Sales Tax [9] | | | | | |
|   Office and Retail Development [10] | | 1.0% City share | 358,000 | 4,029,000 | 7,008,000 |
| Transient Occupancy Tax [11] | | 4.00% | 40,200 | 474,000 | 809,000 |
| | | Revenue Factor ($2009) | | | |
| Utility User Tax [12] | applied to daily population | $71.46 [13] | 141,000 | 1,662,000 | 2,833,000 |
| Franchise Tax [12] | applied to daily population | $35.54 [13] | 70,000 | 826,000 | 1,409,000 |
| Business License Tax [12] | applied to daily population | $36.60 [13] | 72,000 | 851,000 | 1,451,000 |
| Conveyance Tax | | | | | |
|   Secured Property Value | | | 232,809,000 | 2,885,797,000 | 4,563,271,000 |
|   Annual Turnover Rate [14] | | | 0 | 0 | 0 |
|   Taxable Amount | | | 11,640,450 | 144,289,850 | 228,163,550 |
|   Tax Rate | | | $3.3 per $1,000 of value [15] | | |
|   General Fund Share [16] | | | 0 | 0 | 0 |
|   Total Conveyance Tax | | | 3,700 | 46,000 | 72,000 |
| Construction Tax [17] | | $0.08 per square foot | 0 | 36,000 | 36,000 |
| Total Annual Revenue Impact to City General Fund | | | $1,131,000 | $13,472,000 | $22,255,000 |

| Other Municipal Property Tax Revenues Generated | Stabilized Year [2] | 30-Year Net Present Value [3] | 50-Year Net Present Value [3] |
|---|---|---|---|
|   Redevelopment Agency - Housing | $481,000 | $6,005,000 | $6,671,000 |
|   Redevelopment Agency - Non-housing | 524,000 | 6,760,000 | 7,469,000 |
|   City GO Bonds | 74,000 | 928,000 | 1,469,000 |
|   County | 549,000 | 7,060,000 | 10,277,000 |
|   Santa Clara Valley Water District | 18,000 | 203,000 | 581,000 |
|   Bay Area Air Quality Management District | 2,000 | 18,000 | 47,000 |
|   San Jose Unified School District | 426,000 | 5,112,000 | 6,955,000 |
|   San Jose-Evergreen Community College | 59,000 | 714,000 | 975,000 |
|   County Office of Education | 85,000 | 1,043,000 | 1,609,000 |
|   ERAF & Offsets to State Funding for Schools | 191,000 | 2,207,000 | 11,647,000 |
|   Total Property Tax Revenues [22] | $2,409,000 | $30,050,000 | $47,700,000 |

Notes:
(1) Presented in 2009 dollars, discounted at 3 percent annually.
(2) The year 2038 is presented as a stabilized year of operations.
(3) Net present value calculation assumes a discount rate of 5.2 percent.
(4) Property tax rates based on currently projected tax rates obtained from the City of San Jose and the County of Santa Clara.
(5) Allocation of property taxes has been adjusted to reflect the tax increment revenue distribution anticipated in the Diridon Project Area from 2009 to 2048.
(6) In 2048 the Diridon Project Area will cease to collect tax increment.  Therefore, current property tax rates are applied in years 2048 through 2063.
(7) Property tax assessment is based on construction costs of $300 per square foot.  This assessed value excludes soft construction costs and land.
(8) Property tax in lieu of Vehicle License Fees is assessed at a rate of $0.57 per $1,000 of assessed property value.
(9) 1.0 percent City of San Jose Sales Tax levied on goods and services.
(10) Net new sales taxes generated as a result of office and retail operations.
(11) Based on 10 percent transient occupancy tax of which 6 percent is allocated to the TOT Fund and 4 percent of which is allocated to the City's General Fund.
(12) service population.
(13) Technical Memorandum "Updated Fiscal and Economic Impact Analysis of Major League Soccer Stadium" by Economic Planning Systems (March 2009).
(14) Based on City of San Jose estimate.
(15) The City receives $3.30 per $1,000 value of properties that are resold in conveyance tax.
(16) Currently, 9.6 percent of the City's conveyance tax revenue can be used for parks operations and maintenance purposes.
(17) construction.
(18) Excludes tax increment revenues allocated to the City General Fund.



## Appendix I   Economic Impacts of Alternative Development (cont'd)

**Projection of Annual City General Fund Service Costs**
**Fiscal and Economic Impact Analysis**
**Alternative Development Scenario**
**City of San Jose, CA**
**(2009 Dollars)[1]**

| | | | Stabilized Year [2] | 30-Year Net Present Value [3] | 50-Year Net Present Value [3] |
|---|---|---|---|---|---|
| **Service Population** | | | | | |
| office and retail employees | | | 3,946 | n/a | n/a |
| daytime service population | | | 1,973 | n/a | n/a |
| **Service Costs** | 2009 Costs | Service Cost Factors | | | |
| General Government [5] | $17.00 [6] | per daytime service population | $34,000 | $395,000 | $674,000 |
| Finance [7] | $3.00 [6] | per daytime service population | 6,000 | 70,000 | 119,000 |
| Economic Development [8] | $2.00 [6] | per daytime service population | 4,000 | 47,000 | 79,000 |
| Police [9] | $160,856 [6] | per officer with 1.19 per 1,000 daytime svc. pop'n | 378,000 | 4,451,000 | 7,590,000 |
| Fire [10] | $154,421 [6] | per firefighter with 0.64 per 1,000 daytime svc. pop'n | 195,000 | 2,298,000 | 3,919,000 |
| Capital Maintenance | | | | | |
| General Services | $16.00 [6] | per daytime service population | 32,000 | 360,000 | 636,000 |
| Public Works | $8.00 [6] | per daytime service population | 16,000 | 179,000 | 332,000 |
| Transportation | $14,333 [6] | per road mile | no change | no change | no change |
| Community Service | | | | | |
| Library | $10.56 [6] | per resident | no change | no change | no change |
| Parks, Rec. & Neighborhood Services | $15,000 [6] | per acre of park | no change | no change | no change |
| Planning, Building and Code Enforcement | $8.00 [6] | per daytime service population | 16,000 | 186,000 | 317,000 |
| **Total Annual City General Fund Costs** | | | **$681,000** | **$7,986,000** | **$13,666,000** |

Notes:
(1) Presented in 2009 dollars, discounted at 3 percent annually.
(2) The year 2038 is presented as a stabilized year of operations.
(3) Net present value calculation assumes a discount rate of 5.2 percent.
(4) Represents the weighted average of daily employees assuming 200 full-time staff and 600 part-time employees on the assumed 84 event nights.
(5) Includes city attorney, auditor, clerk, manager, mayor, council, emergency services, employee services and information technology.
(6) Technical Memorandum "Updated Fiscal and Economic Impact Analysis of Major League Soccer Stadium" by Economic Panning Systems, Inc. (March 2009).
(7) Includes independent police auditor.
(8) Includes Redevelopment Agency expenses.
(9) Includes salary, benefits, uniform, safety equipment, and an overhead cost equivalent to 10 percent of the expenditure per officer.
(10) Includes salary, benefits, uniforms, safety equipment, and an overhead cost equivalent to 10 percent of the expenditure per firefighter.



## Appendix II   Major League Baseball Overview

The purpose of this section is to provide a general overview of Major League Baseball ("MLB").  The information presented in this section is divided into the following areas:

- League Overview;
- Fan Demographics;
- MLB Attendance;
- MLB Ballpark Development;
- MLB Ticket Prices;
- MLB Premium Seating;
- Media and Sponsorships;
- Franchise Valuations;
- Player Salaries; and,
- Review of Recently Planned/Built Ballparks.

### League Overview

MLB has 30 teams that each play 162 games per year, divided between a 16-team National League and 14-team American League.  Each league has three geographical divisions.  Despite the two league structure, MLB operates as a single major professional sports league under the office of the Commissioner of Baseball.

MLB's current league structure has been in place since 1998 when expansion teams began play in Arizona and Tampa.  A divisional realignment was completed prior to the 1998 season to accommodate the new franchises and to align teams within similar time zones, potentially increasing regional rivalries, fan interest and the attractiveness of broadcasting rights.  MLB's current divisional alignment is summarized below.

**Major League Baseball Division Alignment**

| American League | | |
|---|---|---|
| East | Central | West |
| Baltimore Orioles | Chicago White Sox | LA Angels of Anaheim |
| Boston Red Sox | Cleveland Indians | Oakland Athletics |
| New York Yankees | Detroit Tigers | Seattle Mariners |
| Tampa Bay Rays | Kansas City Royals | Texas Rangers |
| Toronto Blue Jays | Minnesota Twins | |

| National League | | |
|---|---|---|
| East | Central | West |
| Atlanta Braves | Chicago Cubs | Arizona Diamondbacks |
| Florida Marlins | Cincinnati Reds | Colorado Rockies |
| New York Mets | Houston Astros | Los Angeles Dodgers |
| Philadelphia Phillies | Milwaukee Brewers | San Diego Padres |
| Washington Nationals | Pittsburgh Pirates | San Francisco Giants |
| | St. Louis Cardinals | |



## Appendix II   Major League Baseball Overview (cont'd)

According to the Collective Bargaining Agreement that expires in 2011, MLB teams pay 31 percent of their locally-generated revenues into a sharing fund each season.  These funds are then evenly distributed among the 30 teams.  Teams in larger markets such as New York or Chicago will typically contribute more to the revenue sharing fund than teams in Kansas City or Cincinnati, for example.  The MLB also distributes a portion of their Central Fund among the 30 teams with teams having the lowest local revenue getting a larger proportion of the funds distributed.  The Central Fund is comprised of revenues generated via sources such as national TV contracts and MLB website revenue.

In addition, Major League Baseball utilizes a luxury tax system to share revenue between the teams, wherein a team must pay a tax on the portion of their payroll that exceeds a pre-set limit.  For example, in the 2008 season the New York Yankees paid $26.9 million in luxury taxes for exceeding the payroll threshold of the luxury tax in 2008.  The payroll threshold for the 2009 season is set at $162 million and will increase to $170 million for the 2010 and 2011 seasons.  Luxury tax funds are distributed on a sliding scale with teams having the lowest payrolls receiving a higher proportion of the funds.

### Fan Demographics

Major League Baseball appeals to a broad fan base that reaches across numerous demographic categories.  In the table on the following page, MLB fans are indexed by level of interest, using gender, age and race as criteria for segmentation.



## Appendix II   Major League Baseball Overview (cont'd)

**Major League Baseball Fan Demographics**

| | | Level of Interest in MLB | | |
| | | **Very** | **Somewhat** | **Slightly** |
|---|---|---|---|---|
| **Gender** | | | | |
| **Men** | % of U.S. Adults* | 21% | 42% | 61% |
| | % of MLB Fans^ | 65% | 61% | 57% |
| **Women** | % of U.S. Adults | 10% | 26% | 43% |
| | % of MLB Fans | 35% | 39% | 43% |
| **Age** | | | | |
| **18-24** | % of U.S. Adults | 13% | 29% | 48% |
| | % of MLB Fans | 11% | 11% | 12% |
| **25-34** | % of U.S. Adults | 15% | 32% | 51% |
| | % of MLB Fans | 17% | 17% | 18% |
| **35-44** | % of U.S. Adults | 15% | 34% | 54% |
| | % of MLB Fans | 19% | 19% | 20% |
| **45-54** | % of U.S. Adults | 17% | 37% | 55% |
| | % of MLB Fans | 21% | 21% | 21% |
| **55-64** | % of U.S. Adults | 16% | 35% | 53% |
| | % of MLB Fans | 15% | 15% | 15% |
| **65+** | % of U.S. Adults | 16% | 34% | 48% |
| | % of MLB Fans | 18% | 17% | 16% |

* Percent of US residents in that demographic category who identify as an MLB fan.

^ Percent of self-identified MLB fans who are members of that demographic category.

Source: Sports Business Resource Guide & Fact Book 2009.

As illustrated above, approximately 61 percent of U.S. adult males and 43 percent of U.S. adult females identify themselves as at least slightly interested in MLB.  Of those fans that identify themselves as very interested in Major League Baseball, approximately 65 percent are male versus 35 percent female.

Adults of all ages identify themselves as MLB fans, with all of the age categories in the table having at least 48 percent of their members as slightly interested in MLB.  Of those fans that identify themselves as very interested in MLB, a high of 21 percent are aged 45 to 54, versus a low of 12 percent who are aged 18 to 24.



## Appendix II   Major League Baseball Overview (cont'd)

**MLB Attendance**

Attendance patterns vary significantly across Major League Baseball franchises.  The following table presents MLB attendance statistics from the 2008 season, sorted by average attendance per game.

**2008 Major League Baseball Attendance**

| Team | Total Attendance | Average Attendance | Attendance Rank | Seating Capacity | Percent of Capacity |
|---|---|---|---|---|---|
| New York Yankees | 4,298,655 | 53,069 | 1 | 56,936 [(1)] | 93% |
| New York Mets | 4,042,047 | 51,165 | 2 | 57,333 [(2)] | 89% |
| Los Angeles Dodgers | 3,730,553 | 46,056 | 3 | 56,000 | 82% |
| St. Louis Cardinals | 3,430,660 | 42,353 | 4 | 46,900 | 90% |
| Philadelphia Phillies | 3,422,583 | 42,254 | 5 | 43,000 | 98% |
| Los Angeles Angels | 3,336,744 | 41,194 | 6 | 45,050 | 91% |
| Chicago Cubs | 3,300,200 | 40,743 | 7 | 41,118 | 99% |
| Detroit Tigers | 3,202,645 | 39,538 | 8 | 40,000 | 99% |
| Milwaukee Brewers | 3,068,458 | 37,882 | 9 | 42,500 | 89% |
| Boston Red Sox | 3,048,250 | 37,632 | 10 | 37,400 | 101% |
| San Francisco Giants | 2,863,837 | 35,356 | 11 | 41,503 | 85% |
| Houston Astros | 2,779,287 | 34,741 | 12 | 42,000 | 83% |
| Colorado Rockies | 2,650,218 | 33,127 | 13 | 50,200 | 66% |
| Atlanta Braves | 2,532,834 | 31,269 | 14 | 49,000 | 64% |
| Arizona Diamondbacks | 2,509,924 | 30,986 | 15 | 48,500 | 64% |
| Chicago White Sox | 2,501,103 | 30,877 | 16 | 40,615 | 76% |
| San Diego Padres | 2,427,535 | 29,969 | 17 | 42,000 | 71% |
| Toronto Blue Jays | 2,399,786 | 29,626 | 18 | 49,539 | 60% |
| Washington Nationals | 2,320,400 | 29,005 | 19 | 41,888 | 69% |
| Seattle Mariners | 2,329,702 | 28,761 | 20 | 47,000 | 61% |
| Minnesota Twins | 2,302,431 | 28,425 | 21 | 46,564 [(3)] | 61% |
| Cleveland Indians | 2,169,760 | 27,122 | 22 | 42,865 | 63% |
| Cincinnati Reds | 2,058,632 | 25,415 | 23 | 45,000 | 56% |
| Baltimore Orioles | 1,950,075 | 25,000 | 24 | 48,262 | 52% |
| Texas Rangers | 1,945,677 | 24,320 | 25 | 49,178 | 49% |
| Tampa Bay Rays | 1,780,791 | 22,259 | 26 | 36,973 | 60% |
| Oakland Athletics | 1,665,256 | 20,558 | 27 | 35,067 | 59% |
| Pittsburgh Pirates | 1,609,076 | 20,113 | 28 | 38,000 | 53% |
| Kansas City Royals | 1,578,922 | 19,986 | 29 | 40,625 | 49% |
| Florida Marlins | 1,335,075 | 16,688 | 30 | 38,560 [(4)] | 43% |
| **Average** | **2,619,704** | **32,516** | | **44,653** | **73%** |

(1) Capacity is representative of old Yankee Stadium.
(2) Capacity is representative of Shea Stadium.
(3) Capacity is representative of Hubert H. Humphrey Metrodome.
(4) Capacity is representative of Dolphin Stadium.
Note: Sorted by average attendance.
Source: Major League Baseball.

As shown above, MLB franchises averaged approximately 2.6 million fans over the course of the 2008 season.  Per-game attendance ranged from a low of approximately 17,000 for the Florida Marlins to a high of approximately 53,000 for the New York Yankees.  Average attendance as a percentage of total seating capacity ranged from a low of 43 percent for the Florida Marlins to a high of 101 percent for the Boston Red Sox (due to the sale of "standing room" tickets).



## Appendix II   Major League Baseball Overview (cont'd)

Attendance for MLB franchises often fluctuates from year to year.  The following table details average attendance for each franchise over each of the past five seasons, sorted by five-year average.

**Average Major League Baseball Attendance: 2004 to 2008**

| Team | 2004 | 2005 | 2006 | 2007 | 2008 | 5-year Average |
|---|---|---|---|---|---|---|
| New York Yankees | 47,788 | 50,502 | 52,392 | 52,279 | 53,069 | 51,206 |
| Los Angeles Dodgers | 43,065 | 44,489 | 46,401 | 47,617 | 46,056 | 45,526 |
| St. Louis Cardinals | 37,634 | 43,691 | 42,588 | 43,854 | 42,353 | 42,024 |
| Los Angeles Angels | 41,675 | 42,033 | 42,059 | 41,551 | 41,194 | 41,702 |
| New York Mets | 28,979 | 35,374 | 43,327 | 47,579 | 51,165 | 41,285 |
| Chicago Cubs | 39,138 | 38,749 | 39,040 | 40,153 | 40,743 | 39,565 |
| San Francisco Giants | 40,208 | 39,271 | 38,639 | 39,792 | 35,356 | 38,653 |
| Philadelphia Phillies | 40,626 | 33,316 | 34,200 | 38,374 | 42,254 | 37,754 |
| Houston Astros | 38,121 | 34,626 | 37,318 | 37,288 | 34,741 | 36,419 |
| Boston Red Sox | 35,028 | 35,159 | 36,189 | 36,679 | 37,632 | 36,137 |
| San Diego Padres | 37,243 | 35,429 | 32,836 | 34,445 | 29,969 | 33,984 |
| Seattle Mariners | 36,305 | 33,648 | 30,634 | 32,993 | 28,761 | 32,468 |
| Detroit Tigers | 23,962 | 25,306 | 32,048 | 37,619 | 39,538 | 31,695 |
| Atlanta Braves | 29,399 | 31,514 | 31,881 | 33,891 | 31,269 | 31,591 |
| Milwaukee Brewers | 25,461 | 27,296 | 28,835 | 35,421 | 37,882 | 30,979 |
| Chicago White Sox | 24,437 | 28,923 | 36,511 | 33,140 | 30,877 | 30,778 |
| Texas Rangers | 31,818 | 31,565 | 29,490 | 29,795 | 24,320 | 29,398 |
| Baltimore Orioles | 34,344 | 32,404 | 26,581 | 27,060 | 25,000 | 29,078 |
| Arizona Diamondbacks | 31,105 | 25,416 | 25,829 | 28,708 | 30,986 | 28,409 |
| Washington Nationals | n/a | 33,728 | 26,580 | 24,217 | 29,005 | 28,383 |
| Colorado Rockies | 29,595 | 23,929 | 25,979 | 28,978 | 33,127 | 28,322 |
| Toronto Blue Jays | 23,457 | 24,876 | 28,422 | 29,143 | 29,626 | 27,105 |
| Minnesota Twins | 23,597 | 25,114 | 28,210 | 28,349 | 28,425 | 26,739 |
| Cincinnati Reds | 28,237 | 23,988 | 26,353 | 25,414 | 25,415 | 25,881 |
| Cleveland Indians | 22,400 | 24,861 | 24,666 | 28,448 | 27,122 | 25,499 |
| Oakland Athletics | 27,179 | 26,038 | 24,402 | 23,276 | 20,558 | 24,291 |
| Pittsburgh Pirates | 21,107 | 23,003 | 23,269 | 22,141 | 20,113 | 21,927 |
| Kansas City Royals | 21,031 | 17,356 | 17,157 | 19,961 | 19,986 | 19,098 |
| Florida Marlins | 16,139 | 22,871 | 14,372 | 16,919 | 16,688 | 17,398 |
| Tampa Bay Rays | 16,139 | 14,232 | 16,925 | 17,130 | 22,259 | 17,337 |
| Montreal Expos* | 9,356 | - | - | - | - | - |
| **Average** | **30,152** | **30,957** | **31,438** | **32,740** | **32,516** | **31,688** |

\* Relocated to Washington after the 2004 season.

Note: Sorted by five-year average.

Source: Major League Baseball.

As depicted above, MLB teams have drawn an average of nearly 31,700 fans per game over the past five seasons, with a high of approximately 51,200 for the New York Yankees and a low of approximately 17,300 for the Tampa Bay Rays.



## Appendix II   Major League Baseball Overview (cont'd)

**MLB Ballpark Development**

Due to the current economic structure of MLB, the ability of a franchise to generate revenues locally, from local media agreements as well as ballpark revenues, plays a significant role in the financial viability of a franchise. Facility-generated revenues such as ticket sales, premium seating, naming rights, sponsorships and other such revenues typically comprise the largest portion of a team's revenues. In order to maximize franchise revenues, many teams have worked toward the development of new ballparks.

<u>MLB Ballpark Summary</u>

It is widely considered that the modern era of ballpark development began in 1992 with the opening of Oriole Park at Camden Yards.  The table on the following page provides a breakdown of MLB ballpark development, including facilities built or renovated since 1992, ballparks currently under development and teams with no announced development plans.



## Appendix II   Major League Baseball Overview (cont'd)

**MLB Ballpark Summary**

| Team | Stadium | Construction | Roof Type | Year Opened | Capacity | Other Tenants |
|---|---|---|---|---|---|---|
| **Facilities Built Since 1992** | | | | | | |
| **Number of Teams** 19 | | | | | | |
| **Percentage of Teams** 63% | | | | | | |
| New York Yankees | Yankee Stadium *(new)* | New | Open-air | 2009 | 51,000 | none |
| New York Mets | Citi Field | New | Open-air | 2009 | 42,500 | none |
| Washington Nationals | Nationals Park | New | Open-air | 2008 | 41,888 | none |
| St. Louis Cardinals | Busch Stadium | New | Open-air | 2006 | 46,900 | none |
| San Diego Padres | Petco Park | New | Open-air | 2004 | 42,000 | none |
| Philadelphia Phillies | Citizens Bank Park | New | Open-air | 2004 | 43,000 | none |
| Cincinnati Reds | Great American Ballpark | New | Open-air | 2003 | 45,000 | none |
| Milwaukee Brewers | Miller Park | New | Retractable | 2001 | 42,500 | none |
| Pittsburgh Pirates | PNC Park | New | Open-air | 2001 | 38,000 | none |
| Detroit Tigers | Comerica Park | New | Open-air | 2000 | 40,000 | none |
| Houston Astros | Minute Maid Park | New | Retractable | 2000 | 42,000 | none |
| San Francisco Giants | AT&T Park | New | Open-air | 2000 | 41,503 | none |
| Seattle Mariners | Safeco Field | New | Retractable | 1999 | 47,000 | none |
| Arizona Diamondbacks | Chase Field | New | Retractable | 1998 | 48,500 | none |
| Atlanta Braves | Turner Field | New | Open-air | 1997 | 49,000 | none |
| Colorado Rockies | Coors Field | New | Open-air | 1995 | 50,200 | none |
| Cleveland Indians | Progressive Field | New | Open-air | 1994 | 42,865 | none |
| Texas Rangers | Rangers Ballpark in Arlington | New | Open-air | 1994 | 49,178 | none |
| Baltimore Orioles | Oriole Park at Camden Yards | New | Open-air | 1992 | 48,262 | none |
| **Facilities Renovated Since 1992** | | | | | | |
| **Number of Teams** 7 | | | | | | |
| **Percentage of Teams** 23% | | | | | | |
| Kansas City Royals | Kauffman Stadium | Renovated | Open-air | 2009 | 40,625 | none |
| Tampa Bay Rays | Tropicana Field | Renovated | Dome | 2006-2007 | 36,973 | none |
| Toronto Blue Jays | Rogers Centre | Renovated | Retractable | 2006 | 49,539 | CFL, CIS, NCAA [1] |
| Los Angeles Dodgers | Dodger Stadium | Renovated | Open-air | 2005 | 56,000 | none |
| Boston Red Sox | Fenway Park | Renovated | Open-air | 2003-2009 | 37,400 | none |
| Chicago White Sox | US Cellular Field | Renovated | Open-air | 2001-2009 | 40,615 | none |
| Los Angeles Angels | Angel Stadium of Anaheim | Renovated | Open-air | 1997 | 45,050 | none |
| **Facilities Planned/Under Construction** | | | | | | |
| **Number of Teams** 2 | | | | | | |
| **Percentage of Teams** 7% | | | | | | |
| Florida Marlins | New Marlins Ballpark | New | Retractable | 2012 | 37,000 | none |
| Minnesota Twins | Target Field | New | Open-air | 2010 | 40,000 | none |
| **Teams with No Announced Plans** | | | | | | |
| **Number of Teams** 2 | | | | | | |
| **Percentage of Teams** 7% | | | | | | |
| Oakland Athletics | Oakland-Alameda County Coliseum | | Open-air | 1966 | 35,067* | NFL [2] |
| Chicago Cubs | Wrigley Field | | Open-air | 1914 | 41,118 | none |

(1) Other tenants include the Canadian Football League's Toronto Argonauts, the Canadian Interuniversity Sport's Vanier Cup and the NCAA International Bowl.
(2) Other tenant includes the NFL's Oakland Raiders.
* The majority of the upper deck is closed for baseball games. NFL football capacity is 63,026.
Note: Sorted by year.

Of the 30 MLB franchises, 26 teams (approximately 86 percent) are currently playing in ballparks that have been opened or significantly renovated since 1992. Two franchises have new ballparks currently under construction, which would leave the Oakland Athletics and Chicago Cubs as the only two franchises whose ballparks have not been built or significantly updated in the modern era of ballpark development. Additionally, when the new ballparks for the Minnesota Twins and Florida Marlins open in 2010 and 2012 respectively, the Toronto Blue Jays and Oakland Athletics would be the only remaining MLB franchises that do not play in baseball-only ballparks. The Tampa Bay Rays have also developed plans to replace Tropicana Field with a new ballpark, however the project has been delayed indefinitely due to a lack of a viable site or public financing support.



## Appendix II   Major League Baseball Overview (cont'd)

MLB Ballpark Financing

Financing for MLB ballpark development has typically involved both private and public sources.  The following table summarizes construction costs for each ballpark opened since 1992, with a breakdown of the percentage public and private funding for each facility.

MLB Ballpark Development Cost Summary

| Stadium | Team | Opening Year | Original Cost (millions) | Adjusted[1] Cost | Financing Participation Dollars[2] | |
|---|---|---|---|---|---|---|
| | | | | | Public | Private |
| Yankee Stadium | New York Yankees | 2009 | $1,358.2 | $1,368.6 | $1,055.7 | $299.5 |
| Safeco Field | Seattle Mariners | 1999 | $511.0 | 1079.3 | $372.0 | $139.0 |
| Chase Field | Arizona Diamondbacks | 1998 | $354.6 | 958.3 | $238.0 | $116.6 |
| Citi Field | New York Mets | 2009 | $932.5 | 939.7 | $177.2 | $755.3 |
| Nationals Park | Washington Nationals | 2008 | $692.8 | 833.0 | $661.8 | $31.0 |
| Minute Maid Park | Houston Astros | 2000 | $299.0 | 829.3 | $220.0 | $79.0 |
| Busch Stadium | St. Louis Cardinals | 2006 | $388.0 | 802.1 | $89.2 | $298.8 |
| Target Field | Minnesota Twins | 2010 | $559.4 | 785.5 | $392.0 | $167.4 |
| Great American Ballpark | Cincinnati Reds | 2003 | $296.7 | 765.7 | $266.7 | $30.0 |
| Turner Field [3] | Atlanta Braves | 1997 | $260.0 | 761.9 | $209.0 | $51.0 |
| Petco Park | San Diego Padres | 2004 | $449.4 | 756.2 | $386.5 | $62.9 |
| Progressive Field | Cleveland Indians | 1994 | $230.0 | 745.0 | $160.0 | $70.0 |
| Miller Park [4] | Milwaukee Brewers | 2001 | $295.0 | 712.6 | $248.0 | $47.0 |
| New Marlins Ballpark | Florida Marlins | 2012 | $515.0 | 697.0 | $360.5 | $154.5 |
| Coors Field | Colorado Rockies | 1995 | $231.0 | 671.4 | $190.0 | $41.0 |
| Rangers Ballpark in Arlington | Texas Rangers | 1994 | $191.5 | 654.5 | $143.5 | $48.0 |
| Comerica Park | Detroit Tigers | 2000 | $260.0 | 649.6 | $115.0 | $145.0 |
| Oriole Park at Camden Yards | Baltimore Orioles | 1992 | $234.0 | 632.6 | $210.6 | $23.4 |
| Citizens Bank Park | Philadelphia Phillies | 2004 | $346.0 | 629.9 | $195.8 | $150.2 |
| PNC Park | Pittsburgh Pirates | 2001 | $228.6 | 599.6 | $188.6 | $40.0 |
| AT&T Park | San Francisco Giants | 2001 | $290.0 | 421.1 | $15.0 | $275.0 |
| **Average** | | **2002** | **$424.9** | **$775.8** | **$280.7** | **$144.0** |
| **Average (Excl. Yankee Stadium)** | | **2001** | **$378.2** | **$746.2** | **$242.0** | **$136.3** |

(1) Original cost adjusted to 2009 dollars via the Turner Construction Cost Index.  Projected cost of stadiums opening after 2009 have not been adjusted due to lack of future indices.

Costs were then normalized and adjusted using the ACCRA Cost of Living Index and are presented in San Jose dollars.

(2) Dollars shown represent proportions as it relates to original cost.

(3) Public cost allocation represents the contribution of the Atlanta Committee of the Olympic Games.

(4) Private sector contribution adjusted to reflect annual operating subsidy received by Brewers.

Note: Sorted by adjusted cost.

Source: Municipal authorities, facility management, public records, and industry publications.  Amounts have not been audited or otherwise verified.

In order to provide a comparative analysis of the development costs, the original ballpark construction costs were adjusted using construction cost indices and then normalized and adjusted to San Jose dollars using the ACCRA cost of living index.  On average, the adjusted construction cost of new ballparks since 1992 has been approximately $746 million in 2009 San Jose dollars (excluding Yankee Stadium).  Adjusted ballpark construction costs have ranged from a high of approximately $1.4 billion for Yankee Stadium to a low of $421.1 million for AT&T Park.



## Appendix II   Major League Baseball Overview (cont'd)

The following chart illustrates the public/private contribution ratios for stadium funding for each of the MLB stadiums.



**MLB Stadium Funding Sources Ratio**

Source: Municipal authorities, facility management, public records, and industry publications.
Amounts have not been audited or otherwise verified.

As shown above, public funding was a major contributor to MLB stadium financing.  On average, 67 percent of funding for MLB stadiums came from public sources.  Approximately 33 percent of funding was provided by private sources.



## Appendix II   Major League Baseball Overview (cont'd)

Impact of New MLB Ballparks on Attendance

The development of a new ballpark can have a significant impact on a franchise's attendance. The following table summarizes the changes in average per-game attendance that has resulted from the development of new MLB ballparks since 1992.

**Impact of New MLB Ballparks on Attendance**

| Team | New Stadium | Year Open | Prior Year Attendance | First Year Attendance | First-Year Change | Fifth Year Attendance | Fifth-Year Change |
|---|---|---|---|---|---|---|---|
| Cleveland Indians | Progressive Field | 1994 | 26,888 | 39,121 | 45% | 42,806 | 59% |
| San Francisco Giants | AT&T Park | 2000 | 25,659 | 40,973 | 60% | 40,307 | 57% |
| Philadelphia Phillies | Citizens Bank Park | 2004 | 28,973 | 40,626 | 40% | 42,254 | 46% |
| Baltimore Orioles | Oriole Park at Camden Yards | 1992 | 31,515 | 44,047 | 40% | 44,475 | 41% |
| Milwaukee Brewers | Miller Park | 2001 | 19,427 | 34,704 | 79% | 27,296 | 41% |
| Seattle Mariners | Safeco Field | 1999 | 32,735 | 36,004 | 10% | 43,740 | 34% |
| Texas Rangers | Rangers Ballpark in Arlington | 1994 | 27,711 | 39,733 | 43% | 36,141 | 30% |
| San Diego Padres | Petco Park | 2004 | 25,024 | 37,243 | 49% | 29,969 | 20% |
| Cincinnati Reds | Great American Ballpark | 2003 | 23,199 | 29,077 | 25% | 25,414 | 10% |
| Pittsburgh Pirates | PNC Park | 2001 | 21,591 | 30,430 | 41% | 22,435 | 4% |
| Atlanta Braves | Turner Field | 1997 | 35,818 | 42,771 | 19% | 34,858 | -3% |
| Detroit Tigers | Comerica Park | 2000 | 25,018 | 30,106 | 20% | 23,667 | -5% |
| Houston Astros | Minute Maid Park | 2000 | 33,000 | 37,730 | 14% | 30,299 | -8% |
| Washington Nationals | Nationals Park | 2008 | 24,217 | 29,005 | 20% | n/a | n/a |
| St. Louis Cardinals | Busch Stadium | 2006 | 43,691 | 42,588 | -3% | n/a | n/a |
| **Average** | | **2000** | **28,298** | **36,944** | **34%** | **34,128** | **25%** |

Note: 1.  Citi Field (2009) and Yankee Stadium (2009) have been excluded as the New York Mets and New York Yankees have yet to complete a full season in their new ballparks.
2.  Coors Field (1995) and Chase Field (1998) have been excluded as the Colorado Rockies and Arizona Diamondbacks were expansion franchises.
3.  Sorted by fifth-year change.
4.  Excludes Yankee Stadium (2009), Citi Field (2009), Target Field (2010) and new Marlins ballpark (2012).
Source: Major League Baseball.

As shown in the table above, 14 of the 15 new MLB ballparks listed above experienced an attendance increase in their first year of operations. On average, first-year ballparks experienced a 34 percent increase in per-game attendance. On a 5-year basis, just three ballparks have experienced a decrease in average per-game attendance. The average fifth-year attendance increase associated with new ballparks is 25 percent. The higher attendance figures of the first year relative to the fifth year can be attributed to the honeymoon period in which new ballparks experience increased attendance from people who would not normally attend games.

## MLB Ticket Prices

Ticket prices vary greatly among the various MLB ballparks. The price range offered by each franchise is dependent on a variety of factors, including specific market characteristics as well as the inclusion or exclusion of seat licenses for specific seating areas. The table on the following page presents the range of ticket prices for each MLB franchise, including individual game tickets and season ticket packages. It should be noted that the prices shown do not include premium seating ticket prices.



## Appendix II   Major League Baseball Overview (cont'd)

**Major League Baseball Ticket Prices**

| Team | Average Per-Game Ticket Price | Single-Game Low | Single-Game High | Season Tickets Low | Season Tickets High |
|------|------|------|------|------|------|
| Boston Red Sox | $48.80 | $12 | $325 | $1,710 | $7,290 |
| Chicago Cubs | $42.49 | $16 | $70 | $240 | $2,790 |
| New York Mets [3] | $36.58 | $11 | $105 | $1,109 | $13,095 |
| New York Yankees [4] | $34.05 | $12 | $400 | $972 | $26,325 |
| Chicago White Sox | $30.28 | $17 | $51 | $1,134 | $3,726 |
| Los Angeles Dodgers | $29.66 | $6 | $75 | $486 | $4,050 |
| St. Louis Cardinals | $29.32 | $13 | $90 | $972 | $3,240 |
| Oakland Athletics | $29.20 | $9 | $48 | $584 | $3,280 |
| Houston Astros | $28.73 | $7 | $52 | $913 | $4,233 |
| Toronto Blue Jays | $28.37 | $9 | $60 | $636 | $4,293 |
| Philadelphia Phillies | $28.14 | $16 | $60 | $1,458 | $4,860 |
| San Diego Padres | $27.43 | $10 | $65 | $972 | $3,240 |
| Cleveland Indians | $25.72 | $8 | $75 | $567 | $4,455 |
| Seattle Mariners | $25.29 | $7 | $55 | $1,053 | $3,240 |
| Detroit Tigers | $25.28 | $5 | $65 | $405 | $4,860 |
| Washington Nationals | $25.00 | $7 | $105 | $810 | $4,050 |
| Baltimore Orioles | $23.85 | $8 | $45 | $729 | $3,645 |
| San Francisco Giants | $22.06 | $20 | $105 | $840 | $2,772 |
| Los Angeles Angels | $20.78 | $12 | $150 | $656 | $2,200 |
| Minnesota Twins [2] | $20.68 | $7 | $50 | $250 | $3,402 |
| Milwaukee Brewers | $19.88 | $14 | $48 | $729 | $5,022 |
| Colorado Rockies | $19.50 | $6 | $49 | $648 | $2,835 |
| Cincinnati Reds | $19.41 | $7 | $77 | $592 | $4,257 |
| Florida Marlins [1] | $18.69 | $12 | $93 | $547 | $4,994 |
| Texas Rangers | $18.01 | $15 | $109 | $405 | $8,100 |
| Kansas City Royals | $17.54 | $9 | $240 | $567 | $2,754 |
| Tampa Bay Rays | $17.23 | $6 | $75 | $650 | $7,200 |
| Pittsburgh Pirates | $17.07 | $9 | $210 | $399 | $1,944 |
| Atlanta Braves | $17.05 | $12 | $70 | $830 | $4,980 |
| Arizona Diamondbacks | $15.96 | $5 | $200 | $415 | $7,055 |
| **Average** | **$25** | **$10** | **$107** | **$743** | **$5,273** |

(1) Prices represent those for Dolphin Stadium.

(2) Prices represent those for Hubert H. Humphrey Metrodome.

(3) Prices represent those for Citi Field.

(4) Prices represent those for the new Yankee Stadium.

Note: Sorted by average per-game ticket price.

Note: Oakland Athletics ticket prices represent current ballpark, rather than projections for new ballpark.

Sources: Team Marketing Report, 2009 Revenues From Sports Venues.

As shown above, the average MLB franchise has individual ticket prices ranging from $10 to $107, with an average ticket price of $25 in 2008.  For season tickets, the average prices range from $743 to $5,273.  Some teams, such as the Baltimore Orioles, Colorado Rockies, Milwaukee Brewers and Oakland Athletics, offer a relatively small range of ticket prices.  Others, such as the Boston Red Sox and New York Yankees, offer a wide range of ticket prices.



## Appendix II   Major League Baseball Overview (cont'd)

**MLB Premium Seating**

Premium seating amenities, such as private suites and club level seating are significant sources of revenue for MLB franchises.  The following table summarizes the premium seating inventories for each MLB ballpark, sorted alphabetically by team.

Major League Baseball Premium Seating

| Team | Private Suites | | | Club Seats | | |
|---|---|---|---|---|---|---|
| | Quantity | Low Price | High Price | Quantity | Low Price | High Price |
| Arizona Diamondbacks | 70 | $95,000 | $125,000 | 4,500 | $2,241 | $9,960 |
| Atlanta Braves | 59 | $210,000 | $308,000 | 5,372 | $2,656 | $2,656 |
| Baltimore Orioles | 75 | $90,000 | $180,000 | 4,000 | $2,673 | $2,835 |
| Boston Red Sox | 40 | $250,000 | $350,000 | 406 | $12,150 | $22,275 |
| Chicago Cubs | 67 | $110,000 | $182,000 | - | - | - |
| Chicago White Sox | 102 | $110,000 | $300,000 | 1,822 | $2,896 | $3,058 |
| Cincinnati Reds | 57 | $52,000 | $150,000 | 3,000 | $4,110 | $5,730 |
| Cleveland Indians | 122 | $54,000 | $139,000 | 2,064 | $4,941 | $4,941 |
| Colorado Rockies | 52 | $81,000 | $128,000 | 4,400 | $2,835 | $3,078 |
| Detroit Tigers | 108 | $100,000 | $125,000 | 2,000 | $4,050 | $4,860 |
| Florida Marlins | 183 | $50,000 | $300,000 | 10,209 | $1,250 | $3,250 |
| Houston Astros | 62 | $84,000 | $112,000 | 5,000 | $3,320 | $3,984 |
| Kansas City Royals | 19 | $53,000 | $60,000 | 2,487 | $4,455 | $5,670 |
| Los Angeles Angels | 74 | $57,000 | $189,000 | 5,000 | $1,640 | $3,444 |
| Los Angeles Dodgers | 33 | $150,000 | $300,000 | 565 | $2,592 | $2,592 |
| Milwaukee Brewers | 70 | $95,000 | $102,000 | 3,500 | $3,200 | $4,200 |
| Minnesota Twins | 72 | $110,000 | $110,000 | 3,400 | $3,888 | $4,860 |
| New York Mets | 54 | $250,000 | $500,000 | 4,600 | $4,860 | $40,095 |
| New York Yankees | 67 | $600,000 | $850,000 | 4,374 | $8,100 | $202,500 |
| Oakland Athletics | 143 | $30,000 | $150,000 | 9,000 | $1,260 | $1,510 |
| Philadelphia Phillies | 71 | $115,000 | $200,000 | 3,600 | $4,200 | $9,000 |
| Pittsburgh Pirates | 65 | $60,000 | $150,000 | 3,374 | $2,430 | $10,125 |
| San Diego Padres | 50 | $85,000 | $170,000 | 6,580 | $2,916 | $3,888 |
| San Francisco Giants | 67 | $75,000 | $120,000 | 5,300 | $4,500 | $7,500 |
| Seattle Mariners | 69 | $100,000 | $189,000 | 4,271 | $2,997 | $3,483 |
| St. Louis Cardinals | 63 | $105,000 | $185,000 | 3,600 | $7,290 | $8,910 |
| Tampa Bay Rays | 63 | $60,000 | $140,000 | 3,600 | $2,430 | $8,910 |
| Texas Rangers | 129 | $75,000 | $175,000 | 5,699 | $3,888 | $8,100 |
| Toronto Blue Jays | 120 | $60,000 | $235,000 | 5,700 | $2,933 | $4,127 |
| Washington Nationals | 66 | $150,000 | $400,000 | 2,500 | $3,645 | $4,455 |
| **Average** | **76** | **$117,200** | **$220,800** | **4,135** | **$3,800** | **$13,800** |

Note: Sorted alphabetically.
Note: Oakland Athletics premium seating information represents current ballpark, rather than projections for a new ballpark.
Source: 2009 Revenues From Sports Venues.

As shown in the table above, all 30 MLB teams offer private suites.  The average MLB franchise has 76 luxury suites that range in price from approximately $117,000 to $221,000 per season.  The Oakland Athletics have the lowest priced private suite in the league ($30,000 annually), whereas the New York Yankees have the highest priced suite ($850,000 annually).



**Appendix II   Major League Baseball Overview (cont'd)**

Club level seating is offered in 29 of the 30 MLB ballparks.  On average, MLB franchises that offer club seats have 4,135 club seats that range from $3,800 to $13,800 per season. The Florida Marlins offer the lowest priced club seating ($1,250 annually), and the New York Yankees offer the highest priced club seats ($202,500 annually).

**Media and Sponsorship**

Major League Baseball's 29 U.S.-based teams are all located within the nation's 40 largest media markets, including eight teams that are located in the nation's four largest markets (New York, Los Angeles, Chicago and San Francisco).  In addition, the Toronto Blue Jays are located in Canada's largest media market.

MLB currently has national TV contracts with FOX, TBS and ESPN, with all three contracts running through the 2013 season.  FOX owns the exclusive rights to televise the World Series and the All-Star Game, the American League Championship Series (ALCS) and National League Championship Series (NLCS) in alternating years, and 26 regional Saturday Game of the Week broadcasts.   MLB's deal with FOX was undisclosed, however it was an extension of a previous deal that was worth $2.4 billion over six years. TBS owns the rights to televise a Sunday afternoon Game of the Week, as well as the ALCS and NLCS in alternating years, and the exclusive rights to the Division Series in both leagues.  TBS' contract terms with MLB are believed to be similar to those agreed upon by FOX.  ESPN has the right to televise MLB games on Sunday, Monday and Wednesday evenings, under an eight year, $2.4 billion contract.

MLB launched its own cable TV network, MLB Network, in January 2009, following in the foot steps of the other American major league sports, the NBA, NFL and NHL.  MLB Network provides 24-hour coverage of Major League Baseball, including live games on Thursday and Saturday nights.  According to industry sources, MLB expects the network to be profitable by the end of 2009, with projected revenue from cable subscriber fees and advertising of more than $210 million by 2015.

Major League Baseball Advanced Media (MLBAM) is a subsidiary of Major League Baseball that was established in 2000 to operate MLB's internet and interactive media initiatives.  Today, MLBAM operates MLB.com and websites for all 30 MLB teams, MiLB.com, MLB Radio and MLB.TV, a subscription service that allows users to view live games via the internet.

MLB does not disclose league sponsorship revenue, however sponsorship valuation firm IEG estimates that MLB and its 30 teams will generate global sponsorship revenue in excess of $510 million in 2009.  In 2008, overall revenue generated by MLB was approximately $6.5 billion.



## Appendix II   Major League Baseball Overview (cont'd)

One of the largest sources of local sponsorship revenue for Major League Baseball franchises can be the sale of ballpark naming rights.  There are currently 19 MLB ballparks for which naming rights have been sold, as shown in the following table.

**MLB Ballpark Naming Rights**

| Stadium | Team | City | Total Cost (millions) | Years | Annual Average | Expiration Year |
|---|---|---|---|---|---|---|
| Citi Field | New York Mets | Queens, NY | $400.0 | 25 | $16.0 | 2028 |
| Minute Maid Park | Houston Astros | Houston, TX | $178.0 | 28 | $6.4 | 2029 |
| Citizens Bank Park | Philadelphia Phillies | Philadelphia, PA | $95.0 | 25 | $3.8 | 2029 |
| Progressive Field | Cleveland Indians | Cleveland, OH | $57.6 | 16 | $3.6 | 2023 |
| U.S. Cellular Field | Chicago White Sox | Chicago, IL | $68.0 | 23 | $3.0 | 2025 |
| Petco Park | San Diego Padres | San Diego, CA | $60.0 | 22 | $2.7 | 2025 |
| Great American Ballpark | Cincinnati Reds | Cincinnati, OH | $75.0 | 30 | $2.5 | 2032 |
| Chase Field | Arizona Diamondbacks | Phoenix, AZ | $66.4 | 30 | $2.2 | 2028 |
| Comerica Park | Detroit Tigers | Detroit, MI | $66.0 | 30 | $2.2 | 2030 |
| AT&T Park | San Francisco Giants | San Francisco, CA | $50.0 | 24 | $2.1 | 2024 |
| Miller Park | Milwaukee Brewers | Milwaukee, WI | $41.2 | 20 | $2.1 | 2020 |
| PNC Park | Pittsburgh Pirates | Pittsburgh, PA | $40.0 | 20 | $2.0 | 2021 |
| Safeco Field | Seattle Mariners | Seattle, WA | $40.0 | 20 | $2.0 | 2019 |
| Rogers Centre | Toronto Blue Jays | Toronto, ON | $17.7 | 10 | $1.8 | 2014 |
| Tropicana Field | Tampa Bay Rays | St. Petersburg, FL | $46.0 | 30 | $1.5 | 2026 |
| Coors Field | Colorado Rockies | Denver, CO | $15.0 | Indef. | n/a | Indef.* |
| Busch Stadium | St. Louis Cardinals | St. Louis, MO | n/a | 20 | n/a | 2025 |
| Target Field | Minnesota Twins | Minneapolis, MN | n/a | 25 | n/a | 2034 |
| Land Shark Stadium [1] | Florida Marlins | Miami, FL | n/a | 1 | n/a | 2010 |
| **Average** | | | **$82.2** | **22** | **$3.6** | **2025** |
| **Median** | | | **$58.8** | **24** | **$2.2** | **2025** |

(1) Marlins will move into a new stadium in 2012, and thus obtain a new naming rights deal.
* Coors was granted naming rights in return for their $15 million contribution to stadium construction.
Source:  SportsBusiness Journal.

As shown in the table above, on average, MLB ballpark naming rights have been sold for a total cost of approximately $82 million over 22 years, an annual average of approximately $3.6 million.  Citi Field, home of the New York Mets, has the most valuable naming rights deal on both an average annual basis and a total basis.  Coors Field, home of the Colorado Rockies, has the smallest naming rights deal, at $15.0 million.

### Franchise Valuations

As a result of ballpark development, and the growth of revenue streams such as broadcast rights and naming rights, MLB franchise values have generally risen over the past 25 years.  The table on the following page presents a summary of current MLB franchise revenues, operating income and estimated value.



## Appendix II   Major League Baseball Overview (cont'd)

**Major League Baseball Franchise Valuations**

| Team | Revenues | Operating Income | Current Value |
|------|---------|------------------|---------------|
| New York Yankees | $375 | -$3.7 | $1,500 |
| New York Mets | $261 | $23.5 | $912 |
| Boston Red Sox | $269 | $25.7 | $833 |
| Los Angeles Dodgers | $241 | $16.5 | $722 |
| Chicago Cubs | $239 | $29.7 | $700 |
| Los Angeles Angels of Anaheim | $212 | $10.3 | $509 |
| Philadelphia Phillies | $216 | $16.3 | $496 |
| St Louis Cardinals | $195 | $6.6 | $486 |
| San Francisco Giants | $196 | $22.4 | $471 |
| Chicago White Sox | $196 | $13.8 | $450 |
| Atlanta Braves | $186 | $4.7 | $446 |
| Houston Astros | $194 | $17.0 | $445 |
| Seattle Mariners | $189 | $3.8 | $426 |
| Washington Nationals | $184 | $42.6 | $406 |
| Texas Rangers | $176 | $17.4 | $405 |
| San Diego Padres | $174 | $22.9 | $401 |
| Baltimore Orioles | $174 | $27.2 | $400 |
| Cleveland Indians | $181 | $19.5 | $399 |
| Arizona Diamondbacks | $177 | $3.9 | $390 |
| Colorado Rockies | $178 | $24.5 | $373 |
| Detroit Tigers | $186 | -$26.3 | $371 |
| Minnesota Twins | $158 | $26.8 | $356 |
| Toronto Blue Jays | $172 | $3.0 | $353 |
| Milwaukee Brewers | $173 | $11.8 | $347 |
| Cincinnati Reds | $171 | $17.0 | $342 |
| Tampa Bay Rays | $160 | $29.4 | $320 |
| Oakland Athletics | $160 | $26.2 | $319 |
| Kansas City Royals | $143 | $9.0 | $314 |
| Pittsburgh Pirates | $144 | $15.9 | $288 |
| Florida Marlins | $139 | $43.7 | $277 |
| **Average** | **$194** | **$16.7** | **$482** |

Notes:  1. All dollar figures in millions.

2. Team values based on current stadium deal, unless new stadium is pending.

3. Operating income represents earnings before interest, taxes, depreciation, and amortization.

Source: Forbes

As shown above, the average MLB franchise has annual revenues of approximately $194 million and operating income of approximately $17 million, with a total franchise value of approximately $480 million.  The New York Yankees are the most valuable franchise ($1.5 billion), whereas the Florida Marlins are the least valuable franchise ($277 million). It should be noted that the above information was obtained from Forbes' annual team valuation study.  The information was assumed to be accurate and was not audited or verified by CSL.



## Appendix II   Major League Baseball Overview (cont'd)

### Player Salaries

Player salaries are typically an MLB franchise's largest operating expense.    The
following table summarizes the 2009 payroll for each franchise.



**Major League Baseball Franchise Payrolls**

| Franchise | Payroll |
|---|---|
| New York Yankees | $201.4 |
| New York Mets | $149.4 |
| Chicago Cubs | $134.8 |
| Boston Red Sox | $121.7 |
| Detroit Tigers | $115.1 |
| Los Angeles Angels of Anaheim | $113.7 |
| Philadelphia Phillies | $113.0 |
| Houston Astros | $103.0 |
| Los Angeles Dodgers | $100.4 |
| Seattle Mariners | $98.9 |
| Atlanta Braves | $96.7 |
| Chicago White Sox | $96.1 |
| San Francisco Giants | $82.6 |
| Cleveland Indians | $81.6 |
| Toronto Blue Jays | $80.5 |
| Milwaukee Brewers | $80.2 |
| St. Louis Cardinals | $77.6 |
| Colorado Rockies | $75.2 |
| Cincinnati Reds | $73.6 |
| Arizona Diamondbacks | $73.5 |
| Kansas City Royals | $70.5 |
| Texas Rangers | $68.2 |
| Baltimore Orioles | $67.1 |
| Minnesota Twins | $65.3 |
| Tampa Bay Rays | $63.3 |
| Oakland Athletics | $62.3 |
| Washington Nationals | $60.3 |
| Pittsburgh Pirates | $48.7 |
| San Diego Padres | $43.7 |
| Florida Marlins | $36.8 |

Notes:  All dollar figures in millions.
Source: USA Today

As shown, the average franchise payroll is approximately $89 million, however there is a
wide disparity between the highest and lowest payrolls.  The New York Yankees have the
highest a total payroll of $201.4 million, whereas the Florida Marlins have a payroll of
$36.8 million, which represents a difference of nearly $165 million.



## Appendix II   Major League Baseball Overview (cont'd)

**Review of Recently Built/Planned Ballparks**

The purposes of this section is to present an overview of recently built and planned MLB ballparks to provide a benchmark from which to assess the potential operational performance and event levels of the proposed MLB ballpark to be located in San Jose. An assessment of the physical and operational characteristics of comparable ballparks is a critical component in assessing the market potential of the proposed ballpark.

To date, six new ballparks have been built since 2004. In addition, two MLB markets are in the process of developing new ballparks. As a result, the case studies presented herein provide both historical and projected perspectives from which to evaluate the potential operational performance and event levels of the proposed ballpark in San Jose. Physical, financial, and funding statistics were reviewed for the following comparable ballparks:

- Busch Stadium;
- Citi Field;
- Citizens Bank Park;
- Marlins Ballpark;
- Nationals Park;
- PETCO Park;
- Target Field; and,
- Yankee Stadium.

Busch Stadium



| | |
|---|---|
| **Location:** | St. Louis, MO |
| **Year Opened:** | 2006 |
| **Baseball Capacity:** | 46,900 |
| **Suites:** | 63 |
| **Club Seats:** | 3,600 |
| **Owner:** | Team |
| **Operator:** | Team |
| **Cost:** | $388 million |
| **Financing:** | 23% |
| | 77% |

Busch Stadium is located in St. Louis, Missouri and was completed in 2006. The open-air stadium features a retro design with grass turf and seats 46,900 patrons. The St. Louis Cardinals are the sole tenant of the team-owned and operated facility.

Premium seating at Busch Stadium includes 63 private suites that range in price from $105,000 to $185,000 annually. Leases are sold on ten year terms and the suites seat between 10 and 24 patrons. The Stadium has 3,600 club seats which range in price from



## Appendix II   Major League Baseball Overview (cont'd)

$7,290 to $8,910 per year, while season tickets range from $972 to $3,240.  Single-game tickets cost between $13 and $90 per game.

For the 2008 season, Busch Stadium drew over 3.4 million attendees to its 81 home games, ranking it 4th in the league.  Average attendance for the season was 42,353, which is approximately 90 percent of capacity.

Team bonds funded $200 million of the $388 million stadium, while team equity funded $50 million.  County loans provided $45 million, state tax credits provided $30 million, and the Missouri DOT provided $12.5 million.  Revenues from the sale of personal seat licenses funded $40 million and earning on interest funded the remaining $10 million.

Naming rights were sold to Anheuser-Busch for 20 years, expiring in 2025.  The price of the naming rights is undisclosed.

Citi Field



| | |
|---|---|
| **Location:** | New York, NY |
| **Year Opened:** | 2009 |
| **Baseball Capacity:** | 42,500 |
| **Suites:** | 54 |
| **Club Seats:** | 4,600 |
| **Owner:** | City |
| **Operator:** | Team |
| **Cost:** | $932.5 million |
| **Financing:** | 19% Public |
| | 71% Private |

Citi Field is located in New York City and was completed in 2009.  The open-air stadium features a natural grass field and a retro design, which seeks to emulate ballparks from the 1920s.  Citi Field has a seating capacity of 42,500.  The New York Mets are the sole tenant of the city-owned and team-operated facility.

Premium seating at Citi Field includes 54 private suites that range in price from $250,000 to $500,000 annually.  Leases are sold on three to ten year terms and the suites seat between 12 and 24 patrons.  The ballpark has 4,600 club seats which range in price from $4,860 to $40,095 per year, while season tickets range from $1,109 to $13,095.  Single-game tickets cost between $11 and $105 per game.

Naming rights were sold to Citibank for $400 million over 25 years, expiring in 2028, making this the largest naming rights deal in existence in the United States.



## Appendix II   Major League Baseball Overview (cont'd)

Approximately $650 million of the funds used to construct Citi Field were procured through a publicly-issued bond offering, however the Mets have pledged to repay the debt via annual payments in lieu of taxes (PILOT).  According to this PILOT program, instead of paying taxes on ballpark revenue, the Mets will make annual debt service payments.

Citizens Bank Park



| | |
|---|---|
| **Location:** | Philadelphia, PA |
| **Year Opened:** | 2004 |
| **Baseball Capacity:** | 43,000 |
| **Suites:** | 71 |
| **Club Seats:** | 3,600 |
| **Owner:** | Team |
| **Operator:** | Global Spectrum |
| **Cost:** | $346.0 Million |
| **Financing:** | 57% Public |
| | 43% Private |

Citizens Bank Park is located in Philadelphia, Pennsylvania and opened in 2004.  The open-air stadium features a Kentucky Blue Grass playing field and a retro design. Citizens Bank Park has a seating capacity of 43,000.  The Philadelphia Phillies are the sole ballpark tenant.  The facility is owned by the team and operated by Global Spectrum.

Premium seating at Citizens Bank Park includes 71 private suites that range in price from $115,000 to $200,000 annually.  Leases are sold on a four to ten year basis and the suites seat between 16 and 23 patrons.  The park has 3,600 club seats which range in price from $4,200 to $9,000 per year, while season tickets range from $1,458 to $4,860.  Single-game tickets cost between $16 and $60 per game.

For the 2008 season, the Phillies drew over 3.4 million attendees to its 81 home games, ranking it 5th in the league.  Average attendance for the season was 42,254, putting the venue at 98 percent capacity.

The Phillies contributed $172 million of the stadium's $346 costs, while public sources funded the remaining $174 million.

Naming rights were sold to Citizens Bank for $95 million over 25 years.  The naming rights deal expires in 2029.



## Appendix II   Major League Baseball Overview (cont'd)

Marlins Ballpark



| | |
|---|---|
| **Location:** | Miami, FL |
| **Year Opened:** | 2012 |
| **Baseball Capacity:** | 37,000 |
| **Suites:** | 60 |
| **Club Seats:** | 3,000 |
| **Owner:** | County |
| **Operator:** | Team |
| **Cost:** | $515.0 Million |
| **Financing:** | 70% Public |
| | 30% Private |

The new Marlins ballpark will be located in Miami, Florida and is expected to be complete in 2012.  The 37,000-seat facility will feature a retractable roof, making it the sixth retractable-roof venue in the league.  The Marlins are expected to be the sole tenant of the County-owned, team-operated facility.

Premium seating will consist of 60 private suites and 3,000 club seats, although pricing has not yet been determined.

The financing agreement with the City of Miami and Miami-Dade County requires the Marlins to contribute $155 million towards construction of the ballpark, as well as change the team's name from Florida Marlins to Miami Marlins prior to beginning play in the new ballpark.  The City will contribute $13 million, and the County has pledged $347 million, approximately $297 million of which will be backed by tourist tax dollars.

Nationals Park



| | |
|---|---|
| **Location:** | Washington D.C. |
| **Year Opened:** | 2008 |
| **Baseball Capacity:** | 41,888 |
| **Suites:** | 66 |
| **Club Seats:** | 2,500 |
| **Owner:** | DCSEC |
| **Operator:** | Team |
| **Cost:** | $692.8 Million |
| **Financing:** | 96% Public |
| | 4% Private |

Nationals Park is located in Washington D.C. and was completed in 2008.  The open-air stadium features a modern design with natural grass turf and seating for 41,888 patrons. The Washington Nationals are the sole tenant of the facility.  Nationals Park is owned by the D.C. Sports and Entertainment Commission ("DCSEC") and is operated by the team.



## Appendix II   Major League Baseball Overview (cont'd)

Premium seating at Nationals Park consists of 66 private suites that range in price from $150,000 to $400,000 annually.  Leases are sold on a five to ten year basis and the suites seat between 15 and 24 patrons.  The Park has 2,500 club seats which range in price from $3,645 to $4,455 per year, while season tickets range from $810 to $4,050.  Single-game tickets cost between $7 and $105 per game.

For the 2008 season, Nationals Park drew over 2.3 million attendees to its 80 home games, ranking it 19th in the league.  Average attendance for the season was 29,005, putting the venue at 69 percent capacity.

Nationals Ballpark was developed for approximately $693 million with the majority of the funding provided by the District of Columbia.  The team provide cash contributions totaling $31 million, whereas the District contributed $39 million in 2005 tax revenues, $28.7 million in interest earnings, $51 million in additional cash contributions, and more than $543 million in ballpark revenue bonds, backed by rent payments, ballpark-related sales taxes, parking taxes, utilities taxes and a new tax on businesses with gross receipts over $5 million.  The Nationals will pay annual rent of $3.5 million over the course of a 30-year lease agreement, during which time the team will operate the ballpark and retain all revenues, including naming rights.

PETCO Park



| | |
|---|---|
| **Location:** | San Diego, CA |
| **Year Opened:** | 2004 |
| **Baseball Capacity:** | 42,000 |
| **Suites:** | 50 |
| **Club Seats:** | 6,580 |
| **Owner:** | City / Team |
| **Operator:** | Team |
| **Cost:** | $449.4 Million |
| **Financing:** | 86% Public |
| | 14% Private |

PETCO Park is located in San Diego, California and was completed in 2004.  The open-air stadium departed from the popular retro ballpark architecture and instead features a sandstone and stucco exterior designed to mimic the nearby geographical landscape.  PETCO Park contains 42,000 seats and is home to the San Diego Padres.  The park is 70 percent owned by the City and 30 percent owned by the team, while the team retains full management rights.

Premium seating at PETCO Park includes 50 private suites that range in price from $85,000 to $170,000 annually.  Leases are sold on a three to seven year basis and the



## Appendix II   Major League Baseball Overview (cont'd)

suites seat between 16 and 22 patrons.  The park has 6,580 club seats which range in price from $2,916 to $3,888 per year, while season tickets range from $972 to $3,240.  Single-game tickets cost between $10 and $65 per game.

For the 2008 season, the Padres drew over 2.4 million attendees to its 81 home games, ranking it 17th in the league.  Average attendance for the season was 29,969, putting the venue at 71 percent capacity.

Development of Petco Park cost approximately $449 million.  The City of San Diego issued $225 million in municipal bonds secured by hotel/motel taxes.  The Centre City Development Corporation provided another $21 million from existing funds and $29 million from tax increment revenues generated by the ballpark and associated redevelopment project.  The San Diego Unified Port District also contributed $21 million.

The Padres committed to providing $115 million to the project.  However, the City committed to provide the team with a subsidy equal to 30 percent of the ballpark's annual operating expenses, not to exceed $3.5 million, increased annually for CPI.  It is estimated that this commitment offsets approximately $59.3 million of the Padres original $115 million commitment.

In return for operating control of the stadium, the Padres must pay annual rent to the City of $500,000 per annum, inflating annually.  The City will have the right (without rental obligation) to hold or authorize City or third party events on 240 dates per year, while the Padres will have the right to hold Padres events (including games, concerts, fantasy camps, etc.) on 125 dates each year.  The City will receive all revenue from City-related events.  The Padres are liable for property taxes on their ownership interest in the ballpark.

Naming rights were sold to Petco Animal Supplies for $60 million over 22 years.  The naming rights deal expires in 2025.



## Appendix II   Major League Baseball Overview (cont'd)

Target Field



| | |
|---|---|
| **Location:** | Minneapolis, MN |
| **Year Opened:** | 2010 |
| **Baseball Capacity:** | 40,000 |
| **Suites:** | 72 |
| **Club Seats:** | 3,400 |
| **Owner:** | County |
| **Operator:** | Team |
| **Cost:** | $559.4 million |
| **Financing:** | 70% Public |
| | 30% Private |

Target Field will be located in Minneapolis, Minnesota and is expected to be completed by 2010. The open-air stadium will feature neither a retro design nor modern design, but rather geographic-specific style that includes local limestone and fir trees. Although a retractable roof was cost prohibitive, the players and spectators are protected from the winter elements via a canopy as well as a heated field and viewing areas. The Minnesota Twins will be the sole tenant of the 40,000-seat venue. Hennepin County will be the owner and the team will operate the facility.

Premium seating at Target Field will include 72 private suites. Although suite terms are not yet finalized, it is anticipated that suite will cost an average of $110,000 per year. The ballpark will feature 3,400 club seats which will require a membership fee of between $1,000 and $2,000.

Estimated construction and development costs for Target Field equal $559.4 million. The Twins contributed $130 million in up-front cash, as well as an additional $37.4 million towards cost overruns. Hennepin County contributed $392 million that was provided via a County-wide sales tax increase. The Twins will operate the County-owned facility and pay 100 percent of all ballpark operating expenses. The County is projected to collect over $10 million annually in ballpark-related sales taxes and player income taxes.

As part of the ballpark development agreement, the team also committed $1 million annually for capital improvements, which will be matched dollar-for-dollar by Hennepin County, and $250,000 annually for youth activities and amateur sports initiatives, which will be matched by a $4 million annual contribution from Hennepin County. Should the franchise be sold during the ballpark's 30-year lease agreement, the Twins will share up to 18 percent of franchise sales proceeds with the County.

Naming rights were sold to Target Corporation for 25 years. The terms of the deal are undisclosed.



## Appendix II   Major League Baseball Overview (cont'd)

Yankee Stadium



| | |
|---|---|
| **Location:** | Bronx, NY |
| **Year Opened:** | 2009 |
| **Baseball Capacity:** | 51,000 |
| **Suites:** | 67 |
| **Club Seats:** | 4,374 |
| **Owner:** | Team |
| **Operator:** | Team |
| **Cost:** | $1.4 billion |
| **Financing:** | 78% Public |
| | 22% Private |

Yankee Stadium is located in New York City and was completed in 2009. The open-air stadium features a retro design with grass turf and seats 51,000 patrons. The New York Yankees are the sole tenant of the team-owned and operated facility.

Premium seating at Yankee Stadium includes 67 private suites that range in price from $600,000 to $850,000 annually. Leases are sold on a five to ten year basis and the suites seat between 16 and 22 patrons. The Stadium has 4,374 club seats which range in price from $8,100 to $202,500 per year, while season tickets range from $972 to $26,325. Single-game tickets cost between $12 and $400 per game.

Funding for Yankee Stadium was provided in large part via PILOT (payments in lieu of taxes) revenue bonds issued by the City of New York. To retire the PILOT bonds, the City forgoes the receipt of tax revenues related to Yankee Stadium, and rather these payments are applied towards debt service. In all, the City contributed approximately $1.06 billion in funding for the project, including $942.5 million in 2006 PILOT bonds, $259 million in 2009 PILOT bonds and $46.4 million in interest earnings. The Yankees contributed $77 million in cash and $225.5 million in equity contributions, totaling $302.5 million. The Yankees signed a 40-year operating lease agreement on the ballpark, with the option to extend for up to five consecutive ten-year terms. The team retains all revenues (including naming rights) in excess of operating costs and PILOTs and makes an annual lease payment to the City of just $10 per year, which enables the team to attain revenue sharing funds from Major League Baseball.



# EXHIBIT 2



**Silicon Valley Leadership Group**

*224 Airport Parkway, Suite 620*
*San Jose, California  95110*
*(408)501-7864 Fax (408)501-7861*
*www.svlg.net*
*CARL GUARDINO*
*President & CEO*
**Board Officers:**
*TOM WERNER, Chair*
*SunPower*
*MIKE KLAYKO, Vice Chair*
*Brocade*
*AART DE GEUS, Past Chair*
*Synopsys*
*MICHAEL SPLINTER, Past Chair*
*Applied Materials, Inc.*
*ROBERT SHOFFNER*
*Secretary/Treasurer*
*Citibank*
**Board Members:**
*JOHN ADAMS*
*Wells Fargo Bank*
*SHELLYE ARCHAMBEAU*
*MetricStream, Inc.*
*RICHARD BAIRD*
*IBM Corporation*
*ANDREW BALL*
*Webcor Builders*
*NED BARNHOLT*
*KLA-Tencor*
*DON BELL*
*Bell Microproducts*
*GEORGE BLUMENTHAL*
*University of California, Santa Cruz*
*TOM BOTTORFF*
*Pacific Gas & Electric*
*RAMI BRANITZKY*
*SAP Labs North America*
*TORY BRUNO*
*Lockheed Martin Space Systems*
*Company*
*DAVID CUSH*
*Virgin America*
*DAVID DEWALT*
*McAfee, Inc.*
*RAQUEL GONZALEZ*
*Bank of America*
*TIM GUERTIN*
*Varian Medical Systems*
*JON HOAK*
*Hewlett-Packard Company*
*KEVIN KING*
*Affymetrix*
*PAUL LOCATELLI, S.J.*
*Santa Clara University*
*TARKAN MANER*
*Wyse Technology*
*KEN MCNEELY*
*AT&T*
*LEN PERHAM*
*Monolithic Systems*
*KIM POLESE*
*SpikeSource, Inc.*
*Jay Glasscock*
*BD Biosciences*
*ALAN SALZMAN*
*VantagePoint Venture Partners*
*MAC TULLY*
*San Jose Mercury News*
*DAN WARMENHOVEN*
*NetApp, Inc.*
*BILL WATKINS*
*BridgeLux*
*KENNETH WILCOX*
*SVB Financial Group*
*Working Council Chair*
*SHERRI SAGER*
*Lucile Packard Children's Hospital*
*Established in 1978 by*
*DAVID PACKARD*

September 10, 2010

The Office of the Commissioner of Baseball
Allan H. (Bud) Selig, Commissioner
245 Park Avenue, 31st Floor
New York, NY 10167

Dear Commissioner Selig,

The Silicon Valley Leadership Group strongly supports a new home for the Athletics baseball team in downtown San Jose.  We were encouraged to learn of San Jose Mayor Chuck Reed's positive conversation with Major League Baseball President Bob Dupuy regarding the timing of a possible election next spring should the A's be granted approval to pursue the construction of a baseball-only state of the art Ballpark in downtown San Jose.

By way of background, the Silicon Valley Leadership Group was founded in 1977 by David Packard and has grown to become the largest organization of its kind in Silicon Valley with more than 300 member companies.  Combined member companies employ more than 250,000 local workers – nearly one of every three jobs – and generate more than $2 trillion worth in global revenue.

We, the undersigned CEOs and senior executives, are committed to bringing jobs, revenue, a rich culture, and a thriving business climate to Silicon Valley.  We believe that an intimate state of the art ballpark located on a prime downtown San Jose parcel, close to mass transit and major highways will be a catalyst for economic development in our region.  We also believe downtown San Jose offers a compelling location for the advancement of Major League Baseball in the 21st Century.  Silicon Valley is well known throughout the world as the cradle of innovation and the leading incubator of new ideas and new possibilities for human kind.  There is no better location than San Jose, located in the heart of Silicon Valley, to advance the Major League Baseball brand on a global basis.

San Jose is a world-class community, and the ballpark proposal not only secures a quality Major League Baseball team for America's 10th largest city, but also creates jobs, strengthens our economy and enhances the cultural opportunities for our workers and their families.  According to an economic study commissioned by the City of San Jose, a new ballpark will generate thousands of construction jobs and permanent positions at the ballpark and surrounding area.

The Silicon Valley Leadership Group, along with other respected and diverse organizations, stands ready to offer any support needed to move this important project forward.  The Silicon Valley Leadership Group is comprised of both devoted A's and Giants fans and we will continue to enthusiastically support both teams.  We strongly believe that both teams will thrive in a vibrant two team market anchored by San Francisco and the Bay Area's largest city, San Jose.  Today, the Bay Area is the only two team market in Major League Baseball where the teams don't fully share their common geographic territory.  The divided territory was imposed at the request of San Jose baseball boosters in 1992 in a previous attempt to secure a Major League Baseball team.  We can only hope moving forward that the Bay Area can be restored to a shared marketplace for the two teams in a manner similar to Chicago, Los Angeles and New York.

It is integral to our mission that we support and promote opportunities to improve the quality of life for families who live and work in Silicon Valley.  A new A's ballpark will provide a great entertainment and community asset that will capture the essence of Silicon Valley.  It will be a tremendous benefit to our region, with a wide appeal that can help to promote Silicon Valley – and Major League Baseball – on a national and international level. The new venue will be a great source of pride for our innovative region, and deserves your consideration and approval to move forward.

Please call on us to help make this decades old dream to attract a Major League Baseball team to Silicon Valley a reality in the near future.

Sincerely,

| **John Chambers** | **Tom Werner** | **Mike Klayko** | **Carl Guardino** |
|---|---|---|---|
| CEO, Cisco Inc. | CEO, SunPower | CEO, Brocade Inc. | CEO, Silicon Valley Leadership Group |

| **Carol Bartz** | **John Donahoe** | **John Doerr** | **Shantanu Narayen** |
|---|---|---|---|
| CEO, Yahoo! | CEO, eBay | Partner, Kleiner Perkins | CEO, Adobe |

**Bill Coleman**, Partner, Alsop Louie Partners
**Chuck Kissner**, CEO, Aviat Networks
**Jay Glasscock**, President, BD Biosciences
**Don Bell**, CEO, Bell Microproducts
**Jason Wolf**, VP, North America, Better Place
**Brian NeSmith**, CEO, Blue Coat Systems
**John Conover**, CEO, Borel Private Bank & Trust Company
**Bill Watkins**, CEO, Bridgelux
**Pete Nelson**, CEO, California Water Service
**Nick Bruckner**, Managing Director, CareerBuilder
**Chuck Reynolds**, CEO, CH Reynolds
**Richard Lowenthal**, CEO, Coulomb Technologies
**David Ketsdever**, Managing Director, Cowen and Company
**Jason Bright**, CEO, Cyber Switching, Inc.
**Peter Moran**, General Partner, DCM
**J. Kim Fennell**, CEO, DeCarta
**David Lerner**, CEO, Declaration Services
**Stephen Samuel**, CEO, Design Visionaries
**Vishal Verma**, Partner, Edgewood Ventures
**Fred Rosenzweig**, President, Electronics For Imaging
**Kevin Evans**, CEO, EnergyConnect
**Tom Hayse**, CEO, ETM Electromatic
**Terry Clark**, CEO, Finelite
**Linda Thor**, Chancellor, Foothill-De Anza Community College District
**Martin Schoeppler**, CEO, FUJIFILM Dimatix
**Mike Fox Jr.**, CEO, Goodwill of Silicon Valley
**Sonny Aulakh**, CEO, Greenlight Organic
**Dave Anderson**, EVP, GridIron Systems
**Vandana Pant**, Director, The Health Trust
**Bill DelBiaggio**, Founder, Heritage Bank of Commerce
**Conrad Burke**, CEO, Innovalight
**Cecelia McCloy**, CEO, Integrated Science Solutions
**David Bell**, CEO, Intersil
**Amir Mashkoori**, CEO, Kovio

**Gary Steele**, CEO, Landec
**Norman Kline**, CEO, LibraryWorld, Inc.
**Joseph Moless**, President, Lincoln Law School
**Sehat Sutardja**, CEO, Marvell
**Len Perham**, CEO, MoSys
**Lew Wolff**, Owner, Oakland A's/San Jose Earthquakes
**Rich Slavin**, President, Palo Alto Medical Foundation
**Ron Gonzales**, CEO, Presencia LLC
**Ralph Schmitt**, CEO, PLX Technology
**Fred Amoroso**, CEO, Rovi Corporation
**Michael Engh, S.J.**, President, Santa Clara University
**Kevin Surace,** CEO, Serious Materials
**James MacGregor**, Publisher, SV/San Jose Business Journal
**Scott Lang**, CEO, Silver Spring Networks
**John Gilmore**, General Manager, Sling Media
**Michael Armsby**, CFO, Soladigm
**Jim Weldon**, CEO, Solar Junction
**Mark Crowley**, CEO, SolFocus, Inc.
**Tim Harris**, CEO, SoloPower
**Godfrey Sullivan**, CEO, Splunk
**Celeste Ford**, CEO, Stellar Solutions
**Bruce McWilliams**, CEO, SuVolta
**Ken Wilcox**, CEO, SVB Financial Group
**David Côté**, CEO, Symmetricom
**Paul Lovoi**, CEO, Tagent
**Stephen Levers**, CEO, Tecan Systems
**Barbara Kamm**, CEO, Technology Credit Union
**Hank Nothhaft**, CEO, Tessera
**Tom Ayers**, CEO, Tropos Networks
**George Blumenthal**, President, University of California, Santa Cruz
**Tim Guertin**, CEO, Varian Medical Systems
**Tarkan Maner**, CEO, Wyse Technology
**Chris Cabrera**, CEO, Xactly Corporation

# EXHIBIT 3

EXECUTORY COPY

## OPTION AGREEMENT FOR THE SALE OF PROPERTY FROM THE SAN JOSE DIRIDON DEVELOPMENT AUTHORTY TO ATHLETICS INVESTMENT GROUP LLC

This option agreement for the purchase of property ("Agreement" or "Option Agreement") is made as of this 8th of May, 2011 by and between the SAN JOSE DIRIDON DEVELOPMENT AUTHORITY, a California Joint Powers Authority created pursuant to the Joint Exercise of Powers Act, Title 1, Division 7, Chapter 5, of the California Government Code, Government Code Section 6500 et sec ("AUTHORITY"), and ATHLETICS INVESTMENT GROUP LLC ("OPTIONEE").

### RECITALS

WHEREAS, the AUTHORITY is the owner of certain property and improvements located at 105 South Montgomery,150 South Montgomery, 510 West San Fernando,102 South Montgomery,115 South Autumn, and 645 Park Avenue, in San José, California more particularly described in Exhibit A attached hereto and incorporated herein by reference (the "Property"); and

WHEREAS, the Property is located in the Diridon Redevelopment Project Area ("Diridon Area") and was originally purchased by the Redevelopment Agency of the City of San Jose ("AGENCY") with the intent that the Property, along with other adjacent properties, be developed into a Major League Baseball park or alternatively a mixed use development with housing; and

WHEREAS, both the AGENCY and the City of San Jose, ("CITY") have envisioned many potential future development and redevelopment projects in the Diridon Area including corporate offices, housing, high speed rail, BART, and a potential sports stadium/Major League Baseball park; and

WHEREAS, AGENCY and CITY formed AUTHORITY and transferred the Property to AUTHORITY for the purposes of facilitating future development in the Diridon Area; and

WHEREAS, OPTIONEE is exploring the construction of a Major League Baseball park in the Diridon Area; and

WHEREAS, the AUTHORITY and OPTIONEE desire to enter into this Agreement to grant OPTIONEE an option to purchase the Property, subject to the conditions herein.

NOW, THEREFORE, the parties agree as follows:

## SECTION 1.        GRANT OF OPTION.

For consideration in the amount of Fifty Thousand Dollars, ($50,000), payable by OPTIONEE to AUTHORITY upon execution of this Agreement, and on the terms and conditions set forth herein, AUTHORITY grants to OPTIONEE an irrevocable, exclusive option to purchase the Property. ("Option").

Contemporaneously with the execution of this Agreement, AUTHORITY and OPTIONEE have executed a Memorandum of Option Agreement, in the form attached hereto as Exhibit "B" (the "Memorandum"), in recordable form.

If OPTIONEE does not exercise the Option contained in this Agreement prior to the expiration of the Option Period as defined below, OPTIONEE shall, upon Authority's request, execute a quitclaim deed to the Property, in recordable form, releasing OPTIONEE'S interest in the Property and rights under the Memorandum.

## SECTION 2.        TERM OF OPTION.

A.        The Option to purchase the Property shall become effective on full execution of this Agreement and the Memorandum and shall expire two years thereafter if not exercised by OPTIONEE prior to such one year anniversary in accordance with Section 3A. ("Option Period"). With the consent of AUTHORITY, OPTIONEE may extend the Option Period for one additional  year  with the payment of Twenty-five Thousand Dollars, ($25,000), payable by OPTIONEE to AUTHORITY ten (10) days prior to the expiration of the Option Period, in which event the term "Option Period" shall mean the previous Option Period as so extended.

B.        Unless otherwise agreed, this Agreement shall automatically terminate upon the earlier of (i) expiration of the Option Period, as extended pursuant to Section 2.A, or (ii) execution of the Purchase Agreement (as defined below).

## SECTION 3.        EXERCISE OF OPTION.

A.        Notice. As long as OPTIONEE is not in default under this Agreement and all conditions to the exercise of the option are satisfied or are waived in writing by AUTHORITY, OPTIONEE may exercise the option in accordance with this section and in no other manner. The Option shall be exercised by delivering written notice from OPTIONEE to AUTHORITY before the expiration of the Option Period ("Option Notice"). The Option Notice shall affirmatively state that the OPTIONEE exercises the Option without condition or qualification; provided, however, that the purchase and sale of the Property shall be subject to the closing conditions set forth herein and to be set forth in the Purchase Agreement. .

B.        Purchase Price of Property. The Property shall be sold to OPTIONEE for the amount of **SIX MILLION NINE HUNDRED SEVENTY-FIVE THOUSAND TWO HUNDRED TWENTY-SEVEN DOLLARS ($6,975,227)** provided the use of the Property

2

is restricted, to the reasonable satisfaction of AUTHORITY, for use as a Major League Baseball park and uses incidental to the Major League Baseball park, including to host other ticketed events, and use by CITY as provided in the Negotiating Principles noted below, and upon satisfaction of all conditions set forth in Section 4 and the Purchase Agreement.

SECTION 4.        OPTION CONDITIONS.

A. Voter Approval

As a condition to the OPTIONEE's exercise of the Option, AUTHORITY may require a majority vote of the voters of San Jose approving the City, Agency and Authority participation in the building of the ballpark.

B. Purchase and Sale Agreement

AUTHORITY and OPTIONEE shall negotiate, in good faith, a purchase and sale agreement for the Property consistent with the terms of this Agreement, it being understood that the AUTHORITY will provide a first draft of the purchase and sale agreement (the "Purchase Agreement") within 90 days after the execution of this Agreement. AUTHORITY and OPTIONEE will thereafter diligently and continuously negotiate in good faith the form of Purchase Agreement to completion such that the definitive Purchase Agreement is ready to be, and shall be, executed by AUTHORITY and OPTIONEE within 15 days after the exercise of the Option by OPTIONEE in accordance with Section 3.A.  The Purchase Agreement shall also include the following provisions:

1. The Property shall be restricted for use as a Major League Baseball park and uses incidental to the Major League Baseball park, including hosting other ticketed events, and use by CITY as provided in the Negotiating Principles noted below. .

2. A Transportation and Parking Management Plan ("TPMP") and Construction Management Plan ("CMP") will be required to be developed and agreed to prior to the commencement of construction for the CMP and prior to commencement of operations at the park for the TPMP (or at such other time as may be agreed to).

3. The purchase Agreement shall be consistent with the Negotiating Principles established by City Council Resolution No. 75567 as in effect on the date hereof attached hereto as Exhibit C, and shall contain such other commercially reasonable terms and conditions customary in Santa Clara County real estate sale and purchase agreements.

4. The Purchase Agreement may also include additional properties if acquired by AUTHORITY for a Major League Baseball park and uses incidental to the Major

3

League Baseball park including hosting other ticketed events, and use by CITY as provided in the Negotiating Principles, provided AUTHORITY and OPTIONEE agree.

### SECTION 5.      RIGHT OF ENTRY ON PROPERTY.

During the Option Period, OPTIONEE and its designated employees, agents and independent contractors shall have the right to enter on the Property, upon reasonable notice to AUTHORITY, to the extent necessary for the purpose to inspect, investigate, or conduct tests, including tests invasive to the Property. OPTIONEE agrees to repair any damages it or its agents or independent contractors shall cause to the Property, and further agrees to indemnify and hold AUTHORITY harmless from any and all costs, expenses, losses, and liabilities incurred or sustained by AUTHORITY as a result of the acts of OPTIONEES' agents, or independent contractors pursuant to the rights granted under this Section. Notwithstanding anything to the contrary set forth herein, OPTIONEE shall have no liability to repair damage existing prior to OPTIONEE'S entry and OPTIONEE shall have no liability for any pre-existing conditions, facts or circumstances on, in, under or affecting the Property.

### SECTION 6.      ASSIGNMENT.

This Option shall not be assigned by OPTIONEE, without Authority's prior written approval, which approval shall be within the sole and absolute discretion of AUTHORITY, provided, however, that no consent shall be required for an assignment to (1) any entity directly or indirectly controlled by Lew Wolff, John Fisher or any member of their immediate families or (2) any entity to whom the Oakland Athletics are transferred or any subsidiary of, parent entity of, or entity under common control with such transferee entity.

### SECTION 7.      "AS IS" CONDITION.

OPTIONEE is acquiring the Property "AS IS" without any warranty of AUTHORITY, express or implied, as to the nature or condition of or title to the Property or its fitness for OPTIONEE's intended use of same, except as shall be set forth in the purchase and sale agreement described in Section 4.B. hereof. Prior to the exercise of the Option, OPTIONEE shall be familiar with the Property and will be relying solely upon its own, independent inspection, investigation and analysis of the Option Property as it deems necessary or appropriate in so acquiring the Property from AUTHORITY (including, without limitation, any and all matters concerning the condition, use, sale, development or suitability for development of the Property). In the event OPTIONEE shall acquire the Property, OPTIONEE hereby expressly waives any rights which it might have to seek contribution from AUTHORITY under the provisions of the Comprehensive Environmental Response, Compensation and Liability Act 42 U.S.C. § 9601, or any other toxic waste or hazardous waste clean-up statute, law or regulation now or hereafter in existence. OPTIONEE is not relying in any way upon any representations, statements, agreements, warranties, studies, plans, reports,

4

descriptions, guidelines or other information or material furnished by AUTHORITY or its representatives, whether oral or written, express or implied, of any nature whatsoever regarding any of the foregoing matters, except as shall be set forth in the purchase and sale agreement described in Section 4.B. hereof.

SECTION 8.        ENVIRONMENTAL CONDITIONS

AUTHORITY makes no representations or warranties regarding any hazardous materials which may be present in, on or under the Property. Upon request of OPTIONEE, AUTHORITY will make available any and all reports or other information it has in its possession or control regarding any hazardous material which may have been identified on the Property. For purposes of this Agreement, "hazardous material" shall mean any material or substance which is regulated by any federal, state or local law or ordinance due to its hazardous, toxic, dangerous, flammable, corrosive or radioactive characteristic, or that may be harmful to persons who are exposed to them.

SECTION 9.        NOTICES.

All notices, demands, requests, and exercises under this Option by either party shall be hand delivered or sent by United States mail, registered or certified, postage prepaid, addressed to the other party as follows:

**OPTIONEES:**                    Athletics Investment Group LLC
                                  7000 Coliseum Way
                                  Oakland, CA 94621
                                  Attn: Neil Kraetsch - General Counsel


**AUTHORITY:**                    San Jose Diridon Development Authority
                                  City of San Jose
                                  Office of the City Manager
                                  200 East Santa Clara Street
                                  17th Floor
                                  San Jose, CA 95113


Notices, demands, requests and exercises served in the above manner shall be considered sufficiently given or served for all purposes under this Option Agreement at the time the notice, demand, or request is hand delivered or three business days after being postmarked to the addresses shown above.

SECTION 10.       ENTIRE AGREEMENT.

This Option Agreement, including all exhibits attached hereto, contains the entire agreement between the parties respecting the matters set forth, and supersedes all

prior agreements between the parties respecting such matters and all prior negotiations between the parties are merged herein. No verbal agreements or conversations with any officer, agent or employee of the AUTHORITY prior to the execution of this Agreement shall affect or modify any of the terms or obligations contained in this Option Agreement. Any such verbal agreement shall be considered unofficial information and in no way binding upon either party hereto

### SECTION 11. DISTINCTION FROM REGULATORY AUTHORITY OF THE CITY.

OPTIONEE understands and agrees that this Agreement does not and shall not be construed to indicate or imply that the CITY, AGENCY or AUTHORITY, is acting as a regulatory or permitting authority, has hereby granted or is obligated to grant any approval or permit required by law for the development of the Property as contemplated by this Agreement.

### SECTION 12. BINDING EFFECT.

This Option Agreement shall be binding on and inure to the benefit of the parties to this Option Agreement and their successors and assigns.

### SECTION 13. MISCELLANEOUS PROVISIONS.

A. This Option Agreement shall be governed exclusively by the provisions hereof and by the laws of the State of California as the same from time to time exists. In the event that suit shall be brought by either party to this Option Agreement, the parties agree that venue shall be exclusively vested in the state courts of the County of Santa Clara, or where otherwise appropriate, exclusively in the United States District Court, Northern District of California, San Jose, California.

B. Contemporaneously with the execution hereof, the AUTHORITY and OPTIONEE shall execute, acknowledge and record against the Property with the applicable governmental body the Memorandum.

### SECTION 14. COUNTERPARTS

This Option Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Option Agreement.

6

WITNESS THE EXECUTION HEREOF as of the day and year first hereinabove written.

"AUTHORITY"

APPROVED AS TO FORM:

Toni J. Taber, CMC
Assistant City Clerk

"AUTHORITY"

By: _____
Debra Figone
Executive Director

"OPTIONEE"

By: _____
PRESIDENT

7

## EXHIBIT A

## Legal Description

105 S. Montgomery Street                    APN 261-35-003, -006 & -010

### Legal Description – 105 S. Montgomery Street
### APN 261-35-003 & -006

Real property in the City of San Jose, County of Santa Clara, State of California, described as follows:

ALL THAT CERTAIN REAL PROPERTY SITUATE IN THE CITY OF SAN JOSE, COUNTY OF SANTA CLARA, STATE OF CALIFORNIA, DESCRIBED AS FOLLOWS:

**PARCEL 21:**

BEGINNING AT THE INTERSECTION OF THE SOUTHERLY LINE OF SAN FERNANDO STREET (FORMERLY KNOWN AS AND CALLED NORTH STREET) WITH THE WESTERLY LINE OF MONTGOMERY STREET, (FORMERLY KNOWN AS AND CALLED EAST STREET); RUNNING THENCE SOUTHERLY ALONG THE WESTERLY LINE OF MONTGOMERY STREET 111.50 FEET; THENCE WESTERLY AND PARALLEL WITH SAN FERNANDO STREET 77.50 FEET; THENCE NORTHERLY AND PARALLEL WITH MONTGOMERY STREET 111.501 FEET TO THE SOUTHERLY LINE OF SAN FERNANDO STREET; AND THENCE EASTERLY ALONG SAID LAST NAMED LINE 77.50 FEET TO THE POINT OF BEGINNING, AND BEING LOT 28 OF THE LOS COCHES RANCHO.

APN: PORTION 261-35-003

**PARCEL 22:**

BEGINNING AT A POINT ON THE SOUTHERLY LINE OF SAN FERNANDO STREET; DISTANT THEREON 77 FEET AND 6 INCHES WESTERLY FROM THE POINT OF INTERSECTION OF THE SOUTHERLY LINE OF SAN FERNANDO STREET WITH THE WESTERLY LINE OF MONTGOMERY STREET, FORMERLY KNOWN AS AND CALLED EAST STREET; RUNNING THENCE WESTERLY ALONG THE SOUTHERLY LINE OF SAN FERNANDO STREET 5 FEET 4 INCHES, THENCE SOUTHERLY AND PARALLEL WITH MONTGOMERY STREET 111 FEET AND 6 INCHES, THENCE EASTERLY AND PARALLEL WITH SAN FERNANDO STREET 5 FEET AND 4 INCHES; THENCE NORTHERLY AND PARALLEL WITH MONTGOMERY STREET, 111 FEET AND 6 INCHES TO THE POINT OF BEGINNING, AND BEING A PART OF LOT 28 OF THE LOS COCHES RANCHO.

APN: PORTION OF 261-35-003

**PARCEL 23:**

BEGINNING AT A POINT ON THE SOUTHERLY LINE OF SAN FERNANDO STREET DISTANT THEREON 82 FEET 10 INCHES WESTERLY FROM THE INTERSECTION OF SAID LINE OF SAN FERNANDO STREET WITH THE WESTERLY LINE OF MONTGOMERY STREET, FORMERLY EAST STREET, AS SAID LINE EXISTED ON MAY 26, 1891; THENCE WESTERLY ALONG SAID LINE OF SAN FERNANDO STREET 52 FEET; THENCE AT RIGHT ANGLES SOUTHERLY ON A LINE PARALLEL WITH SAID WESTERLY LINE OF MONTGOMERY STREET 111 FEET 6 INCHES; THENCE AT RIGHT ANGLES EASTERLY ON A LINE PARALLEL WITH SAID LINE OF SAN FERNANDO STREET 52 FEET; THENCE AT RIGHT ANGLES NORTHERLY ON A LINE PARALLEL WITH SAID WESTERLY LINE OF MONTGOMERY STREET 111 FEET 6 INCHES TO THE POINT OF BEGINNING, AND BEING A PORTION OF LOT 28 OF THE SUBDIVISION OF LOS COCHES RANCHO.

APN: PORTION OF 261-35-003

PARCEL 24:

LOT 1 AS DELINEATED AND SO DESIGNATED UPON MAP ENTITLED, "MAP OF THE OTTERSON LOTS, IN THE LOS COCHES RANCHO", IN WHICH SAID MAP WAS RECORDED OF JUNE 23, 1896 IN THE OFFICE OF THE COUNTY OF RECORDER OF THE COUNTY OF SANTA CLARA, STATE OF CALIFORNIA, IN VOLUME "B" OF MAPS, AT PAGE 35.

APN: 261-35-006

## Legal Description; APN 261-35-010

## PARCEL 19:

BEGINNING AT A POINT ON THE WESTERLY LINE OF MONTGOMERY STREET, FORMERLY KNOWN AS EAST STREET, DISTANT THEREON SOUTHERLY 111.50 FEET FROM THE POINT OF INTERSECTION OF SAID LINE OF MONTGOMERY STREET WITH THE SOUTHERLY LINE OF SAN FERNANDO STREET, FORMERLY KNOWN AS NORTH STREET, AND SAID POINT OF BEGINNING BEING THE SOUTHEASTERLY CORNER OF THE PARCEL OF LAND DESCRIBED IN THE DEED FROM CHARLES J. RYLANDER ET UX TO W.A. RISSLAND ET UX, DATED SEPTEMBER 19, 1914 AND RECORDED SEPTEMBER 19, 1914 INBOOK 419 OF DEEDS, PAGE 587, THENCE SOUTHERLY AND ALONG SAID LINE OF MONTGOMERY STREET, 42.0 FEET TO THE NORTHEASTERLY CORNER OFTHE PARCEL OF LAND DESCRIBED IN THE DEED FROM GEORGE EDWARD RAMER TO BERTHA CAROLINE BRADLEY DATED AUGUST 18, 1903 AND RECORDED JULY 26, 1904 IN BOOK 281 OF DEEDS, PAGE 121; THENCE WESTERLY AND PARALLEL WITH SAID LINE OF SAN FERNANDO STREET, AND ALONG THE NORTHERLY LINE OF LAND DESCRIBED IN THE DEED TO SAID BERTHA CAROLINE BRADLEY, 135.0 FEET TO THE NORTHWESTERLY CORNER THEREOF, AND IN THE EASTERLY LINE OF THE PARCEL OF LAND DISTRIBUTED IN THE ESTATE OF DELIA BRYANT, ALSO KNOWN AS DELIA A. BRYANT, DECEASED, TO HARRIETTE FRANCES BOWMAN AND PRINCE WARREN GODFREY, BY DECREE OF DISTRIBUTION DATED MARCH 31, 1916, A CERTIFIED COPY OF WHICH DECREE WAS FILED FOR RECORD IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SANTA CLARA, STATE OF CALIFORNIA ON APRIL 03, 1916 IN BOOK 440 OF DEEDS, AT PAGE 265, AND THENCE NORTHERLY AND ALONG SAID LAST REFERRED TO EASTERLY LINE 42.0 FEET TO THE SOUTHWESTERLY CORNER OF THE PARCEL OF LAND DESCRIBED IN THE DEED FROM H.H. MADSEN ET UX TO F.B. GILGER, DATED AUGUST 24, 1922 AND RECORDED AUGUST 30, 1922 IN BOOK 561 OF DEEDS, PAGE 143; THENCE EASTERLY AND PARALLEL WITH THE SAID LINE OF SAN FERNANDO STREET, AND ALONG THE SOUTHERLY LINE OF LAND DESCRIBED IN THE DEED TO SAID F.B. GILGER AND THE PROLONGATION OF SAID LINE EASTERLY 135.0 FEET TO THE WESTERLY LINE OF MONTGOMERY STREET; AND THE POINT OF BEGINNING, AND BEING A PORTION OF LOT 28 OF THE LOS COCHES RANCHO.

PARCEL 20:

BEGINNING AT A POINT ON THE WESTERLYLINE OF MONTGOMERY STREET, FORMERLY EAST STREET, DISTANT THEREON 153.50 FEET SOUTHERLY FROM THE POINT OF INTERSECTION OF THE WESTERLY LINE OF MONTGOMERY STREET WITH THE SOUTHERLY LINE OF SAN FERNANDO STREET, FORMERLY NORTH. STREET, SAID POINT OF BEGINNING BEING THE SOUTHEASTERLY CORNER OF THAT CERTAIN PARCEL OF LAND CONVEYED BY AMANDA J. GODFREY, A WIDOW, TO MATTIE E, HOFFMAN, BY DEED DATED APRIL 19, 1898 AND RECORDED APRIL 19, 1898 IN BOOK 208 OF DEEDS, PAGE 176, RECORDS OF SANTA CLARA COUNTY CALIFORNIA; THENCE RUNNING SOUTHERLY AND ALONG THE WESTERLY LINE OF MONTGOMERY STREET, 80 FEET TO THE NORTHEASTERLY CORNER OF THE LANDS SHOWN AND DESIGNATED UPON MAP ENTITLED, "MAP OF THE OTTERSON LOTS IN THE LOS COCHES RANCHO", AND WHICH SAID MAP WAS RECORDED IN THE OFFICE OF THE COUNTY

9

RECORDER OF THE COUNTY OF SANTA CLARA, STATE OF CALIFORNIA ON JUNE 23, 1886 IN BOOK B OF MAPS, AT PAGE 35; THENCE RUNNING WESTERLY AND ALONG THE NORTHERLY LINE OF SAID OTTERSON LOTS, 135.00 FEET TO A POINT ON THE EASTERLY LINE OF THAT CERTAIN PARCEL OF LAND DISTRIBUTED IN THE ESTATE OF DELIA BRYANT, ALSO KNOWN AS DELIA A. BRYANT, DECEASED, TO HARRIETTE FRANCES BOWMAN AND PRINCE WARREN GODFREY, BY DECREE OF DISIRIBUTION ENTERED IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA, IN AND FORTHE COUNTY OF SANTA CLARA ON MARCH 31, 1916, A CERTIFIED COPY OF WHICH WAS RECORDED ON APRIL 03, 1916 IN BOOK 440 OF DEEDS, PAGE 266, RECORDS OF SAID COUNTY OF SANTA CLARA RUNNING, THENCE NORTHERLY AND ALONG LAST SAID LINE, 80 FEET TO THE SOUTHWESTERLY CORNER OF THAT CERTAIN PARCEL OF LAND DESCRIBED IN THE DEED TO MATTIE E. HOFFMAN, AS HEREINABOVE REFERRED TO; THENCE RUNNING EASTERLY AND ALONG THE SOUTHERLY LINE OF SAID LAND SO DESCRIBED IN THE DEED TO MATTIE E. HOFFMAN, 135 FEET TO THE POINT OF BEGINNING, AND BEING A PORTION OF LOT 28 OF THE LOS COCHES RANCHO.

## 102 S. Montgomery Street          APN 259-48-012

### Legal Description – 102 S. Montgomery Street
### APN 259-48-012

Real property in the City of San Jose, County of Santa Clara, State of California, described as follows:

ALL THAT CERTAIN REAL PROPERTY SITUATE IN THE CITY OF SAN JOSE, COUNTY OF SANTA CLARA, STATE OF CALIFORNIA, DESCRIBED AS FOLLOWS:

PARCEL 5:

BEGINNING AT THE POINT OF INTERSECTION OF THE EASTERLY LINE OF MONTGOMERY STREET, FORMERLY EAST STREET, WITH THE SOUTHERLY LINE OF SAN FERNANDO STREET; THENCE RUNNING SOUTHERLY AND ALONG THE EASTERLY LINE OF MONTGOMERY STREET, 73.50 FEET; THENCE AT RIGHT ANGLES EASTERLY AND PARALLEL WITH THE SOUTHERLY LINE OF SAN FERNANDO STREET, 86 FEET; THENCE AT RIGHT ANGLES NORTHERLY AND PARALLEL WITH THE EASTERLY LINE OF MONTGOMERY STREET 73.50 FEET TO A POINT ON THE SOUTHERLY LINE OF SAN FERNANDO STREET; THENCE RUNNING WESTERLY AND ALONG THE SOUTHERLY LINE OF SAN FERNANDO STREET, 86 FEET TO THE POINT OF BEGINNING, AND BEING A PORTION OF THE LOS COCHES RANCHO.

11

510 W. San Fernando Street          APN 259-48-011
115 South Autumn Street             APN 259-48-013

## Legal Description -- 510 W. San Fernando Street
### APN 259-48-011 & -013

Real property in the City of San Jose, County of Santa Clara, State of California, described as follows:

PARCEL 1:
ALL OF LOTS 16 AND 17, AND A PORTION OF LOTS 14 AND 15, AS SHOWN UPON THAT CERTAIN MAP ENTITLED, "MAP OF THE GILLESPIE SUBDIVISION", WHICH MAP WAS FILED FOR RECORD IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SANTA CLARA, STATE OF CALIFORNIA ON APRIL 18, 1911 IN BOOK N OF MAPS, AT PAGE 48 AND A PORTION OF THE LOS COCHES RANCHO, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:
BEGINNING AT A POINT ON THE SOUTHERLY LINE OF SAN FERNANDO STREET DISTANT THEREON NORTH 85° 49' EAST 86.00 FEET FROM THE POINT OF INTERSECTION THEREOF WITH THE EASTERLY LINE OF MONTGOMERY STREET (FORMERLY EAST STREET), AS SAID STREETS ARE SHOWN UPON THE MAP ABOVE REFERRED TO; RUNNING THENCE FROM SAID POINT OF BEGINNING, SOUTH 3° 16' EAST AND PARALLEL WITH THE SAID EASTERLY LINE OF MONTGOMERY STREET, FOR A DISTANCE OF 73.50 FEET TO A POINT ON THE NORTHERLY LINE OF LOT 17, AS SAID LOT IS SHOWN UPON THE MAP ABOVE REFERRED TO; RUNNING THENCE SOUTH 85° 49' WEST ALONG SAID LAST NAMED LINE, FOR A DISTANCE OF 86.00 FEET TO THE NORTHWESTERLY CORNER THEREOF ON THE SAID EASTERLY LINE OF MONTGOMERY STREET; RUNNING THENCE SOUTH 3° 10' EAST ALONG THE SAID EASTERLY LINE OF MONTGOMERY STREET, FOR A DISTANCE OF 86.00 FEET TO THE NORTHWESTERLY CORNER OF THAT CERTAIN PARCEL OF LAND DESCRIBED IN THE DEED FROM T. J. GILLESPIE HARDWOOD PLANING MILL COMPANY, A CORPORATION, TO LENA BENNETT, DATED DECEMBER 20, 1935, RECORDED DECEMBER 24, 1935 IN BOOK 755 OF OFFICIAL RECORDS, PAGE 222, SANTA CLARA COUNTY RECORDS, THENCE LEAVING THE SAID EASTERLY LINE OF MONTGOMERY STREET AND RUNNING NORTH 85° 49' EAST ALONG THE NORTHERLY LINE OF LAND SO DESCRIBED IN THE DEED TO SAID BENNETT, FOR A DISTANCE OF 116.50 FEET TO THE NORTHEASTERLY CORNER THEREOF ON THE EASTERLY LINE OF LOT 14, AS SAID LOT IS SHOWN UPON THE MAP ABOVE REFERRED TO; RUNNING THENCE NORTH 3° 16' WEST ALONG SAID LAST NAMED LINE, FOR A DISTANCE OF 1.825 FEET, MORE OR LESS TO THE NORTHWESTERLY CORNER OF THAT CERTAIN PARCEL OF LAND DESCRIBED IN THE DEED FROM T. J. GILLESPIE HARDWOOD PLANNING MILL COMPANY, A CORPORATION, TO GEORGE SCHLOSSER, DATED MARCH 23, 1925, RECORDED MARCH 28, 1925 IN BOOK 145 OF OFFICIAL RECORDS, PAGE 279, SANTA CLARA COUNTY RECORDS; RUNNING THENCE NORTH 87° 40' EAST ALONG THE NORTHERLY LINE OF LAND SO DESCRIBED IN THE DEED TO SAID SCHLOSSER, FOR A DISTANCE OF 118.80 FEET TO THE NORTHEASTERLY CORNER THEREOF ON THE WESTERLY LINE OF GILLESPIE AVENUE, AS SAID AVENUE IS SHOWN UPON THE MAP ABOVE REFERRED TO; RUNNING THENCE NORTH 3° 16' WEST ALONG THE SAID WESTERLY LINE OF GILLESPIE AVENUE, FOR A DISTANCE OF 159.17 FEET TO THE POINT OF INTERSECTION THEREOF WITH THE SAID SOUTHERLY LINE OF SAN FERNANDO STREET; RUNNING THENCE SOUTH 85° 49' WEST ALONG THE SAID SOUTHERLY LINE OF SAN FERNANDO STREET, FOR A DISTANCE OF 147.50 FEET TO THE POINT OF BEGINNING. APN: PORTION OF 259-48-011

PARCEL 2:
PORTION OF LOTS 13 AND 14, AS SHOWN UPON THAT CERTAIN MAP ENTITLED, "MAP OF THE GILLESPIE SUBDIVISION BEING PART OF LOT 29 OF THE LOS COCHES RANCHO", WHICH MAP

12

WAS FILED FOR RECORD IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SANTA
CLARA, STATE OF CALIFORNIA ON APRIL 18, 1911 IN VOLUME "N" OF MAPS, AT PAGE 48, AND
MORE PARTICULARLY DESCRIBED AS FOLLOWS:
BEGINNING AT A POINT ON THE EASTERLY LINE OF MONTGOMERY STREET (FORMERLY EAST
STREET) DISTANT THEREON 159.50 FEET SOUTHERLY FROM THE INTERSECTION THEREOF
WITH THE SOUTHERLY LINE OF SAN FERNANDO STREET; AND RUNNING THENCE EASTERLY
AND PARALLEL WITH THE DIVIDING LINE BETWEEN SAID LOTS 13 AND 14, 116.80 FEET TO A
POINT IN THE EASTERLY LINE OF LOT 14; THENCE SOUTHERLY AND ALONG THE EASTERLY
LINE OF LOTS 14 AND 18, 50 FEET TO A POINT; THENCE WESTERLY AND PARALLEL WITH THE
DIVIDING LINE BETWEEN LOTS 18 AND 14, 116.80 FEET TO A POINT ON THE EASTERLY LINE
OF MONTGOMERY STREET; THENCE NORTHERLY AND ALONG THE SAID EASTERLY LINE OF
MONTGOMERY STREET 50 FEET TO THE POINT OF BEGINNING.
APN: PORTION OF 259-78-011

PARCEL 3:
COMMENCING AT A POINT ON THE WESTERLY LINE OF AUTUMN STREET (FORMERLY
GILLESPIE AVENUE) DISTANT THEREON S. 8° 16' E. 159.17 FEET FROM THE INTERSECTION
THEREOF WITH THE SOUTHERLY LINE OF SAN FERNANDO STREET; RUNNING THENCE ALONG
SAID WESTERLY LINE OF GILLESPIE AVENUE S. 8° 16' E. 50 FEET; THENCE S. 86° 49' W.
116.80 FEET; THENCE N. 8° 16' W. 50.00 FEET, MORE OR LESS, TO A POINT DISTANT
SOUTHERLY 15 FEET FROM THE NORTHERLY LINE OF LOT 15 HEREINAFTER MENTIONED;
THENCE N. 87°45' E. AND DISTANT SOUTHERLY 15 FEET FROM THE NORTHERLY LINE OF SAID
LOT 15, 116.80 FEET MORE OR LESS, TO THE WESTERLY LINE OF GILLESPIE AVENUE AND THE
POINT OF BEGINNING, AND BEING PORTIONS OF LOTS 12 AND 15 AS DESIGNATED AND
DELINEATED UPON THAT CERTAIN MAP ENTITLED; "MAP OF THE GILLESPIE SUBDIVISION
BEING PART OF LOT 28 OF THE LOS COCHES RANCHO", AND WHICH MAP WAS FILED FOR
RECORD IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SANTA CLARA, STATE OF
CALIFORNIA, ON APRIL 18, 1911 IN BOOK "N" OF MAPS, AT PAGE 48.
APN: 259-48-013
APN: 259-48-011 and 259-48-013
A/b: 259-48-011 & 013

150 S. Montgomery Street          APN259-48-053

## Legal Description – 150 S. Montgomery Street
## APN 259-48-053

Real property in the City of San Jose, County of Santa Clara, State of California, described as follows:

ALL THAT CERTAIN REAL PROPERTY SITUATE IN THE CITY OF SAN JOSE, COUNTY OF SANTA CLARA, STATE OF CALIFORNIA, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE EASTERLY LINE OF MONTGOMERY STREET (60.00 FEET IN WIDTH), AT THE SOUTHWESTERLY CORNER OF THE GILLESPIE SUBDIVISION A MAP OF WHICH WAS FILED FOR RECORD IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SANTA CLARA, STATE OF CALIFORNIA, ON APRIL 18, 1911 IN BOOK N OF MAPS, AT PAGE 48, SAID POINT OF BEGINNING BEING DISTANT SOUTH 3° 15' 00" EAST 329.03 FEET FROM THE POINT OF INTERSECTION THEREOF WITH THE SOUTHERLY LINE OF SAN FERNANDO STREET (60.00 FEET IN WIDTH); THENCE FROM SAID POINT OF BEGINNING NORTH 87° 24' 00" EAST ALONG THE SOUTHERLY LINE OF SAID GILLESPIE SUBDIVISION ABOVE REFERRED TO FOR A DISTANCE OF 221.44 FEET TO A POINT IN THE WESTERLY LINE OF A PROPOSED 72 FOOT STREET; THENCE SOUTHERLY ALONG SAID LAST MENTIONED LINE, ALONG AN ARC OF A CURVE TO THE RIGHT, FROM A TANGENT BEARING SOUTH 9° 35' 20" WEST, WITH A RADIUS OF 500.00 FEET, THROUGH A CENTRAL ANGLE OF 30° 42' 51", FOR AN ARC DISTANCE OF 268.03 FEET; THENCE WESTERLY ON A COMPOUND CURVE TO THE RIGHT, WITH A RADIUS OF 50.00 FEET, THROUGH A CENTRAL ANGLE OF 123° 12' 55", FOR AN ARC DISTANCE OF 107.53 FEET; THENCE SOUTH 87° 05' 00" WEST, 10.00 FEET TO A POINT IN THE SAID EASTERLY LINE OF MONTGOMERY STREET; THENCE NORTH 3° 16' 00" WEST ALONG SAID LAST MENTIONED LINE FOR A DISTANCE OF 212.84 FEET TO THE POINT OF BEGINNING.

14

645 Park Avenue                    APN 261-35-014

Legal Description – 645 Park Avenue
APN 261-35-014

Real property in the City of San Jose, County of Santa Clara, State of California, described as follows:

A PORTION OF LOTS 27 AND 28, AS SAID LOTS ARE SHOWN UPON THAT CERTAIN MAP ENTITLED, "MAP SHOWING THE SUBDIVISION OF THE RANCHO DE LOS COCHES ADJOINING THE CITY OF SAN JOSE", WHICH MAP WAS FILED FOR RECORD ON NOVEMBER 6, 1867 IN BOOK "A" OF MAPS AT PAGE 47, AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWEST CORNER OF THE PARCEL OF LAND CONVEYED TO THE CITY OF SAN JOSE, A MUNICIPAL CORPORATION, BY GRANT DEED RECORDED SEPTEMBER 21, 1965 IN BOOK 7111 AT PAGE 130 OF OFFICIAL RECORDS; THENCE SOUTH 86° 59' 15" WEST ALONG THE NORTHERLY LINE OF PARK AVENUE A DISTANCE OF 331.00 FEET TO A CHISELED "X" IN THE SIDEWALK; THENCE LEAVING SAID LAST NAMED LINE AND RUNNING NORTH 3° 00' 45" WEST AT A RIGHT ANGLE THERETO A DISTANCE OF 10 FEET; THENCE SOUTH 86° 59' 15" WEST AT A RIGHT ANGLE TO AND PARALLEL WITH SAID NORTHERLY LINE OF PARK AVENUE A DISTANCE OF 50.00 FEET; THENCE NORTH 3° 00' 45" WEST AT A RIGHT ANGLE THERETO, A DISTANCE OF 162.19 FEET, MORE OR LESS, TO THE SOUTHWESTERLY CORNER OF PARCEL 2, AS SAID PARCEL 2 IS DESCRIBED IN THAT CERTAIN MEMORANDUM OF LEASE FROM GILL INDUSTRIES, A CALIFORNIA CORPORATION, TO THE PACIFIC TELEPHONE AND TELEGRAPH COMPANY, A CORPORATION, RECORDED AUGUST 14, 1973 IN BOOK 0516 AT PAGE 402 OF OFFICIAL RECORDS, SAID SOUTHWESTERLY CORNER BEING AT A POINT IN LINE PARALLEL WITH AND DISTANT SOUTHERLY 2.00 FEET, MEASURED AT RIGHT ANGLES, FROM THE SOUTH FACE OF THE SOUTH WALL OF THE THEN EXISTING SUNLITE BAKERY BUILDING; THENCE ALONG THE SOUTHERLY LINE OF PARCEL 2 AS DESCRIBED IN SAID MEMORANDUM OF LEASE NORTH 86° 59' EAST 94.59 FEET; THENCE, ALONG THE BOUNDARIES OF THE EXISTING TRANSFORMER CAGE, SOUTH 3° 01' EAST 8.00 FEET, NORTH 86° 59' EAST 18.00 FEET AND NORTH 3° 01' WEST 8.00 FEET TO A POINT IN THE LAST MENTIONED PARALLEL LINE; THENCE, ALONG SAID PARALLEL LINE, NORTH 86° 59' EAST 18.00 FEET; THENCE, ALONG THE BOUNDARIES OF THE EXISTING EVAPORATOR, SOUTH 3° 01' EAST 13.90 FEET, NORTH 86° 59' EAST 10.00 FEET, AND NORTH 3° 01' WEST 13.90 FEET TO A POINT IN LAST MENTIONED PARALLEL LINE; THENCE, ALONG SAID PARALLEL LINE, NORTH 86° 59' EAST 94.60 FEET; THENCE, ALONG THE BOUNDARIES OF AN EXISTING SUMP, SOUTH 3° 01' EAST 1.00 FEET, NORTH 86° 59' EAST 6.00 FEET, AND NORTH 3° 01' WEST 1.00 FEET TO A POINT IN LAST MENTIONED PARALLEL LINE; THENCE ALONG SAID PARALLEL LINE, NORTH 86° 59' EAST 132.09 FEET TO THE BACK OF THE EXISTING DRIVEWAY CURB; THENCE ALONG SAID BACK OF SAID EXISTING DRIVEWAY CURB; SOUTH 3° 01' EAST 16.12 FEET, AND EASTERLY ALONG A CURVE TO THE LEFT, TANGENT TO LAST DESCRIBED COURSE HAVING A RADIUS OF 7.50 FEET, A CENTRAL ANGLE OF 90° 00', AN ARC DISTANCE OF 11.78 FEET; THENCE NORTH 86° 59' EAST 40.22 FEET TO A POINT IN A LINE PARALLEL WITH AND DISTANT 10.00 FEET WESTERLY, MEASURED AT RIGHT ANGLES, FROM THE WESTERLY LINE OF MONTGOMERY STREET; THENCE SOUTH 3° 01' 00" EAST ALONG THE WESTERLY LINE OF SOUTH MONTGOMERY STREET AS ESTABLISHED BY THE ABOVE REFERRED TO GRANT DEED TO THE CITY OF SAN JOSE A DISTANCE OF 108.54 FEET TO THE BEGINNING OF A CURVE TO THE RIGHT; THENCE ALONG A TANGENT CURVE CONCAVE SOUTHEASTERLY WITH A RADIUS OF 40 FEET THROUGH AN ANGLE OF 89° 59' 40" FOR AN ARC LENGTH OF 52.83 FEET TO THE POINT OF BEGINNING.

15

**EXHIBIT B**

RECORDING REQUESTED BY AND
WHEN RECORDED, RETURNED TO:

KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, California 90067
Attention: Benzion J. Westreich, Esq.

## MEMORANDUM OF OPTION

By this Memorandum of Option (this "*Memorandum*") entered into as of _____, 2011, THE SAN JOSE DIRIDON DEVELOPMENT AUTHORITY, a California Joint Powers Authority created pursuant to the Joint Exercise of Powers Act, Title 1, Division 7, Chapter 5, of the California Government Code, Government Code Section 6500 *et sec* ("*AUTHORITY*") grants to Athletics Investment Group LLC, a California Limited Liability Company, ("*Optionee*"), an option to purchase the real property described in the attached Exhibit A, attached hereto ("*Property*"). The option is more particularly described in the Option Agreement for the Sale of Property ("*Option Agreement*") executed in connection with this Memorandum, dated as of even date herewith, by and between Optionor and Optionee.

1. Term. The term of the Option Agreement begins and ends as provided in Section 2 of the Option Agreement.

2. Purpose. This Memorandum is prepared solely for the purposes of notice and recordation of Optionee's right to purchase the Property in accordance with the terms of the Option Agreement.

3. Termination. The Option Agreement shall automatically terminate and shall have no further force or effect upon the first of the following events to occur:

    a.   The purchase of the Property by Optionee; or
    b.   As set forth in the Option Agreement.

If Optionee does not exercise the Option contained in the Option Agreement prior to the expiration of the Option Period as defined in the Option Agreement, Optionee shall, upon AUTHORITY's request, execute a quitclaim deed to the Property, in recordable form, releasing Optionee's interest in the Property and rights under this Memorandum.

4. Price and Terms. The Optionor and Optionee have executed and recorded this instrument to give notice of the Option Agreement and the respective rights and obligations of Optionee and Optionor. The price and other terms are in the unrecorded Option Agreement, which is incorporated by reference in its entirety in this Memorandum. In the event of any inconsistency between this Memorandum and the Option Agreement, the Option Agreement shall control.

5. Successors and Assigns. This Memorandum and the Option Agreement shall bind and inure to the benefit of the parties and their respective heirs, successors, and assigns.

6. Governing Law. This Memorandum and the Option Agreement are governed by California law.

[End of text; signature on following page]

16

IN WITNESS WHEREOF, the parties have executed and delivered this Memorandum as of the date set forth hereinabove.

OPTIONOR:

THE SAN JOSE DIRIDON DEVELOPMENT AUTHORITY, a California Joint Powers Authority created pursuant to the Joint Exercise of Powers Act, Title 1, Division 7, Chapter 5, of the California Government Code, Government Code Section 6500 *et sec*

APPROVED AS TO FORM:

_____

By:   _____

OPTIONEE:

ATHLETICS INVESTMENT GROUP LLC, a California Limited Liability Company.

By:   _____
        Its:    President

STATE OF CALIFORNIA )
                     ) ss.
COUNTY OF _____ )

On _____ before me, _____ (here insert name and title of the officer),
personally appeared _____ (insert name(s) of signer(s)) who proved to me on the
basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument
and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and
that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the
person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.


WITNESS my hand and official seal.


Signature _____ (Seal)

STATE OF CALIFORNIA     )

COUNTY OF _____ ) ss.

On _____ before me, _____ (here insert name and title of the officer), personally appeared _____ (insert name(s) of signer(s)) who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

# EXHIBIT C

RD:TDM:CER
9/9/2010

RES. NO. 75567

### RESOLUTION NO. 75567

A RESOLUTION OF THE COUNCIL OF THE CITY OF SAN
JOSE: (A) REAFFIRMING THE NEGOTIATING
PRINCIPLES PREVIOUSLY ESTABLISHED AND
AMENDED BY THE CITY COUNCIL; AND (B)
SUPPORTING THE EFFORTS OF THE OAKLAND
ATHLETICS OWNERSHIP TO MOVE THE TEAM TO SAN
JOSE AND THE ASSISTANCE OF THE SILICON VALLEY
LEADERSHIP GROUP AND OTHER LOCAL GROUPS IN
THEIR EFFORTS TO BRING MAJOR LEAGUE
BASEBALL TO SAN JOSE

WHEREAS, on April 7, 2009 and August 3, 2010, the City Council and Agency Board
affirmed its interest in supporting the efforts of the Oakland Athletics' ownership to
move the team to the City of San Jose; and

WHEREAS, on May 12, 2009, the City Council and Agency Board established
Negotiating Principles for the development of a stadium in the Downtown for a Major
League Baseball team, which were subsequently amended by Council on August 3,
2010; and

WHEREAS, on September 10, 2010, through the efforts of the Silicon Valley
Leadership Group, a letter from seventy five (75) of Silicon Valley's leading CEOs was
sent to Major League Baseball urging Commissioner Selig to approve the Athletics'
move to San Jose; and

WHEREAS, various local organizations, including the San Jose Silicon Valley Chamber
of Commerce, the San Jose Convention and Visitors Bureau, the San Jose Sports
Authority and Baseball San Jose, have all expressed their support for the Athletics'
move to San Jose, and Lew Wolff, the Athletics' owner, is also on record as indicating
he would prefer San Jose as the new home of the Athletics; and

WHEREAS, the Council desires to reaffirm the following previously-approved Negotiating Principles that will guide the City's efforts in bringing a Major League Baseball stadium to San Jose:

1. No new taxes are imposed to fund ballpark-related expenditures.

2. The City must determine that the ballpark development will generate a significant economic benefit to the City and have a positive impact on City General Fund revenues.

3. No public funds shall be spent to finance or reimburse any costs associated with construction of the ballpark or construction of any on-site infrastructure or improvements needed for the ballpark.

4. No public funds of any kind are spent to finance or reimburse any ballpark operational or maintenance costs related to activities conducted by or under the authority of the baseball team that uses the ballpark either at the ballpark or in the streets surrounding the ballpark.

5. No public funds shall be spent to finance or reimburse the cost of any traffic control, street cleanup, emergency or security services within the ballpark site or within the streets surrounding the ballpark that are related to activities at the ballpark conducted by or under the authority of the baseball team.

5. If the property is leased for a ballpark, the baseball team must be willing, at the end of the term of the lease, either to purchase the property at fair market value or to do one of the following things at the City's option and at no cost to the City or the Redevelopment Agency:

RD:TDM:CER
9/9/2010

RES. NO. 75557

    a. Transfer ownership of the improvements to the City or Redevelopment
       Agency; or

    b. Demolish the improvements and clear the site to make way for other
       development.

7. The entity that builds or operates the ballpark must be willing, if the City
   deems it appropriate, to make the ballpark available to the City during
   baseball's offseason for up to 10 days per year for community-related events;
   at no rental charge to the City.

8. The name of the baseball team must include San Jose.

NOW, THEREFORE, BE IT RESOLVED THAT THE COUNCIL OF THE CITY OF SAN
JOSE:

    (a)    Reaffirms the negotiating principles previously established and amended
by the City Council; and

    (b)    Supports the efforts of the Oakland Athletics ownership to move the team
to San José and the assistance of the Silicon Valley Leadership Group and other local
groups in their efforts to bring Major League Baseball to San Jose.

T-524.44Cl 081442.doc
Council Agenda: 9-21-2010
Item No.1      2.1

5

RD:TDM:CER
9/9/2010

RES. NO. 75557

ADOPTED this 21st day of September, 2010, by the following vote:

AYES:        CHIRCO, CHU, CONSTANT, HERRERA, KALRA,
             LICCARDO, NGUYEN, OLIVERIO, PYLE; REED.

NOES:        NONE.

ABSENT:      CAMPOS.

DISQUALIFIED:   NONE.

Chuck Reed

CHUCK REED
Mayor

ATTEST:

LEE PRICE, MMC
City Clerk

T-524.445.591442.doc
Colboll Agenda: 9-21-2010
Item No.:    9.1

4

# EXHIBIT 4

**MAJOR LEAGUE CONSTITUTION**
**MLC Art. I to Art. II, Sec. 2**

# MAJOR LEAGUE CONSTITUTION

(originally adopted as the Major League Agreement on January 12, 1921)

### Article I

#### FORMATION AND DURATION OF CONSTITUTION

This Major League Constitution constitutes an agreement among the Major League Baseball Clubs, each of which shall be entitled to the benefits of and shall be bound by all the terms and provisions hereof, and it shall remain in effect through December 31, 2012, except that the provisions of Article II, Section 3(g) shall expire at such time as the current Commissioner ceases to hold office.

### Article II

#### THE COMMISSIONER

Sec. 1.    The Office of the Commissioner of Baseball is an unincorporated association also doing business as Major League Baseball and has as its members the Major League Baseball Clubs.

Sec. 2.    The functions of the Commissioner shall include:

(a)    To serve as Chief Executive Officer of Major League Baseball. The Commissioner shall also have executive responsibility for labor relations and shall serve as Chairman, or shall designate a Chairman, of such committees as the Commissioner shall name or the Major League Clubs shall from time to time determine by resolution.

(b)    To investigate, either upon complaint or upon the Commissioner's own initiative, any act, transaction or practice charged, alleged or suspected to be not in the best interests of the national game of Baseball, with authority to summon persons and to order the production of documents, and, in case of refusal to appear or produce, to impose such penalties as are hereinafter provided.

(c)    To determine, after investigation, what preventive, remedial or punitive action is appropriate in the premises, and to take such action either against Major League Clubs or individuals, as the case may be.

**3/08**

(d)    From time to time, to formulate and to announce the rules of procedure to be observed by the Commissioner and all other parties in connection with the discharge of the Commissioner's duties.  Such rules shall always recognize the right of any party in interest to appear before the Commissioner and to be heard.

(e)    To appoint a President of each League to perform such functions as the Commissioner may direct.

(f)    To make decisions, or to designate an officer of the Commissioner's Office to make decisions, regarding on-field discipline, playing rule interpretations, game protests and any other matter within the responsibility of the League Presidents prior to 2000.

Sec. 3.    In the case of conduct by Major League Clubs, owners, officers, employees or players that is deemed by the Commissioner not to be in the best interests of Baseball, punitive action by the Commissioner for each offense may include any one or more of the following:

(a)    a reprimand; (b) deprivation of a Major League Club of representation in Major League Meetings; (c) suspension or removal of any owner, officer or employee of a Major League Club; (d) temporary or permanent ineligibility of a player; (e) a fine, not to exceed $2,000,000 in the case of a Major League Club, not to exceed $500,000 in the case of an owner, officer or employee, and in an amount consistent with the then-current Basic Agreement with the Major League Baseball Players Association, in the case of a player; (f) loss of the benefit of any or all of the Major League Rules, including but not limited to the denial or transfer of player selection rights provided by Major League Rules 4 and 5; and (g) such other actions as the Commissioner may deem appropriate.

Sec. 4.    Notwithstanding the provisions of Section 2, above, the Commissioner shall take no action in the best interests of Baseball that requires the Clubs to take, or to refrain from taking, action (by vote, agreement or otherwise) on any of the matters requiring a vote of the Clubs at a Major League Meeting that are set forth in Article II, Section 9 or in Article V, Section 2(a) or (b); provided, however, that nothing in this Section 4 shall limit the Commissioner's authority to act on any matter that involves the integrity of, or public confidence in, the national game of Baseball.  Integrity shall include without limitation, as determined by the Commissioner, the ability of, and the public perception that, players and Clubs perform and compete at all times to the best of their abilities.  Public confidence shall include without limitation the public perception, as determined by the Commissioner, that there is an appropriate level of long-term competitive balance among Clubs.

**MAJOR LEAGUE CONSTITUTION**
**MLC Art. II, Sec. 5 to Art. II, Sec. 9**

Sec. 5.    Notwithstanding the provisions of Sections 2 and 4, above, the powers of the Commissioner to act in the best interests of Baseball shall be inapplicable to any matter relating to the process of collective bargaining between the Clubs and the Major League Baseball Players Association.

Sec. 6.    In the case of conduct by organizations not parties to this Constitution, or by individuals not connected with any of the parties hereto, that is deemed by the Commissioner not to be in the best interests of Baseball, the Commissioner may pursue appropriate legal remedies, advocate remedial legislation and take such other steps as the Commissioner may deem necessary and proper in the interests of the morale of the players and the honor of the game.

Sec. 7.    The Office of the Commissioner shall be financed in such manner as the Major League Clubs shall by rule and/or agreement determine.  Audited financial statements for the preceding fiscal year and a proposed budget for the ensuing year shall be submitted annually by the Commissioner for the approval of the members of the Executive Council.  The Commissioner shall obtain the approval of the Executive Council before incurring any expenses in excess of the annual budget so approved by the Executive Council, except that the Commissioner need not secure such approval in the case of expenses that the Commissioner would be required by law or pre-existing contract to pay in any event.

Sec. 8.

(a)    The Commissioner shall hold office for a minimum term of three years or for such longer term as shall be established by the Major League Clubs at the time of the Commissioner's election. The Commissioner shall be eligible to succeed himself or herself.

(b)    Any re-election shall be considered at a Major League Meeting held not less than six months nor more than 15 months prior to the expiration of any term. The Commissioner's compensation shall be fixed at the time of election.

(c)    No diminution of the compensation or powers of the present or any succeeding Commissioner shall be made during the Commissioner's term of office.

Sec. 9.    The election of a Commissioner hereunder shall be at a Major League Meeting; the vote shall be by Clubs and by written ballot, and to elect shall require the affirmative vote of not less than three-fourths of all Major League Clubs.  The re-election of a Commissioner to succeed himself or herself shall be by Clubs and by written ballot, and to re-elect shall require the affirmative vote of not less than a majority of all Major League Clubs.   During any period of incapacity of the

**MAJOR LEAGUE CONSTITUTION**
**MLC Art. II, Sec. 9 to Art. III, Sec. 2**

Commissioner, as determined by a majority of the Executive Council or by the Commissioner, all the powers and duties of the Commissioner shall be conferred upon and exercised by the Executive Council. During any vacancy in the Office of the Commissioner, all the powers and duties of the Commissioner shall be conferred upon and thenceforth exercised by the Executive Council, until a Commissioner of Baseball has been elected as herein set forth. Notwithstanding the two preceding sentences, in the event of such incapacity or vacancy and upon the affirmative vote of not less than three-fourths of all Major League Clubs, a Commissioner Pro Tem may be elected to serve for any period less than three years, with all of the powers and duties that are conferred upon the Commissioner pursuant to this Constitution.

### Article III

### THE EXECUTIVE COUNCIL

Sec. 1.    The Major League Executive Council shall be composed of the Commissioner and eight Club members, four from each League. The Club members shall be appointed by the Commissioner and ratified by the vote of a majority of the Major League Clubs. Club members shall serve a four-year term, with the term of one member from each League expiring annually. The Commissioner may designate a substitute or alternate to serve at any meeting of the Council in the absence of any member of the Council. The Commissioner and five other members shall constitute a quorum at all meetings. Each member of the Council shall have one vote. In the case of a division within the Council, the decision of a majority shall be controlling and final. The Commissioner shall have authority, solely and finally, to determine and decide all jurisdictional questions.

Sec. 2.    The Executive Council shall have jurisdiction in the following matters:

(a)    To cooperate, advise and confer with the Commissioner and other offices, agencies and individuals in an effort to promote and protect the interests of the Clubs and to perpetuate Baseball as the national game of America, and to surround Baseball with such safeguards as may warrant absolute public confidence in its integrity, operations and methods.

(b)    To survey, investigate and submit recommendations for change in, elimination of, addition to or amendments to any rules, regulations, agreements, proposals or other matters in which the Major League Clubs have an interest and particularly in respect to:

**MAJOR LEAGUE CONSTITUTION**
**MLC Art. III, Sec. 2 to Art. III, Sec. 4**

(1)   Rules and regulations determining relationships between players and Clubs and between Clubs, and any and all matters concerning players' contracts or regulations; and

(2)   Rules and regulations to govern the playing of World Series games, All-Star Games and any other contests or games in which Major League Clubs participate and/or games that may be played for charitable purposes.

(c)   In the interim between Major League Meetings, to exercise full power and authority over all other matters pertaining to the Major League Clubs, not within the jurisdiction granted to the Commissioner under this Constitution, including the adoption, amendment or suspension of Major League Rules, for said interim; provided that all actions of the Executive Council pursuant to this paragraph (c) shall be noticed for action at the next regular or special Major League Meeting for approval or other disposition.

(d)   To submit to the Major League Clubs recommendations as to persons to be considered for election as Commissioner whenever a vacancy may exist in that office.

(e)   To review and to either approve or disapprove, in whole or in part, the proposed budget submitted annually by the Commissioner for the financing of the Commissioner's Office and requests by the Commissioner for authority to incur expenses in excess thereof.

Nothing contained in this Section 2 shall be deemed to diminish or curtail the jurisdiction granted to the Commissioner under Article II hereof or to empower the Executive Council to amend or suspend in any respect any provisions of this Constitution.

Sec. 3.   The Commissioner shall be permanent Chairman of the Executive Council. The members of the Executive Council shall receive no compensation or reimbursement of expenses for their services as members thereof.

Sec. 4.   The Executive Council shall hold regularly scheduled meetings at least bi-monthly each calendar year. The Executive Council shall hold such other meetings as may, from time to time, be called at the request of the Commissioner or a majority of the Major League Clubs. The Executive Council shall establish its own rules of procedure for all such meetings and shall keep minutes of its meetings.

**MAJOR LEAGUE CONSTITUTION**
**MLC Art. IV to Art. V, Sec. 1**

## Article IV

### RULES, RESOLUTIONS AND REGULATIONS

Any rules, resolutions or regulations adopted as provided in this Constitution shall be binding upon the Major League Clubs and shall not thereafter be amended or repealed except as provided in Article III, Section 2(c), Article V, Section 2 or Article XI, Section 3 hereof. The authority of the Commissioner shall include the authority to determine finally a disagreement over a rule, resolution, regulation or this Constitution.

## Article V

### MAJOR LEAGUE MEETINGS

Sec. 1.

(a)    Four regular Major League Meetings shall be held each year on such dates and at such places as the Commissioner shall designate.  One such regular meeting shall be held each off-season in December or January.    The Commissioner may either cancel a regular meeting so called or may fail to call a regular meeting if in the Commissioner's judgment there is not sufficient business to justify holding the meeting.  The Commissioner may also hold any meeting by teleconference or videoconference or conduct any vote by mail, facsimile, electronic mail or other means.  At all Major League Meetings, the Commissioner shall preside, except that the Commissioner shall not preside at any Major League Meeting for the election of a Commissioner or for consideration of the term of office or duties of a Commissioner.  In the absence of the Commissioner, the presiding officer shall be elected by written ballot of a majority vote of the Major League Clubs represented at the meeting.  Whatever Clubs shall be represented at a Major League Meeting shall constitute a quorum. Each Club at a Major League Meeting shall be represented by a person having full authority to act for the Club and to bind the Club on all matters.  Voting shall be by roll call of the Clubs, in rotating alphabetical order; provided, however, that upon the majority vote of all Clubs, the vote shall be by written ballot.

(b)    The Commissioner or the Executive Council or any Major League Club may, from time to time, propose to the Major League Clubs the adoption, amendment or rescission of any rule, resolution or other matter for action at a Major League Meeting.  Except by unanimous consent, no action shall be taken at any Major League Meeting upon any matter of which at least 20 days, or at any special meeting upon any matter of which at least 10 days, of prior written

6                                                **3/08**

**MAJOR LEAGUE CONSTITUTION**
**MLC Art. V, Sec. 1 to Art. V, Sec. 2**

notice shall not have been given all Major League Clubs and the Executive Council. The notice calling any Major League Meeting may specify that the meeting shall act in Executive Session either entirely or as to any particular matter specified therein. Upon the affirmative vote of a majority of the Major League Clubs represented at a Major League Meeting or at the Commissioner's direction, such meeting shall go into Executive Session. At an Executive Session each Club shall be represented by not more than two representatives.

Sec. 2.

(a)    The vote of a majority of the Major League Clubs shall be required for the approval of any of the following:

(1)  Any action relating to the process of collective bargaining with the Major League Baseball Players Association or with any representative of the Major League umpires;

(2)  Any action relating to scheduling for the championship season;

(3)  Any action relating to the All-Star Game, Division Series, League Championship Series or World Series;

(4)  Any action to amend Major League Rule 25 relating to the Uniform Playing Rules and Official Scoring Rules; provided, however, that any action to amend the designated hitter rule shall require the vote of three-fourths of all Clubs;

(5)  Any action relating to radio, television or other audio or video media (including the Internet or any other online technology), including but not limited to any agreement or amendment thereto with any other party, pursuant to which there is the grant, license or other transfer of radio, television or other audio or video media rights for Major League Baseball games; or

(6)  Any action to extend the term of this Constitution.

(b)    The vote of three-fourths of the Major League Clubs shall be required for the approval of any of the following:

(1)  Expansion by the addition of a new Club or Clubs or contraction by the subtraction of a Club or Clubs;

7                                    **3/08**

**MAJOR LEAGUE CONSTITUTION**
**MLC Art. V, Sec. 2 to Art. V, Sec. 3**

(2)   The sale or transfer of a control interest in any Club; provided, however, that a majority vote of all Major League Clubs shall be sufficient to approve any such sale or transfer occurring upon the death of an owner to a spouse or one or more lineal descendants.  For purposes hereof, the term "control" shall mean the possession by the transferee, directly or indirectly, of the power or authority to influence substantially the management policies of the Club.  A sale or transfer of a non-control interest in any Club shall require only the approval of the Commissioner;

(3)   The relocation of any Major League Club;

(4)   Any change from the present form of three-division play in either League (e.g., two-division or four-division play);

(5)   The realignment of one or more Clubs into a different division(s) or into the other League; provided, however, that no Club may be moved to a different division or to the other League without its consent;

(6)   Any provision affecting the sharing by the Major League Clubs of revenues from any source;

(7)   Any provision amending this Constitution, except as specifically provided elsewhere in this Constitution; or

(8)   The involuntary termination of the rights, privileges and properties of a Major League Club pursuant to the procedures of Article VIII hereof.

(c)   Except as specifically provided in Article II, Section 9 and Article V, Section 2(b) of this Constitution, all actions to be voted upon by the Major League Clubs shall be decided by a majority vote of all Major League Clubs.

(d)   Interpretation and applicability of this Section 2 shall be made by the Commissioner and that decision shall be final and non-appealable.

Sec. 3.   Special Major League Meetings may be called by the Commissioner and shall be so called whenever the Commissioner is requested in writing by any eight Major League Clubs.  If the Commissioner shall, within five days after receipt of such request, fail to call a Major League Meeting, any Major League Club so requesting may call the Major League Meeting.

**3/08**

**MAJOR LEAGUE CONSTITUTION**
**MLC Art. VI, Sec. 1 to Art. VI, Sec. 2**

### Article VI

### ARBITRATION

Sec. 1.    All disputes and controversies related in any way to professional baseball between Clubs or between a Club(s) and any Major League Baseball entity(ies) (including in each case, without limitation, their owners, officers, directors, employees and players), other than those whose resolution is expressly provided for by another means in this Constitution, the Major League Rules, the Basic Agreement with the Major League Baseball Players Association, or the collective bargaining agreement with any representative of the Major League umpires, shall be submitted to the Commissioner, as arbitrator, who, after hearing, shall have the sole and exclusive right to decide such disputes and controversies and whose decision shall be final and unappealable.  The procedure set forth in this Section is separate from and shall not alter or affect the procedure set forth in Article V governing the role of the Commissioner at Major League Meetings, or the Commissioner's powers to act in the best interests of Baseball under Article II.

Sec. 2.    The Major League Clubs recognize that it is in the best interests of Baseball that all actions taken by the Commissioner under the authority of this Constitution, including, without limitation, Article II and this Article VI, be accepted and complied with by the Clubs, and that the Clubs not otherwise engage in any form of litigation between or among themselves or with any Major League Baseball entity, but resolve their differences pursuant to the provisions of this Constitution.  In furtherance thereof, the Clubs (on their own behalf and including, without limitation, on behalf of their owners, officers, directors and employees) severally agree to be finally and unappealably bound by actions of the Commissioner and all other actions, decisions or interpretations taken or reached pursuant to the provisions of this Constitution and severally waive such right of recourse to the courts as would otherwise have existed in their favor.  In the event of any legal action other than as prescribed by Section 1 of this Article VI by any Club (including, without limitation, their owners, officers, directors and employees) in connection with any dispute or controversy related in any way to professional baseball, or in the event of noncompliance with any action of the Commissioner, with any action or decision taken or reached pursuant to the provisions of this Constitution, or with the terms or intent of this Article VI, in addition to any other remedy that may be available to the Commissioner, the Commissioner may direct that the costs, including attorneys' fees, to the Office of the Commissioner or any other Baseball entity, whether as plaintiff or defendant, of any court proceeding or other form of litigation resulting therefrom be reimbursed to the Office of the Commissioner or such other Baseball entity by such non-complying Club (on its own behalf and including, without limitation, on behalf of its owners, officers, directors and

**MAJOR LEAGUE CONSTITUTION**
**MLC Art. VI, Sec. 2 to Art. VIII, Sec. 1**

employees). Nothing herein shall be construed to limit any rights of indemnity that the Major League Clubs or any Major League Baseball entity may have against any Club.

Sec. 3.    The form of player's contract to be used by the Major League Clubs, and all contracts between Major League Clubs and their officers and employees, shall contain a clause by which the parties agree to submit themselves to the jurisdiction of the Commissioner, and to accept the Commissioner's decisions rendered in accordance with this Constitution.

## Article VII

### SUPERSEDING EFFECT

This Constitution, and all actions taken pursuant to this Constitution, shall supersede any conflicting provisions of any other agreement, as amended, whether now existing or hereinafter entered into, to which any Major League Club is a party and any conflicting actions taken pursuant thereto.

## Article VIII

### CLUBS AND TERRITORIES

Sec. 1.    **Clubs.**  There shall be 30 Major League Clubs, which agree hereby to act at all times in the best interests of Baseball. The Clubs shall be organized into two Leagues, the American League and the National League, with three divisions in each League, as follows:

| American League | National League |
|---|---|
| East | East |
| Baltimore Orioles | Atlanta Braves |
| Boston Red Sox | Florida Marlins |
| New York Yankees | New York Mets |
| Tampa Bay Rays | Philadelphia Phillies |
| Toronto Blue Jays | Washington Nationals |

**MAJOR LEAGUE CONSTITUTION**
**MLC Art. VIII, Sec. 1 to Art. VIII, Sec. 4**

Central

Chicago White Sox
Cleveland Indians
Detroit Tigers
Kansas City Royals
Minnesota Twins

West

Los Angeles Angels of Anaheim
Oakland Athletics
Seattle Mariners
Texas Rangers

Central

Chicago Cubs
Cincinnati Reds
Houston Astros
Milwaukee Brewers
Pittsburgh Pirates
St. Louis Cardinals

West

Arizona Diamondbacks
Colorado Rockies
Los Angeles Dodgers
San Diego Padres
San Francisco Giants

Sec. 2. **Expansion, Contraction, Realignment, Divisions.** Any increase or decrease in the number of or any realignment of the Major League Clubs or any change from the present form of three-division play shall be governed by the voting provisions in Article V, Section 2 (b).

Sec. 3. **Voluntary Termination.** A Major League Club may withdraw from this Constitution only with the approval of three-fourths of all Major League Clubs, subject to such terms and conditions as the Commissioner may require, by submitting a written request to withdraw to the Commissioner, making full payment of all Baseball indebtedness and offering to assign to the Commissioner or the Commissioner's designee all of the withdrawing Club's rights, privileges and other property rights hereunder and under any other Baseball-related agreement.

Sec. 4. **Involuntary Termination.** The rights, privileges and other property rights of a Major League Club hereunder and under any other Baseball-related agreement may be terminated (i) in the event of contraction, pursuant to Article V, Section 2 (b) (1), or (ii) involuntarily, with the approval of three-fourths of all Major League Clubs, if the Club in question shall do or suffer any of the following:

(a)    Disband its team;

(b)    Disband its business organization or cease its business;

(c)    Except pursuant to official policies promulgated by the Commissioner, allow gambling of any kind upon its grounds or any building owned or controlled by it;

11    **3/08**

**MAJOR LEAGUE CONSTITUTION**
**MLC Art. VIII, Sec. 4 to Art. VIII, Sec. 6**

(d)    Offer, agree, conspire or attempt to lose any game participated in by the Club; or fail to suspend immediately any player, employee or officer who shall be proved guilty of offering, agreeing, conspiring or attempting to lose any such game or of being interested in any pool or wager on any game in which a Club participates;

(e)    Fail to present its team at the time and place it is scheduled to play any championship game, unless such failure is caused by unavoidable accident in travel or conditions beyond the control of the Club or its officers;

(f)    Fail or refuse to comply with any requirement of the Commissioner;

(g)    Willfully violate any provision of this Constitution or any provision of the Professional Baseball Agreement, or any rules duly adopted pursuant to either of those agreements;

(h)    Transfer or assign such number of its player contracts as will prevent it from functioning as a Major League Club;

(i)    Fail to pay any indebtedness owing to Baseball within thirty days after receiving written notice from the Commissioner of default of such payment;

(j)    Fail or refuse to fulfill its contractual obligations;

(k)    Fail to maintain a ballpark suitable for the playing of home Major League Baseball games; or

(l)    Make an assignment for the benefit of its creditors or file a voluntary petition in bankruptcy, or if a receiver or trustee in bankruptcy is appointed for the properties and assets of the Club, or if reorganization proceedings in bankruptcy are instituted by or against the Club.

Sec. 5.    **Termination Procedure.**  The Commissioner shall determine the procedure to be followed with respect to a termination of a Club's rights hereunder, whether voluntary or involuntary.  Such procedures shall include, in the case of a proposed involuntary termination, a written charge identifying the basis for the proposed involuntary termination, and an opportunity for the Club in question to be heard with respect to the charge.

Sec. 6.    **Effect of Termination.**  Upon termination of a Major League Club in accordance with Section 3 or 4 hereof, the Commissioner may, but is not required to,

<div align="center">12</div>          **3/08**

**MAJOR LEAGUE CONSTITUTION**
**MLC Art. VIII, Sec. 6 to Art. VIII, Sec. 8**

cancel and/or make such other disposition of the terminated Club's rights, privileges and other property rights hereunder or under any other Baseball-related agreement as the Commissioner deems appropriate. Without limiting the foregoing, the Commissioner is hereby authorized and empowered (but not required) to acquire through a designee and operate or dispose of the baseball park (or leasehold interest therein if such park is leased by such Club) and/or all other baseball properties, including without limitation the Club and the television, radio and other media contracts of such Club, the Player Development Contracts of such Club, the trademark and copyright rights of such Club and any other property, contracts, rights under this Constitution or other rights the Commissioner shall designate. Any terminated Club shall be obligated to assist in carrying out the provisions of any intended sale or other disposition and will execute and deliver any and all documents determined by the Commissioner to be necessary or convenient therefor, including without limitation instruments of conveyance, transfer, lease, bill of sale, assignment or quit claim. In the event of a failure, refusal or inability of any terminated Club to execute any and all such documents, each Club agrees i) that the Commissioner shall have the full and complete authority, to execute any and all such documents on behalf of the terminated Club in order to carry out the intended sale or other disposition, and ii) that any court of competent jurisdiction may enter any orders, judgments or decrees necessary to enforce and carry out the provisions hereof and that such Club will not oppose the entry of any such orders, judgments or decrees. Upon consummation of such purchase or sale, the Commissioner may first apply the proceeds to the payment of Baseball-related debts of the terminated Club, and finally any balance remaining thereafter shall be paid over to the terminated Club. The cancellation, operation, acquisition or disposition of a terminated Club's rights, privileges and properties shall be conducted in such manner, if any, as may be decided by the Commissioner in the Commissioner's sole discretion.

Sec. 7.    **Effect of Termination on Active Player Contracts and Reservation Rights.**  Upon a termination of a Major League Club in accordance with Section 3 or 4 hereof, title to the contracts of all active players then under contract to the terminated Club and all rights of player reservation of such Club shall, at the option of the Commissioner, thereupon vest in the Commissioner or a designee of the Commissioner, to be disposed of in such manner as the Commissioner may determine. The Commissioner may exercise this option with respect to all or less than all of the active player contracts and reservation rights of the terminated Club.

Sec. 8.    **Operating Territories.**    The Major League Clubs shall have assigned operating territories within which they have the right and obligation to play baseball games as the home Club.

**3/08**

## MAJOR LEAGUE CONSTITUTION
### MLC Art. VIII, Sec. 8

(a)    National League.  The National League Clubs shall have the following operating territories:

Arizona Diamondbacks:    Maricopa County in Arizona;

Atlanta Braves:    City of Atlanta; and Fulton, Cobb, Gwinette and Dekalb Counties in Georgia;

Chicago Cubs:    Cook, Lake, DuPage, Will, Kendall, McHenry and Grundy Counties in Illinois; and Lake and Porter Counties in Indiana; provided, however, that this territory shall be shared with the Chicago White Sox franchise in the American League;

Cincinnati Reds:    Butler, Warren, Clermont and Hamilton counties in Ohio; Boone, Kenton and Campbell Counties in Kentucky; and Dearborn and Franklin Counties in Indiana;

Colorado Rockies:    City of Denver; and Adams, Arapahoe, Boulder, Broomfield, Douglas, Jefferson and Denver Counties in Colorado;

Florida Marlins:    Dade and Broward Counties in Florida; provided, however, that with respect to all Major League Clubs, Palm Beach County in Florida shall also be included;

Houston Astros:    City of Houston; and Harris, Brazoria, Chambers, Fort Bend, Galveston, Liberty, Montgomery and Waller Counties in Texas;

Los Angeles Dodgers:    Orange, Ventura and Los Angeles Counties in California; provided, however, that this territory shall be shared with the Los Angeles Angels of Anaheim franchise in the American League;

Milwaukee Brewers:    Milwaukee, Ozaukee and Waukesha Counties in Wisconsin;

New York Mets:    City of New York; Nassau, Suffolk, Rockland and Westchester Counties in New York; Bergen, Hudson, Essex and Union Counties in New Jersey; and that

**MAJOR LEAGUE CONSTITUTION**
**MLC Art. VIII, Sec. 8**

portion of Fairfield County in Connecticut located south of Interstate 84 and west of Route 58; provided, however, that this territory shall be shared with the New York Yankees franchise in the American League;

Philadelphia Phillies: Bucks, Montgomery, Chester, Delaware and Philadelphia Counties in Pennsylvania; and Gloucester, Camden and Burlington Counties in New Jersey;

Pittsburgh Pirates: City of Pittsburgh and Allegheny County in Pennsylvania;

St. Louis Cardinals: City of St. Louis; and St. Louis, Jefferson, St. Charles and Franklin Counties in Missouri; and St. Clair, Madison, Monroe and Jersey Counties in Illinois;

San Diego Padres: San Diego County in California;

San Francisco Giants: City of San Francisco; and San Francisco, San Mateo, Santa Cruz, Monterey and Marin Counties in California; provided, however, that with respect to all Major League Clubs, Santa Clara County in California shall also be included;

Washington Nationals: District of Columbia; and Arlington, Fairfax and Prince William Counties, and all independent cities bordering such counties, in Virginia.

(b)  American League.  The American League Clubs shall have the following operating territories:

Baltimore Orioles: City of Baltimore; and Baltimore, Anne Arundel, Howard, Carroll and Harford Counties in Maryland;

Boston Red Sox: Suffolk, Middlesex, Essex, Bristol, Worcester, and Norfolk Counties in Massachusetts; provided, however, that Bristol and Worcester Counties and the territory south and west of Highway 128 in Norfolk County shall be shared with the Pawtucket franchise in the International League;

15  **3/08**

## MAJOR LEAGUE CONSTITUTION
### MLC Art. VIII, Sec. 8

| | |
|---|---|
| Chicago White Sox: | Cook, Lake, DuPage, Will, Kendall, McHenry and Grundy Counties in Illinois; and Lake and Porter Counties in Indiana; provided, however, that this territory shall be shared with the Chicago Cubs franchise in the National League; |
| Cleveland Indians: | Cuyahoga, Lorrain, Medina, Geauga, Lake and Summit Counties in Ohio; provided, however, that Summit County shall be shared with the Akron franchise in the Eastern League; |
| Detroit Tigers: | Wayne, Monroe, Washtenaw, Oakland, Macomb and St. Clair Counties in Michigan; |
| Kansas City Royals: | Johnson, Wyandotte, Miami and Leavenworth Counties in Kansas; and Clay, Jackson, Cass and Platte Counties in Missouri; |
| Los Angeles Angels of Anaheim: | Los Angeles, Orange and Ventura Counties in California; provided, however, that this territory shall be shared with the Los Angeles Dodgers franchise in the National League; |
| Minnesota Twins: | Ramsey and Hennepin Counties in Minnesota; |
| New York Yankees: | City of New York; Nassau, Suffolk, Rockland and Westchester Counties in New York; Bergen, Hudson, Essex and Union Counties in New Jersey; and that portion of Fairfield County in Connecticut located south of Interstate 84 and west of Route 58; provided, however, that this territory shall be shared with the New York Mets franchise in the National League; |
| Oakland Athletics: | Alameda and Contra Costa Counties in California; |
| Seattle Mariners: | King County in Washington; |
| Tampa Bay Rays: | Hillsborough and Pinellas Counties in Florida; |
| Texas Rangers: | Cities of Dallas, Ft. Worth and Arlington; and Dallas and Tarrant Counties in Texas; |

**MAJOR LEAGUE CONSTITUTION**
**MLC Art. VIII Sec. 8 to Art. IX, Sec. 5**


Toronto Blue Jays:        Cities of Scarborough, York, East York, North York, Etobicoke and Toronto, commonly referred to as Metropolitan Toronto.

Sec. 9.    **Home Television Territories.**    The definitions of the home television territories of the Major League Clubs shall be maintained in the Commissioner's Office. Amendments to such territories shall be made only with the approval of the Executive Council.


**Article IX**


**CONDUCT OF CHAMPIONSHIP SEASON AND POST-SEASON**

Sec. 1.    **Schedule.**    The games for each championship season shall be arranged in a written schedule prepared by the Commissioner, acting in accordance with any standing resolutions passed at a Major League Meeting and with the Basic Agreement with the Major League Baseball Players Association.  No Major League Club shall schedule or play any exhibition game during the championship season without the prior approval of the Commissioner.

Sec. 2.    **Playing Rules.**    All championship games shall be played under the Official Baseball Rules.

Sec. 3.    **Parks Not to be Changed During Season.**    No Club shall change the size or dimensions of its playing field during the championship season.

Sec. 4.    **Championship Season and Post-Season.**    The Commissioner shall have responsibility for all matters relating to the administration of the championship season and the post-season, which shall be conducted in accordance with the Major League Rules and the Major League Regulations.

Sec. 5.    **All-Star Game.**    The Clubs shall provide the necessary services of players, and, if selected as a host Club, the park, facilities and equipment needed for the playing of an All-Star Game during each baseball season.  All-Star Games shall be played under the supervision, control and direction of the Commissioner. The date and the park in which an All-Star Game is to be played shall be determined by the Executive Council. Each host Club agrees that when it is designated to conduct an All-Star Game, it will provide the park, facilities and equipment for such a game for a total rental of one dollar and will act as agent for the Major League Clubs in the conduct of said game.

**MAJOR LEAGUE CONSTITUTION**
**MLC Art. X, Sec. 1 to Art. X, Sec. 3**

### Article X

### MAJOR LEAGUE CENTRAL FUND

Sec. 1.   **Maintenance of Major League Central Fund.**   There shall be maintained for the Major League Clubs in the Office of the Commissioner a separate account to be known as the "Major League Central Fund" and to be administered by the Executive Council. All sums received for the account of the parties hereto under this Constitution shall be deposited in the Major League Central Fund.   The Commissioner is hereby appointed the fiscal agent of the Major League Central Fund.

Sec. 2.   **All-Star Game Revenues and Expenses.**   The All-Star Game host Club shall be required to submit such revenue and expense budgets for the All-Star Game and reasonably related events as may from time to time be required by the Commissioner. The host Club shall be entitled to reimbursement of its reasonable and necessary expenses out of such revenues. With the approval of the Commissioner, reimbursement of expenses included in the budget may be made on application of the host Club periodically in advance of each All-Star Game. Final settlement pursuant to the approved budget shall be made following submission of a post-game accounting by the host Club. All-Star Game receipts from the sale of tickets (net of applicable local taxes) shall be transmitted by the host Club to the Major League Central Fund without deduction for expenses, but the host Club may retain revenues received from related activities until the final accounting and settlement.

The net proceeds of each such game and related activities after the payment of expenses shall be deposited in the Major League Central Fund and shall be credited to the Major League Clubs equally.

Sec. 3.   **Major League Club Broadcasts.**   Major League Club practices with regard to the telecasting and radio broadcasting of games are governed as follows:

(a)   The Clubs hereby agree that each Club shall have, with respect to each game in which it participates, the right to authorize the telecast of such game only by means of over-the-air, cable and satellite technology, and only within its home television territory.

(b)   Each Club shall have, with respect to each game in which it participates, the right to authorize the radio broadcast of such game (1) if such Club is a home Club, over any radio broadcast station in the United States, for Clubs in the United States, or in Canada, for Clubs in Canada, except a station whose transmitter is not

**MAJOR LEAGUE CONSTITUTION**
**MLC Art. X, Sec. 3 to Art. X, Sec. 4**

located within 50 miles of such Club's ballpark and is located within 50 miles of the visiting Club's ballpark, or (2) if such Club is a visiting Club, over any radio broadcast station in the United States, for Clubs in the United States, or in Canada, for Clubs in Canada, whose transmitter is located within 50 miles of such visiting Club's ballpark, except as may be agreed by the home Club and the visiting Club.

(c)     Each Club shall provide in its ballpark to the visiting Club suitable space to be used for the purposes described in subparagraphs (a) and (b), above, together with the ability to install and maintain in such ballpark such wires, cables and other equipment and items as may be necessary for such purposes, at the expense of the visiting Club or the visiting Club's rightsholder.  Each home Club will additionally admit such employees and agents of the visiting Club and the visiting Club's rightsholder to the home Club's ballpark free of charge as may be necessary for the purposes described in subparagraphs (a) and (b), above.

(d)     Each Club hereby agrees, with respect to each game in which it participates, that the other participating Club shall have the right, and hereby authorizes the Commissioner to grant to national rightsholders the right, to make use of the Club's trademarks in connection with all productions made pursuant to subparagraphs (a) and (b), above, and Section 4, below, and all advertising related thereto.  All such use of trademarks shall inure to the benefit of the trademark owner and shall be made pursuant to all established standards of quality.

Sec. 4.     **National Broadcasts, Copyright Royalties.**  Subject to such approving vote of the Major League Clubs as may be required by Article V, Section 2 of this Constitution, the Major League Clubs grant to the Commissioner, acting as their agent, with the prior advice and prior consent of the Major League Executive Council, the exclusive right to sell on their behalf, throughout the United States and other territories as chosen by the Commissioner, exclusive or non-exclusive television and radio or other video or audio media rights (including the Internet and any other online technology) (live or taped) to the World Series, League Championship Series, Division Series, All-Star Games, regular season championship games, spring training games, exhibition games and other Major League Baseball events.  All contracts for the sale of such television, radio and other video and audio media and online rights shall be administered by the Commissioner on behalf of the Clubs, and the contracts shall so provide.

The Clubs further authorize and empower the Commissioner, acting as their agent, to make exclusive demand and present formal claim on their behalf, by appropriate notice, filings and otherwise, and to negotiate and enter into settlement agreements with respect to the collection of royalty fees for broadcasts of Major League Baseball games carried as distant signal programming by cable television systems, satellite providers

**MAJOR LEAGUE CONSTITUTION**
**MLC Art. X, Sec. 4 to Art. X, Sec. 5**

and other media providers, pursuant to applicable provisions of the United States, Canada and foreign copyright laws.

The proceeds received from the sales of television and radio or other video or audio media rights to the World Series, League Championship Series, Division Series, All-Star Games, regular season championship games, spring training games and exhibition games and from copyright royalty fees shall be made payable to the Commissioner as agent for the Clubs, and when received by the Commissioner, shall be deposited in the Major League Central Fund and shall be credited to each of them equally.

Sec. 5.    **Payments from Central Fund, Books of Account.**  Each of the Major League Clubs hereto hereby authorizes and directs the Commissioner to make the following payments on its behalf out of the Major League Central Fund.   These payments are to be charged to the Clubs equally.

(a)    There shall be payments of such contributions to the Major League Baseball Players Benefit Plan as the Clubs are or may become obligated to contribute to the Benefit Plan by agreement with the Major League Baseball Players Association or by action of the Clubs.

(b)    In October of each year, there shall be paid to the Commissioner an amount which shall be sufficient for the following purposes:

(1)  to enable the Commissioner, after expenditure of the receipts of the Commissioner's Office from all other sources, to cover (i) the clerical, administrative and operational expenses of the Commissioner's Office and the Executive Council incurred during the fiscal year ending in that month pursuant to the budget for such year as approved by the Executive Council, and (ii) expenditures for contributions and other non-operational purposes made pursuant to the appropriations for such purposes recommended by the Executive Council, and

(2)  to provide, as of the close of each fiscal year, a reserve fund for the Commissioner's Office of at least $10,000,000, or such amount approved by the Executive Council (such reserve fund to be the excess of all assets over all liabilities).

(c)    There shall be paid from time to time such amounts as shall be approved by the Executive Council for the administrative expenses of the Central Fund and for other purposes common to all Clubs, including the compensation and expenses of advisors, attorneys, actuaries and other persons retained or employed by the

20                                                                        **3/08**

**MAJOR LEAGUE CONSTITUTION**
**MLC Art. X, Sec. 5 to Art. X, Sec. 6**

Commissioner in connection with player relations matters and the Major League Baseball Players Benefit Plan or other matters.

(d)     The balance of each Club's share of the Major League Central Fund remaining after said payments (less the reserve) shall be paid to the Clubs on or before October 31 of the year in which received, or as soon thereafter as possible, unless otherwise determined by the Commissioner.

The Commissioner may from time to time invest any balance of the Major League Central Fund on hand in certificates of deposit, obligations of the United States Government, $A_1P_1$ rated commercial paper or such other interest bearing accounts or instruments as have been approved in advance by the Major League Finance & Compensation Committee.

Upon termination of the Major League Central Fund, any remaining funds shall be distributed and paid to the Clubs.

The Commissioner shall provide and keep true and accurate books of account and records of all receipts and disbursements and other transactions involving or pertaining to the Major League Central Fund.

On or before February 15 of each year, the Commissioner shall submit to the Executive Council an accurate statement of account showing all receipts and disbursements and other transactions involving or pertaining to the Major League Central Fund during the preceding fiscal year ending October 31 and, in addition thereto, setting forth a full and complete schedule of all cash obligations of the United States Government and other property then comprising the Major League Central Fund.

Each Major League Club shall be furnished a copy of such annual statement and shall be entitled at all times during business hours to inspect the books of account and records of the Major League Central Fund.

Sec. 6.     **Termination of Central Fund.**  The Major League Central Fund shall be in existence continuously unless and until three-fourths of the Major League Clubs shall have given to the Commissioner written notice on or before June 30 of any year of their intention to terminate the Major League Central Fund, and upon the giving of any such notice the Major League Central Fund shall terminate on the 31st day of December of the year following the year in which such notice is given.

### Article XI

### MISCELLANEOUS

Sec. 1.    **Fiscal Responsibility**.  Each Major League Club shall comply with the Debt Service Rule and any other rules dealing with fiscal responsibility as may be contained in the then-current Basic Agreement with the Major League Baseball Players Association, as may be amended in accordance with Article V, Section 2(a)(1).

Sec. 2.    **Indemnification of Officials.**  The Major League Clubs hereby jointly indemnify each person who is now or hereafter serves as the Commissioner of Baseball, or as an employee, officer or director of the Office of the Commissioner of Baseball, Major League Baseball Properties, Inc., Major League Baseball Enterprises, Inc., Major League Baseball Advanced Media, L.P., the Major League Scouting Bureau, the Arizona Fall League, Inc. or any other similar or affiliated entity currently existing or hereafter created to carry out functions of interest to Major League Baseball or to professional baseball, and each person who is an officer, director, employee or representative of a Major League Club who has been or is hereafter elected, appointed or selected by the Commissioner of Baseball or the Commissioner's designee or the Major League Executive Council to perform, individually or as a member of a committee, a function related to the Office of the Commissioner of Baseball or any other matter of interest to Major League Baseball or to professional baseball, whether or not then acting as such Commissioner of Baseball, employee, officer or director or as such a person so elected, appointed or selected, against expenses (including attorney's fees) judgments, fines and amounts paid in settlement actually and reasonably incurred by him or her in connection with any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative to which he or she shall have been made a party by reason of his or her being or having served in such capacity if he or she acted in good faith and in a manner he or she reasonably believed to be in and not opposed to the best interests of baseball, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he or she reasonably believed to be in or not opposed to the best interest of baseball, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his or her conduct was unlawful.

The Commissioner shall hereafter be indemnified in any case, provided that he or she has met the applicable standard of conduct set forth in the preceding portion

**MAJOR LEAGUE CONSTITUTION**
**MLC Art. XI, Sec. 2 to Art. XI, Sec. 3**

of this resolution. In the case of any other person covered by this resolution, indemnification shall be only as authorized in a specific case upon a determination either by the Commissioner or a majority vote of the Major League Clubs that the indemnification of the person is proper in the circumstances because he or she has met the applicable standard of conduct set forth in the preceding portion of this resolution.

Sec. 3.   **Major League Regulations.**   The Commissioner shall adopt a set of Major League Regulations relating to games, ballparks, uniforms and other matters and may otherwise promulgate bulletins and directives binding on the Major League Clubs (including without limitation their owners, officers, directors and employees) in matters relating to the Commissioner's functions and the administration of the game of baseball that are not inconsistent with this Constitution.   Amendments to such Regulations, bulletins and directives may be made in the discretion of the Commissioner.