# EXHIBIT B

1042-A

# PROFESSIONAL SPORTS ANTITRUST IMMUNITY

SuDocs
Y4.
J89/2:
J-97-134

## HEARINGS

BEFORE THE

## COMMITTEE ON THE JUDICIARY
## UNITED STATES SENATE

NINETY-SEVENTH CONGRESS

SECOND SESSION

ON

## S. 2784 and S. 2821

AUGUST 16, SEPTEMBER 16, 20, AND 29, 1982

**Serial No. J–97–134**

Printed for the use of the Committee on the Judiciary

UCLA LAW LIBRARY
RECEIVED

MAY 11 1983

DEPOSITORY ITEM
GOVERNMENT
PUBLICATIONS

U.S. GOVERNMENT PRINTING OFFICE

16-645 O WASHINGTON : 1983

COMMITTEE ON THE JUDICIARY

STROM THURMOND, South Carolina, *Chairman*

CHARLES McC. MATHIAS, Jr., Maryland
PAUL LAXALT, Nevada
ORRIN G. HATCH, Utah
ROBERT DOLE, Kansas
ALAN K. SIMPSON, Wyoming
JOHN P. EAST, North Carolina
CHARLES E. GRASSLEY, Iowa
JEREMIAH DENTON, Alabama
ARLEN SPECTER, Pennsylvania

JOSEPH R. BIDEN, Jr., Delaware
EDWARD M. KENNEDY, Massachusetts
ROBERT C. BYRD, West Virginia
HOWARD M. METZENBAUM, Ohio
DENNIS DeCONCINI, Arizona
PATRICK J. LEAHY, Vermont
MAX BAUCUS, Montana
HOWELL HEFLIN, Alabama

VINTON DEVANE LIDE, *Chief Counsel and Staff Director*
W. STEPHEN CANNON, *Chief Antitrust Counsel*
MARCY J. K. TIFFANY, *Antitrust Counsel and Chief Economist*
MARK H. GITENSTEIN, *Minority Chief Counsel*

# PROFESSIONAL SPORTS ANTITRUST IMMUNITY

MONDAY, AUGUST 16, 1982

U.S. SENATE,
COMMITTEE ON THE JUDICIARY,
*Washington, D.C.*

The committee met, pursuant to notice, at 10:33 a.m., in room 2228, Dirksen Senate Office Building, Hon. Strom Thurmond, (chairman of the committee) presiding.

Present: Senators Heflin, Specter, DeConcini, Leahy, and Simpson.

Staff present: Stephen Cannon, Marcy Tiffany, Jock Nash, Bruce Cohen, Mary Louise Westmoreland, Ally Milder, Boyd Hollingsworth, Ed Baxter, Romano Romani, Arthur Briskman, Wes Howard, Marge Baker, John Podesta, Mary Troland, and Kathy Zebrowski.

## OPENING STATEMENT OF HON. STROM THURMOND, A U.S. SENATOR FROM THE STATE OF SOUTH CAROLINA, CHAIRMAN, COMMITTEE ON THE JUDICIARY

The CHAIRMAN. The committee will come to order.

Today, the committee begins hearings on legislation that addresses the antitrust implications of relocation of professional sports teams and the sharing of team revenue. While the two bills we consider differ in approach, they clearly reflect concern with team movement when it occurs against both the wishes of the city it desires to leave as well as those of the league of which it is a member. Only one bill, S. 2784, addresses team revenue sharing.

Those who support this legislation suggest the need for maintaining stable ties between local communities and their teams, pointing to the many large investments, both financial and emotional, at stake. Those opposed to this legislation argue that professional sports leagues should be granted no special antitrust exemption permitting them to control team movement.

Rather, it is argued that such decisions should remain squarely within our free market system and subject to the laws of open competition. The arguments for and against revenue sharing center around the need to insure competitive play through reasonably equivalent financial team resources.

We obviously do not consider this legislation in a vacuum. The Oakland Raiders litigation has brought the question of team movement to the attention of the entire Nation. Both bills we consider today impact the *Raiders* case.

We are mindful of our responsibility to weigh the arguments of all concerned and determine where the public interest rests in this

matter. That is our primary interest—the public interest. As chairman of this committee, I am committed to a full and fair examination of this legislation, and will work to insure that both proponents and opponents have equal opportunity to present their views. While today's testimony focuses on professional football, the committee will conduct additional hearings after Labor Day to examine the impact of this legislation on other sports.

Senator Specter, do you have an opening statement?

## OPENING STATEMENT ON HON. ARLEN SPECTER, A U.S. SENATOR FROM THE STATE OF PENNSYLVANIA

Senator SPECTER. Yes. Thank you, Mr. Chairman; just a comment or two. I want to commend the chairman for agreeing to these hearings so promptly on a question which is of major importance to many, many people in this country.

I think the legislation which has been introduced by Mr. DeConcini and myself focuses on one issue of owners' interests versus fans' interests. My own sense is that there are two or three generations of fans who are still concerned about the movement of the Brooklyn Dodgers to Los Angeles and the New York Giants to San Francisco.

There is an understanding when a team is a failing team, as, for example, on the moves of the St. Louis Browns or the Philadelphia Athletics, that it cannot be avoided. But my own sense has been that there is a fans' interest and that the football leagues are affected with the public interest.

I think it should be made clear at the outset that the legislation which limits movement is not a restriction on private property rights, because the football owners have voluntarily given up the right to move, except with the consent of three-fourths of the league, and it is the antitrust laws which have limited that free use of property rights when it is against public policy.

So, the legislation which I have introduced, which would restrict the antitrust laws, does not go to free enterprise and private contract rights, but only to a limitation on the antitrust laws.

I frankly have some doubts myself as to the general wisdom of application of the law to a pending case, or, as some put it, to a retroactive application. I think this situation is different from contribution in antitrust cases, at least from my point of view, where sophisticated litigants did not settle those cases, and the Raiders controversy was not settlable.

I retain, as the chairman has outlined, an open mind on that question, and it may be that these hearings will prove persuasively that whatever legislation, if any, is enacted ought to apply in the future only. But I think these hearings are important, and, like the chairman, I personally am committed to seeing a full and complete hearing with all sides being represented before any judgments are made.

Thank you, Mr. Chairman.

The CHAIRMAN. The distinguished Senator from Alabama.

## OPENING STATEMENT OF HON. HOWELL HEFLIN, A U.S. SENATOR FROM THE STATE OF ALABAMA

Senator HEFLIN. Mr. Chairman, I am most appreciative to you for calling these hearings on this important legislation. I congratulate Senator DeConcini for his leadership in introducing Senate bill 2784. However, I am a reluctant cosponsor of Senator DeConcini's bill. I say reluctant because this Senator desires a much stronger final product.

Professional football is dependent upon a league arrangement. Antitrust policies ignore the dependency of teams on each other, and the inherent need for league rules on how the game is played both on and off the field.

This bill has a very narrow answer to many complex problems. The only thing that S. 2784 does is allow the leagues to keep a team in an existing location; second, to establish rules for the division of league revenues; and, third, makes it applicable to pending actions, which we all know means the *Oakland Raiders* case.

I applaud these goals. However, my problem is that it does not, first, confirm that member clubs of the NFL are entitled to act together to conduct the internal operations of the league and to determine the standards for ownership of member clubs.

Second, it does nothing to recognize the joint venture nature of the league, nor to dispel the standard rules applicable to traditional horizontal business competitors, which professional sports leagues are not.

Third, it does nothing to strengthen the authority of the league to forcefully handle the apparent drug problem within the NFL. This is a major problem that must be addressed. Our youths are hero worshippers. Their heroes are athletes, primarily football athletes.

I think the best way to solve this problem is within the league; give the NFL the authority, give them a chance to solve their own problems, allow them an opportunity to clean their own dirty linen.

To sum up, the NFL is not composed of economic competitors. They are engaged in a common business operation. To my mind, a franchise is awarded to a community, not to an individual. The community in most instances provides a stadium at the taxpayers' expense and fans' expense.

Antitrust policies which permit individual team owners to ignore the league's relationship and act as if they were sole proprieters do not reflect free enterprise principles, and they do not serve the public interest. Instead, as Senator Specter noted in introducing his legislation, free enterprise principles would require that league agreements voluntarily entered into by league members should be enforced according to their terms.

Free enterprise does not require the destruction of business partnerships or joint ventures. It does exactly the opposite. It demands that voluntary partnerships and joint ventures be permitted to function on the terms agreed on by the participants.

One of the distressing aspects of recent court developments is that in the name of antitrust, courts are rewriting a voluntary

NFL partnership agreement and replacing free enterprise with regulations of league conduct through judicial declaration.

Mr. Chairman, I look forward to the testimony today and am hopeful that the U.S. Senate will be able to consider meaningful, strong legislation in this area.

The CHAIRMAN. The distinguished Senator from Arizona.

**OPENING STATEMENT OF HON. DENNIS DeCONCINI, A U.S. SENATOR FROM THE STATE OF ARIZONA**

Senator DECONCINI. Mr. Chairman, ladies and gentlemen, and distinguished colleagues I would like to thank you, Mr. Chairman, for agreeing to hold these hearings on such short notice. As usual, Chairman Thurmond has graciously consented to give of his own time and effort on a matter of importance to some members of this committee. The chairman has also assigned his staff to organize and manage these hearings, and I would like to extend special thanks to Steve Cannon, who has done a remarkable job on such short notice.

My staff and I have been working, Mr. Chairman, for a number of months to develop legislation that would protect communities and fans from arbitrary and unilateral decisions by owners, while simultaneously not affecting other sports antitrust issues, including labor-management relations. I am personally pleased that we have achieved this dual objective, although the purpose of these hearings, in part, is to explore that contention.

I am hopeful that the witnesses will be able to provide us with alternative approaches if they cannot agree with the ones we have chosen.

On July 28, Senators Heflin, Simpson, Huddleston, Bentsen, and I introduced S. 2784, the Major League Sports Community Protection Act. The purpose, as I will suggest in more detail shortly, is to clarify congressional intent regarding the application of antitrust laws to certain types of major sports league practices and decisions.

Those of us who have been involved in this legislation from the outset are primarily concerned about the impact of recent court decisions on communities that have or expect to receive major sports league franchises.

Unfortunately, the opponents of this legislation have engaged in a series of scurrilous attacks on a number of Members of Congress. The unifying thread in these attacks seems to be that the NFL has bought off Senators and Congressmen through the promise of franchises.

Frankly, Mr. Chairman, I have never seen in my 6 years in the Senate anything quite like this. One can only suppose that this type of attack is the refuge of those who have a position that cannot be defended or sustained in a normal manner, and I resent it as one Member of this Senate.

The truth of the matter is this: Those of us involved in the legislation generally fall into two categories: First, Senators and Congressmen from States and communities that already have major league sports franchises; second, those of us from States and communities that will shortly receive such franchises.

Although the opposition has attempted to raise a number of false issues and red herrings, the basic issue is simply the protection of communities and fans from financially and emotionally disruptive, arbitrary decisions by team owners.

As will become clear, our legislation does not force a team to remain in a community, but it does allow normal and usual league rules governing such decisions to remain in effect.

Recent court decisions under the antitrust laws have placed in jeopardy longstanding league rules governing the relocation of sports franchises. If these decisions are upheld, an individual owner could be free to move teams—even well-supported teams—without regard to the community, fan or overall league interest. While such a result might benefit some team owners, it would unfortunately leave local taxpayers in many communities the responsibility to pay off public bonds issued to construct stadiums and other sports facilities. This financial impact would be compounded by the emotional loss felt by thousands of loyal fans.

It is ironic that it has become necessary for the Congress to consider special legislation in this area. The primary goal of the conspiracy provisions of the antitrust law is to prevent unfair cooperation among economic competitors. The provisions were deliberately written in a broad fashion so as to allow the court the ability to apply the basic principles which stand behind the provisions to differing factual situations.

Clearly, it was not intended that these provisions be applied inflexibly to prevent the members of joint enterprises, such as professional sports leagues, from enforcing reasonable rules designed to protect the interests of fans and communities.

Clearly, antitrust decisions which permit highly successful and well-supported teams to abandon a community at the whim of a single owner do not serve the public interest. Nevertheless, current applications of antitrust principles to sports leagues allow individual club owners to dictate league policy and to elevate narrow club interests over leaguewide and community interests. That is why I introduced S. 2784.

It is with extreme caution that I approach the task of clarifying our antitrust laws. Yet, the recent efforts of the Oakland Raiders and the San Diego Clippers to abandon their respective communities have shown a clear need for this legislation.

S. 2784 is a narrowly drafted response intended to clarify the intent of Congress that the antitrust laws will not apply to league decisions preventing teams from abandoning their home communities and revenue sharing arrangements designed to promote comparable economic opportunity among member clubs.

Let me emphasize for the record that this legislation will have no effect on labor-management relations or any other sports antitrust issues. The language of the bill makes it clear that it will have absolutely no effect on the ongoing labor negotiations affecting the National Football League.

Unless the Congress acts swiftly on this important legislation, communities will run the risk that stadiums and other sports facilities built with taxpayers' funds will be darkened. Unless Congress acts, every team owner will be free to auction his team for sale to

the highest bidder, regardless of how well the team has been supported at home.

Unless Congress acts, the revenue sharing arrangements that make it possible for communities of all sizes throughout the Nation to support professional sports teams may be subject to legal challenges or misguided standards.

For these reasons, S. 2784 has the strong support of the mayors in cities across the country, including the mayor of Phoenix, Ariz., in my home State. I am pleased to report that the companion bill in the House has over 130 cosponsors, and that its distinguished sponsors are here this morning. The House bill is similar to S. 2784 and is rapidly gaining support in the House.

These mayors and other elected officials realize the important economic and other intangible benefits that the presence of professional sports teams bring to a community.

I look forward to the hearings, Mr. Chairman, and the testimony which will be presented this morning and later. I urge the committee to act expeditiously on this very important legislation. Thank you, Mr. Chairman.

[The bills, S. 2784 and S. 2821, follow:]

Senator HEFLIN. No. Thank you.

The CHAIRMAN. We thank you very much for your presence. You go meet with your President and I am sure he will advance you what you want.

Mayor HANCE. Hearing no objection, I do have time to remain for a few minutes and I want to be sure to hear what my friend has to say.

Senator HEFLIN. I would like to inquire are you going to do the same, Mr. Chairman?

The CHAIRMAN. Our next witness is Hon. Donald Schaefer, mayor of the city of Baltimore.

Mayor Schaefer, we are glad to have you with us.

## STATEMENT OF HON. DONALD SCHAEFER, MAYOR, CITY OF BALTIMORE, MD.

Mayor SCHAEFER. Thank you very much.

First, let me thank you for allowing me this opportunity to appear before the committee.

I was in a great city last year. I went down to Charleston, S.C. I try to leave the city of Baltimore in the late afternoon and go to another city and see what they are doing there. Very impressed. The rehabilitation that you started in 1931 learned that you just do not tear old houses down. Rehabilitate. It was a great experience for me. A fine young mayor down there.

The CHAIRMAN. We are very pleased to have you visit Charleston. When you are ready to retire, I imagine you will find it a very desirable place.

Mayor SCHAEFER. There was a Mrs. Edmonds that has invited me to do that, and I am thinking very seriously. She has got a couple of houses but you will have to reduce the price a little bit for me.

Let me first apologize for not having a prepared statement. I had prepared one and then I read every bit of testimony that has been given so far. I read your opening statement and I commend you for giving everyone an opportunity to be heard. I heard all the testimony of the Commissioner and all the mayors, and I just listened to the mayor of Phoenix, and that was an outstanding statement.

By the way, now this city does not have a team and it would be very easy for them to say let us not pass this legislation and try to take a team from someplace else and put it in my city. A responsible statement made by the mayor of Phoenix is something that encourages me because all mayors are beginning to understand we are all facing serious problems in our cities and we have got to work together to make it a strong country. So I personally thank you for that.

I thought rather than duplicate the testimony, I will try to give you a little bit of the history that has occurred in Baltimore as far as the team is concerned. Let me start off with a very simple statement and this is my interest in the legislation. It is not very complicated.

I believe that every supported and responsibly financial successful team should not, except in the most extraordinary circumstances, be permitted to relocate outside of the home cities.

Now, that is a very selfish statement, but I firmly believe that.

Baltimore City is a unique place. It is an older city fighting hard for survival. We have done remarkably well in the last few years with the assistance of the Federal Government, the State government, the city government, and the people. We have gotten more national publicity, I guess—as much, let me put it that way, as any other city in the United States. We have worked very hard to make it a great city and it is moving along.

It must have a combination of everything. Not only can it have a good harbor, an aquarium, a science center, it has to have museums, sports teams—it has to have everything to make it what I call a big league city, and that is what we are attempting to do. We need the Orioles, we need the Colts, we need a hockey team to make a total network of a city.

For the past 30 years, the Colts have been a very, very important part of the city of Baltimore. The Colts were one of the outstanding teams in the NFL. Great players. Greatest game ever played when Ameche plunged over the goal line. It was worldwide publicity and, since then, the publicity has gone on and on and on.

Let me just try to stress four points: First, the economic impact on the community; second, taxpayers' money to maintain the stadium and to maintain a team; third, the efforts to support a team; and, fourth, the role of the players in the community. I will tell you what I mean by the role of the players in the community.

First, the economic impact. I look on it as a major industry. I know when you say a major industry, you try to differentiate, is it an entertainment or is it an industry. Let me tell you that the Colts and the Orioles are a major industry in our city. The reason I say that, payrolls, taxes, jobs for senior citizens, jobs for young people, gas stations where people come in and buy gasoline, restaurants and hotels. All those things are commodities that make this a major industry in the city of Baltimore and it is an asset that we are very interested in. We figure that a major league team, such as the Colts, generates about $20 million in activities as far as the city is concerned.

We found that out when there was a strike, a baseball strike, when we lost all of the jobs and all of the things that were necessary to keep the team going. And our people began to see it. So it is an economic stability for our city. So it has a great economic impact on a city to keep it there and keep a stable team there.

Now, I think the city has responsibilities, too. They have responsibilities to the league. I think the responsibility of the team owner is, No. 1, to put the best possible team on the field and have the organization, the organization, whether it is the Colts or the Orioles, whoever it might be, to become part of the community.

I think the players also have a responsibility to become part of the community now, and I will refer to that in a moment.

What is the responsibility of the city? Well, I happen to think that we are responsible for promoting the team. I think it is our responsibility and my responsibility to try in every way possible to get people to go out and support the team, whether they are winning or whether they are losing. Of course, we like to be in first place, but I think it is absolutely essential that there be a partnership between the team and the community and the city, and we have tried to do that and we have done it over a period of years.

We have tried to provide an adequate facility. We have to have community acceptance, police protection, fire protection, all of the things that are necessary.

But the team, in their way, has to provide us with the best team available. Edward Bennett Williams said something that I thought was very fundamental: Teams are held in trust for the cities where they function. And I believe that.

You wonder what does the taxpayer have to say about a team. You know, when the teams are there, it costs a lot to maintain the stadium. It costs a tremendous amount of money to maintain a stadium. We have upgraded the stadium. We have gotten the cooperation of the State with bond issues and we have received the help of Commissioner Rozelle when we went down to the State legislature to get $22 million to renovate our stadium.

Now, the problem with our—if we are not sure if the team will be there next year or the year after that, then we have a worry as to whether we can float the bonds, and we have received great assistance from the commissioner and that is a very important part—that is, the taxpayers have a very, very important part in this.

Let me talk about the players and the responsibility of the players. I happen to think that the players have a responsibility to the community. In the past we have had such players, Johnny Unitas, who has restaurants in the city; Jim Parker who has become a successful businessman in the city of Baltimore; Lenny Moore who is in the city of Baltimore and works in its community service and recently Glenn Dowdy who went into business on Pennsylvania Avenue to help minority kids and others.

So there is a responsibility of not only the city, the taxpayers, the team and the players, but I think the most important thing is the stability of knowing that a team will be in your city if you reasonably support the team, bring the public into the stadium and bring the fans in.

So I strongly recommend the passage of this. I know one thing, and I know you are trying to do this, and that is passage of the bill as fast as you can. Very important. You know, when cities are in a position of not knowing what is going to happen to them week after week or year after year, it is very difficult for mayors, like the mayor of Phoenix and the mayor of Baltimore and other mayors. So we strongly support this legislation.

That is all I really have to say except to answer any questions that you might have. And to, incidentally, to support the testimony made by the other mayors who testified as to the need for teams in cities.

The CHAIRMAN. Mr. Mayor, thank you very much for your presence here and your testimony which adds greatly to the record.

The distinguished Senator from Arizona.

Senator DECONCINI. Mr. Chairman, thank you.

Mayor Schaefer, as you may be aware, in addition to S. 2784, this committee has another professional sports team bill before it and that is 2871, the Professional Football Stabilization Act, introduced by my good friend and colleague, Senator Specter of Pennsylvania. The two bills are different in philosophical approach.

My bill, S. 2784, relies upon a professional sports league to take what I consider more of a long-term look at whether the given com-

munity can and will support a given team. It does not permit a team to abandon a community merely because a team does not have community support during a certain period of time.

The Specter bill, on the other hand, as introduced, is more toward the short-term view. In a sense, it takes more of a snapshot of community relations and permits a team to leave the community if the picture is not pretty economically.

Given the ups and downs of the Baltimore Colts over the years, I presume you are more comfortable with S. 2784. I do not want to put words in your statement here, and I would like a response, if you can, as to the difference between the two bills.

Mayor SCHAEFER. 2784 is the bill I support. Now, let me tell you why. Let me start off by saying, Mr. Irsay, the owner of the Colts, is a friend of mine. I like Irsay. Some people—I like him.

There is another side to my liking him. The Colts have been an integral part of the community, as I said, for 30 years. When there was stability of the Colts, the fans supported the team. When the team seemed to possibly be shifting some place else, it caused great consternation with the mayor, to-wit, me. It caused great consternation with the Governor. It caused both of us to be very worried because we knew that the loss of this industry, entertainment, whatever it might be, to the city of Baltimore, to the region, and to the State, would be a tremendous loss. I did not like that period at all.

I do not think that an owner in a way really has a right, and I must say this in all sincerity, has a right to sort of play one city against another in order to identify where he is going to put the team. If we have supported the team, if we have worked very hard, if we have done everything we can to support the team financially, whatever it might be, I think we deserve better than that. I think we should have a team.

Now, we cannot compete against some cities. There are some cities much wealthier than ours. We cannot keep upping the ante to keep a team in.

What my responsibility is is to provide the best facility I can with what resources we have. I am supposed to try to sell tickets, and I am not selling tickets one by one, but I tell our people support our teams and go out, whether we win or lose. But you can only do that if the people in the city feel that next year the team is going to be there. We had the best fans of any city in the United States. They would walk in that stadium and they would rock that stadium, and they will do it again when I am able to go back and say this legislation was passed, and when I am able to say to them that team will most likely be here for a number of years, and the only way we will lose it is if you do not think it is important enough to put people in that stadium. And I predict in a couple of years, 2 at the most, when Kush is finished chasing all the players around and putting that team on the field, you will see that stadium on 33d Street rock again.

Senator DECONCINI. I want to confirm that with coach Kush at the head, we have had the greatest experience at Arizona State University. You will have one great team there. He is an outstanding gentleman and outstanding coach, and I thank you for calling that to the record's attention.

I am sure the mayor wants to add something.

Mayor HANCE. I want to agree wholeheartedly. He is a very excited coach and does bring a lot of spirit.

In an exhibition game in Phoenix in August, when the humidity was high and I think the temperature was over 100——.

Senator DECONCINI. I was there and it was over 100 degrees.

Mayor HANCE. And they sold almost 60,000 tickets on one of the worst nights of the year.

I would also add, why I did not come to oppose any bill, it is my understanding that Senator Specter's bill does not address revenue sharing. I think even though Phoenix is the ninth largest city in the United States, that professional sports belong in small cities, smaller cities, as well as major cities, and I know that it would seem to me some of the smaller cities could not sustain the team, the support, financial or any other thing for the cities, and I believe that to achieve the geographic balance that Congress has sought in the past, that it is necessary for smaller cities to participate also.

Senator DECONCINI. Mayor Schaefer, with the ups and downs that the Colts have had, what effect, if any, do you feel revenue sharing has had on the stability of maintaining the Colts in Baltimore?

Mayor SCHAEFER. I think it is a major turn upward for us. I think Mr. Irsay recognizes that, talks about it, favors it, and I think it will assist him in staying in the city.

I think the passage of the legislation, revenue sharing, the intent of Congress, our continued support—I think it is fine.

Senator DECONCINI. Thanks, Mr. Mayor. Please give our best to Mr. Kush. You will see him before we will. Tell him we miss him in Arizona.

Senator BIDEN. Mr. Chairman, I would like to ask the mayor several questions.

The CHAIRMAN. The distinguished Senator from Delaware.

Senator BIDEN. Mr. Mayor, I guess you read in the morning paper that the court struck down the arrangement the National Collegiate Athletic Association has with regard to television. University of Maryland football is an integral part.

Do you want protection there?

Mayor SCHAEFER. I have not read it, Senator.

Senator BIDEN. Well, it is coming.

I wonder, what do we do now? Does the Congress get into the business of saying we should pass legislation that will allow the NCAA to engage in what the court apparently ruled—have not read the whole decision, just the New York Times—with an antitrust venture, or is it better for—I guess Father Hesburgh wakened this morning a happy man. He is probably the only team in America that could go out—not necessarily because it is the best but it has the widest following of any team in terms of a geographic sense, other than Alabama.

The CHAIRMAN. What about Clemson? They were No. 1 last year.

Senator BIDEN. The point I am trying to make is this: I do not know why you think you have much more security with the owners making the decision. I agree with everything you have said except

for the fact that my vote depends on a franchise for Wilmington, Del. But other than that, I believe in small cities, Mayor.

Without being facetious though, we are in a situation where we are understandably, and I am really undecided on this bill, we are understandably concerned about the plight that form shopping causes for Mayors. I think it is real, genuine.

Bill Green is a close friend in Philadelphia—half of Delaware is part of Maryland and half of Delaware is part of Philadelphia, and Delawareans would be devastated if the Eagles left. But I am not sure if there is any more certainty that Leonard Tose would keep the Eagles in Philadelphia with the way it is now because now it is total caprice of the league. If the league said let us move it, there is not a thing you could do as mayor, nothing at all.

So why do we not have an amendment in this legislation that says that this exemption be granted so that individual owners cannot pick up and leave? Why do we not also have an exemption saying the league cannot make that decision, they have to stay where they are? Why do we not do that?

Mayor SCHAEFER. You know, I do not want to seem like I am always on the defensive, but, you know, when you are right here and right there—they got the Phoenix team and I happen to know the impact on Baltimore. And incidently the Colts have an impact on you.

Senator BIDEN. Sure they do. That is what I said.

Mayor SCHAEFER. I would much rather look at the history of the NFL and the statement that the commissioner has made which, by the way, is a very fine statement, about not moving teams around and trying to maintain stability in the NFL. I will cast my lot with the owners, all of them.

Senator BIDEN. But would you object if I, as a Senator, said owners could not move either—I mean the league could not make that decision other than under certain circumstances?

I asked the commissioner, for example, what are the considerations that the league takes into consideration in determining whether a team can move. Can you give me a copy of that? Are they written down? What are they? What are the criteria?

And he said, well, we make a collective judgment. We all decide what is best for the league.

Well, you know, that is fine now. But what happens when cable breaks through? Technology is changing, changing drastically.

Mayor SCHAEFER. Senator, the great thing about this country is that the mayor of Phoenix and I can come over and ask you to change it again. You see, this is necessary now, right now, and while I know you sit in judgment on long term, the mayor of Phoenix and I live day to day, and what the problem is right now, what happens to teams right now. Now, I am telling you—I just know from my own personal knowledge the upset that we have about the possibility of a move of the Colts.

Senator BIDEN. How about the Orioles? Are the Orioles good citizens?

Mayor SCHAEFER. They are.

Senator BIDEN. Are they as important to Baltimore as the Colts?

Mayor SCHAEFER. All depends on what you are leading me on to.

Senator BIDEN. Mr. Mayor, you are beginning to sound like Al Haig now. That is just a question.

Mayor SCHAEFER. Let me answer what the Orioles are. Edward Bennett Williams is one of the finest team owners that I know. There was no question in my mind that he was going to move to Washington. I believe this. We were able to tell him, Edward Bennett Williams, we need the Orioles in the city of Baltimore, and I will tell you what we will do. We will try to fill the stadium, anything you want, to keep them here, because if you take the Orioles, this is the loss to the community. Edward Bennett Williams listened to us. Edward Bennett Williams, I think, will keep the team there so long, and this is where I agree with what Mr. Rozelle said, that they should have the opportunity to review, and I will take my chances with the total league making the right decision. Edward Bennett Williams—the thing that I worry about with the Colts right now, the players are not part of the community, mainly because they are coming and going. I think when that team is stable again, with players like Unitas and Lenny Moore and Parker and Glenn Dowdy—the Orioles are right now. Eddie Murray saves 500 tickets per game for senior citizens.

Senator BIDEN. Let me be more specific. It seems to me, in a financial sense and in a psychological sense, the Orioles are a very integral part of Baltimore, which happens to be my home city, and they are a very integral part of Delaware. One of the four largest radio stations carries every Orioles game. They are a very, very integral part, just like the Colts are.

What I am getting to is they are totally exempt. Baseball is totally exempt. Now, why? And football is treated differently. I mean, why are you less secure or more secure with a single owner making a decision or the whole league, the American League making a decision? It seems to me—what I am trying to get at, I do not think it makes a whole lot of difference in terms of your security.

Mayor SCHAEFER. I do.

Senator BIDEN. Tell me why it is different.

Mayor SCHAEFER. I can only repeat again the history of the NFL and Rozelle's statement. They have not moved teams for the sake of playing one city against another city in the history of the league. The NFL has been a stable league, and I have faith in the total management of the team—the total team members. I think they are interested in stability. I think they are also now—now that revenue-sharing matter they came forward with keep a team. I feel right now that I would rather have it that way.

Senator BIDEN. Baseball is exempt in these antitrust rules. So the league can get together, conspire, do all the things they want to, and apparently they do. Yet they moved. The Braves moved to Milwaukee. The Brooklyn Dodgers broke Howard Cosell's heart when they moved out of Brooklyn. Washington went to Texas.

Mayor SCHAEFER. But there were reasons for the movement.

Senator BIDEN. What were the reasons?

Mayor SCHAEFER. I am not sure.

Senator BIDEN. But the point is that they were exempt and they conspired and they still moved and now we are acting as though an exemption from antitrust, no matter how big or small, is going to give you more security. And my argument is we have a whole

league that is totally exempt and Brooklyn was not secure and Washington was not secure and New York was not secure. They moved. The owners got together and said times have changed, Jack, we got to go. They are going to go where the dollar is. And what I am worried about is in the next 5 years, the financial aspects of sports will be revolutionized. It may be that in 5 years it will be that it will pay the owners to pay people to come to the stands because they will be making so much money on cable and they will not care where the heck the stadium is. That could work out to the advantage of the cities. Then there is no incentive to leave.

On the other side, it could work the other way.

I kind of like the Specter bill myself but I will wait to hear the rest of the testimony. But I am very leery of assuming that good times will continue when those good times are dependent upon management that changes and not dependent on rules and regulations.

Mayor SCHAEFER. Senator, I respect you because you are the Senator and my destiny is in your hands——

Senator BIDEN. I thought you did because I was a great Senator.

Mayor SCHAEFER. Well, if you support the bill, you are a great Senator.

You know, one thing that worries me is we are—the mayor and I are right there affected by something now and it is nice to be able to say that we are going to worry about 5 or 10 years from now. I have got to worry about what happens to Baltimore right now. If that team leaves, you might be directly affected by a higher unemployment rate in the city of Baltimore. You may be affected by many things that happen in the city of Baltimore. So the stability of the city is important now. I happen to think now is the time for this legislation and we can talk about cable 5 years from now.

Senator BIDEN. We agree on the objective. I am just not sure this accomplishes it.

Thank you.

Mayor HANCE. Could I, Mr. Chairman, add to that. Again the mayor is correct in that he does need this legislation right now. I think the suggestion that further roadblocks be placed, as you suggest, so that it is almost impossible for the owners to make a decision to move a team is not a good one, only in that times do change and there should be reasons allowed under any sort of interpretation of free enterprise that a team can, for extraordinary reasons, move. When you try to put down certain reasons, at least I found in city legislation, they are so wide open to interpretation that you are always involved in litigation.

Another thing that is really bothering the sports universe is the fact that at this point we have conflicting opinions just in the State of Arizona—California, through the Supreme Court decision versus what the Federal court has done, and I think that all professional sports are feeling this kind of malaise because legislation is needed to clarify that.

Senator BIDEN. Good point.

Thank you, Mayors.

The CHAIRMAN. The distinguished Senator from Pennsylvania.

Senator SPECTER. Thank you.

I shall be very brief because I know Mr. Cosell, our next witness, has a Monday night football game this Thursday.

I just have one question that I would like to address at Mayor Schaefer. Perhaps Mayor Hance would have a response.

Mayor Hance has commented that 2821, my bill, does not deal with revenue sharing, which it does not, because revenue sharing is not a problem at the moment. And when the league has brought to the Senate its concerns, my part was to respond on the narrowest ground, not to deal with the generalized antitrust exemption or consider revenue sharing for the future.

One of the concerns I have about 2784 is the possible interpretation that it may exempt professional football and other sports as to the issue of pay television or cable, which may well be an ultimate answer, but one which I am not prepared to address now, nor do I think we should with 5 years to run, and the sports-watching public will have an enormous interest in that. We could take that up at the appropriate time.

My legislation deals specifically with the problem of the Raiders, and I have left open whether it be applied to other cases.

Mayor Schaefer, my bill would answer your problem today in Baltimore because the Baltimore Colts are not a distressed team. They are making money and they could not move under the provisions of my legislation.

The question I have is why does that not satisfy you at the moment.

Mayor SCHAEFER. Because I am more familiar with the other bill, Senator.

Senator SPECTER. Then I should not prolong the questioning. But I would ask you to take a look at the provisions of my bill because I think you will find they do solve Baltimore's problems today and direct themselves at the long-range philosophical concerns that Senator Biden has brought up, that is, leaving the control more with the fans than the ability of the city to sustain the team as opposed to the league. The league may be perfectly fine but, on the other hand, they may not be perfectly fine. But if the fan support is there, and the bill I have introduced is directed more to the interest of the fans which are more closely allied to the cities, and guaranteeably so, than what a league may or may not do at any given time.

Mr. Chairman, thank you. I shall resist from asking any further questions.

The CHAIRMAN. Thank you very much. We appreciate the presence of you distinguished mayors.

Our next witness is Howard Cosell.

We are pleased to have you with us and you may proceed as you see fit.

## STATEMENT OF HOWARD COSELL, ESQ., SENIOR PRODUCER, ABC SPORTS

Mr. COSELL. Thank you, sir.

First, I would like to say it is a privilege to be here. I am very respectful of your invitation.