UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CITY OF SAN JOSÉ; CITY OF SAN JOSÉ AS SUCCESSOR AGENCY TO THE REDEVLOPMENT AGENCY OF THE CITY OF SAN JOSÉ; and THE SAN JOSÉ DIRIDON DEVELOPMENT AUTHORITY<br><br>Plaintiffs,<br><br>v.<br><br>OFFICE OF THE COMMISSIONER OF BASEBALL, an unincorporated association doing business as Major League Baseball; and ALLAN HUBER "BUD" SELIG,<br><br>Defendants. | Case No. C-13-02787 RMW<br><br>**ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**<br><br>**[Re: Docket No. 25]** |

> *[W]e continue to believe that the Supreme Court should retain the exclusive privilege of overruling its own decisions, save perhaps when opinions already delivered have created a near certainty that only the occasion is needed for pronouncement of the doom.*
>
> *Salerno v. American League of Professional Baseball Clubs*, 429 F.2d 1003, 1005 (2d Cir. 1970).

This lawsuit yet again raises the question of the scope of baseball's exemption from federal antitrust laws. The judicially created exemption was born in 1922 in *Federal Base Ball Club of Baltimore, Inc. v. National League of Professional Base Ball Clubs* ("*Federal Baseball*"), 259 U.S. 200 (1922) (Holmes, J.), and reaffirmed in *Toolson v. New York Yankees, Inc.*, 346 U.S. 356 (1953)

(per curiam) and *Flood v. Kuhn*, 407 U.S. 258 (1972) (Blackmun, J.).   Many distinguished jurists, including the Justices themselves, however, have openly criticized the Supreme Court's decisions distinguishing baseball from other professional sports for the purposes of exempting *only* baseball from antitrust laws.  In 1957, in *Radovich v. National Football League*, Justice Clark writing for the majority acknowledged that the distinction for baseball may be "*unrealistic, inconsistent,* or *illogical,*" and "*were we considering the question of baseball for the first time upon a clean slate, we would have no doubts*" that the business of baseball is within the scope of the Sherman Antitrust Act.  352 U.S. 445, 452 (1957) (emphasis added) (holding that the business of football is subject to the Sherman Act).  In 1970, Judge Friendly writing for the Second Circuit "freely acknowledge[d] [the court's] belief that *Federal Baseball* was not one of Mr. Justice Holmes' happiest days, that the rationale of *Toolson* is extremely dubious and that, to use the Supreme Court's own adjectives, the distinction between baseball and other professional sports is 'unrealistic,' 'inconsistent' and 'illogical.'"  *Salerno*, 429 F.2d at 1005 (quoting *Radovich*, 352 U.S. at 452).  In 1972, in *Flood*, Justice Blackmun writing for the majority said that "*Federal Baseball* and *Toolson* have become an *aberration* confined to baseball."  407 U.S. at 282 (emphasis added).

Despite the recognized flaws in the antitrust exemption for baseball, the Court has consistently "conclude[d] that the orderly way to eliminate error or discrimination, if any there be, is by legislation and not by court decision."  *Radovich*, 352 U.S. at 452 (reasoning that "Congressional processes are more accommodative, affording the whole industry hearings and an opportunity to assist in the formulation of new legislation" and "[t]he resulting product is therefore more likely to protect the industry and the public alike.").  "The Court has emphasized that since 1922 baseball, with full and continuing congressional awareness, has been allowed to develop and to expand unhindered by federal legislative action."  *Flood*, 407 U.S. at 283.  The *Flood* Court held that "[i]f there is any inconsistency or illogic in all this, it is *an inconsistency and illogic of long standing* that is to be remedied by the Congress and not by this Court."  *Id.* at 284 (emphasis added) (affirming *Federal Baseball* and *Toolson*).

United States District Court
For the Northern District of California

1       The facts of this case present the issue of whether club *relocation* is a part of the "business

2 of baseball" subject to the Supreme Court's holdings in *Federal Baseball*, *Toolson* and *Flood*.

3 Plaintiffs, the City of San José, City of San José as successor agency to the Redevelopment Agency

4 of the City of San José ("RDA"), and the San José Diridon Development Authority (collectively,

5 "City" or "San José"), argue that the antitrust exemption set forth in *Federal Baseball*, *Toolson* and

6 *Flood* applies only to baseball's "reserve clause."[1]  This position, however, is contrary to the

7 holdings of a vast majority of the courts that have addressed the issue.  All federal circuit courts that

8 have considered the issue (the Eleventh, Seventh, Ninth and Second Circuits) have *not* limited the

9 antitrust exemption to the reserve clause, but have adopted the view that the exemption broadly

10 covers the "business of baseball."[2]  Only one federal district court[3] and one state supreme court[4]

11 have explicitly limited the antitrust exemption to baseball's reserve system.  Two other federal

12 district courts have considered the breadth of the "business of baseball" exemption, holding that the

13 radio broadcasting of baseball games[5] and employment relations with umpires[6] are not "integral" to

14 the business of baseball and thus not within the exemption.  They do not, however, define the

15 "business of baseball" or hold that it is limited to the reserve clause.[7]

---

16

17 [1] The reserve clause, "publicly introduced into baseball contracts in 1877," confined "the player to the club that ha[d] him under the contract."  *Flood*, 407 U.S. at 259 n.1.  The Court of Appeals for

18 the District of Columbia in the *Federal Baseball* case described the reserve clause as follows: "Generally speaking, every player was required to contract with his club that he would serve it for

19 one year, and would enter into a new contract 'for the succeeding season at a salary to be determined by the parties to such contract.'  The quoted part is spoken of as the 'reserve clause,' and

20 it is found, in effect, in the contracts of the minor league players, as well as in those of the major league players."  *Nat'l League of Prof. Baseball Clubs v. Federal Baseball Clubs of Baltimore*, 269

21 F. 681, 687 (D.C. Cir. 1920).
[2] *Major League Baseball v. Crist*, 331 F.3d 1177 (11th Cir. 2003); *Prof'l Baseball Schools & Clubs,*

22 *Inc. v. Kuhn*, 693 F.2d 1085, 1086 (11th Cir. 1982); *Charles O. Finley & Co., Inc. v. Kuhn*, 569 F.2d 527, 541 (7th Cir. 1978); *Portland Baseball Club, Inc. v. Kuhn*, 491 F.2d 1101 (9th Cir. 1974)

23 *Salerno*, 429 F.2d at 1005 (2d Cir. 1970); *Portland Baseball Club, Inc. v. Baltimore Baseball Club, Inc.*, 282 F.2d 680 (9th Cir. 1960); *see also Triple-A Baseball Club Assocs. v. Northeastern*

24 *Baseball, Inc.*, 832 F.2d 214, 216 n.1 (1st Cir. 1987) (noting the baseball exemption in a breach of contract case).

25 [3] *Piazza v. Major League Baseball*, 831 F. Supp. 420 (E.D. Pa. 1993).
[4] *Butterworth v. Nat'l League of Prof'l Baseball Clubs*, 644 So.2d 1021 (Fla. 1994).

26 [5] *Henderson Broadcasting Corp. v. Houston Sports Ass'n, Inc.*, 541 F. Supp. 263, 265-72 (S.D. Tex. 1982).

27 [6] *Postema v. Nat'l League of Prof'l Baseball Clubs*, 799 F. Supp. 1475, 1489 (S.D.N.Y. 1992), *overruled on other grounds by* 998 F.2d 60 (2d Cir. 1993).

28 [7] *See Henderson*, 541 F. Supp. at 269 ("Radio broadcasting is not a part of the sport in the way in which players, umpires, the league structure and the reserve system are."); *Postema*, 799 F. Supp. at 1489 ("It is thus clear that although the baseball exemption does immunize baseball from antitrust

United States District Court

For the Northern District of California

1    San José filed suit against the Office of the Commissioner of Baseball and Allan Huber

2    "Bud" Selig (collectively, "MLB") alleging claims for violation of the Sherman Antitrust Act,

3    California's Cartwright Act, and state tort and unfair competition laws based on MLB's failure to

4    approve the Oakland Athletics Baseball Club's ("the A's") proposed relocation from Oakland to

5    San José.  MLB moves to dismiss the City's complaint on the basis that the business of baseball,

6    including club relocation, has long been exempt from antitrust regulation.  For the reasons explained

7    below, this court concludes that: (1) the Supreme Court trilogy (*Federal Baseball*, *Toolson* and

8    *Flood*) is not limited to MLB's reserve system; (2) the longstanding antitrust exemption still

9    encompasses all MLB decisions integral to the business of baseball; (3) the City's state law claims

10   based upon state antitrust and unfair competition law are preempted; and (4) the City's state law tort

11   claims are sufficiently pled to survive MLB's motion to dismiss.   Accordingly, the court GRANTS-

12   IN-PART and DENIES-IN-PART MLB's motion to dismiss the complaint.

## I.  BACKGROUND

14   The Office of the Commissioner of Baseball, doing business as MLB, is an unincorporated

15   association of thirty Major League Baseball Clubs, "organized into two leagues, the American

16   League and the National League, with three divisions in each League."  Major League Const. ("ML

17   Const.") art. II, § 1, art. VIII, § 1, Compl. Ex. 4, Dkt. No. 1; *see also* current ML Const. at Dkt. No.

18   35-2.  All thirty Clubs are "entitled to the benefits of" and "bound by" by the Major League

19   Constitution ("ML Constitution") and the rules adopted and promulgated by the Commissioner

20   pursuant thereto.  *Id.* art. I, art. IV, art. XI, § 3.  With respect to Club relocation, the ML

21   Constitution provides that "[t]he vote of three-fourths of the Major League Clubs" is required for

22   the approval of "[t]he relocation of any Major League Club."  *Id.* art. V, § 2(b)(3).

23   The A's is a Major League Baseball Club in the American League, Western Division.  *Id.*

24   art. VIII § 1.  Pursuant to the Major League Constitution, the A's "operating territory" is "Alameda

---

26   challenges to its league structure and its reserve system, the exemption does not provide baseball
     with blanket immunity for anti-competitive behavior in every context in which it operates.  The
27   Court must therefore determine whether baseball's employment relations with its umpires are
     'central enough to baseball to be encompassed in the baseball exemption.'" (quoting *Henderson*,
28   541 F. Supp. at 265)).

ORDER RE: MOTION TO DISMISS
Case No. C-13-02787 RMW                     - 4 -
ALG

United States District Court
For the Northern District of California

and Contra Costa Counties in California." *Id.* art. VIII, § 8.  The team was founded in Philadelphia, Pennsylvania in 1901 as the "Philadelphia Athletics," one of the American League's eight charter franchises.  Compl. ¶ 47.  In 1955, the team relocated to Kansas City and became the "Kansas City Athletics." *Id.*  Just over a decade later, in 1968, the A's moved to Oakland.  *Id.* ¶ 48.  The A's enjoyed tremendous success in the next two decades, winning three consecutive World Championships in the 1970s; three American League Pennants in 1999, 1989 and 1990; and the 1989 World Series.  *Id.*  Today, the A's remain in Oakland.  Their home stadium is the "Oakland Coliseum," or "Coliseum," which the team shares with the Oakland Raiders of the National Football League.  *Id.* ¶ 50.

Since 1990, however, "attendance at A's games has plummeted." *Id.* ¶ 51.  The City alleges various reasons for the low attendance: (1) the Coliseum is currently the fourth-oldest ballpark in MLB; (2) according to the 2010 census, the Giants' territory includes 4.2 million people and the A's territory only 2.6 million; and (3) the team is "heavily dependent on revenue sharing" with the Raiders because they share the Coliseum.  *Id.* ¶¶ 49-52.  The City also alleges that the A's are "one of the most economically disadvantaged teams" in MLB because MLB "does not split team revenues as evenly as other sports." *Id.* ¶ 49.

For several years, the Athletics have considered possible alternative locations for their home stadium, including Fremont (which ultimately failed in February 2009) and San José.  Since 2009, A's owner Lew Wolff has focused the team's relocation efforts on San José.  In early 2009, the City of San José issued an Economic Impact Analysis detailing the economic benefits of the proposed A's stadium in San Jose, which would consist of 13.36 acres near the Diridon train station and would seat 32,000 fans.  Compl. ¶¶ 68, 70 and Ex. 1.  In March 2011, the RDA purchased six parcels of land with the intent that that the property would be developed into a MLB ballpark.  *See* Option Agreement, Compl. Ex. 3.

The ML Constitution, however, currently designates San José as within the San Francisco Giants' operating territory.  ML Const. art. VIII, § 8.  Unlike the Los Angeles Dodgers and Los Angeles Angels and the New York Mets and New York Yankees, which share certain operating territories, the A's and the Giants territories do not overlap.  *Id.*  Because San José is outside of the

A's operating territory, relocation requires a three-quarter majority approval by MLB's Clubs.  *Id.* art. V, § 2(b)(3), art. VIII, § 8.[8]  As such, Commissioner Selig allegedly asked the mayor of San José, Chuck Reed, to delay a public vote on whether the A's could purchase land and build a new stadium in San José.  Compl. ¶ 73.   The City also alleges that the Giants have "interceded to prevent the A's from moving to San José" based on the Giants' assertion that "if the [A's] were allowed to move there, it would undermine the Giants' investment in its stadium in San Francisco and marketing to fans."  *Id.* ¶¶ 118, 121.  Commissioner Selig, commenting on the territorial dispute, allegedly stated:

> Wolff and the Oakland ownership group and management have worked very hard to obtain a facility that will allow them to compete into the 21st century. . . .  The time has come for a thorough analysis of why a stadium deal has not been reached.  The A's cannot and will not continue indefinitely in their current situation.

*Id.* ¶ 119.

Despite the ongoing dispute, on November 8, 2011, the San José City Council and the Athletics Investment Group entered into a two-year Option Agreement giving the A's the option to purchase the six parcels of land set aside by the RDA for the purposes of building the ballpark for a purchase price of $6,975,227.  Option Agreement 2, Compl. Ex. 3.  The Athletics Investment Group paid $75,000 for the initial two year option, which included the option to renew for a third year for an additional $25,000.  At oral argument, the City represented that the Athletics Investment Group recently paid the additional $25,000 to extend the option for a third year.  The City alleges that MLB has intentionally delayed approving the A's relocation for over four years, effectively preventing the A's from exercising its option to purchase the land set aside by the City under the Option Agreement and resulting in damages to the City in the form of lost revenue "reasonably expected under the Option Agreement and Purchase Agreement, respectively."  Compl. ¶¶ 162-64. The City alleges that the territorial rights restrictions in the ML Constitution and MLB's failure to act on the territorial dispute restrains competition in the bay area baseball market, perpetuates the Giants' monopoly over the Santa Clara market, and creates anticompetitive effects that lead to

---

[8]  Allegedly because the MLB is "hostile" to Club movement, only one MLB Club has relocated in the past 40 some years.  Compl. ¶ 111 (In 2005, the Montreal Expos relocated to Washington D.C. and became the Washington Nationals.).

United States District Court
For the Northern District of California

consumer harm in violation of federal and state antitrust laws.  The complaint also brings claims

under California's unfair competition laws and for tortious interference with San José's contractual

relationships with the A's and its prospective economic advantage.  MLB moves to dismiss all

counts in the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

## II.  MATERIALS CONSIDERED

"Generally, a district court may not consider any material beyond the pleadings in ruling on

a Rule 12(b)(6) motion."  *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555

n.19 (9th Cir. 1989).  Two exceptions exist: (1) the court may consider materials properly submitted

as part of the complaint; and (2) the court may take judicial notice of facts that are "not subject to

reasonable dispute," Fed. R. Evid. 201(b), including "matters of public record."  *See Lee v. City of

Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001).   There is no dispute that the court may consider

the materials attached to the complaint.  There is a dispute about the propriety of judicial notice.

MLB asks the court to take judicial notice of: San José City Council Resolution No. 74908

(Exhibit A); excerpts from the 1982 hearings before the Senate Judiciary Committee on Professional

Sports Antitrust Immunity (Exhibit B); the October 29, 1997 Report of the Senate Judiciary

Committee on the Curt Flood Act, S. Rep. 105-118 (Exhibit C); the California State Controller's

March 2013 report titled "[RDA]: Asset Transfer Review January 1, 2011 through January 31,

2012" (Exhibit D); and a memorandum of the San Jose City Manager and San José [RDA]

Executive Director bearing the subject line "Option Agreement for Sale of Property to Athletics

Investment Group, LLC," dated October 24, 2011 (Exhibit E).  Dkt. No. 26.

The City argues that judicial notice of Exhibit A (San José City Council Resolution No.

74908) is improper because the Resolution is unsigned, calling the authenticity of the document into

question.  Despite the unsigned nature of San José City Council Resolution No. 74908, the court

concludes that document is a matter of public record and that its contents are not subject to

reasonable dispute,[9] and thus deems judicial notice of the contents of the document appropriate.

With respect to Exhibits B and C (the legislative records), the City argues that the documents

are offered for the sole purpose of legal argument and are thus improper.  Similarly, the City argues

---

[9] The signed version of the Resolution is also publicly available through the City government's
online archives, and it is identical to the unsigned version attached to the request for judicial notice.

United States District Court
For the Northern District of California

1  that Exhibits D and E (City government report and memorandum) are offered solely to contest the

2  validity of the Option Agreement and to argue that performance would require the A's to purchase

3  additional parcels of land, respectively, both improper purposes.

4      The court concludes that the legislative histories, the Controller's Report and the RDA's

5  Memorandum are all matters of public record not subject to reasonable dispute. Accordingly, the

6  court takes judicial notice of Exhibits B-E. With respect to all exhibits, however, the court takes

7  judicial notice "for the purpose of determining what statements are contained therein, not to prove

8  the truth of the contents or any party's assertion of what the contents mean." *United States v. S.*

9  *Cal. Edison Co.*, 300 F. Supp. 2d 964, 975 (E.D. Cal. 2004).

## III.  ANALYSIS

11     Quoting *Major League Baseball v. Butterworth*, 181 F. Supp. 2d 1316, 1331 (N.D. Fla.

12  2001), MLB argues that: "[t]he business of baseball is exempt from the antitrust laws, as it has been

13  since 1922, and as it will remain until Congress decides otherwise. Period." According to MLB, all

14  of the City's claims are premised on the same alleged antitrust violations and all fail for this reason.

15  The City counters that *Federal Baseball*, *Toolson* and *Flood* are limited to anticompetitive

16  restrictions on players' abilities to negotiate their employment contracts, and as such, restraints on

17  team relocation are not exempt from antitrust laws under the trilogy of Supreme Court cases. The

18  City further asserts that once the scope of the exemption is properly cabined to player issues, all of

19  its state law claims succeed. The City argues, however, that its unfair competition and tort claims

20  would succeed even without any underlying antitrust violation. The court addresses the City's

21  claims in turn.

### A.  Sherman Act Claims

23     The City charges MLB with violations of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2.

24  The question is whether MLB's alleged restraints on the A's relocation are exempt from the City's

25  antitrust claims. The issue boils down to whether *Federal Baseball*, *Toolson* and *Flood* ("the

26  Trilogy") are limited to baseball's reserve system. Although the reasoning and results of those cases

27  seem illogical today, they have survived for many years and are precedent that the court must

28  follow.

United States District Court
For the Northern District of California

## 1. The Trilogy and Related Supreme Court Cases

In *Federal Baseball*, petitioner Federal Baseball Club of Baltimore sued the National League and the American League ("the Major Leagues") under the Sherman Antitrust Act alleging that the Major Leagues conspired to monopolize the baseball business by means of league structure and the reserve system.  259 U.S. at 207.  The Supreme Court for the District of Columbia entered judgment for petitioner, but the Court of Appeals for the District of Columbia reversed on the basis that the Major Leagues "were not within the Sherman Act." *Id.* at 208.  The Supreme Court granted certiorari and affirmed judgment for the Major Leagues. *Id.* at 208-09.  The Court first held that baseball qualifies as a business, specifically: "the business is *giving exhibitions of base ball* [sic], which are purely state affairs." *Id.* at 208.  The Court then held, however, that the business of baseball is not engaged in interstate commerce. *Id.* at 208-09 (Although "competitions must be arranged between clubs from different cities and States" to carry out the exhibitions, "the fact that . . . the Leagues must induce free persons to cross state lines and must arrange and pay for their doing so is not enough to change the character of the business."). The Court held that any interstate activities were merely incidental to the state exhibitions, and thus "would not be called trade or commerce in the commonly accepted use of those words." *Id.* at 209.  Accordingly, the Court concluded that "the restrictions by contract that prevented the plaintiff from getting players to break their bargains [(i.e., the reserve system)] and the other conduct charged against the defendants were not an interference with commerce among the states." *Id.*

Thirty years later, the Supreme Court revisited *Federal Baseball* for the first time in *Toolson*.[10]  In *Toolson*, in a per curiam, one paragraph opinion, the Court upheld *Federal Baseball*:

---

[10] There were three petitioners in *Toolson*, all professional baseball players.  Two of the petitioners originally filed separate actions in the Southern District of Ohio, each alleging injury based on the reserve system and certain restrictions "with respect to the sale of broadcasting rights for radio and television," which deprived each player of "the reasonable value of his services and his opportunities for professional promotion." *Kowalski v. Chandler*, 202 F.2d 413, 414 (6th Cir. 1953); *see also Corbett v. Chandler*, 202 F.2d 428 , 428 (6th Cir. 1953) (summary affirmance citing to *Kowalski*).  Petitioner Toolson originally filed suit in the Southern District of California, alleging, *inter alia*, that he was injured by MLB's enforcement of his reserve clause and certain territorial restrictions, including those related to the media broadcasting of baseball exhibitions. *See Toolson v. New York Yankees*, 101 F. Supp. 93, 94 (S.D. Cal. 1951); *see also* Petitioner's Opening Supreme Court Brief, *Toolson*, 346 U.S. 356, 1953 WL 78316, at *5-*9 (Sept. 16, 1953). The respective district courts decided for defendants, and the Sixth and Ninth Circuits affirmed.  The Supreme Court granted certiorari in all three actions and decided them together in one opinion.

In [*Federal Baseball*], this Court held that the business of providing public baseball games for profit between clubs of professional baseball players was not within the scope of the federal antitrust laws. Congress has had the ruling under consideration but has not seen fit to bring such business under these laws by legislation having prospective effect. The business has thus been left for thirty years to develop, on the understanding that it was not subject to existing antitrust legislation. The present cases ask us to overrule the prior decision and, with retrospective effect, hold the legislation applicable. We think that if there are evils in this field which now warrant application to it of the antitrust laws it should be by legislation. Without re-examination of the underlying issues, the judgments below are affirmed on the authority of [*Federal Baseball*], so far as that decision determines that Congress had no intention of including the business of baseball within the scope of the federal antitrust laws.

*Toolson*, 346 U.S. at 356-57.

After *Toolson*, the Court faced the issue of whether other types of sport or leisure were also exempt from the antitrust laws under the same reasoning. The Court held that they were not. *United States v. Shubert*, 348 U.S. 222 (1955) (theatrical attractions), *United States v. Int'l Boxing Club*, 348 U.S. 236 (1955) (boxing), and *Radovich*, 352 U.S. 445 (1957) (football). In all three cases, the Court cabined the antitrust exemption to the "business of baseball." *Shubert*, 348 U.S. at 227-30; *Int'l Boxing Club*, 348 U.S. at 242-43; *Radovich*, 352 U.S. at 450-51. In *Radovich*, the Court considered *Federal Baseball*, *Toolson*, *Shubert* and *International Boxing* and, in line with those cases, continued to characterize baseball's exemption as broadly applicable to "the business of organized professional baseball." *Radovich*, 352 U.S. at 451. In *Radovich*, the Court admitted that any distinction between the interstate nature of football and baseball may be "unrealistic, inconsistent, or illogical," but nevertheless upheld the distinction on the basis of *stare decisis*, concluding that the proper remedy was "by legislation and not by court decision." *Id.* at 452.

In 1972, the Court again had the opportunity to overrule *Federal Baseball* and *Toolson* in *Flood*. In *Flood*, petitioner, professional baseball player Curtis Flood, was traded to another major league club without his previous knowledge or consent. 407 U.S. at 264-65. The Commissioner of Baseball denied Flood's request to be made a free agent. *Id.* at 265. Flood brought suit against the Commissioner of Baseball, the presidents of the two major leagues, and the major league clubs challenging professional baseball's reserve clause under, *inter alia*, the Sherman Antitrust Act, under New York's and California's antitrust laws, and common law. *Flood*, 316 F. Supp. 271, 272 (S.D.N.Y. 1970). The District Court for the Southern District of New York dismissed the federal

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    antitrust claims under *Federal Baseball* and dismissed the state law claims on the basis that there

2    must be "uniformity in any regulation of baseball and its reserve system" and, as such, any

3    conflicting state regulation would violate the Commerce Clause.  *Id.* at 279-80.  The Second Circuit

4    affirmed.  443 F.2d 264, 267-68 (2d Cir. 1971).  On certiorari, the Supreme Court affirmed the

5    dismissal of all claims.  407 U.S. at 285.

6         In so affirming, the Supreme court did overturn *Federal Baseball* in one respect, holding that

7    "[p]rofessional baseball is a business and it *is engaged in interstate commerce*."  407 U.S. at 282

8    (emphasis added).  Despite officially recognizing that, unlike in 1922, the business of baseball was

9    then "in interstate commerce," the Court held that, based on Congress's inaction for "half a century"

10   following *Federal Baseball*, Congress intended for baseball to remain outside the scope of antitrust

11   regulation:

12            Congress as yet has had no intention to subject baseball's reserve system to the reach
              of the antitrust statutes.  This, obviously, has been deemed to be something other
13            than mere congressional silence and passivity.

14   *Id.* at 282-83.  Although the Court describes baseball's exemption as an "aberration,"[11] the Court

15   reaffirmed that the exemption is "an established one . . . that has been recognized not only in

16   *Federal Baseball* and *Toolson*, but in *Shubert*, *International Boxing*, and *Radovich*, as well, a total

17   of five consecutive cases in this Court."  *Id.* at 282.

18        Because *Flood* explicitly overrules *Federal Baseball*'s holding that the business of the

19   exhibition of baseball is purely a state activity, the City argues that *stare decisis* only requires this

20   court to adhere to an antitrust exemption limited to the reserve clause, which was at issue in

21   *Flood*.[12] This court examines the decisions that have analyzed the issue post-*Flood*.

22

23

24

---

25   [11] "With its reserve system enjoying exemption from the federal antitrust laws, baseball is, in a very
     distinct sense, an exception and an anomaly.  *Federal Baseball* and *Toolson* have become an
     aberration confined to baseball."  *Id.* at 282.
26   [12] While *Federal Baseball* and *Toolson* did address baseball's reserve system, *Federal Baseball* also
     addressed league structure.  259 U.S. at 207.  Similarly, *Toolson* also addressed certain territorial
27   restrictions and issues of league structure.  *See* 101 F. Supp. at 94 (district court decision);
     Petitioner's Opening Supreme Court Brief, 1953 WL 78316, at *5-*9 (outlining the various
28   allegations).  Accordingly, those opinions are not properly characterized as limited on their facts to
     the reserve clause.

ORDER RE: MOTION TO DISMISS
Case No. C-13-02787 RMW                              - 11 -
ALG

### 2. Circuit Court Decisions Post-*Flood*

At the circuit court level, the Ninth, Seventh and Eleventh Circuits have addressed the issue post-*Flood*, although the Ninth Circuit did so without substantial analysis.  Two years after *Flood*, in 1974, the Ninth Circuit considered whether MLB's relocation into formerly minor league territory violated Professional Baseball Rule 1(a) or the antitrust laws.  *Portland Baseball Club, Inc. v. Kuhn*, 491 F.2d 1101, 1102-03 (9th Cir. 1974) (per curiam).  In one sentence, the court upheld the district court's dismissal of the antitrust claims: "Finally, the plaintiff's claim for relief under the antitrust laws was properly dismissed."  *Id.* at 1103 (citing *Flood*, 407 U.S. 258).

In 1978, the Seventh Circuit considered whether restraints on the A's ability to sell A's contractual rights in three players to other teams violated federal antitrust laws.  *Charles O. Finley & Co. v. Kuhn*, 569 F.2d 527, 530 (7th Cir. 1978).  The court provided substantial analysis and held that, notwithstanding "two" references in *Flood* to the reserve clause, it was clear from *Federal Baseball*, *Toolson*, *Flood* and *Radovich* that the Court "intended to exempt the business of baseball, not any particular facet of that business, from the federal antitrust laws."  *Id.* at 541.

In 1982, the Eleventh Circuit considered federal antitrust claims based on, *inter alia*, "the player assignment system and the franchise location system" and "the Carolina League's rule requiring member teams to only play games with other teams that also belong to the National Association."  *Prof'l Baseball Schools & Clubs, Inc. v. Kuhn*, 693 F.2d 1085, 1085 (11th Cir. 1982).  The Eleventh Circuit did not squarely address whether the Supreme Court trilogy was limited to the reserve clause, but implicitly denied any such argument by upholding the challenged conduct— which included the "franchise location system" and certain territorial restrictions on the games—as exempt from antitrust regulation under *Federal Baseball*, *Toolson* and *Flood*.  *Id.* at 1086.  The court reasoned that "[e]ach of the activities appellant alleged as violative of the antitrust laws plainly concerns matters that are *an integral part of the business of baseball*" and thus affirmed the dismissal.  *Id.* (emphasis added).[13]

---

[13] The Eleventh Circuit reaffirmed this view in *Major League Baseball v. Crist*, 331 F.3d 1177, 1179 (11th Cir. 2003), *affirming Major League Baseball v. Butterworth*, 181 F. Supp. 2d 1316 (N.D. Fla. 2001), discussed *infra*.

United States District Court
For the Northern District of California

The City relies on *Twin City Sportservice, Inc. v. Charles O Finley & Co., Inc.*, 676 F.2d 1291 (9th Cir. 1982), for the proposition that baseball's antitrust exemption is limited.  In *Twin City*, the issue was whether a concessioner's long-term, exclusive contract to provide concessions for the A's (entered into in 1950 when the A's were in Philadelphia) constituted an unreasonable restraint on trade.  *Id.* at 1296.  The Ninth Circuit considered the antitrust issue without mentioning baseball's exemption from antitrust laws because the exemption was never at issue in the case. *Twin City* does not provide support for the City's position.

### 3.  District Court Decisions Post-*Flood*

#### a.  Issues Merely Related to, but Not Integral to, Baseball

Two district courts have concluded that certain aspects of baseball, which are merely related to, but not *essential* to, the business of baseball, including the radio broadcasting of baseball games and umpire employment issues, are not subject to the antitrust exemption.  *See Henderson Broadcasting Corp. v. Houston Sports Ass'n, Inc.*, 541 F. Supp. 263, 265-72 (S.D. Tex. 1982) (radio broadcasting); *Postema v. Nat'l League of Prof'l Baseball Clubs*, 799 F. Supp. 1475, 1489 (S.D.N.Y. 1992) (umpire employment issues), *overruled on other grounds by* 998 F.2d 60 (2d Cir. 1993).  In *Postema*, the district court held:

> It is thus clear that although the baseball exemption does immunize baseball from antitrust challenges to its *league structure and its reserve system*, the exemption does not provide baseball with blanket immunity for anti-competitive behavior in every context in which it operates.  The Court must therefore determine whether baseball's employment relations with its umpires are "central enough to baseball to be encompassed in the baseball exemption."

*Postema*, 799 F. Supp. at 1489 (citing *Henderson*, 541 F. Supp. at 265) (emphasis added); *but see Salerno*, 429 F. 2d at 1004-05 (affirming dismissal of antitrust claims premised on the wrongful discharge of MLB umpires based on both (1) the binding effect of *Federal Baseball* and *Toolson* and (2) the plaintiffs' failure to allege "restrictive trade practices directed at umpires").  The *Postema* court distinguished *Salerno* on the basis that *Salerno* was decided before *Flood* "anchored the baseball exemption to the sport's 'unique characteristics and needs.'"  *Postema*, 799 F. Supp. at 1489 (quoting *Flood*, 407 U.S. at 282).  Thus, the court concluded that, "[u]nlike the *league structure* or the reserve system, baseball's relations with non-players are not a *unique characteristic*

1    *or need* of the game. Anti-competitive conduct toward umpires is not an *essential part of baseball*

2    and in no way enhances its vitality or viability." *Id.* (emphasis added). Even under this more

3    narrow view of the exemption, however, there can be no dispute that team relocation is a "league

4    structure" issue and an "essential part of baseball" that would fall within the exemption post-*Flood*.

5    *See Prof'l Baseball Schools & Clubs*, 693 F.2d at 1085 (describing "franchise location" as "plainly

6    [a] matter[] that [is] *an integral part of the business of baseball*" (emphasis added)).

7                  **b. Cases Relating to the Giant's Attempted Relocation to Tampa Bay**

8         A series of cases in the 1990s related to the San Francisco Giant's attempted relocation to

9    Tampa Bay, Florida resulted in differing opinions regarding the scope of baseball's antitrust

10    exemption. In 1993, in *Piazza v. Major League Baseball*, potential investors (from Pennsylvania)

11    brought claims for constitutional violations, federal antitrust violations under the Sherman Act, and

12    state law claims, on the basis that MLB impeded their efforts to purchase the San Francisco Giants

13    and relocate the team to Tampa Bay, Florida. 831 F. Supp. 420, 421 (E.D. Pa. 1993). Judge Padova

14    concluded, in a very lengthy opinion, that once the Court in *Flood* held that the business of baseball

15    was in interstate commerce, the Court "stripped from *Federal Baseball* and *Toolson* any

16    precedential value those cases may have had beyond the particular facts there involved, i.e., the

17    reserve clause." *Id.* at 436.

18         In 1994, the Florida Supreme Court considered the same issue in *Butterworth v. National*

19    *League*, 644 So. 2d 1021 (Fla. 1994). The Florida Attorney General ("AG") initiated antitrust civil

20    investigative demands ("CIDs") related to the same investors' unsuccessful effort to relocate the

21    San Francisco Giants to Tampa Bay, Florida. 644 So. 2d at 1022. Despite finding "no question that

22    *Piazza* is against the great weight of federal cases regarding the scope of the exemption," the Florida

23    Supreme Court followed *Piazza* and upheld the AG's initiation of the CIDs. *Id.* at 1025 and n.8.

24         Then, in 2001, in *Major League Baseball v. Butterworth*, MLB sued the Florida AG in the

25    Northern District of Florida seeking declaratory and injunctive relief for the AG's issuance of

26    another set of CIDs with respect to MLB's alleged interference with the Giant's relocation. Judge

27    Hinkle expressly considered whether *Flood* limited *Federal Baseball* to the reserve clause, and

28

*United States District Court*
For the Northern District of California

United States District Court
For the Northern District of California

rejected *Piazza* and the Florida Supreme Court's approach.  *Butterworth*, 181 F. Supp. 2d 1316,

1326-31 (N.D. Fla. 2001).  The court held:

> In sum, although in *Flood* the Court was asked to overrule *Federal Baseball* and *Toolson*, the Court explicitly declined to do so, holding instead that the business of baseball was exempt from the antitrust laws, just as *Federal Baseball* and *Toolson* had said.  The Court reached this result not based on any original antitrust analysis but instead because of its explicit determination that any change should come from Congress.

*Id.* at 1330.  The district court characterized *Flood* as "not so much a decision about antitrust law as

about the appropriate role of the judiciary within our constitutional system."  *Id.*  The district court

also held that collateral estoppel did not attach to the Florida Supreme Court's decision permitting

the CIDs because there was a lack of identity of parties between the two cases, namely the fact that

the state action had no binding effect on MLB or the Commissioner, and the different issues in each

case.  *Id.* at 1336-37.  On appeal, the Eleventh Circuit affirmed, holding that the business of baseball

is exempt from antitrust regulation, and also concluding that "the federal exemption preempts state

antitrust law."  *Crist*, 331 F.3d at 1179.

It is against this backdrop that the court considers whether MLB's alleged conduct in this

case is immune from antitrust regulation.

### 4. Application

This court agrees with the other jurists that have found baseball's antitrust exemption to be

"unrealistic, inconsistent, or illogical."  *Radovich*, 352 U.S. at 452.   The exemption is an

"aberration" that makes little sense given the heavily interstate nature of the "business of baseball"

today. *See Flood*, 407 U.S. at 282.  Despite this recognition, the court is still bound by the Supreme

Court's holdings, and cannot conclude today that those holdings are limited to the reserve clause.

*Flood* explicitly declined to overrule *Federal Baseball* and *Toolson*, holding: "we adhere once again

to *Federal Baseball* and *Toolson* and to their application to *professional baseball*."  *Id.* at 284

(emphasis added).  *Federal Baseball* and *Toolson* are broadly decided, i.e., the cases are *not* limited

to the reserve clause either by the underlying facts (which include other claims related to, *inter alia*,

territorial restrictions on media broadcasting) or the language used in the holdings.  The court

disagrees with the Eastern District of Pennsylvania's opinion in *Piazza* that *Federal Baseball*,

United States District Court
For the Northern District of California

*Toolson* and *Flood* can be limited to the reserve clause because the reserve clause is never referenced in any of those cases as part of the Court's holdings.  While the Court does reference MLB's reserve system in *Flood* , the reserve system is the only alleged anticompetitive restraint on trade in that case.  *See Flood*, 407 U.S. at 260-61, 265-66.  Thus, in *Flood*, the court naturally held that, under *Federal Baseball* and *Toolson*, the reserve system, a part of the broader "business of baseball," continued to enjoy exemption from the antitrust laws.  *See id.* at 282-83.  The Court's recognition and holding in *Flood* that the business of baseball is now in interstate commerce cannot override the Court's ultimate holding that Congressional inaction (at that time for half a century, but now for now over 90 years) shows Congress's intent that the judicial exception for "the business of baseball" remain unchanged.  *See id.* The Supreme Court is explicit that "if any change is to be made, it [must] come by legislative action that, by its nature, is only prospective in operation."  *Id.* at 283.

Since *Flood*, Congress did take legislative action, passing the Curt Flood Act of 1998 ("Act"), codified at 15 U.S.C. § 26b.  The Act provides:

> Subject to subsections (b) through (d) of this section, the conduct, acts, practices, or agreements of persons in the business of organized professional major league baseball directly relating to or affecting employment of major league baseball players to play baseball at the major league level are subject to the antitrust laws to the same extent such conduct, acts, practices, or agreements would be subject to the antitrust laws if engaged in by persons in any other professional sports business affecting interstate commerce.

15 U.S.C. § 26b(a).  Subsection (b), however, provides that "[n]o court shall rely on the enactment of this section as a basis for changing the application of the antitrust laws to any conduct, acts, practices, or agreements other than those set forth in subsection (a)."  *Id.* § 26b(b).  Subsection (b) further provides that the Act "does not create, permit or imply a cause of action by which to challenge under the antitrust laws, or otherwise apply the antitrust laws to . . . (3) . . . *franchise expansion, location or relocation*."  *Id.* § 26b(b)(3) (emphasis added).  Accordingly, despite the opportunity to do so, Congress chose not to alter the scope of the exemption with respect to any issues other than those "directly relating to or affecting employment of major league baseball players."  *Id.* § 26b(a)-(b); *see also* Sen. Rep. No. 105-118, at 6 (1997) ("With regard to contexts,

1   actions or issues outside the scope of subsection 27(a) . . . , the law as it exists today is not changed

2   by this bill.").   The Curt Flood Act provides further support for the Court's holding in *Flood* that

3   Congress does not intend to change the longstanding antitrust exemption for "the business of

4   baseball" with respect to franchise relocation issues.  15 U.S.C. § 26b(a)-(b); *accord Morsani v.*

5   *Major League Baseball*, 79 F. Supp. 2d 1331, 1336 n.12 (M.D. Fla. 1999) ("Congress explicitly

6   preserved the exemption for all matters 'relating to or affecting franchise expansion, location or

7   relocation' . . . .  Congress' preservation of the broadest aspects of the antitrust exemption in this

8   recent legislation casts in sharp relief the misdirection in *Butterworth*, 644 So.2d 1021 (Fla.

9   1994).").

10       For these reasons, the court concludes that the federal antitrust exemption for the "business

11   of baseball" remains unchanged, and is not limited to the reserve clause.  Although not endorsing

12   the more narrow tests from *Henderson* and *Postema*, even applying those tests, in contrast to the

13   radio broadcasting or umpire employment issues in those cases, the alleged interference with a

14   baseball club's relocation efforts presents an issue of league structure that is "integral" to the

15   business of baseball, and thus falls squarely within the exemption.  *See Prof'l Baseball Schools &*

16   *Clubs*, 693 F.2d at 1086.

17       The court holds that MLB's alleged interference with the A's relocation to San José is

18   exempt from antitrust regulation.  Accordingly, the court dismisses the City's Sherman Act claims.

19       **B.   Antitrust Standing and Injury**

20       MLB further argues that dismissal of the antitrust claims is proper because the City does not

21   have standing under sections 4 or 16 of the Clayton Act.  *See* 15 U.S.C. § 15(a) ("section 4" of the

22   Act) (conferring standing for the recovery of treble damages to "any person who shall be injured in

23   his business or property by reason of anything forbidden in the antitrust laws . . . ."); *id.* § 26

24   ("section 16" of the Act) (permitting claims for injunctive relief "against threatened loss or damage

25   by a violation of the antitrust laws").   "[T]he standing requirements under [section] 16 of the

26   Clayton Act are broader than those under [section] 4 of the Act."  *City of Rohnert Park v. Harris*,

27   601 F.2d 1040, 1044 (9th Cir. 1979).  The City asserts that it possesses standing to bring claims

28   under section 4, 15 U.S.C. § 15(a), based on "direct injury to their property, i.e., the Diridon

United States District Court
For the Northern District of California

1    Redevelopment Project Area," and under, section 16, 15 U.S.C. § 26 based on "an existing threat to

2    their ability to compete for relocation of the [A's] to San José." Opp'n 20, 21, Dkt. No. 28.

3         To state a claim for antitrust injury under section 4, the City must allege "(1) unlawful

4    conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct

5    unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Am. Ad Mgmt.,*

6    *Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999); *see also Associated Gen.*

7    *Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 535-45 (1983).  Injury that has not

8    yet occurred, indirect, or merely speculative is generally insufficient to give rise to standing under

9    section 4 of the Clayton Act.  *See Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 (1986);

10   *Datagate, Inc. v. Hewlett-Packard Co.*, 941 F.2d 864, 869-70 (9th Cir. 1991); *Eagle v. Star-Kist*

11   *Foods, Inc.*, 812 F.2d 538, 542 (9th Cir. 1987).   Here, the alleged economic injury resulting from

12   the A's not relocating to San José has not yet occurred, and depends on an assumption that future

13   events will take place, including that: (1) the A's choose to make the move and exercise the Option

14   Agreement; (2) the City can legally perform the Option Agreement; and (3) the A's can obtain

15   financing, regulatory approvals, and ultimately build the stadium.  Accordingly, the City lacks

16   standing to assert an antitrust claim for treble damages under section 4 of the Clayton Act.

17        "However, section 16 of the Clayton Act, 15 U.S.C. § 26, 'invokes traditional principles of

18   equity and authorizes injunctive relief upon the demonstration of *threatened* injury.'"  *Datagate*,

19   941 F.2d at 869 (quoting *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 130 (1969)

20   (emphasis added)).  "To have standing under [section 16], a plaintiff must show (1) a threatened loss

21   or injury cognizable in equity (2) proximately resulting from the alleged antitrust violation."

22   *Rohnert Park*, 601 F.2d at 1044.  In *Rohnert Park*, plaintiff, the City of Rohnert Park, in an effort to

23   develop a regional shopping center, designated certain city land as a commercial zone suitable for

24   development.  *Id.* at 1042-43.  The City of Rohnert Park owned two parcels within that commercial

25   zone.  *Id.* at 1043.  Defendants decided to construct a regional shopping center in the neighboring

26   town of Santa Rosa as part of an urban renewal project, and the City of Rohnert Park alleged, *inter*

27   *alia*, antitrust violations under sections 1 and 2 of the Sherman Act based on defendants' "attempt to

28   monopolize retail merchandise space in the Santa Rosa trade area."  *Id.* at 1042-43.  The Ninth

1    Circuit held that Rohnert Park failed to allege an injury cognizable in equity because the City's

2    proprietary interest in the commercial zone was merely speculative (i.e., it was not clear that the two

3    parcels of land owned by the City would have actually been a part of a shopping center because part

4    of the property was designated for non-commercial purposes, including a library and a waste water

5    facility).  *Id.* at 1044-45.  Even if Rohnert Park did have a property interest, the court held that

6    Rohnert Park failed to show proximate causation because it did not "ma[k]e a sufficient showing

7    that, absent the alleged antitrust violations by appellees, its commercial area would have been

8    selected as a site for shopping center development."  *Id.* at 1045.[14]  The court reasoned that Rohnert

9    Park could not rely on the "remote possibility, unsubstantiated by allegations of fact, that their

10   situation might have been better had respondents acted otherwise."  *Id.* (quoting *Warth v. Seldin*,

11   422 U.S. 490, 507 (1975)).

12       Unlike in *Rohnert Park*, where the city's property interest was speculative, here, the

13   complaint alleges that the City of San José owns the parcels of land set aside for the A's Stadium

14   pursuant to the Option Agreement (the "Diridon land").  *See* Comp. ¶ 75.  Also unlike in *Rohnert*

15   *Park*, where there was no indication that the Rohnert Park would have been selected for the urban

16   renewal project but for some antitrust violation, here, the A's have already selected the Diridon land

17   as the prospective site for a new stadium.[15]  The allegations in the complaint, taken as true, along

18   with the fact that the A's have elected to extend the option for a third year, indicate that the A's very

19   seriously wish to relocate to San José, and would do so but for MLB's alleged antitrust violation.

20       Although the court finds that the City may have standing to sue for injunctive relief, there is

21   still a question as to whether the City's claimed injury to the Diridon property would sufficiently

22   state an injury in the relevant market.  *See Cargill*, 479 U.S. at 111-13 (holding that that a plaintiff

23   seeking injunctive relief under section 16 of the Clayton Act must also allege a threat of antitrust

---

[14] The court also held that political subdivision, including cities, cannot sue "as Parens patriae on behalf of its property owners, taxpayers, and inhabitants who might be injured by the loss of investment profits and tax revenues," but "may, however, 'sue to vindicate such of their own proprietary interests as might be congruent with the interests of their inhabitants.'"  *Id.* at 1044 (quoting *In re Multidistrict Vehicle Air Pollution M. D. L. No. 31*, 481 F.2d 122, 131 (9th Cir. 1973)).

[15] MLB argues that the A's could relocate to another city within the club's operating territory.  But, the complaint alleges that the A's have already attempted to do so, and failed, at least in Fremont.  It is unrealistic, at this point, that the A's would voluntarily *choose* another city over San José given the efforts that the A's have already expended to negotiate the Option Agreement with San José.

injury "of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful"); *McCoy v. Major League Baseball*, 911 F. Supp. 454, 458 (W.D. Wash. 1995) (holding that baseball fans do not have section 4 standing because "the fans' damages do not arise out of the allegedly illegal conduct that the antitrust laws are intended to remedy"). The court need not decide this issue, however, because the court dismisses the antitrust claims on the basis of the federal antitrust exemption for the business of baseball.

### C. Cartwright Act Claims

The City also charges MLB with violations of California's Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq. In *Flood*, the Supreme Court upheld the lower courts' dismissals of all related state and common law claims on the grounds that "national uniformity is required in any regulation of baseball and its reserved [sic] system" and that "the Commerce Clause precludes the application here of state antitrust law." 407 U.S. at 284-85 (internal quotations and alterations omitted); *see Flood*, 316 F. Supp. at 280 ("As we see it, application of various and diverse state laws here would seriously interfere with league play and the operation of organized baseball."); *Flood*, 443 F.2d at 268 ("[A]s the burden on interstate commerce outweighs the states' interest in regulating baseball's reserve system, the Commerce Clause precludes the application here of state antitrust law."); *see also Crist*, 331 F.3d at 1179 ("[W]e hold that the federal exemption preempts state antitrust law."); *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 611 (7th Cir. 1997) (explaining that *Flood* is an "isolated exception" in "a field in which Congress has *not* sought to replace state with federal law.").

The City argues that the cited cases, except for *Crist*, are limited to labor matters and inapplicable to team relocation issues. But, this court rejected that distinction, holding that the federal antitrust exemption extends beyond player issues, to team relocation actions. Thus, these cases are on point. In *Partee v. San Diego Chargers Football Co.*, the California Supreme Court explicitly adopted the reasoning in *Flood* and held that California's Cartwright Act does not apply to the interstate activities of professional football:

> No case has been found applying state antitrust laws to the interstate activities of professional sports. Professional football is a nationwide business structure essentially the same as baseball. Professional football's teams are dependent upon

the league playing schedule for competitive play, *just as in baseball. . . . We are satisfied that national uniformity required in regulation of baseball and its reserve system* is likewise required in the player-team-league relationships challenged by Partee and that *the burden on interstate commerce outweighs the state interests in applying state antitrust laws to those relationships.*

34 Cal. 3d 378, 384-85 (1983) (emphasis added). This court follows the Supreme Court in *Flood*, the Eleventh Circuit in *Crist*, and the California Supreme Court in *Partee*, and dismisses the City's Cartwright Act claims under the Commerce Clause. Allowing the state claims to proceed would "prevent needed national uniformity in the regulation of baseball." *Butterworth*, 181 F. Supp. 2d at 1333.

### D. State Unfair Competition Claims

The City also asserts claims under California's Unfair Competition Laws ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq.[16] California law requires a plaintiff to prove an "unlawful, unfair or fraudulent business act or practice." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). The City alleges UCL violations based on both "unlawful" and "unfair" conduct. The unlawful or unfair conduct alleged is the same conduct that underlies the City's antitrust claims: MLB's alleged interference with the A's relocation to San José by delaying any relocation approval decision. The court held these allegations to be insufficient to state a claim under the Sherman Act, and thus the unlawful competition claims necessarily fail.

California law defines "unfair competition" as "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because it effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech*, 20 Cal. 4th at 187. Where the alleged conduct does not violate the antitrust laws, a claim based on *unfair* conduct cannot survive. *DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F. Supp. 2d 1119, 1147 (N.D. Cal. 2010) ("[Plaintiff] has not alleged facts showing that

---

[16] Although state law creates the City's causes of action, the court appears to have federal question jurisdiction over the UCL claims because entitlement to relief is necessarily predicated on the resolution of a substantial federal antitrust question. *See Franchise Tax Bd. of State of Cal. v. Const. Laborers Vacation Trust for So. Cal.*, 463 U.S. 1, 14 (1983) (superseded by statute on other grounds) ("Even though state law creates appellant's causes of action, its case might still 'arise under' the laws of the United States if a well-pleaded complaint established that its right to relief under state law *requires resolution of a substantial question of federal law in dispute between the parties*." (emphasis added)); *California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 841-43 (9th Cir. 2004).

ORDER RE: MOTION TO DISMISS
Case No. C-13-02787 RMW
ALG

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

[Defendant]'s conduct violated the Sherman Act . . . .  As a result, any claims [plaintiff] might be asserting under the UCL's unfair prong *necessarily fail as well*." (emphasis added)); *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001) ("If the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason—because it unreasonably restrains competition and harms consumers—the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers."); *LiveUniverse, Inc. v. MySpace, Inc.*, 304 Fed. Appx. 554, 557 (9th Cir. 2008) (same). Even considering the unfair competition claim, the court does not find that the alleged conduct—an unwarranted and intentional delay in approving the A's relocation request—can arguably violate the "policy or spirit" of the antitrust laws where MLB remains exempt from antitrust regulation.  "To permit a separate inquiry into essentially the same question under the unfair competition law would only invite conflict and uncertainty and could lead to the enjoining of procompetitive conduct." *Chavez*, 93 Cal. App. 4th at 375.   Accordingly, the court dismisses the City's UCL claims.

### D. Tortious Interference Claims

Finally, the City asserts claims for tortious interference with prospective economic advantage and tortious interference with contract.[17]  "[T]he tort of interference with contract is merely a species of the broader tort of interference with prospective economic advantage." *Buckaloo v. Johnson*, 14 Cal. 3d 815, 823 (1975), *overruled on other grounds by Della Penna v. Toyota Motor Sales, U.S.A.*, 11 Cal. 4th 376, 393 n.5 (1995).  As such, the broader tort of interference with prospective economic advantage does not require the existence of a valid contract. *Id.* at 826-27.

Because interference claims are not exclusively premised on the alleged violation of antitrust law, but are also based on MLB's alleged delay in rendering a relocation decision in frustration of the Option Agreement, the court considers these claims independently of the antitrust claims.

---

[17] The court exercises supplemental jurisdiction over these state law claims pursuant to 28 U.S.C. § 1367(a).

**1.  Whether MLB Must be a "Stranger" or "Outsider" to the Contract**

The California Supreme Court has held that these interference torts can be brought only against non-contracting parties.  *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 514 (1994) ("[C]onsistent with [the state's] underlying policy of protecting the expectations of contracting parties against frustration *by outsiders* who have no legitimate social or economic interest in the contractual relationship, the tort cause of action for interference with contract *does not lie against a party to the contract*." (second emphasis added)).  The parties dispute whether, in that case, the California Supreme Court also required the allegedly interfering parties to be "outsiders" to or "strangers" to the contract, i.e., parties without any economic interest in the contract.  In *Woods v. Fox Broadcasting Sub., Inc.*, 129 Cal. App. 4th 344, 352-53 (2005), the California Court of Appeals held that the rule from *Applied Equipment* does not require anything other than that the accused interfering party be a non-contracting party, rejecting the Ninth Circuit's statements to the contrary in *Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*, 271 F.3d 825, 832-34 (9th Cir. 2001) (requiring the accused interfering party to be a "stranger" to the contract).  In *G&C Auto Body Inc. v. GEICO Gen. Ins. Co.*, 552 F. Supp. 2d 1015, 1019-21 (N.D. Cal. 2008), the Northern District of California recently followed *Woods* and rejected *Marin Tug* on this point.  In light of *Woods*, the California Supreme Court would likely reject the "stranger" test from *Marin Tug*.  Accordingly, the court declines to dismiss the claims on this basis.  MLB is not a party to the contract and thus satisfies the *Applied Equipment* requirement.

**2.  Tortious Interference with Prospective Economic Advantage**

To prove a claim of tortious interference with prospective economic advantage in California, a plaintiff must set forth the following elements: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant."  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003) (quotation omitted).  With respect to the third element, "a plaintiff seeking to recover for alleged interference with prospective economic relations has the

burden of pleading and proving that the defendant's interference was wrongful by some measure

beyond the fact of interference itself." *Della Penna*, 11 Cal. 4th at 392-93 (1995) (internal

quotation omitted); *Korea Supply Co.*, 29 Cal. 4th at 1154 (clarifying that this requirement is part of

the third element of the test and holding that, under the third element, specific intent is not required).

Unlike a claim for tortious interference with contract, where "intentionally interfering with an

existing contract is 'a wrong in and of itself,' . . . intentionally interfering with a plaintiff's

prospective economic advantage is not." *Korea Supply Co.*, 29 Cal. 4th at 1158 (quoting *Quelimane*

*Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 56 (1998)).  For this reason, a claim for tortious

interference with prospective economic advantage requires an allegation of an independently

wrongful act.  *See id.*  In *Korea Supply Company*, the California Supreme Court defined an

independently wrongful act as one that "is *unlawful*, that is, if it is proscribed by some

constitutional, statutory, regulatory, common law, or other determinable legal standard."  29 Cal.

4th at 1159 (emphasis added).

　　　Here, because the court has already concluded that there was no unlawful act under the

antitrust laws (or unfair competition laws), the only independently wrongful act could be tortious

interference with contract, if there is, which is discussed below.

### 3.  Tortious Interference with Contract

　　As discussed above, "[b]ecause interference with an existing contract receives greater

solicitude than does interference with prospective economic advantage . . . , it is not necessary that

the defendant's conduct be wrongful apart from the interference with the contract itself."

*Quelimane*, 19 Cal. 4th at 55 (internal citation omitted).  Thus, the absence of an antitrust violation

or otherwise unlawful anticompetitive action does not necessarily foreclose this claim.

　　　To state a cause of action for intentional interference with contractual relations, however, the

City must allege: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge

of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the

contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5)

resulting damage."  *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990).

1    MLB argues that the complaint fails to allege the fourth and fifth elements of "breach or

2    disruption" and "resulting damage."  The City counters that the MLB Relocation Committee's delay

3    in deciding whether to approve the A's relocation for over four years directly caused a disruption of

4    the A's ability to execute the Option Agreement and disrupted any future negotiation of a purchase

5    agreement, presumably causing damage to the City.  *See* Opp'n 18; Compl. ¶ 162.

6         The fourth element of "breach or disruption" does not require an allegation of "an actual or

7    inevitable breach of contract" but may be satisfied with allegations that "plaintiff's performance

8    [has been made] made more costly or more burdensome."  *Id.* at 1129.  At the time the Option

9    Agreement was negotiated, both parties were aware that MLB might or might not approve the A's

10   relocation.  *See* Compl. ¶ 73 ("San José Mayor Chuck Reed called for a public vote on whether the

11   [A's] could purchase land and build a new stadium for the [A's] in San José.  However at

12   Commissioner Selig's request, Mayor Reed delayed the vote pending the MLB Relocation

13   Committee's determination of the A's—Giants territorial dispute.").  Despite this knowledge, it is

14   reasonable to infer that the A's and the City entered into the Option Agreement with the

15   understanding that MLB would return a relocation decision within the two year term of the contract.

16        The court finds that the complaint sufficiently alleges a "disruption" of the contract because,

17   here, the A's are unable to exercise the option due to MLB's delay in conducting the vote pursuant

18   to the MLB Constitution to approve or deny relocation.  By asking the City to delay on a public vote

19   on the stadium, the City was justified in assuming that MLB would make a decision within a

20   reasonable time which it has not.  Regardless of whether MLB ultimately approves or denies the

21   relocation request—and the court has concluded that it is within MLB's authority to decide either

22   way—the A's were recently forced by MLB's delay to extend the Option Agreement for another

23   year, or lose the option.  As a result of MLB's delay, the A's incurred an additional $25,000 expense

24   to renew the option, and the City is left waiting another year to sell the land set aside for the stadium

25   in question.  Fact questions remain regarding the City's damages resulting from the alleged

26   interference.  The court cannot say at this stage that the City has incurred no damages owing to

27   MLB's frustration of the contract.  Although MLB's frustration of the Option Agreement is not an

28   antitrust violation, MLB is nonetheless aware of the Option Contract and has engaged in acts (or

1   rather, has failed to engage a vote pursuant to the MLB Constitution) indicating an intent to frustrate

2   the contract.  The court concludes that the allegations in the complaint are sufficient to state a claim

3   for tortious interference with contract.[18]  The alleged tortious interference with contract is an

4   independently unlawful act sufficient to support the City's tortious interference with prospective

5   economic advantage claim, although the claims may be duplicative.

6                                   **IV.  ORDER**

7        For the foregoing reasons, MLB's motion to dismiss the Sherman Act claim and the state

8   claims for violation of the Cartwright Act and for unfair competition are granted without leave to

9   amend.  Although leave to amend is generally given after the initial granting of a motion to dismiss

10  for failure to state a claim, leave may be denied if amendment would be futile.  *See, e.g.*,

11  *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).  Here, the City has not

12  suggested how its dismissed claims could be successfully amended nor does the court see how they

13  could be.  MLB's motion to dismiss the state claims for tortious interference with contract and

14  economic advantage is denied.

15

16

17  Dated: October 11, 2013                    *Ronald M. Whyte*

18                                             RONALD M. WHYTE
                                               United States District Judge
19

20

21

22

23

---

24  [18] MLB also asserts in a footnote that the option agreement between San Jose and the A's is void,
    and therefore the City has not pled the existence of a valid contract, relying on the judicially noticed
25  "[RDA]: Asset Transfer Review" report from the California State Controller finding certain asset
    transfers from the RDA to the City after January 1, 2011 to be invalid.  *See* Dkt. No. 26-4.  The
26  court concludes that the "[RDA]: Asset Transfer Review" report is insufficient to definitively show
    that the Option Agreement is invalid.  At the dismissal stage, the court draws all reasonable
27  inferences in favor of the plaintiff based on the allegations in the complaint and presumes that the
    contract is valid.
28

ORDER RE: MOTION TO DISMISS
Case No. C-13-02787 RMW                    - 26 -
ALG